**EXHIBIT 1**

1      **Q.**  Had any physician prescribed for you any

2  type of antianxiety drug?

3      **A.**  Yes, Xanax.

4      **Q.**  Do you recall in what year the Xanax was

5  first prescribed for you?

6      **A.**  I think it was in 1993.

7      **Q.**  Do you recall who the physician was who

8  prescribed it?

9      **A.**  Doctor --

10      **Q.**  If you don't remember, that's okay.

11      **A.**  I do know.  Doctor Ashburn.

12      **Q.**  Was Doctor Ashburn your primary care

13  physician at that point?

14      **A.**  Yes.

15      **Q.**  Prior to going out on leave in October of

16  1999, had you ever taken a disability leave from

17  work?

18      **A.**  Yes.

19      **Q.**  When?

20      **A.**  October.  I mean in I think it was, it was

21  the spring of 1993.

22      **Q.**  Do you recall how long that leave lasted?

23      **A.**  It was approximately a year.

1    Q.  What was your job at the time that you began

2    that leave?

3    A.  I was a data clerk for all business

4    accounts.

5    Q.  What was the nature of your disability?

6    A.  Major depression.

7    Q.  Did you receive treatment during your leave?

8    A.  Yes, I did.

9    Q.  Did that treatment in 1993 include any

10   medications?

11   A.  Yes.

12   Q.  Do you recall what medications?

13   A.  Pamelor and Xanax.

14   Q.  Was the depressive episode in 1993 related

15   to anything that had happened in the workplace?

16   A.  Yes.

17   Q.  What had happened in the workplace in 1993?

18   A.  Do I have to go back to this?  We had been

19   moved into a new area, and there was a division

20   manager, his name was Steve Gallagher.  From the time

21   we moved in he was really unhappy and he would

22   complain and say, you know, he was a miserable SOB

23   since we made the move up there and stuff.

1          He began to like make fun of me and

2   criticize the way I dress and hound me to do more

3   work when I was like buried and doing the best I

4   could.  He was stalking me around the building, and I

5   could not -- I couldn't stand up to him.

6          He said to me -- you know, the

7   immediate supervisor that I had was trying to blame

8   me for errors that weren't mine, they were somebody

9   else's.  I went to him as her superior, you know, and

10   I said -- I showed him.  I said, "This is not even my

11   writing and I'm getting blamed for this."  He said,

12   "Your problems don't begin until you start coming in

13   to see me," and then he started, you know, harassing

14   me on a regular basis.

15          I was at my desk one day and I was

16   upset, and he walked by and he said, "See what

17   happens when you wear false eyelashes," and like he

18   was -- like he would give me degrading looks and

19   stuff from head to toe.  He always had something to

20   say about the way I dressed, and I dressed very nice

21   I mean for work.  You know, he was a big fat guy, and

22   I just -- I couldn't handle him, you know.  My

23   husband went in and said something to personnel, but

1    I never did.

2        Q.  You never went to anyone in personnel back

3    in 1993?

4        A.  No, I just -- I was so upset.  I was

5    hysterical when I left there.  I called my doctor and

6    he said, "Come in right now and see me."  Then I went

7    to see my doctor, and I told him what was happening.

8        Q.  Did you make a worker's compensation claim,

9    do you remember?

10       A.  I don't think so.  I begged my doctors not

11   to tell them.  I was afraid of the man, and I begged

12   them not to tell them what I talked about with them

13   and stuff.  They all told me to get a lawyer and

14   everything, but I just was -- you know, I just was

15   afraid and I didn't know what to do.

16       Q.  Did you get a lawyer in 1993?

17       A.  No.  All I wanted to do is do my job, and

18   he'd come by my desk and he would push the folders

19   down and say, "We need to get some of this work

20   done."  It was like -- I was doing that.  I was

21   buried in work, and I was doing the best I could.

22       Q.  Who was your immediate supervisor?

23       A.  Margaret Maroney.  She was like stalking me

*LEAVITT REPORTING SERVICE, INC.*

1  too around the building.

