UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BARBARA CONNICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 04-12208-WGY |
| | ) | |
| CONTINENTAL CASUALTY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, Defendant Continental Casualty Company ("Defendant" or "CNA") hereby submits this Statement of Undisputed Material Facts in support of its motion seeking summary judgment.

**The Parties**

Headquartered in Chicago, CNA is a leading global insurance organization, providing insurance protection to businesses and professionals in the United States and abroad. Connick is a former Data Clerk in CNA's Commercial Mass Auto Unit, located in Quincy, Massachusetts. Connick began working in CNA's Quincy office in 1984. Connick was last actively employed by CNA on October 7, 1999. At this time, Connick left CNA to commence a short term disability leave from which she never returned. Connick is currently a resident of Hull, Plymouth County, Massachusetts. (Complaint ("Complt.") ¶ 1, attached hereto as Exhibit A.) Connick claims that she was subjected to racial harassment by African American co-workers in violation of Title VII of the Civil Rights Act, as amended.

**Procedural History**

On March 11, 2000, Connick filed a charge against CNA with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity

Commission ("EEOC") alleging race discrimination in violation of Title VII of the Civil Rights Act, as amended. After a full investigation, the MCAD found no probable cause to conclude that CNA discriminated against Connick and dismissed her charge on May 7, 2002. On October 21, 2004, Connick filed a complaint (the "Complaint") in this Court, alleging same. (*See* Exhibit A.)

### CNA's Employee Handbook and Policies

At all relevant times, CNA has maintained a "Our Commitment to Professional Conduct" handbook (the "Handbook") that provides for, among other things, the procedures for reporting misconduct. (Deposition of Barbara Connick ("Connick Dep."), Exh. 7, attached hereto as Exhibit B.)

Connick admits that she had previously received a copy of the Handbook, including its procedures relating to harassment and threats, and that she attended a program at which these materials were reviewed with employees. (Connick Dep. 72:9-73:21; 214:18-23.)

### Connick's Prior Disability Leave

In 1994 Connick commenced a 52 week short term disability leave from CNA. Connick allegedly suffered an anxiety attack after several months of alleged stalking by her supervisor. (Supp. Ans. Interrog. No. 17, attached hereto as Exhibit C.) Connick returned to work in 1995.

### Connick's Employment History and Allegations of the Complaint

Connick began working in CNA's Quincy office in 1984; however, the events that underlie her hostile environment claim began some 15 years later, in early 1999. (Connick Dep. 33:15, 34:10-23.) On June 24, 1999, Connick accompanied a developmentally disabled Caucasian coworker to a party being held in an accounting unit adjacent to the area in which Connick worked. This party was intended for the accounting unit, and the food and funds for the event were supplied by the unit itself. (Connick Dep. 74:22-76:4.) At that party, Connick helped herself to a plateful of food for her coworker. (Connick Dep. 60:11-23; 64:16.)

While so engaged, Connick felt that an African-American accounting employee named Greta Thomas ("Thomas"), <u>stared</u> at her "hatefully." (Connick Dep. 64:19.) Connick initiated a conversation, asking whether Thomas had a problem; Thomas' response was allegedly to ask Connick whether Connick wanted to "beat her [Thomas] up." (Connick Dep. 64:16-66:1; 69:7.) Connick admits that Thomas' objection to her presence at the party was not race-based. (Connick Dep. 76:10-13.) Connick did not report this incident to any supervisor, manager, or human resources representative. (Connick Dep. 70:23-71:3.) Likewise, while Connick claims to have felt physically "threatened" by Thomas's "hateful" stare, Connick did not report the incident to CNA's corporate security department. (Connick Dep. 71:4-9.)

Connick first approached her supervisor, Abbi Laushine ("Laushine"), about the work environment during August, 1999. (Connick Dep. 98:13.) Before this time, Connick had not discussed her work environment concerns with anyone in human resources or in corporate security, as she understood she was supposed to do. (Connick Dep. 113:4-11.) According to Connick, she overheard a personal conversation between two African-American coworkers, Shauna Williams ("Williams") and Grace Clemetson ("Clemtson"), in which Williams referred to Connick as "white trash" or "that white trash bitch," and referencing that another former coworker (no longer in the workplace), Heather Gill, would "have no problem beating her up." (Connick Dep. 142:5-11.) On Friday, August 20, Connick's next regularly scheduled day off, she called Laushine from home to request a confidential off-site meeting to discuss work-related concerns. (Connick Dep. 112:13-14; 124:6-11; 166:23.) This was the first time Connick contacted Laushine regarding her concerns of the work environment.[1] (Connick Dep.

---

[1] In the Spring of 1999, Connick alleges that Laushine was sitting at her (Connick's) desk when several African American coworkers were "grouping." (Connick Dep. 137:11-17.) Connick alleges that she overheard a coworker state "white trash," although Connick was unsure whether Laushine overheard the same comment. (Connick Dep. 140:6-10.) At that time, Connick did not complain to Laushine that a racial comment was made. Rather, Connick stated: "they're putting

- 3 -

112:10-22.) Connick did not say that her safety was threatened or that she was being racially harassed at work. (Connick Dep. 135:16-136:1.)