2      Q.  When you say stalking you around the

3  building, what do you mean?

4      A.  I mean like I would be in the atrium having

5  lunch and like she would come up and they would be

6  like looking around.  Then when they saw me they

7  would go back to the elevator, and then I would go on

8  the elevator to take the elevator up to go to work

9  and like they would try to like get out of there like

10  so I couldn't see them.  I knew what they were doing.

11  You know, it was like it was so obvious.

12      Q.  You felt they were watching what you did?

13      A.  Like following me, yes, even to go to the

14  bathroom.

15      Q.  At the end of your leave of absence in 1993

16  -- I think you said it lasted about a year?

17      A.  Yes.

18      Q.  Was it 1994 when you went back to work, do

19  you remember?

20      A.  Yes.

21      Q.  When you went back to work in 1994, did you

22  go back into the same job?

23      A.  Yes.

**EXHIBIT 2**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*\*\*\*

| | |
|---|---|
| **BARBARA CONNICK** | \* |
| | \* |
| **Plaintiff** | \* |
| | \* |
| **v.** | \* |
| | \* |
| | \* |
| **CONTINENTAL CASUALTY** | \* |
| **COMPANY** | \* |
| | \* |
| **Defendant** | \* |
| | \* |

**CIVIL ACTION NO.**

**04-12208-WGY**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*\*\*\*

## PLAINTIFF' BARBARA CONNICK'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Now comes the Plaintiff; Barbara Connick ("Connick"), pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and hereby answers the following interrogatories which have been propounded by Defendant Continental fully in writing and under oath.

## INTERROGATORIES

### INTERROGATORY NO.1:

Identify all persons you believe to have knowledge of facts, statements, or circumstances relevant to the allegations in your Complaint and describe in detail the issues upon which you believe they have knowledge.

**RESPONSE NO.1:**

Abbi Laushine        -        Is aware of all the threats and racially hostile conduct that I was subjected to during the course of my employment.

Charles Edwards    -        Is aware of all the threats and racially hostile conduct that I was subjected to during the course of my employment. Made the statement that calling me a white trash bitch is the same as someone using the "N" word to an African American individual.

Chris Dye        -        Is aware of all the threats and racially hostile conduct that I was subjected to during the course of my employment. Chris Dye told me, "I know all about the situation."

Lisa Wright Observed the racial harassment that I was subject to.

Doris Chan   Victim of harassment.

Margie Fleming        -        Is aware of the numerous incidents of racial harassment.

Joan O'Brien        -        Is aware of the numerous incidents of racial harassment.

Jean Beaudreau    -        Is aware that Shauna Williams threatened to beat me up She is also aware that Greta Thomas threatened me with bodily injury.

Maura Capplis        -        Was present the day Shauna Williams threatened me.

Gina Antoine        -        Is aware of the ongoing racial harassment.

Gerard Millette        -        Is aware of ongoing harassment

2

Paul Connick      -      Is aware of the ongoing emotional distress
                         suffered by the plaintiff.

Gil Peters        -      Is aware of the ongoing emotional distress
                         suffered by the plaintiff.

Dr. Alex Accardi  -      Is aware of the ongoing emotional distress
                         suffered by the plaintiff.

Also please see my chronology of events, which is being provided in response to Defendant's request for production of documents.

**INTERROGATORY NO.2:**

Regarding your contention that "several African American employees" engaged in discriminatory conduct against you, please identify each employee by name, last known job title, and working relationship you have with them.

**RESPONSE NO.2:**

| | | |
|---|---|---|
| Shauna Williams | Rater Tech | Co worker |
| Grace Clemetson | Rater Tech | Co worker |
| Greta Thomas | Rater Tech | Co worker |
| Ernie Goddard | Rater Tech | Co worker |
| Heather Gill | Clerk | Co worker |

INTERROGATORY NO.3:

Please describe with particularity the events and happenings that are alleged in your Complaint to have occurred, and describe the nature of the acts each employee named in Interrogatory No.2 subjected upon you.