On August 26, 1999, Connick and Laushine met off-site. During a two-hour meeting, Connick told Laushine her opinion that there were racial cliques in the workforce. (Connick Dep. 136:6-8.) The thrust of the conversation revolved around Connick's belief that her coworkers were not adequately performing their job duties and that the workplace was racially divided. (Barbara Connick Personal Narrative, Connick Dep. Exh. 2, p. 3.) Although Connick claims that she informed Laushine of the "white trash" comment, Laushine vehemently denies as much. (Connick Dep. 142:5-13; Deposition of Abbi Laushine ("Laushine Dep.") 25:15-19, attached hereto as Exh. D) Connick did not approach Laushine again until September 16, 1999. (Connick Dep. 180:14-16; Laushine Dep. 37:6-9.) In response to the August 26 meeting, Laushine organized a unit meeting to be held shortly after the Labor Day holiday. The meeting took place on September 15, 1999, and Laushine addressed each of Connick's concerns raised in the August 26 off-site meeting. (Connick Dep. 164:5-9.)

On the morning of September 16, 1999, Connick had a verbal altercation with an African-American coworker, Ernie Goddard ("Goddard"), during which Connick told Goddard that "he should be shot." (Connick Dep. 175:10-18.) After this, Connick and Williams exchanged words about the verbal altercation between Connick and Goddard, prompting Laushine to step in and summon Connick and Williams, privately and separately, to a conference room to discuss their behavior. (Connick Dep. 180:3-13, 183:16-18.) Later that same day, Connick approached Laushine. Connick claimed that she overheard a telephone conversation in which Williams allegedly made threatening remarks to an unidentified third

---

us all down…[t]hey do this everyday." (Connick Dep. 139:21-140:5.) In response, Connick admits that Laushine spoke to the coworkers that same day or the next day. (Connick Dep. 140:18-141:7.) Subsequently, Connick did not discuss the work environment with Laushine until the August 26 off-site meeting.

party, including comments that someone would be waiting for "that white trash bitch" in the parking garage. (Connick Dep. 184:20-185:10.) This comment was not made to Connick. (Connick Dep. 151:21.)

Immediately on the heels of Connick's report, Laushine and Edwards investigated the September 16 incident. (Connick Dep., Exh. 2, p.8; Laushine Dep. 37:6-38:7; Deposition of Charles Edwards ("Edwards Dep.") 48:15-51:10, attached hereto Exh. E.) They first spoke with Connick and then questioned Williams. (Connick Dep. 180:12-13, 183:16-18; Edwards Dep. 50:15-51:0.) Williams admitted a verbal altercation with Connick, but denied having made any racial or disparaging comments. (Edwards Dep. at 50:12-14.) When asked about her telephone conversation, Williams stated that because Connick had upset her, Williams called her husband for support. Williams denied making any threats. (*Id.* at 50:19-20.)

In accord with CNA's harassment policy, Edwards also advised both Employee Relations and Corporate Security of Connick's concerns. (Edwards Dep. 51:10-52:8; 53:20-54:16.) In addition, Edwards spoke with Connick's husband and advised Connick to contact her local police. (*Id.* at 71:21-72:17; Connick Dep. Exh. 2, p. 9.) To further address Connick's concerns, CNA initiated a production monitoring system, conducted teamwork training, and monitored employee interactions. CNA also organized a mandatory meeting for the entire Mass Auto Unit to discuss performance expectations and reiterate CNA's employee relations policies. CNA hosted this meeting after Connick returned from her scheduled vacation, which ran from September 17, 1999, through September 26, 1999. (Connick Dep. 188:21-189:10.) While on vacation, Connick did not speak with any of her coworkers. (Connick Dep. 189:15; 191:21-192:1.)

On October 4, 1999, Laushine, Edwards, Jim Martin (Caucasian), Chief Underwriting Officer, and Charles Dye (Caucasian), Branch President conducted the all-unit meeting.

(Laushine Dep. 57:16-18; Edwards Dep. 65:13-66:19; 74:15-20.) The meeting underscored the importance of respecting diversity and reinforced that the consequences of engaging in behavior that created a hostile work environment for others would be swift and severe. (Edwards Dep. 65:13-66:19; Laushine Dep. 57:15-18.) Connick attended this meeting; however, she arrived 15 minutes after it started. (Connick Dep. Exh. 2, p. 24.)

Connick alleges that CNA's investigation was inadequate because "[t]hey didn't question any witnesses." (Connick Dep. at 198:2.) Connick admits, however, that although she provided Edwards with names of "witnesses," none of the individuals she identified had actually been in a position to overhear Williams' alleged threat. (*Id.* at 203:2-204:20.)

On October 5, 1999, Connick requested a half-day off. (Connick Dep. Exh. 2, p.26.) On October 6, Connick again requested a personal day. (*Id.*) At the end of the day on Wednesday, October 7, Connick commenced a disability leave from which she never returned to work. (Connick Dep. 13:17-14:17.) From the time Connick returned from her vacation, September 27, 1999, through the time she commenced her leave, October 7, 1999, Connick admits that she was not subjected to any racial remarks. (Connick Dep. 192:13-16.)

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

By: *Dana Gruen (LM)*
One of the attorneys for Defendant
Continental Casualty Company

Jeffrey S. Goldman
Dana B. Gruen
Catherine S. Nasser
SONNENSCHEIN NATH & ROSENTHAL LLP
8000 Sears Tower
233 S. Wacker Dr.
Chicago, Illinois 60606
(312) 876-8000

- 7 -

(312) 876-7934 (facsimile)

Scott Douglas Burke
Lynne McNeill
Morrison Mahoney LLP
250 Summer Street
Boston, Massachusetts 02210
(617) 439-7500
(617) 969-8737 (facsimile)

November 29, 2005

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each (other) party by ~~mail~~ ~~(by hand)~~ on 11-29-05 *electronic filing*