3

**RESPONSE NO.3:**

Grace, Greta and Heather would group together during lunch at Grace's desk making disparaging comments about employees on a regular basis for the past several years. I was referred to by these individuals as "pure garbage." They constantly put down Doris with disparaging comments. They referred to me and other employees as stupid people  I reported this conduct to my former supervisor Laura Nichols. No action was ever taken by Laura regarding these complaints. In the presence of Abbie Laushane Shauna mimicked Doris' accent. They regularly made disparaging comments regarding Doris' national origin.

In June 1999 Greta Thomas stared at me during an office party. She also threatened me with physical violence. I reported this misconduct to Abbie Laushane, however no action was taken.

In August 1999 Grace and Shauna were talking at Shauna's desk. I heard Grace say that I was pure garbage. Shauna said that Heather would have no problem beating me up. Shauna stated, "White trash bitch, we'll get Heather to beat her up". I reported this misconduct to Abbie Laushane, however no action was taken.

In September 1999 Shauna was on the telephone. I heard her say into the telephone about me, "This white trash bitch that sits in front of me, white trash bitch, I'll have her taken care of, I'll have someone waiting in the garage for her, and you know who I mean." I reported this racially harassing statements and threats to my physical safety to Abby and Charles Edwards. However, no

action was taken to address the racial harassment of threats to my physical safety.

**INTERROGATORY NO.4:**

Describe with particularity any and all reports you allegedly made to Abbi Laushine, Mass Auto Manager, regarding the events and happenings that are alleged in your Complaint to have occurred.

**RESPONSE NO.4:**

I reported the conduct to my former manager Laura Nichols on several occasions. I reported the conduct to Abbie in the spring of 1999 during a meeting on my desk. I had an off site meeting with Abbie on August 26, 1999. I reported the conduct to Abbie and Charles Edwards in a meeting held on September 16, 1999.

**INTERROGATORY NO.5:**

Describe with particularity any and all reports you allegedly made to Charles Edwards, Vice President of Human Resources, regarding the events and happenings that are alleged in your Complaint to have occurred.

**RESPONSE NO.5:**

I described the three incidents to Charles Edwards in a meeting on September 16, 1999 in the conference room. Charles was on the speakerphone. Between September 28, 1999 through October 6, 1999 I reported my concerns regarding the ongoing harassment to Charles Edwards.

**INTERROGATORY NO.6:**

Identify and describe with particularity any and all conversations you had with any other employee of Defendant regarding the events and happenings that are alleged in your Complaint to have occurred.

**RESPONSE NO.6:**

I spoke with Doris, Maura Capliss Lisa Wright Joan DiCola and Jean Boudreau regarding the above described hostile environment and threats to my physical safety.

**INTERROGATORY NO. 7:**

Please identify with particularity if you, or anyone else, has obtained statements in any form, from any person(s), regarding any of the events or happenings that are alleged in your Complaint to have occurred. Please identify all persons who made such statements or have such statements and describe the substance of the statements or notes of statements.

**RESPONSE NO. 7:**

Transcripts of the depositions of Abby Laushine and Charles Edwards are available.

**INTERROGATORY NO.8:**

Identify with particularity and describe what occurred after you allegedly reported the concerns rose in your Complaint to Abbi Laushine and Charles Edwards.

**RESPONSE NO. 8:**

No action was taken to eliminate the racially hostile environment.  No

6

action was taken to make the work environment safe so that I could return to work and not be in fear that the threats on my life would not be carried out. I asked that Shauna's desk be moved but this request was denied. Abbie told me she was for this move but that Charles was against. I told Abbie that I felt as though the matter was being swept under the rug. I asked to meet face to face with Shauna behind closed doors to discuss the matter. However Abbie told me this could not be done because they were afraid of Shauna's aggression.

**INTERROGATORY NO.9:**

Identify and describe with particularity why and how you contend Defendant allegedly failed to investigate and failed to take corrective action regarding your voicing your concerns of harassment as alleged in your Complaint. Please also identify and describe with particularity how Defendant has allegedly failed and refused on an ongoing basis to investigate the hostile work environment as alleged in your Complaint.

**RESPONSE NO. 9:**

Paul Connick asked Charles Edwards during a telephone conference what actions were being taken to give Barbara a safe non-racially hostile work environment. Charles Edwards responded, "I can't guarantee anything." I requested that the Company move Shauna's desk, a reasonable request given the racist and threatening statements that she had made. However, this request was denied. This request was made at the suggestion of the Quincy Police department, to whom I had been referred by Charles Edwards.

7

**INTERROGATORY NO. 10:**

Please identify and describe with particularity how you think Defendant should have investigated the events and happenings that are alleged in your Complaint to have occurred.

**RESPONSE NO. 10:**

Respondent failed to talk with witnesses to the events, including but not limited to, Lisa Wright, Doris and others. Contrary to Defendant's Code of Professional Conduct policy, this matter was not investigated by Corporate Security after I spoke with Abbie on August 26, 1999. Failed to respond to my suggestion that Shauna's telephone records be checked. Failed to move Shauna's work location after the same was suggested by Detective Nancy Coletta of the Quincy Police Department.

**INTERROGATORY NO. 11:**

Do you contend that you have been injured or damaged by the acts or omissions of Defendant? If you content that you have suffered any physical, mental or emotional injuries proximately caused by Defendant, please describe the nature and duration of the alleged injury and identify all physicians, psychiatrists, psychologists, clinical social workers, clergy, counselors, or other healing arts professionals from which you have sought or obtained treatment for such injuries since January 1, 1994 to the present.

**RESPONSE NO. 11:**

**OBJECTION:**    The interrogatory is not designed to lead to the production of

8

relevant evidence, and is overbroad.   Notwithstanding the foregoing objection, the interrogatory will be answered with for the period from September 1999 to the present time.

I have suffered severe emotional and physical injuries caused by Respondent's unlawful conduct.   I have suffered constantly from September 1999 to the present time from post traumatic stress syndrome, major clinical depression, lack of sleep, anxiety, exhaustion, suicidal ideation, loss of self esteem, side effects from medications, inability to concentrate, nausea,  inability to sleep, nightmares and dizziness.   Dr. Robert Sipzener, Kate Taylor, Dr. Collella, Dr. Accardi and Gil Peters have treated me.

**INTERROGATORY NO. 12:**

If you contend that you have suffered any physical injury proximately caused by Defendant, please describe the nature and duration of the injury and identify all physicians, osteopaths, naturopaths, homeopaths, or other healing professionals from whom you have sought or obtained treatment for such injuries since January 1, 1994 to the present.

**RESPONSE NO. 12:**

See the answer to interrogatory number 11 above.

**INTERROGATORY NO. 13:**

If you are seeking an award of any sum of money, whether as damages or otherwise, state the full amount of money you seek and describe the manner in which the amount was calculated.   Your description should include each element of damage or component of recovery that you seek (wages,

9

employment benefits, other compensation), the amount sought for each element or component, the manner in which each element or component of the calculation was determined, and should identify the source of each number used in the calculation and any documents which support your damage allegations.

**RESPONSE NO. 13:**

I am seeking all lost wages and benefits of approximately $650.00 per week, plus any increases given to similarly situated employees from 1999 to the present and continuing,  including but not limited to contributions to the 401k plan, (the six per cent company match), the bonus that was paid to employees in the first quarter of 2000 based on my service to the company during 1999 (everyone in my group got the bonus except for me), approximately $500.00 in out of pocket expenses for co - pays and approximately $72.00 per month in out of pocket expenses for medications. The total out of pocket cost for medications is approximately $7,416.00. My insurance is not paying the cost of my therapist at the present time.  The cost of the weekly appointments with my therapist, Kate Taylor is $90.00 and $110.00 for Dr. Collella Dr. Acardi is $15.00 co pay and for Gil Peters. The current total out of pocked for the therapists and psychiatrists is $!,535.00 from April 2000 to the present time.  I am also seeking reimbursement for all other medical expenses that would have been covered by my medical insurance if I had not been unlawfully terminated.  There is no amount of money that can sufficiently compensate me for the severe emotional and physical distress caused by Respondent's unlawful conduct. I will leave for the jury to

10

determine the extent to which I should be compensated for my emotional distress damages. I have also incurred attorney's fees.

**INTERROGATORY NO. 14:**

Please identify the sources and amounts of all income and other monies you have received since September, 1999 to the present including, but not limited to, wages, fringe benefits, and disability income benefits.

**RESPONSE NO. 14:**

Between September 1999 to the present I have not received any wages or fringe benefits other than what I received from the defendant before I went out on a leave of absence on October 6, 1999. Since that time I have received short term disability for one year and long term disability for one year. I also received a lump sum workers compensation payment of $19,125.00. My disability payments were $760.00 per month to the best of my knowledge. I began receiving social security disability payments in or about 2002. I currently receive $1,157.00 per month.

**INTERROGATORY NO. 15:**

Please identify all documents not in your possession or subject to your custody or control that you believe may support the allegations made in your Complaint, and for each document or group of documents so identified, please identify the maker and the last known custodian.

**RESPONSE NO. 15:**

There are numerous documents within the possession of Respondent that I am certain will corroborate my claim, including but not limited to, documents

11

pertaining to the investigation into this matter, e mail between Abbie and me and documents in the possession of Abbie Laushine and Charles Edwards.

**INTERROGATORY NO. 16:**

Please identify and describe the nature and duration of any short-term, long-term or social security disability benefits you have received or applied for since January 1, 1994 to the present.

**RESPONSE NO. 16:**

OBJECTION:    The interrogatory is not designed to lead to the production of information relevant to any issue in the Complaint.

Without waiving said objection I have received social security disability benefits as follows: 2002 - $31,916.00 of which $17,972.00 was repaid to the disability insurance carrier, and $270 was deducted for Medicare; 2003 - $14,144.00 less $704.40 for Medicare payment: 2004 - $14,431.00 less $800.00 for Medicare payment; for 2005 I receive $1,157.00 per month after deduction for Medicare.

**INTERROGATORY NO. 17:**

Please identify and describe the nature of your leave from CNA in 1995, including, but not limited to, the reasons for the leave, any persons with knowledge of the facts and circumstances of this leave and the issues upon which you believe they have knowledge.

**RESPONSE NO. 17:**

OBJECTION:    The interrogatory is not designed to lead to the production of relevant evidence.

12

**INTERROGATORY NO. 18:**

Please identify and describe the nature of any leave from CNA, including, but not limited to, the reasons for the leave, any persons with knowledge of the facts and circumstances of this leave and the issues upon which you believe they have knowledge.

**RESPONSE NO. 18:**

**OBJECTION:**    The interrogatory is not designed to lead to the production of relevant evidence.

**INTERROGATORY NO. 19:**

For each expert witness you intend to call at trial, state or identify:

(a) The expert's identity;

(b) The identity of the expert's employer;

(c) The subject matter on which each such expert is expected to testify;

(d) The present occupation of each such expert;

(e) The substance of the facts to which each such expert is expected to testify;

(f) The opinions to which each such expert is expected to testify;

(g) A detailed summary of the grounds for each opinion; and

(h) Identify any documents which you, or your counselor representatives, gave to or   received from the witness or other documents related to your answer.

13

**RESPONSE NO. 19:**

I have not yet determined whether or not I intend to call an expert witness

at the trial of this case.

Signed under the pains and penalties of perjury this   day of August 2005.

BARBARA CONNICK

As to Objections:
**BARBARA CONNICK**
By Her Attorney

**HOWARD I WILGOREN,**
6 Beacon Street,
Suite 700
Boston, MA 02108
(617) 523 – 5233
BBO No. 527840

DATED: August 1, 2005

14

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served upon the attorney of record for each party by Federal Express on August 1, 2005.

HOWARD I WILGOREN