**EXHIBIT E**

COMMONWEALTH OF MASSACHUSETTS

COMMISSION AGAINST DISCRIMINATION

Docket No.: 00130700

BARBARA C. CONNICK,                :       Volume 1

          Complainant    :       Pages 1-85

                                   :       Exhibits 2

          v                        :

                                   :

CONTINENTAL CASUALTY COMPANY,      :

          Respondent     :

DEPOSITION OF CHARLES EDWARDS, a witness called on behalf of the Complainant, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Elizabeth O. Bailey, a Notary Public in and for the Commonwealth of Massachusetts, at the Law Office of Howard I. Wilgoren, 1661 Worcester Road, Framingham, Massachusetts, on Thursday, August 24, 2000, commencing at 9:30 a.m.

JOHN V. SZOLOMAYER

38 NANCY DRIVE

ASHLAND, MASSACHUSETTS 01721

(508) 881-5833

---

**Page 2**

1  APPEARANCES:

2  Law Offices of Howard I. Wilgoren (By Howard I. Wilgoren,
   Esquire), 1661 Worcester Road, Framingham,
3  Massachusetts, 01701, for the Complainant.

4  Fox and Grove (By Allison C. Blakley, Attorney at Law),
   Suite 6200, 311 South Wacker Drive, Chicago, Illinois,
5  60606, for the Respondent.

6  CNA (By Dale R. Crider, Assistant Vice President &
   Assistant General Counsel), CNA Plaza, 43 South,
7  Chicago, Illinois, 60685, for the Respondent.

8  Also Present:

9     Barbara Connick
      Paul Connick

10

11              I N D E X

12  Witness:        Direct      Cross

13  Charles Edwards

14  (By Mr. Wilgoren)      3
    (By Ms. Blakley)              83

15

16              EXHIBITS

17  No.   Description                Page

18  1     Professional Conduct Policy     28

19  2     Reporting Misconduct Policy     36

20

21

22

23

24

---

**Page 3**

1              PROCEEDINGS

2          CHARLES EDWARDS, first being duly

3  sworn, deposes and says as follows:

4              DIRECT EXAMINATION

5  BY MR. WILGOREN:

6  Q   Good morning, Mr. Edwards.

7  A   Good morning.

8  Q   Could you state your name and residential address,

9      please?

10 A   Charles Edwards.  119 Valley Path, Marshfield,

11     Massachusetts.

12 Q   Thank you.

13         MR. WILGOREN:  Just before we continue, in

14 an off-the-record discussion, counsel have agreed that

15 all objections, except to form, will be reserved for a

16 later time, and the deponent will read and sign the

17 transcript before a notary.

18 Q   Mr. Edwards, the purpose of this deposition today is,

19     as you know, Barbara Connick has filed a complaint of

20     racial discrimination, racial harassment against CNA

21     with the Mass. Commission Against Discrimination.

22         This deposition is part of that process.  It

23 is designed to develop factual evidence for use in

24 that case.  How we do that is I ask a series of

---

**Page 4**

1  questions to you and you provide the answers fully and

2  to the best of your ability and certainly, as you've

3  just heard, under oath.

4          In order for the process to work, there has

5  to be some baseline understanding.  The questions I

6  ask you, you understand, and you have the ability to

7  answer them.  So, when I ask you a question, if you do

8  not understand it, I will expect you to tell me.

9  Okay?

10 A   Uh-huh.

11 Q   Can we further agree that if you don't say anything

12     and you answer the question that you understand the

13     question?

14 A   Yes.

15 Q   Thank you.  Other than your attorneys, have you

16     discussed your testimony today with any other

17     individuals?

18 A   No.

19 Q   Have you reviewed any documents in preparation for

20     your testimony today?

21 A   Yes.

22 Q   Which documents have you reviewed?

23 A   The document that Barbie wrote.

24 Q   Any others?

**DEPOSITION OF CHARLES EDWARDS**

5

1  A  No.
2  Q  Have you ever testified in a prior deposition?
3  A  Yes.
4  Q  What were those case or cases that you testified?
5  A  It was a case in Michigan. Boy, I really can't
6     remember. I think it was a hostile work environment.
7  Q  By whom were you employed at that time?
8  A  CNA.
9  Q  How long ago was that?
10 A  Probably in '93.
11 Q  Do you know what the basis of the hostile work
12    environment claim was? Was it sex, race, religion?
13 A  I think it was -- it may have been sexual harassment.
14 Q  Do you know the outcome of that case?
15 A  No. I don't.
16 Q  What was your position at the time when you testified?
17 A  Human resources manager.
18 Q  For what facility?
19 A  Southfield, Michigan, branch.
20 Q  Other than that, have you testified at any other
21    depositions?
22 A  No.
23 Q  Have you testified in any other legal proceedings,
24    either court or administrative agency?

6

1  A  No.
2  Q  Could you previously state your educational history?
3  A  High school graduate with four years of college.
4     Education major. 20 hours of graduate work toward my
5     graduate degree.
6  Q  Where did you go to college?
7  A  Aurora University, Aurora, Illinois.
8  Q  When did you graduate?
9  A  1975.
10 Q  That was an education major?
11 A  Uh-huh.
12 Q  What was the course of studies for the 20 graduate
13    credits?
14 A  It was all in education.
15 Q  I see. Have you had any training or education course
16    work of any kind in the area of human resources?
17 A  Yes.
18 Q  Okay. Tell me what.
19 A  I'm a member of the Society of Human Resource Managers
20    who put on seminars constantly referencing my area of
21    expertise, and I've been participating in those for
22    about 14 years now.
23 Q  Do you remember some subject matter of those
24    conferences or seminars?

7

1  A  Employ relations, benefits, affirmative action, how to
2     -- how to handle issues of hostile work environments,
3     race discrimination issues.
4  Q  Have you attended any seminars or conferences or
5     courses on diversity in the work place?
6  A  Absolutely.
7  Q  Tell me which ones you have.
8  A  We have a law department at Chicago that over the past
9     14 years have put on several seminars on diversity.
10    I've attended all of those -- as many as I could. I
11    would assume that's probably five or six over 14 years
12    and almost every Society of Human Resource function
13    today offered those courses in most of the seminars
14    that they had.
15 Q  I see. You went -- this training that was conducted
16    by the CNA law department, who attended that
17    training? Human resources types?
18 A  Yes. Human resources professionals typically, but we
19    would also put anyone in a leadership position through
20    that training.
21 Q  Do you know whether Abbi Laushine --
22 A  Abbi did not attend.
23 Q  Has she ever attended any diversity training?
24 A  No.

8

1  Q  Are you familiar with an individual by the name of
2     Laura Nicholas?
3  A  Yes.
4  Q  Who was Laura Nicholas?
5  A  She was -- well currently a technology person that
6     works within our organization, and prior to that, she
7     was a supervisor in our services area.
8  Q  The services would be the Mass. auto department?
9  A  She functioned in that area, but services would
10    incorporate any of our processing units that we have
11    had.
12 Q  Was she Abbi Laushine --
13 A  Laushine.
14 Q  -- predecessor?
15 A  Yes.
16 Q  Did Laura Nicholas have any diversity training? Do
17    you know?
18 A  I just want to make sure -- during the time -- I've
19    been in this office for four years, and my assumptions
20    were as long as Laura has been in her current job --
21    not current job -- job as a manager, she would have
22    gone through.
23 Q  You have no --
24 A  No.

9

1  Q  -- firsthand knowledge?
2  A  No.
3  Q  That's an assumption?
4  A  No.
5  Q  It's not an assumption?
6  A  Say that again.
7  Q  Do you have any firsthand knowledge as to whether or
8     not she had attended any diversity training --
9  A  No.
10 Q  -- during the time she was the manager of the Mass.
11    auto lines?
12 A  No.
13 Q  She is still employed by CNA?
14 A  Yes.
15 Q  Do you know what location?
16 A  In the Quincy location.
17 Q  Have you had any training in conducting
18    investigations --
19 A  Yes.
20 Q  -- into employee complaints?
21 A  Yes.
22 Q  What training have you had in that area?
23 A  That training would have also come from our law
24    department when those seminars were put on.

10

1  Q  Other than human resources professionals, did line
2     managers receive similar training?
3  A  Yes.
4  Q  Do you know whether Abbi Laushine had such training?
5  A  She did not.
6  Q  How about Laura Nicholas?
7  A  I don't know.
8  Q  Could you give me your job history since you started
9     working?
10 A  I want to make sure I understand your question.  Since
11    I've started working or since I've been with CNA?
12 Q  Since you started working.  You can leave out high
13    school jobs and such.
14 A  Probably the first major job I had was with the United
15    States Air Force.  I went into the Air Force in 1976
16    and stayed there for nearly ten years.  During that
17    period of time, I worked over the first couple of
18    years as a medical laboratory technician, became a
19    commissioned officer, and served as a commander for
20    six years.  Six or eight years.  I left that job and
21    became a recruiter, and I did that for about 18 months
22    and then I became an employee of CNA insurance
23    company.
24 Q  Let me just ask you about your service in the Air

11

1  Q  Force.  Commander is the rank?
2  A  Captain was the rank.  Title commander.
3  Q  What were you commander of?
4  A  Several units.  The last unit I had was a student
5     squadron organization.  Air training command basically
6     where we took recruits from basic training and they
7     came into my organization to learn a trade, and it was
8     my responsibility to make sure that they were
9     academically qualified to go out to the work force.
10 Q  During your service, the ten years you served in the
11    Air Force, did you have any human resource positions?
12 A  That position has a lot of Human resources in it, and
13    to answer your question, one of my jobs was director
14    of personnel.
15 Q  Where was that?
16 A  That was in the Air Force when I spent time at George
17    Air Force base in California.
18 Q  I take it you were honorably discharged?
19 A  Yes.
20 Q  Then after you left the Air Force, you went to work
21    immediately for CNA?
22 A  No.  As a recruiter/head hunter.  Executive recruiter
23    with another organization.
24 Q  I thought that was recruiting for the Air Force.  What

12

1     was the name of that company?
2  A  I want to say Management Recruiters.  It's a long time
3     ago, but I don't think that's the name.  I have it on
4     my resume somewhere.
5  Q  How long did you stay there?
6  A  18 months.
7  Q  Why did you leave that job?
8  A  I needed more money plus I didn't like the job.
9  Q  What job did you take next?
10 A  The job with CNA.
11 Q  What job was that?
12 A  I worked as a human resources representative in
13    Chicago on a regional staff for about four months
14    before going to Cleveland as a human resources
15    manager.
16 Q  How long did you stay in Cleveland?
17 A  About four years.
18 Q  Let me just see.  Can you put the dates when you first
19    started at CNA and the time you stayed in Cleveland?
20 A  Started with CNA in '87.  I want to say April.
21    Somewhere around August, I moved to Cleveland.  The
22    same year.  Stayed there until '93.  Then went to
23    Michigan.
24 Q  Same position?

## 13

1 A Same position.

2 Q How long were you there?

3 A Until '96. Coming to Boston.

4 Q The Quincy location?

5 A Yes.

6 Q What was your position when you came to Quincy?

7 A Human resources manager.

8 Q That's the position you hold today?

9 A Yes.

10 Q That's the position you held at all times since coming
11 here in '96?

12 A Yes.

13 Q Tell me your job duties as human resources manager in
14 Quincy.

15 A As a human resources manager, I'm responsible for the
16 organization complying with all personnel policies and
17 procedures, which is to include employee relations,
18 compensation and benefits, and I'm also responsible
19 for training and recruiting.

20 Q What types of training do you provide to the employees
21 in Quincy?

22 A Most of the training that I would be involved with
23 would be training the leadership staff to comply with
24 any changes in personnel policies and procedures as it

## 14

1 relates to comp. and benefits, investigation of
2 complaints, diversity, any of those issues that help
3 us to comply with our policies and procedures.

4 Q I see. Since the time you've been in the Quincy
5 location, have you provided diversity training to any
6 managers?

7 A Yes.

8 Q Who?

9 A Most of our claims organization, which would include
10 Kelly Cramer, Kathy Button-West. Just names of unit
11 managers that have gone through the training.

12 Q During the time you've been in Quincy, has CNA ever
13 provided diversity training to any of the rank and
14 file employees?

15 A No.

16 Q Are you familiar with a person by the name Mary Ann
17 Soncrant?

18 BARBARA CONNICK: Marlene.

19 A Yes.

20 Q Who was she?

21 A Marlene Soncrant was -- when I came to the
22 organization, she was a services manager.

23 Q That's a position you said Laura Nicholas had?

24 A Laura was not the manager of the services

## 15

1 organization. She was a supervisor within that
2 organization or department, I should say.

3 Q Did Laura Nicholas hold the position of Mass. auto
4 manager?

5 A I don't know if she did or not. It could have been.

6 BARBARA CONNICK: Yes. She did.

7 Q Have you told me all of your job duties?

8 A Can I just go back? What was your last question? Do
9 you remember?

10 Q My last question was whether Laura Nicholas -- we can
11 have it read back. Was it possible that Laura
12 Nicholas was the Mass. auto manager?

13 A Yes. The answer to that is yes.

14 Q Did you tell us now your complete job duties as human
15 resources manager in Quincy?

16 A I believe that I have.

17 Q During the time that you have been the human resources
18 manager, has CNA been sued by any employees of the
19 Quincy operation?

20 A Explain what you mean by "sued."

21 Q Any employee ever file a complaint with the Mass.
22 Commission Against Discrimination, the Equal
23 Employment Opportunity Commission, any other state or
24 Federal administrative agency, or any state or Federal

## 16

1 court?

2 A We have had an employee to file a charge against CNA.

3 Q Charge of discrimination?

4 A Hostile work environment.

5 Q What was the name of that employee?

6 A That employee's name was Gail Ioven.

7 Q Gail who?

8 A Ioven, I-O-V-E-N.

9 Q Where was Gail Ioven employed?

10 A Claims.

11 Q Same department Barbara Connick worked in?

12 A No.

13 Q When did Gail Ioven bring the claim of hostile work
14 environment?

15 A Probably in July of '99.

16 Q Where did she bring it? The Mass. Commission Against
17 Discrimination?

18 A She brought it to me.

19 Q So, it was an internal complaint?

20 A Right.

21 Q What was the nature of her complaint?

22 A That a unit manager was abrasive.

23 Q Did she describe what she meant by "abrasive"?

24 A Talked down, throw things on the desk. That type of

17

1  thing.
2  Q  Was the manager abrasive to all employees in the
3     department or just her or just a particular class of
4     employees?
5  A  Her claim was that she was abrasive to her.
6  Q  Was it because of a particular characteristic of
7     Ms. Ioven?
8  A  I don't understand that question.
9  Q  Was it because of Ms. Ioven's sex or race or religion,
10    international origin, age?
11 A  No.
12 Q  Just a personal thing the manager had against her?
13 A  Right.
14       MS. BLAKLEY:  With the fan, you have to
15    speak up.
16 Q  When you received that complaint from Ms. Ioven, what
17    did you do?
18 A  I immediately raised the issue to our employee --
19    employee relations department in Chicago and, with
20    direction from them, did an investigation.
21 Q  You conducted the investigation yourself?
22 A  I did.
23 Q  What steps did you take to pursue that investigation?
24 A  Had the employee tell me what the real issues were and

18

1     tried to get some questions answered as to exactly
2     what was happening.  Then --
3  Q  Did -- sorry.  Go ahead.  Please continue.
4  A  Then to talk with the person that she charged these
5     allegations against so that I could get that side of
6     the story.  Then to talk to anyone that we thought
7     could help us in trying to come to a resolution as to
8     whether or not these allegations were accurate or not.
9  Q  How did you identify the other witnesses that you
10    talked to in this investigation?
11 A  By asking the person that brought the complaint.  Were
12    there any other people that she could tell me that was
13    involved or at least heard the things or saw the
14    things that were happening.
15 Q  Ms. Ioven suggested the names of particular
16    individuals --
17 A  Yes.
18 Q  -- who she thought would be witnesses?
19 A  Right.
20 Q  Did you interview each of the individuals whom she
21    suggested?
22 A  Yes.
23 Q  Did you do anything else during the course of that
24    investigation?

19

1  A  No.  Not that I can think of.
2  Q  How was the charge resolved?
3        MS. BLAKLEY:  I'm going to object to the
4     form of the question.  Go ahead.
5  A  We got the results of everyone that we had spoken to
6     and shared those results -- not shared them but got
7     back to the employee to say, Here are some of the
8     things we learned, and this issue will be resolved one
9     way or another and then we took the disciplinary steps
10    we needed to take internally with that employee.
11 Q  With the manager?
12 A  Yes.
13 Q  What was the manager's name?
14 A  Claudette LaBonte.
15 Q  What disciplinary steps did you take?
16 A  We documented her personnel file with the fact that
17    the behavior was not acceptable and her performance
18    review and then removed her from those duties.
19 Q  So, she was demoted?
20 A  Right.
21 Q  When you interviewed Ms. LaBonte, did she admit to the
22    behavior, the claimed behavior?
23 A  No.
24 Q  She denied?

20

1  A  Right.
2  Q  How many other witnesses did you interview?
3  A  Five or six.
4  Q  Did any of those five or six witnesses corroborate
5     either Ms. LaBonte's version of the events or
6     Ms. Ioven's version of the events?
7  A  Both.
8  Q  So, you had a credibility issue.  Is that fair to
9     say?  You had conflicting stories from both the
10    principals as well as witnesses?
11       MS. BLAKLEY:  Object to the form of the
12    question.
13 A  Could you state your question again?
14 Q  Surely.  You just told me that Ms. Ioven told you of
15    certain harassing conduct or abusive conduct.
16    Ms. LaBonte denied that abusive conduct, right?
17 A  Right.
18 Q  Stop me if I'm wrong in any of my assumptions here.
19 A  Let me stop you, if I can, so I can make sure.  Of all
20    of the, Do I throw files on the desk all the time?  I
21    might do that sometimes, but I know I don't do it a
22    lot.  Those were the conflicting issues.  Yes.  I do
23    it, but I don't do it abusively.
24 Q  When you had the results of this investigation into

21

1 Ms. Ioven's charge, would you characterize the results
2 as being conflicting?
3 A No.
4 Q So, everyone corroborated, in some form or another,
5 Ms. Ioven's charge?
6 A I'm having a difficult time with the term
7 "conflicting" because --
8 Q Let me ask it this way: You did the investigation.
9 You spoke to Ms. Ioven. You spoke to Ms. LaBonte.
10 You spoke to five or six other individuals. You had
11 all this data that you had collected, and you had to
12 sift through it and you had to analyze it. Is that
13 fair to say?
14 A That's correct.
15 Q In certain respects, what different people said was at
16 odds with each other. Is that fair to say?
17 A No. That's not fair to say. Let me just give an
18 example of why I'm saying it's not fair to say. My
19 concern in that issue was: Is there abusive conduct
20 from the manager, and let me describe what abusive
21 is.
22 Am I abusive in my language to you, in my
23 body language and my tone, and am I throwing stuff on
24 the desk.

22

1 The people that I talked to said, Yes. That
2 happens. She said, It happens but not all the time,
3 and when it does, it's not abusive. So, in my mind,
4 it happens. That was enough for me. So, if that's
5 conflicting, I don't know.
6 Q Did you have to make determinations as to who was
7 telling the truth during the course of that
8 investigation?
9 A Yes.
10 Q And who was not telling the truth?
11 A Right.
12 Q You did so?
13 A Right.
14 Q That would be called a credibility resolution?
15 A Okay.
16 Q That's how us lawyers sometimes define it instead of
17 saying, in plain English, someone is telling the truth
18 and someone is not.
19 A Okay.
20 Q You did that. You were able to decide one was telling
21 the truth and one was not?
22 A Right.
23 Q You took action based on your judgment as to who you
24 concluded was telling the truth?

23

1 A That's correct.
2 Q Let's get back to the training you've had in
3 conducting investigations into work place complaints.
4 Has any of that training ever focused on making
5 conclusions as a result of two different stories as to
6 who is telling the truth and who is not?
7 A Yes.
8 Q What was the essence of the training in that area?
9 A The essence of the training is to -- when you're
10 interviewing someone to make sure that you are
11 focusing on the real facts; that you're taking emotion
12 out of it; and that you're trying to get some direct
13 and specific answers.
14 If you don't come to that conclusion, then
15 you're probably best not taking any action or -- any
16 disciplinary action anyway.
17 When you do come to some conclusions where
18 it's direct and specific, then you certainly have to
19 follow our policy and procedures, and any time you're
20 unsure along the way, get some expertise from the area
21 of the employee relations department in Chicago.
22 Q You would do that?
23 A Yes.
24 Q Let me ask you: In part of your training either in

24

1 conducting investigations or other training, have you
2 had training in sexual harassment issues?
3 A Yes.
4 Q Would it be fair to say that often times sexual
5 harassment issues or complaints are matters of one
6 person's word against the other?
7 A That's correct.
8 Q How has your training prepared you to deal with those
9 types of investigations where the investigation is
10 essentially one person's word against the other?
11 A We would -- in our training, we would have case
12 studies and a case study would take us through where
13 sexual harassment is obvious, and it would also take
14 us through cases where it's a person's word against
15 another and how would you go about handling that.
16 In most of those cases, whether you're sure
17 or not, just make sure you get a partner who has all
18 of the expertise in looking at the stuff on a daily
19 basis, and that's what I try to do.
20 Q In your training, have you learned how to deal with
21 those types of issues in terms of reaching conclusions
22 where the investigation is essentially one person's
23 word against the other?
24 A Yes.

DEPOSITION OF CHARLES EDWARDS

25

1 Q    What did you learn about how to deal with those types
2       of complaints or those types of investigations?
3 A    What I've learned through all of the training I've
4       gone through is that -- sit down and try to get the
5       facts, and once you get the facts to the best of your
6       ability, call upon someone that has the expertise in
7       that area so that they can give you some advice.
8 Q    You conducted an investigation into Barbara Connick's
9       complaints of racial harassment in the work place?
10 A   Yes.
11 Q   We are going to talk about that in some more detail
12      down the road. Would it be fair to say at the end of
13      the investigation, you had the -- the evidence you had
14      was essentially one person's word against the other?
15 A   Yes.
16 Q   Barbara Connick was saying that certain harassing
17      statements and conduct were made and harassing conduct
18      was exhibited?
19 A   Correct.
20 Q   The alleged perpetrators denied the same? Denied that
21      it occurred?
22 A   Correct.
23 Q   After you had that -- you would have called someone in
24      employee relations for guidance?

26

1 A    That's correct.
2 Q    Did you do that in this case?
3 A    Yes.
4 Q    Who did you call?
5 A    Debbie Nutley.
6 Q    Who is Debbie Nutley?
7 A    Debbie Nutley is a lawyer in our corporate law
8       department.
9 Q    Other than Ms. Ioven, have any other employees filed
10      complaints, as I've defined them, either internally or
11      in courts or administrative agencies during the time
12      you've been human resource manager in Quincy?
13 A   Please explain to me what you mean by "file
14      complaints."
15 Q   Either internal complaints with you as a manager. A
16      complaint with the Mass. Commission Against
17      Discrimination, Equal Employment Opportunity
18      Commission, any state or Federal agency, any state or
19      Federal court?
20 A   I think those are the only ones.
21 Q   Barbara Connick and Gail Ioven are the only ones?
22 A   Right.
23 Q   Do you have any documents pertaining to Gail Ioven's
24      complaint?

27

1 A    No. I don't.
2 Q    No notes of your investigation? No write ups of
3       Ms. LaBonte?
4 A    She's no longer with the organization. So, I wouldn't
5       have any of that.
6 Q    Where would her personnel file go as an ex-employee?
7 A    It would be in Chicago filed away in storage.
8 Q    That's -- those are the only two complaints. How many
9       employees are currently in the Quincy location?
10 A   About 220.
11 Q   How many were there in 1993 when you first became
12      manager?
13         MS. BLAKLEY: Objection to the form of the
14      question.
15 Q   You can answer.
16 A   I would say -- in '93? Is that what you said? I
17      didn't come until '96.
18 Q   I'm sorry. '96. I apologize.
19 A   I would think there was closer to 300.
20 Q   Does CNA have a policy that prohibits harassment in
21      the work place based on race?
22 A   Yes. We do.
23 Q   What's the name of that policy?
24 A   The name of the policy -- we put it under sexual

28

1       harassment.
2 Q    Is it the same policy that's been continually in
3       effect since you've been the manager in Quincy?
4 A    I believe in '97 we put out a policy of personal
5       conduct where we require each person to read and
6       sign. Maybe we did that in '98.
7 Q    That's the policy of professional conduct?
8 A    Right.
9 Q    Would that have been issued by Mr. Hengesbaugh, the
10      chairman and chief executive officer?
11 A   Yes.
12 Q   You say that, as part of that, there's guidelines
13      prohibiting harassment in the work place based on
14      race?
15 A   That's correct.
16         MR. WILGOREN: Maybe I could have this
17      document marked as Exhibit 1.
18 Q   By the way, if you need to take a break at any time,
19      just let me know.
20         (Photocopy of Professional Conduct
21      Policy marked as Exhibit No. 1 for identification.)
22 Q   Mr. Edwards, let me show you what's been marked as
23      deposition Exhibit No. 1 and ask if you can identify
24      that document.

29

1 A  Yes.
2 Q  Is that the policy that you've been talking about?
3 A  This is the policy --
4        MS. BLAKLEY:  Let me see.
5        MR. WILGOREN:  I'm sorry.
6        MS. BLAKLEY:  There's more here than just --
7        There are multiple documents.  You might want to look
8        at them and see what they are.
9 A  Yes.  I can identify this as our commitment to
10      professional conduct policy.
11 Q  Your counsel indicated there were some other documents
12      attached to it as well.
13 A  The human resources manual document that also
14      identifies our equal employment opportunity --
15 Q  Could you point out in that document, either of the
16      two you just identified, where harassment based on
17      race is prohibited?
18        MS. BLAKLEY:  You need to explain for the
19        record where you're pointing.
20 Q  That's on paragraph -- page 8 of 11 entitled,
21      "Employment Practices Equal Employment/Work Place
22      Harassment"?
23 A  Page 8 of 11.  Under "Employment Practices Equal
24      Employment Opportunity/Work Place Harassment."

30

1        It states, "CNA policy prohibits any form of
2   discrimination by its managers or employees, based on
3   race, color, religion, age disability, sexual
4   orientation, national origin, marital status, or
5   gender."
6 Q  Okay.  Thank you.  By the way, I just want to go
7      back.  Are you sure you told me, to the best of your
8      recollection, all of the employee complaints as I've
9      defined them that have been filed either with you or
10     with an agency since you've been the manager?
11 A  Yes.  I can't -- we have not -- fortunately have not
12      had issues of racial discrimination in our office.
13 Q  I'm talking about any type of discrimination.
14 A  Or discrimination.
15 Q  Or harassment?
16 A  We just haven't had that many.  These are the only two
17      I can think of at this point.
18 Q  Are you familiar with an individual by the name of
19      Diane DeSimone?
20 A  Yes.
21 Q  Is she an employee or was she an employee on
22      September 1, 1999, of CNA?
23 A  Yes.
24 Q  Did she ever file, with you, a complaint of harassment

31

1   by a coworker?
2 A  I want to make sure I know what you mean by
3     "harassment."
4 Q  A threat of physical violence would be one part of
5     it.  I'm asking -- I'm going to ask you for the
6     specifics if you have a recollection.
7 A  Let me tell you my recollection of it.  Two females
8     got into an argument, and we had to sit down and talk
9     to them about it.  That's what I remember of that.
10 Q  That's all you remember?
11 A  Yes.  That's what I remember of that.
12 Q  Who was the female that got into the argument with --
13 A  I can't remember the name of the employee.
14 Q  Do you remember the race of that employee?
15 A  White female.
16 Q  Ms. DeSimone, do you know her race?
17 A  White female.
18 Q  Do you remember the nature of Ms. DeSimone's
19     complaint?
20        MS. BLAKLEY:  Object to the form of the
21        question.
22 A  What I remember about the incident was that there were
23     two.
24 Q  Go ahead.

32

1 A  That there were two females that were arguing with
2     each other, and we basically got the side of each
3     story from each one of them.  Couldn't figure out
4     exactly what they were debating about.  Had a
5     conversation and said that, Here are our policies and
6     procedures.  Unprofessional conduct in the work place
7     is unacceptable, and that was the end of that
8     situation.
9 Q  Did Ms. DeSimone tell you that -- I'm sorry.  Did you
10     tell me the name of the coworker?
11 A  If you recall the name, I'm sure I'll remember it.
12 Q  I don't know.
13 A  I see the person's face, but I don't know the name of
14     the employee.
15 Q  I don't have the name.
16 A  If I think of it, I'll...
17 Q  Okay.  Did Ms. DeSimone report to you that this
18     coworker threatened to beat her up?
19 A  Threatened to beat her up?  You know, I can't remember
20     the real nature of that incident.  So, I can't answer
21     that that way.
22 Q  Do you remember that Ms. DeSimone reported to you that
23     she was -- the coworker was scaring her?
24 A  No.

DEPOSITION OF CHARLES EDWARDS

---

33

1  Q   Did you investigate Ms. DeSimone's complaint?
2         MS. BLAKLEY:  Object to the form of the
3     question.
4  A   Yes.
5  Q   What action did you take to investigate her complaint?
6  A   I talked with her and the person that was involved in
7     that particular incident.
8  Q   Do you remember what Ms. DeSimone told you?
9  A   No.  I really can't remember that incident.  That
10    happened when?  Are we saying --
11 Q   September 1, 1999, or thereabouts.
12 A   I can't remember the specifics of that.
13 Q   Would you have any documents that would help refresh
14    your recollection regarding either the complaint or
15    your investigation or both?
16 A   Probably not.
17 Q   Do you remember -- so, you don't remember what the
18    specific nature of her complaint was?
19 A   No.  What I do know is that as we -- as we went
20    through talking with her and the other person, we
21    found that they were very good friends who had -- what
22    I do remember about that, who you had just -- one had
23    had a wedding and one was on the wedding party, and
24    there were some debates between them that we wanted

---

34

1     them to resolve right away.  So, we didn't view it as
2     something that we needed to document.
3  Q   Was there any discipline meted out to either
4     individual as a result of this complaint?
5  A   No.
6  Q   Are you familiar with an individual by the name of
7     Marilyn Barrett?
8  A   Yes.
9  Q   Who was she?
10 A   Marilyn Barrett is an employee in our -- she's in our
11    claims department.
12 Q   In or about December 14, 1998, did she complain to you
13    or anyone else at CNA that she was being harassed at
14    work?
15        MS. BLAKLEY:  Object to the form of the
16    question.
17 A   Yes.
18 Q   Do you remember the nature of Ms. Barrett's complaint
19    of harassment?
20 A   She was receiving phone calls from someone outside the
21    organization.
22 Q   I see.
23 A   We basically turned that over to corporate security
24    without any investigation on our part at all.

---

35

1  Q   So, that was the extent of your involvement?
2  A   Yes.
3  Q   Now, when do you determine to investigate a complaint
4     by an employee, yourself, or to turn the matter over
5     to corporate security?
6  A   I will always investigate, myself, in terms of
7     investigation, and I'll describe it as:  If someone
8     comes to me with a complaint, I'll try to get the
9     facts, talk to whoever I need in order to get the
10    facts.  If at that point in time -- determine how
11    we're going to resolve it.
12 Q   Are you aware of a CNA corporate policy that requires
13    threats of violence must be investigated -- initiated
14    by corporate security?
15 A   Yes.
16 Q   Did Barbara Connick report a threat of violence to
17    you?
18 A   Yes.
19 Q   But you didn't turn that matter over to corporate
20    security, did you?
21 A   Yes.  I did.
22 Q   Did corporate security investigate her complaint?
23        MS. BLAKLEY:  Object to the form of the
24    question.  Lack of foundation.

---

36

1  A   I don't know what they would determine in
2     investigating, but they heard the complaint from me
3     and gave me advice on how to proceed.
4  Q   Did anyone else, other than yourself, investigate
5     Barbara Connick's complaint?
6  A   No.
7  Q   Let me show you this document.
8         MR. WILGOREN:  I'm sorry.  Let's have this
9     marked.
10        (Photocopy of Reporting Misconduct
11    Policy marked as Exhibit No. 2 for identification.)
12 Q   Let me show you, Mr. Edwards, what's been marked as
13    deposition Exhibit No. 2 and ask if you can identify
14    this document.
15 A   Yes.  I can.  I'm looking at a document that is a part
16    of our commitment to professional conduct and gives --
17 Q   That's what you identified as Exhibit 1?
18 A   Yes, and gives direction on reporting misconduct.
19 Q   Do you see there where it says, "If your concern
20    relates to theft, fraud, threat of violence or the
21    like, contact corporate security through the
22    compliance hotline.  Managers and supervisors should
23    not attempt to investigate these situations.  These
24    investigations must be initiated by corporate

---

37

1    security."

2 A  Yes. I see that. However --

3 Q  That's all the question. Was Barbara Connick's
4    complaint investigation initiated by corporate
5    security?

6 A  It was elevated to corporate security.

7 Q  You just told me you were the only one who
8    investigated Barbara Connick's complaint. Tell me how
9    it was elevated to corporate security.

10 A  I will. Several times now I've asked you to explain
11    to me what you mean by "conflict" or what you mean by
12    "investigation," and I will again ask you what you
13    mean by "investigation."

14        I don't know what corporate security may
15    have done on their own. I know my responsibility is
16    to elevate it to them and then let them do what they
17    need to do. In this case, they gave me advice on what
18    I needed to do.

19        Now, if they investigated the case or not
20    depending upon what you mean by "investigation," did
21    they talk to witnesses and that whole thing, I think
22    that you would probably have to talk to corporate
23    security to find that out. I think they gave me
24    instructions enough to move forward where they

38

1    probably did not need to do that.

2 Q  So, to your knowledge, other than giving you advice
3    moving forward, corporate security did not investigate
4    this matter in any way?

5        MS. BLAKLEY: Object to the form of the
6    question.

7 A  That's correct, and I would tell you that in my
8    position in the corporation, I would respect corporate
9    security if something is elevated to them that they
10    make a determination as to whether or not they should
11    go further or not.

12        I would also tell you that this document
13    gives instructions to employees, managers, and
14    supervisors, and it does not say that human resources
15    should not attempt to investigate. We are trained to
16    do that.

17 Q  But it does say in no uncertain terms, "These
18    investigations must be initiated by corporate
19    security."

20 A  I would --

21        MS. BLAKLEY: The document speaks for
22    itself. Let's not argue about it.

23 A  I would --

24 Q  Okay. Now, did you become aware at any time that

39

1    there were problems in the Mass. auto department among
2    the employees?

3 A  I became aware of problems in the Mass. auto unit when
4    Abbi Laushine had a conversation with me about this
5    issue with Barbara Connick.

6 Q  Prior to that time, had you had any discussions with
7    Abbi Laushine or Laura Nicholas about any problems in
8    the Mass. auto lines department among the employees?

9 A  No.

10 Q  So, no conversations about personality conflicts --

11 A  No.

12 Q  -- or mistreatment by one employee of another?

13 A  No.

14 Q  The first time, so I understand, you became aware of
15    any issues was when Barbara Connick's complaint was
16    brought to your attention?

17 A  That's correct.

18 Q  When was the first time that Barbara Connick's
19    complaint was brought to your attention?

20 A  I don't know dates, but Abbi had a meeting with Barbie
21    where she raised some issues -- issues centered
22    around, you know, conflicts within that unit, and Abbi
23    brought that back to me at that point in time.

24 Q  Was that meeting that was held between Barbara Connick

40

1    and Abbi Laushine off the premises?

2 A  That's correct.

3 Q  Could that have been sometime in the middle or end of
4    August of 1999?

5 A  Don't know.

6 Q  You have no recollection as to when that conversation
7    took place at all?

8 A  No. I don't.

9 Q  Tell me, if you will, Mr. Edwards, exactly what
10    Ms. Laushine said to you about this matter and what,
11    if anything, you may have said to her.

12 A  She said that Barbie wanted to have a confidential
13    meeting with her. Did not want her to share any
14    information in terms of what they discussed but had
15    some real concerns about personalities in the unit.
16    People on the telephone not really working and that
17    cliques were forming or something to that effect.

18 Q  Okay. Did she tell you anything else?

19 A  No. Not that I can recollect.

20 Q  Did she tell you who the individuals were in this
21    clique that were harassing her?

22        MS. BLAKLEY: Object to the form of the
23    question.

24 A  No.

41

1 Q   Did she tell you anything more specific about the
2     basis of the harassment?
3         MS. BLAKLEY:  Object to the form of the
4     question.
5 A   She never mentioned harassment at that point.
6 Q   So, she only told you there were some cliques --
7     Barbie complained about some cliques?
8 A   That's correct.
9 Q   Did she identify who were in each of the respective
10    cliques or clique?
11 A  Yes.
12 Q  How did she identify them?
13 A  She identified one person as just -- I want to say not
14    pulling her weight.  Spending a lot of time on the
15    telephone and named that particular person.
16 Q  Who was that person?
17 A  Shauna Williams.
18 Q  Do you know Ms. Williams' race?
19 A  She's an African American female.
20 Q  Do you have any further recollection about what
21    Ms. Laushine told you the first time she brought
22    Barbara Connick's complaint to your attention?
23 A  I can't think of anything else.
24 Q  Did Ms. Laushine tell you that Barbara had reported to

42

1     her that Shauna Williams stated that Barbara Connick
2     was white trash and that they would get Heather Gill
3     to beat her up?
4 A   No.
5 Q   Abbi Laushine never told you that Shauna stated,
6     "White trash.  White trashy bitch.  We'll get Heather
7     to beat her up.  Heather will have no problem beating
8     her up."
9 A   No.
10        MS. BLAKLEY:  Object to the form of the
11    question.
12 A  We're still talking about the first time Abbi came to
13    me.  Is that correct?
14 Q  Correct.
15 A  No.
16 Q  By the way, Mr. Edwards, as human resource manager
17    with all the experience you've told us about, would
18    you equate the use of the epithet by an African
19    American toward a Caucasian "White trash bitch" as
20    similar to a Caucasian using the N word to an African
21    American?
22 A  Yes.
23 Q  In fact, you told that to Barbara Connick on
24    September 16, 1999?

43

1 A   Yes.
2 Q   You have no further recollection of what Ms. Laushine
3     reported to you the first time?
4 A   No.
5 Q   What, if anything, did you tell Ms. Laushine in that
6     first conversation?
7 A   I told her that she -- we really needed to listen to
8     Barbie's issues and concerns, and I was really
9     concerned about the fact that someone is not pulling
10    their weight and whether or not we knew if that was
11    accurate or not.  If we did not know that, we needed
12    to find that out.
13 Q  Did you instruct Ms. Laushine to determine who was
14    pulling their weight and who wasn't?
15 A  Yes.
16 Q  Did she do so?
17 A  Yes.
18 Q  Did she report back to you what she did to determine
19    who was pulling their weight and who wasn't?
20 A  Not immediately.
21 Q  When did she do so?
22 A  It was several weeks later before she actually learned
23    that we did not have production standards and that we
24    needed to put some in place and how we were going to

44

1     go about determining what those production standards
2     should be.
3 Q   So, she reported to you she was unable to determine
4     whether or not Barbie's complaints were valid?
5 A   Yes.  We did not have production standards in the unit
6     at that time.
7 Q   When was that conversation?
8 A   That conversation took place when she had the
9     conversation with Barbie, and Barbie had concerns
10    about people not pulling their weight.
11 Q  I'm sorry.  Maybe I wasn't clear.  You indicated that
12    Ms. Laushine reported to you Barbie's first complaint
13    some indeterminate time.  You advised Ms. Laushine to
14    determine whether those complaints were accurate with
15    respect to who was doing the work and who wasn't?
16 A  Right.
17 Q  Am I okay so far?
18 A  That's correct.
19 Q  Several weeks later, Ms. Laushine reported back to you
20    that she was unable to determine --
21 A  No.  Not several weeks later.  I'm sorry.  I may have
22    taken you down the wrong path here.  She needed to go
23    back immediately and determine whether or not we could
24    tell whether people were pulling their weight.

**DEPOSITION OF CHARLES EDWARDS**

**45**

1　　　　So, within a matter of days, she got back to
2　me to say, We don't have production standards and I
3　need to figure out how to put them in place, and we
4　started to work toward that at that time.
5　Q　Did you put production standards in place?
6　A　Yes.
7　Q　What types of standards were put in place?
8　A　We mainly focused on the area of our raters at that
9　point in time. So, we put a production standard of 12
10　items per day in place with them shortly after our
11　meeting with Barbie -- her meeting with Barbie.
12　Q　Her first meeting?
13　A　Right.
14　Q　Barbie was a rater?
15　A　No. She's not a rater.
16　Q　What was her position?
17　A　We would -- her title would be general clerk for us or
18　sometimes we change it. It may have been data entry
19　operator.
20　Q　Why did you determine that you needed to set standards
21　first for the rater position?
22　A　First of all, we should always, as an organization,
23　have standards, and I didn't realize we didn't until
24　that point in time. Secondly, we need to be able to

**46**

1　justify to anyone -- if someone makes the allegation
2　that someone is not pulling their weight, we need to
3　be able to say, Yes, they are; or No, they are not.
4　That's why I was really concerned about that.
5　Q　Is Shauna Williams a rater?
6　A　Yes.
7　Q　She was at that time?
8　A　Yes.
9　Q　When did those standards become effective?
10　A　I don't know dates.
11　Q　After they became effective, did you review Shauna
12　Williams' productivity?
13　A　Yes.
14　Q　What was the result of that review?
15　A　She was below standard.
16　Q　Did you review Barbara Connick's work performance?
17　A　We didn't put standards in place for her unit, I
18　believe. It's a little more difficult to do, I think.
19　Q　You have performance reviews, I take it?
20　A　That's correct.
21　Q　There is a one to five rating?
22　A　One to four.
23　Q　What's one?
24　A　One is consistently exceeding your production

**47**

1　standards.
2　Q　Do many people get ones in the Quincy operation?
3　A　About five percent, I would say.
4　Q　If I told you Barbara Connick's most recent evaluation
5　was a two, would you have any reason to dispute that?
6　A　No.
7　Q　What's a two?
8　A　Two is meeting and sometimes exceeding.
9　Q　Do you have a recollection as to what Shauna Williams'
10　performance rating was in 1999?
11　A　No.
12　Q　Have you told me everything about your first contact
13　with Abbi Laushine and your response?
14　A　I believe that I have.
15　Q　What was the next time that you became aware that
16　there was a problem or a continuing complaint by
17　Barbara Connick of harassment?
18　A　I received a phone call from Abbi Laushine while I was
19　in Farmington, Connecticut, telling me that there was
20　an issue that she needed to talk to me about.
21　Q　Do you remember the date of that phone call?
22　A　No. I don't.
23　Q　If I told you September 16, 1999, would you have any
24　reason to dispute that?

**48**

1　A　No.
2　Q　Tell me, sir, as best you can recollect, what
3　Ms. Laushine said to you and what, if anything, you
4　said to her.
5　A　She told me that there had been an incident in the
6　office where Barbie and Shauna had had a confrontation
7　and that Barbie had talked to her and was very upset
8　because she believed that Shauna had called her white
9　trash and said that she was going to have someone to
10　get her in the parking lot.
11　　　　So, I immediately asked Abbi to go get
12　Barbie and bring her into a conference room so that I
13　could speak with her, and I believe they actually came
14　into my office. I'm not really sure.
15　　　　I then began my investigation at that point
16　by asking Barbie to walk me through what had happened
17　that day, and she began to tell me that there was a
18　conversation where an employee was calling someone
19　stupid or dumb or something of that nature.
20　　　　She said to the employee, You ought to be
21　shot for that. That conversation -- For saying that,
22　I think she said. I may not have all of this exactly,
23　but I'm trying to give you the gist of the
24　conversation.

49

1    I think the conversation then moved to
2 across the building near the file room area, which is
3 across the hall from where both employees would have
4 sat.
5    There was a conversation that took place
6 there that was dispersed and went back to the desk,
7 and as Barbie was sitting, she heard Shauna Williams
8 on the phone saying to someone, I'm talking about that
9 piece of white trash that sits behind me or whatever.
10 Something of that nature. She doesn't know who I am
11 and I'll have her taken care of in the parking lot --
12 in the parking garage. So, that was the conversation
13 she gave me.
14 Q  That was everything she told you, to your
15    recollection?
16 A  No. It wasn't, but it was as much as I can remember
17    of the conversation. There was a lot of conversation
18    that went on, but the basic facts that I was looking
19    for is: That there was a racial slur that had been
20    made, and secondly, that there was a threat and I
21    needed to get that resolved.
22    I asked her, Was there anybody that heard
23 Shauna make those threats. Her response to me was,
24 No.

50

1    She didn't think so. So, she seemed very
2 upset. So, I said to her, I think you should go home
3 and take the rest of the day off and try and take care
4 of this and get back to you as quickly as I can, but I
5 do want to talk to Shauna. Are you okay with that?
6 She said, Fine.
7    Do you want me to continue?
8 Q  Yes. I want you to give me the entire conversation.
9    What you said, what she said, what Ms. Laushine said,
10    as you can remember it as we sit here today.
11 A  She left the room. We brought Shauna in. I asked her
12    to tell me what had happened. She told the basic
13    story that Barbie had told leaving out the threat and
14    the racial slur.
15    My comment to her was: Did you at any time
16 make a statement that -- on the telephone about white
17 trash sitting behind you and that you were going to
18 take care of her in the parking lot because she
19 doesn't know who she's messing with, and she denied
20 that statement.
21    We wanted to know who was she on the phone
22 with. She said she was upset after the conversation
23 and called her husband, and so at that point in time,
24 I instructed her about our policy and procedure as it

51

1 relates to racial slurs, threats, and that she could
2 be terminated immediately for this and that I was
3 going to investigate this further, and I would get
4 back to her as soon as possible.
5    I asked her did she know of anyone that was
6 sitting around or anybody that we could talk to that
7 could validate any of this. She didn't have any
8 witnesses other than the people that were involved in
9 those conversations that they were in.
10    I then got off the phone with her and
11 immediately called corporate security. Reported the
12 incident to them.
13 Q  Who did you speak to in corporate security?
14 A  Larry Schroeder.
15 Q  What is Mr. Schroeder's position?
16 A  He is the director of corporate security. I think in
17    that particular -- in that particular conversation
18    with Barbie, she was really frightened about not only
19    the work place but at home as well, and I remember
20    sharing that conversation with Larry Schroeder and
21    asking his advice on what to do.
22    So, his instructions were to instruct her to
23    call the local police if she was frightened about
24    being at home and that if I thought it was necessary

52

1 to call the Quincy police, to do that as well if I
2 thought this was an unsafe environment for her.
3    I then got on the phone and talked to Debbie
4 Nutley about the incident and to get instructions from
5 her as to where do I proceed with this at this point.
6 Q  Tell me, sir, if you will -- have you told me the
7    essence of your conversation with Mr. Schroeder?
8 A  Yes.
9 Q  By the way -- let me go back. When you heard Barbie
10    say that she had said to an employee, You should be
11    shot, did you understand what she meant when she was
12    saying that?
13    MS. BLAKLEY:  Object to the form of the
14    question.
15 A  I just want to make sure I understand. Did I
16    understand what she meant?
17 Q  You didn't think she was threatening to actually shoot
18    that person with a gun, did you?
19 A  No.
20 Q  You understood it, is it fair to say, that that was a
21    colloquialism that, you know, that was a terrible
22    thing to say. Is that basically what you understood
23    the context of, You should be shot?
24 A  I can't answer that question yes or no, but what I can

53

1   say to you is that that was not a concern of mine at
2   that point in time because she was the person that was
3   complaining.
4       If another employee would have walked into
5   my office at the time and said to me, I'm afraid
6   because Barbie said that I should have been shot, that
7   would have been a serious issue for me, but at the
8   time, the issue was that there was a racial slur and
9   threat.
10  Q  Did any employee ever complain about Barbie's
11     statement?
12  A  No.
13  Q  In fact, Barbie explained to you what she meant by
14     that, did she not?
15  A  No.  She didn't.  We didn't discuss that.
16  Q  Not at any time?
17  A  No.
18  Q  Tell me what you said to Debbie Nutley and what she
19     said to you, if anything.
20  A  I told Debbie Nutley basically what I just told you;
21     that the incident had happened.  Told her what I had
22     done at that point in time, and then we had a
23     discussion about it.  Debbie asked several questions
24     about the incident, and I responded to the best of my

54

1   ability.
2   Q  Do you remember the questions she asked?
3   A  Debbie wanted to know who said, you know -- whether or
4      not -- let me see.  To the best of my recollection,
5      she wanted to know whether or not we had had any other
6      incidents from either person.  My answer to that was:
7      No.  Did any employee appear, to the best of my
8      knowledge, to be violent?  The answer to that was:
9      No.
10      Were there witnesses that we could talk to
11     about the incident?  The answer is no.  There are
12     none.  So, she told me that -- and I told her that I
13     sent Barbie home, and so she said to me, Let's just
14     wait and see how Barbie is with this once you give her
15     the information that you have come up with and then
16     we'll take it from there.
17  Q  Did she tell you the time that Gretta Thomas had
18     threatened to beat her up?
19  A  No.
20  Q  Do you recall her saying that Shauna threatened to
21     have Heather Gill beat her up?
22  A  No.
23  Q  Do you recall Abbi saying to you, Do you remember
24     Charles?  I told you about that one.

55

1       MS. BLAKLEY:  Object to the form of the
2   question.
3   Q  Referring to the threat by Heather Gill to have her
4      beaten up.
5   A  No.
6   Q  Abbi Laushine never reported to you that Barbie had
7      told her that Heather Gill -- that Shauna had
8      threatened to have Heather Gill beat her up?
9       MS. BLAKLEY:  Object to the form of the
10  question.
11  A  No.
12  Q  After you finished speaking with Debbie Nutley, what
13     steps, if any, did you take next in your
14     investigation?
15  A  What I did at that point in time was have a
16     conversation with Abbi because she's a new unit
17     manager.  Had not gone through any of the training
18     that managers would go through.  I informed her to
19     have a very close and watchful eye in her unit at this
20     point in time because I thought that there was some
21     serious issues there.
22      I wasn't sure how this particular issue was
23     going to work out because we had one employee who had
24     a complaint and another one denying it.  So, she had

56

1   to be very, very conservative in any steps she would
2   take with anybody in her unit.
3       Don't do anything -- anything that comes up,
4   you need to bring it to my attention and get me
5   involved here so I can help you through this.  I just
6   wanted to make sure she was okay because I was now at
7   a point where I thought there may be some serious
8   issues based upon the statement that Barbie had given
9   me.
10  Q  What actions, if any, did you take to pursue the
11     investigation of Barbie's complaint of racial
12     harassment?
13  A  At that point in time, I didn't do anything else.  We
14     had one employee's word against another.  Barbie was
15     going away for a day.  We were going to make sure that
16     we put these production standards in place.  The
17     conversation that they were having back and forth led
18     me to believe that there should probably be some more
19     teaming training there.
20  Q  What does that mean, "teaming training"?
21  A  Employees getting along with each other.  So, we
22     probably needed to initiate some of that, and we do
23     have some very formalized courses that we could take
24     some people through, and some of them are informal in

DEPOSITION OF CHARLES EDWARDS

---

**57**

1  terms of sitting down and just having general
2  conversation with how people should get along with
3  each other. It was obvious that there was some
4  personality differences there.
5  Q  What happened next? Did you conduct any further
6     investigation into Barbara Connick's complaint of
7     racial harassment?
8  A  No. Not at that time.
9  Q  At any time?
10 A  No.
11 Q  Did Barbara Connick ask you to interview particular
12    potential witnesses?
13 A  No.
14 Q  She didn't ask you to interview Lisa Wright?
15 A  No.
16 Q  Or Doris Chan?
17 A  No.
18 Q  She didn't tell you Todd Stansbury was sitting right
19    nearby when Shauna Williams had made the statement,
20    White trash bitch, and he may have heard the
21    conversation?
22 A  I don't recall that.
23 Q  Did you interview Todd Stansbury?
24 A  No.

---

**58**

1  Q  Did you interview Margie Fleming?
2  A  Who?
3  Q  Margie Fleming?
4  A  Don't know her.
5  Q  Joan O'Brien?
6  A  I don't think she was in the organization at the time.
7  Q  Janet Boudreau?
8  A  Jean, no.
9  Q  You didn't interview her?
10 A  No.
11 Q  Maura Capplis?
12 A  No.
13 Q  Gina Antoine?
14 A  No.
15 Q  Ferard Millette?
16 A  Gerard, no.
17 Q  Barbara told you she was on the telephone and made
18    this threat, White trash bitch. Saying in front of
19    her, We're going to get someone and get her in the
20    parking lot?
21    MS. BLAKLEY: Object to the form of the
22    question.
23 Q  Barbara reported that to you?
24 A  Yes.

---

**59**

1  Q  Do you know about what time it was when you spoke to
2     Barbara Connick?
3  A  No. I don't.
4  Q  Was it in the morning or afternoon?
5  A  I kind of want to say in the afternoon. I could be
6     wrong on that. I just don't recollect the time.
7  Q  Did you make any efforts to check Shauna Williams'
8     telephone records?
9  A  No.
10 Q  Why not?
11 A  I don't know what that would have told me.
12 Q  Well, perhaps it could have told you -- it could have
13    corroborated Shauna Williams' story that she spoke to
14    her husband or Barbara Connick's version that she
15    spoke to someone else and made the threat, wouldn't
16    it?
17    MS. BLAKLEY: That's not a question. That's
18    argumentative. Why don't you ask a question.
19 Q  Is it possible that, had you checked the telephone
20    records, it could have corroborated either Barbara
21    Connick's version of the events as to who Shauna
22    Williams was speaking to or Shauna Williams' version
23    of the events as to who she was speaking to?
24    MS. BLAKLEY: Objection.

---

**60**

1  A  I don't know.
2  Q  If you looked at the telephone records, you would have
3     seen who she was speaking to or what number she dialed
4     during the day, correct?
5  A  I have never looked at a telephone record since I've
6     been at CNA.
7  Q  That's not the question, sir.
8     MS. BLAKLEY: I think -- you didn't let him
9     finish because I think it was the answer.
10    MR. WILGOREN: I didn't ask him whether he
11    looked at the telephone records. I said, If he looked
12    at the records --
13    MS. BLAKLEY: He was in the middle of the
14    answer. Let's let him finish the answer. Then if
15    you're not happy, you can ask the question again.
16    MR. WILGOREN: By all means.
17 Q  I'm sorry. You want to complete your answer?
18 A  Repeat your question.
19 Q  Let me see if I can do it. Tax my aged memory. Have
20    you ever looked at any phone records before?
21 A  No.
22 Q  Telephone bill?
23 A  A telephone bill I have.
24 Q  Telephone bills show calls that are made?

---

SCRUNCH™

Pages 57 - 60
15

61

1       MS. BLAKLEY: Object to the form of the
2  question and lack of foundation.
3  A  Yes, however --
4       MS. BLAKLEY: You only need to answer the
5  questions.
6  Q  If you had looked at Shauna Williams' telephone
7  records for September 16th, it would have told you the
8  telephone number she dialed on the day?
9       MS. BLAKLEY: Object to the form of the
10 question and lack of foundation.
11 A  I don't know the answer to that.
12 Q  You don't know?
13 A  No.
14 Q  Do you know whether or not CNA maintains telephone
15 records?
16 A  I believe that we do. However, I don't know if they
17 are itemized or not.
18 Q  So, you didn't consider that that would have been an
19 important element in the investigation?
20 A  No.
21 Q  Despite the fact that you had two diametrically
22 opposed stories?
23 A  Correct.
24      MS. BLAKLEY: Objection.

62

1  Q  One individual telling you that Shauna Williams was
2  speaking to someone making the threat, White trash
3  bitch. We're going to get someone in the garage, and
4  Ms. Williams saying she was speaking to her husband?
5  A  That's correct.
6  Q  Okay. Did you take any other steps to try to
7  determine who was telling the truth between these two
8  diametrically opposite stories?
9  A  No. Not at this time.
10 Q  At any time?
11 A  No. There was no witnesses involved. The answer is
12 no.
13 Q  Did you make any determination as to who you believed
14 was telling the truth?
15 A  Yes. I did.
16 Q  What was that determination?
17 A  My determination is that during the time that I had
18 known Barbie, that I had never known her to not tell
19 me the truth about anything; and during the time I had
20 known Shauna Williams, there was no reason for me not
21 to believe that she was making an accurate statement
22 as well. That was my determination.
23 Q  So, your determination is you couldn't conclude who
24 was telling the truth?

63

1  A  Exactly.
2  Q  What further actions or efforts did you take to
3  investigate this matter, if any?
4  A  None at that time.
5  Q  At any other time?
6  A  No.
7  Q  Did you have a further conversation with Barbara
8  Connick?
9  A  Yes.
10 Q  When was the next time after September 16 you spoke to
11 Barbara Connick?
12 A  Don't remember dates. However, I was in New Jersey,
13 and Barbie gave me a phone call, and she told me that
14 there were some employees that were making a mockery
15 of her and I asked her to give me an example of that.
16      She said it was two employees. Shauna
17 Williams was involved. I can't remember the other
18 employee, but one employee said, and I really can't
19 remember exactly but something along the lines of, I'm
20 going to tell on you, and other employees said, Are
21 you really going to tell on me? Go right ahead. I
22 don't care if you do tell on me.
23      It was along those lines. She was very
24 upset about it.

64

1  Q  Did you take any steps to investigate that?
2  A  Yes. At that point in time -- she also stated to me
3  that she was really, really nervous and afraid for her
4  life and that she was -- I recall her saying that she
5  was going to the post office, and she was worried
6  about getting a bullet in her head or getting shot or
7  something of that nature.
8       I then got off the telephone. Again called
9  Larry Schroeder to give him the statement just to find
10 out whether or not there was anything else that I
11 needed to do. Let him know that we -- that Barbie had
12 already contacted the police in her own community and
13 the police in Quincy. I received a phone call from
14 the police in Quincy.
15      Just asked him was there anything further
16 that we should be doing. At that point, he told me,
17 No.
18      I got back on the phone with Debbie Nutley
19 and shared with her the statement that Barbie had made
20 to me, and from that conversation, she wanted to know
21 who -- repeat the whole thing back to her from the
22 beginning and I did.
23      She asked me to find out who made the
24 statement about, You ought to be shot. I called

DEPOSITION OF CHARLES EDWARDS

**65**

1   Barbie back just to make sure I understood exactly who
2   made that statement. She told me -- I got back on the
3   phone with Debbie and gave her that information, and
4   after a long conversation, we decided that we needed
5   to have a meeting with the entire department and set
6   up the expectations in terms of personal conduct,
7   behavior, racial slurs, that whole piece and make sure
8   that we had our expectations in place for our
9   employees from a production standpoint because I still
10  had that concern. That was the gist of that
11  conversation.
12 Q  What happened next?
13 A  The next thing I remember with this particular
14  incident is us coming back and actually having the
15  meeting with the employees.
16 Q  Who talked during that meeting?
17 A  Our agenda had three people on the agenda. One was
18  Jim Martin, who is the chief underwriting officer who
19  had recently come to the organization. So, his role
20  was to introduce himself and tell the unit of his
21  expectations of every employee there.
22      Then we wanted Abbi -- Abbi Laushine, who is
23  the unit manager, to give her expectations as a unit
24  manager and to be specific in terms of some of the

**66**

1   things that were happening in the unit that certainly
2   were not going to be tolerated any further; and then
3   my role was actually going to be to just make sure
4   that the -- the two ahead of me communicated the
5   expectations the way the corporation needed them to be
6   communicated.
7       However, at that point in time, I didn't
8   feel that the direction was strong enough. So, I then
9   added my version of what expectations should be like
10  based upon our policies and procedures as it relates
11  to conduct, racial slurs, and threats.
12 Q  I see. Were there any questions asked during the
13  course of the meeting?
14 A  There were some questions. There were a few people
15  who had just moved into the unit and actually wanted
16  no part of it, and their questions were, Why am I
17  here?
18 Q  Any others?
19 A  No.
20      MS. BLAKLEY: Excuse me. Can we take a
21  break when it's convenient?
22      MR. WILGOREN: Sure. Why don't we stop
23  right now.
24      (A recess was taken.)

**67**

1       MR. WILGOREN: Back on.
2 Q  Were there questions from these individuals -- further
3   questions such as, Why weren't the particular
4   individuals who were at fault addressed individually
5   rather than in an entire group meeting?
6 A  I believe the answer to that is yes.
7 Q  What was your response to that question?
8 A  My response was, Your unit is a team. I don't want to
9   assume that anyone knows anything at all as it relates
10  to harassment, discrimination, misconduct. I just
11  want to be sure that everybody understands what the
12  expectations are.
13 Q  Now, you testified you didn't conduct any further
14  investigation. Did you ever tell Barbara Connick that
15  CNA promotes personal phone calls?
16 A  Yes.
17 Q  Does CNA promote the use of company time to engage in
18  personal phone calls?
19      MS. BLAKLEY: Object to the form of the
20  question.
21 A  Yes. The way that I used that statement was that we
22  are not going to terminate someone because they are on
23  the telephone. However, if it interferes with their
24  production at work and how they do their job, then we

**68**

1   will.
2       I encourage the use of the phone to call
3   family members, you know, to talk to a child, a
4   husband or whatever. We are not going to tell people
5   they can't use the phone to do that.
6 Q  If Shauna Williams had made the statements attributed
7   to her by Barbara Connick, would she be terminated?
8       MS. BLAKLEY: Object to the form of the
9   question.
10 Q  If you could corroborate she had made those
11  statements?
12 A  Repeat your question.
13 Q  Barbara Connick told you Shauna Williams called her,
14  White trash bitch, and she was going to get somebody
15  to get her in the garage, right?
16 A  (Witness nods.)
17 Q  If you were able to corroborate that story, would CNA
18  require Shauna Williams' termination?
19 A  If we were able to corroborate or prove that that was
20  true, yes. Our recommendation would have been to
21  terminate.
22 Q  But given the state of events, you felt no obligation
23  to make a determination faced with two diametrically
24  opposed stories to determine which individual was

DEPOSITION OF CHARLES EDWARDS

69

1    telling the truth and which individual was lying?
2         MS. BLAKLEY: Object to the form of the
3    question.
4  A  I have an obligation to make that determination.
5    However, I couldn't at that time.
6  Q  Could you at any time in this matter?
7  A  At any time during this matter, I was not able to say
8    to anybody that this person or that one needed to be
9    terminated.
10 Q  Could you, at any time from the time it was reported
11   up until today, reach a conclusion as to whether
12   Barbara Connick was telling the truth or Shauna
13   Williams was telling the truth?
14        MS. BLAKLEY: Object to the form of the
15   question.
16 A  Could you repeat the question again?
17 Q  Have you, at any time from the time Barbara Connick
18   reported the incident to you up until today, been able
19   to determine who was telling the truth as between
20   Ms. Connick and Ms. Williams?
21 A  No.
22 Q  Aside from the statements on the 16th of September
23   regarding what Ms. Connick reported to you that she
24   claims Ms. Williams said, it's your testimony that you

70

1    had no knowledge of any other threats or statements --
2    racially harassing statements toward Ms. Connick?
3  A  Repeat that again.
4  Q  Aside from the single statement that Barbara Connick
5    reported to you that Shauna Williams said, White trash
6    bitch. White trash bitch sitting in front of me.
7    We're going to get someone to get her in the garage,
8    it's your testimony that Barbara Connick never
9    reported any other racially harassing statements to
10   you?
11 A  Before I answer that, I noticed that you've indicated
12   the statement, White trash bitch, several times.
13 Q  Right.
14 A  I don't recall that phrase. I recall Barbie saying to
15   me that Shauna said, I'm talking about that piece of
16   white trash sitting behind me. I never heard her say,
17   White trash bitch. I just wanted to --
18 Q  Does it make any difference?
19 A  No. It doesn't but you had said that several times,
20   but I just wanted to tell you.
21 Q  Thank you.
22 A  No one has ever reported any statements other than
23   that.
24 Q  So, there were no statements that came to your

71

1    knowledge about Heather Gill making any racially
2    harassing statements?
3         BARBARA CONNICK: Gretta Thomas.
4  Q  Or Gretta Thomas?
5  A  No.
6  Q  Did you have a discussion somewhere around the end of
7    September with Paul Connick?
8  A  Yes. Is this Paul, the husband?
9  Q  Yes.
10 A  Yes. I did.
11 Q  Tell me, as best you can recollect, who initiated that
12   conversation?
13 A  I don't know who initiated the phone call. However, I
14   was on the phone with Barbie, and I believe Paul
15   wanted to speak with me and my concern at that point
16   in time is that, as a human resources person, I want
17   to deal specifically with the employee and not with
18   the spouse, you know, or relative, and I was really
19   reluctant to talk to Paul at the time.
20        However, being a husband, I understand what
21   his issues would be with a spouse. So, I agreed to
22   talk with him, and the conversation centered around
23   what had been said and I basically told him that
24   Barbie had lodged a complaint, and I had talked with

72

1    another person.
2         The person had denied it and so we have one
3    person's word against another, and I was going to try
4    to work through that the best I could. His concern
5    was that whether or not I could assure his wife was
6    going to be safe.
7         I tried to assure him that I believe that
8    the work place was safe and that we would take every
9    measure possible to make sure that Barbie was taken
10   care of inside our work place.
11 Q  Did you tell him that you couldn't guarantee Barbie's
12   safety in the work place?
13 A  I don't know if I used the term "can't guarantee" or
14   not. However, I do remember him having a real concern
15   about her safety and that I have wanted to, to the
16   best of my ability, let him know that I thought we had
17   a safe environment.
18 Q  Any further involvement on your part with Barbara
19   Connick's complaint after that conversation?
20 A  Not other than the fact that, after that period of
21   time, Barbie was out, I believe, on short-term
22   disability, and then the only pieces we had at that
23   point in time, if I can remember -- if I've got this
24   in order, is as it relates to her short-term

73

1  disability.
2 Q  You did receive a letter from myself?
3 A  Yes. Correct.
4 Q  What actions, if any, did you take when you received
5     that letter?
6 A  When I received that letter, I immediately faxed it to
7     our employee relations.
8 Q  Debbie Nutley?
9 A  Right.
10 Q  Did you have discussions with any members of
11     management at Quincy or corporate security or the
12     employee relations about how to resolve Barbie
13     Connick's complaints?
14 A  I'm leading -- I lead the process in terms of
15     investigation. So, in terms of leadership within the
16     branch, I would be giving them instructions on what
17     we're doing. So, I kept them informed as we went
18     along as to what needed to be done. I've already
19     given you the discussions I've had with corporate
20     security and Debbie Nutley. So, I'm trying to figure
21     out how to answer that question.
22 Q  Let me ask the question: How was Barbie Connick's
23     complaint resolved?
24 A  The complaint has not been resolved.

74

1 Q  Was it dropped?
2 A  No. It hasn't been dropped. She had a complaint on
3     the table about an employee, and she left and went out
4     on short-term disability. That stops at that point in
5     time until -- we can't do anything until she returns
6     back to work.
7 Q  You can't continue to investigate the complaint?
8 A  I've investigated the complaint as much as I could.
9     We discussed that. There was no witnesses, in my
10     opinion, that we could go talk to at that time. We
11     had one employee's statement versus another, and there
12     was a direct conflict.
13         However, Barbie had concerns about her
14     teammates and working with them and that whole piece.
15     So, we have put training in place, laid down
16     expectations, put expectations in place from a
17     production standpoint. Those are the necessary
18     ingredients, I think, to bring a group of people
19     together versus the bickering that we may have had in
20     a unit like that.
21 Q  Other than that, no further action has been taken on
22     Barbie Connick's complaint?
23 A  No.
24 Q  Were some suggestions made to you about action that

75

1     could be taken to defuse the situation?
2 A  By whom?
3 Q  By Barbie Connick, by myself, by anyone internally.
4 A  Yes.
5 Q  What steps were suggested?
6 A  Barbie Connick suggested that we move Shauna Williams'
7     desk. That was one early on in the process. We
8     decided at that point in time that I just didn't think
9     that was the right thing to do.
10 Q  Why was that?
11 A  When you're in an environment such as ours and someone
12     comes and makes a complaint about another person and
13     their characteristics and their traits, you're not
14     eager -- at least in my training, you're not eager to
15     go and move a desk just because someone says, Move a
16     desk.
17         You want to make sure it's the right thing
18     to do. At that point in time, I didn't think we had
19     gotten far enough in resolving the problem -- not the
20     investigation but resolving the issue to move a desk.
21         The second thing was to fire Shauna Williams
22     -- by Barbie Connick. We were not going to do that.
23     You can't just fire somebody. You've got to have
24     reasons to fire them. So, I was not inclined to do

76

1     that either. So, those were the two things that I can
2     remember that were suggestions.
3 Q  You didn't think it was a good idea to separate the
4     two individuals to avoid any potential future
5     problems?
6 A  No. I didn't. Separating people in the work place --
7     putting one over there and one over there when they
8     still have to work together doesn't resolve the
9     problem. It would put a temporary fix on it, and
10     we're not into just putting temporary fixes. We have
11     to fix the problem itself.
12         If one of those people were making threats
13     or allegations of untruths, we needed to find that out
14     so that that employee is no longer a part of our
15     organization. That's how I would lead my leadership
16     team into fixing some of those kinds of problems.
17 Q  Have there been further problems in that department
18     since --
19 A  Yes.
20 Q  Could you describe those, please?
21 A  Barbie pointed out to us that there were severe
22     personality differences that we didn't realize. In
23     our investigation of -- it wasn't an investigation but
24     our management style of looking at that closer have

## 77

1   led us to believe that there are people within the
2   unit that have abrasive attitudes and probably just
3   don't treat people the way we would like for them to
4   be treated.
5  Q  In the exercise of your management style, which
6   individuals did you identify had abrasive attitudes
7   and weren't treating people the way CNA likes them to
8   be treated?
9  A  Ernest Goddard.
10 Q  Anyone else?
11 A  Grace Clemetson.
12 Q  Anyone else?
13 A  Those are the two that we are mainly focusing on at
14   this point.
15 Q  Are they both still employed?
16 A  Yes.
17 Q  Has Shauna Williams remained employed by CNA?
18 A  No.
19 Q  When was her employment terminated?
20 A  Don't know dates. I don't know the date she was
21   terminated.
22 Q  Do you know why her employment was terminated?
23 A  She voluntarily terminated.
24 Q  Did Shauna Williams threaten CNA with a lawsuit?

## 78

1  A  No. Not that I know of.
2  Q  Was she given any severance pay?
3  A  No.
4  Q  At the time she terminated, had she had a disciplinary
5   action placed in her file?
6  A  Yes.
7  Q  What discipline?
8  A  For production. Performance.
9  Q  Oral warning, written warning, what?
10 A  Written warning.
11 Q  At the time she terminated, was there pending any
12   further disciplinary action?
13 A  No.
14 Q  What would have been the next step in the process?
15 A  Our discipline process takes us through a verbal
16   warning, written action plan, probation. So, she was
17   at the written action plan, and then she would have
18   gone to probation and the next step would have been
19   termination.
20 Q  What fringe benefits are provided to employees of CNA
21   such as Barbara Connick?
22 A  Explain fringe benefits.
23 Q  Employee benefits. Health insurance, dental, 401K.
24   What's the whole package? Do you know?

## 79

1  A  An employee with CNA would receive health and dental
2   insurance.
3  Q  Fully paid by the company?
4  A  No.
5  Q  Do you know what the split is?
6  A  It's different for a family of one versus a family of
7   two or more. So, I don't recall exactly. Then the
8   choices whether or not you choose CNA's insurance
9   versus one of the HMO's. It would be different for
10   that.
11 Q  Other benefits?
12 A  Vision care, tuition reimbursement.
13 Q  401K?
14 A  401K.
15 Q  Do you know what the company match?
16 A  70 cents per dollar.
17 Q  Is there a cap?
18 A  Six percent.
19 Q  Anything else?
20 A  Not that I can...
21 Q  Now, have any other employees filed complaints with
22   you about Shauna Williams?
23 A  No.
24 Q  How about Grace Clemetson?

## 80

1  A  No.
2  Q  Gretta Thomas?
3  A  No.
4  Q  Heather Gill?
5  A  No.
6  Q  Is Heather Gill still employed?
7  A  No.
8  Q  When was her employment terminated?
9       MS. BLAKLEY: Object to the form of the
10   question.
11 A  I don't know exactly. I want to say June of '99.
12 Q  Was she, in fact, terminated?
13 A  No. She was -- we had a lay off. She was a part of
14   the lay off.
15 Q  What disciplinary action is pending or has been
16   imposed on Grace Clemetson? Do you know?
17 A  None.
18 Q  How about Gretta Thomas?
19 A  Well, can I just strike that last one?
20 Q  Sure.
21 A  When I said "none," verbal warnings is what has
22   happened for both of them.
23 Q  For performance?
24 A  For conduct.

### 81

1 Q   What was the conduct that resulted in the verbal
2     warning issued to Grace Clemetson?
3 A   Abrasiveness.
4 Q   Can you define the circumstances of the abrasiveness?
5 A   Just abrasiveness in her tone with her coworkers.
6 Q   Who brought the complaint?  Do you know?
7 A   No one brought a complaint to us.  It was Abbi's
8     observation.
9 Q   The same for Gretta Thomas?  Was it abrasiveness?
10 A   No.  Not Gretta Thomas.  We were simply talking about
11     two employees.  Grace Clemetson and Ernest Goddard.
12 Q   So, Gretta, does she have any discipline --
13 A   No.
14 Q   At the time Heather Gill was laid off, had she been
15     disciplined at all?
16 A   No.
17 Q   Has any employee in the auto department ever been
18     terminated for harassment or threats against a
19     coworker?
20 A   No.
21 Q   Did any of the other managers feel that moving Shauna
22     Williams' desk would have been a good idea to resolve
23     the situation?
24     MS. BLAKLEY:  Object to the form of the

### 82

1     question.
2 A   I believe that Abbi initially thought that that might
3     be a good idea.
4 Q   Now, getting back to your conversation with Paul
5     Connick.  Did you tell him that Shauna admitted to
6     aggression toward Barbara Connick when you interviewed
7     her?
8 A   No.
9 Q   Now, were certain document requests brought to your
10     attention; requests that I had made to your counsel to
11     provide documents?
12 A   I believe so.  Explain what documents you're referring
13     to.
14 Q   I'm going to get to that.  I have received, from your
15     attorney, a response to my document request.  One of
16     the things I asked for was documents related to
17     litigation pending or completed pertaining to
18     discrimination based on race, retaliation, and/or
19     harassment of any employees at the respondent's
20     Quincy, Massachusetts, facility during the years 1990
21     through the present time, and your counsel reported
22     that the investigation is continuing.  Are you
23     continuing that investigation at the present time?
24 A   Which investigation?

### 83

1 Q   For any -- a search for any documents.
2 A   I'm not aware.
3     MR. WILGOREN:  Off the record for a moment.
4     (Discussion off the record.)
5     MR. WILGOREN:  Back on.
6 Q   I have no further questions.
7     MS. BLAKLEY:  I just have one.
8     CROSS-EXAMINATION
9 BY MS. BLAKLEY:
10 Q   You mentioned that the company has an employee
11     relations department.  To the best of your knowledge,
12     is Debbie Nutley employed in employee relations?
13 A   Yes.
14 Q   Nothing further.
15     MR. WILGOREN:  Okay.  Thank you,
16     Mr. Edwards.
17     (Whereupon, at 11:45 a.m., the deposition was concluded.)
18
19
20
21
22
23
24

### 84

1 ATTACh TO THE DEPOSITION OF:  CHARLES EDWARDS
   CASE:  BARBARA CONNICK V CONTINENTAL CASUALTY COMPANY
2
   ERRATA SHEET
3
   INSTRUCTIONS:  After reading the transcript of your
4  deposition, please note any change or correction to your
   testimony and the reason therefor on this sheet.  DO NOT make
5  any marks or notations on the transcript volume itself.
   Please sign and date this errata sheet (before a Notary
6  Public, if required).
7  PAGE   LINE   CHANGE OR CORRECTION AND REASON
8  ____/____/ _____
9  ____/____/ _____
10 ____/____/ _____
11 ____/____/ _____
12 ____/____/ _____
13 ____/____/ _____
14
      I have read the foregoing transcript of my deposition
15 taken on August 24, 2000, and except for any corrections or
   changes noted above, I hereby subscribe to the transcript as
16 an accurate record of the statements made by me.
17
18     _____
19          (Signature of Witness)
20
   SWORN TO AND SUBSCRIBED BEFORE ME THIS _____ day
21 of _____, 2000, AT _____.
22
23 _____
24 MY COmmission EXPIRES: _____

DEPOSITION OF CHARLES EDWARDS

85

1
2       CERTIFICATE
        COMMONWEALTH OF MASSACHUSETTS
3       WORCESTER, SS.
4
5               I, Elizabeth O. Bailey, a Notary Public in
        and for the Commonwealth of Massachusetts and a Court
6       Reporter, hereby certify that there came before me on the
        24th day of August, 2000, CHARLES EDWARDS, who was duly sworn
7       by me; that the ensuing examination upon oath of the said
        deponent was reduced to typewriting under my direction and
8       control; and that the within transcript is a true record of
        the questions asked and answers given at the deposition.
9
10              I FURTHER CERTIFY that I am neither attorney
        nor counsel for, nor related to or employed by any of the
11      parties to the action in which this deposition is taken; and,
        further, that I am not a relative or employee of any attorney
12      or financially interested in the outcome of the action.
13              IN WITNESS WHEREOF, I have hereunto set my
        hand and affixed my seal of office this 31st day of August,
14      2000.
15
16
17      --------------------------
        Elizabeth O. Bailey
18      Notary Public, Commonwealth
        of Massachusetts
19      My Commission Expires
        March 29, 2002
20
21
22
23
24

DEPOSITION OF CHARLES EDWARDS

- ' -

'87 12:20
'93 5:10 12:22 27:16
'96 13:3,11 27:17,18
'97 28:4
'98 28:6
'99 16:15 80:11

- 0 -

01701 2:3

- 1 -

1 2:18 28:17,21,23 30:22
  33:11 36:17
11 29:20,23
119 3:10
11:45 83:17
12 45:9
14 6:22 7:9,11 34:12
16 42:24 47:23 63:10
16th 61:7 69:22
18 10:21 12:6
1975 6:9
1976 10:15
1990 82:20
1993 27:11
1998 34:12
1999 30:22 33:11 40:4
  42:24 47:10,23

- 2 -

2 2:19 36:11,13
20 6:4,12
2000 84:15,21 85:6,14
2002 85:19
220 27:10
24 84:15
24th 85:6
28 2:18
29 85:19

- 3 -

3 2:14
300 27:19
36 2:19

- 4 -

401K 78:23 79:13,14

- 6 -

60606 2:5
60685 2:7

- 7 -

70 79:16

- 8 -

8 29:20,23

- A -

a.m 83:17
Abbi 7:21,22 8:12 10:4
  39:4,7,20,22 40:1 42:5,12
  47:13,18 48:11 54:23
  55:6,16 65:22,22 82:2
Abbi's 81:7
ability 4:2,6 25:6 54:1
  72:16
able 22:20 45:24 46:3
  68:17,19 69:7,18
abrasive 16:22,23 17:2,5
  77:2,6
Abrasiveness 81:3,4,5,9
Absolutely 7:6
abusive 20:15,16 21:19,20,
  22 22:3
abusively 20:23
academically 11:9
acceptable 19:17
accurate 18:8 43:11 44:14
  62:21 84:16
across 49:2,3
action 7:1 22:23 23:15,16
  33:5 74:21,24 78:5,12,16,
  17 80:15
actions 56:10 63:2 73:4
actually 43:22 48:13 52:17
  65:14 66:3,15
added 66:9
address 3:8
addressed 67:4
administrative 5:24 15:24
  26:11
admit 19:21
admitted 82:5
advice 25:7 36:3 37:17
  38:2 51:21
advised 44:13
affirmative 7:1
afraid 53:5 64:3
African 41:19 42:18,20
afternoon 59:4,5
again 9:6 20:13 37:12
  60:15 64:8 69:16 70:3
against 3:20,21 15:22
  16:2,16 17:12 18:5 24:6,
  10,14,23 25:14 26:16
  56:14 72:3 81:18
age 17:10 30:3
aged 60:19
agencies 26:11
agency 5:24 15:24 26:18
  30:10
agenda 65:17,17
aggression 82:6
ago 5:9 12:3
agree 4:11
agreed 3:14 71:21
ahead 18:3 19:4 31:24
  63:21 66:4

Air 10:15,15,24 11:5,11,
  16,17,20,24
all 3:15 6:14 7:10 13:10,
  16 15:7 17:2 20:19,20
  21:11 22:2 24:17 25:3
  30:8 31:10 34:24 37:3
  40:7 42:17 45:22 48:22
  60:16 67:9 81:15
allegation 46:1
allegations 18:5,8 76:13
alleged 25:20
Allison 2:4
almost 7:12
along 23:20 56:21 57:2
  63:19,23 73:18
already 64:12 73:18
Am 21:22,23 44:17 49:10
  66:16 85:11
American 41:19 42:19,21
among 39:1,8
analyze 21:12
and/or 82:18
Ann 14:16
answer 4:7,12 11:13 15:13
  27:15 32:20 52:24 54:6,
  8,11 60:9,14,14,17 61:4,
  11 62:11 67:6 70:11
  73:21
answered 18:1
answers 4:1 23:13 85:8
Antoine 58:13
apologize 27:18
appear 54:7
APPEARANCES 2:1
April 12:20
area 6:16,20 8:7,9 9:22
  23:8,20 25:7 45:8 49:2
argue 38:22
arguing 32:1
argument 31:8,12
argumentative 59:18
around 12:21 39:22 51:6
  71:6,22
Aside 69:22 70:4
asking 18:11 31:5 48:16
  51:21
Assistant 2:6
assume 7:11 67:9
assumption 9:3,5
assumptions 8:19 20:18
assure 72:5,7
ATTACH 84:1
attached 29:12
attempt 36:23 38:15
attend 7:22
attended 7:4,10,16,23 9:8
attention 39:16,19 41:22
  56:4 82:10
attitudes 77:2,6
Attorney 2:4 82:15 85:11
attorneys 4:15
attributed 68:6
August 12:21 40:4 84:15
  85:6
Aurora 6:7,7
auto 8:8 9:11 15:3,12
  39:1,3,8 81:17

avoid 76:4
aware 35:12 38:24 39:3,14
  47:15 83:2
away 27:7 34:1 56:15

- B -

back 15:8,11 19:7 23:2
  30:7 39:23 43:18 44:19,
  23 45:1 49:6 50:4 51:4
  52:9 56:17 64:18,21
  65:1,2,14 67:1 74:6 82:4
  83:5
Bailey 85:17
Barbara 2:9 3:19 14:18
  15:6 16:11 25:8,16 26:21
  35:16 36:5 37:3,8 39:5,
  15,18,24 41:22,24 42:1,
  23 46:16 47:4,17 57:6,11
  58:17,23 59:2,14,20 63:7,
  11 67:14 68:7,13 69:12,
  17 70:4,8 71:3 72:18
  78:21 82:6
Barbie 4:23 39:20 40:12
  41:7 44:9,9 45:11,11,14
  48:6,7,12,16 49:7 50:13
  51:18 52:9 53:6,13
  54:13,14 55:6 56:8,14
  62:18 63:13 64:11,19
  65:1 70:14 71:14,24
  72:9,21 73:12,22 74:13,
  22 75:3,6,22 76:21
Barbie's 43:8 44:4,12
  53:10 56:11 72:11
Barrett 34:7,10
Barrett's 34:18
base 11:17
based 22:23 27:21 28:13
  29:16 30:2 56:8 66:10
  82:18
baseline 4:5
basic 11:6 49:18 50:12
basically 11:5 32:2 34:23
  52:22 53:20 71:23
basis 5:11 24:19 41:2
beat 32:18,19 42:3,7
  54:18,21 55:8
beaten 55:4
beating 42:7
began 48:15,17
beginning 64:22
behavior 19:17,22,22 65:7
behind 49:9 50:17 70:16
being 3:2 21:2 34:13
  51:24 71:20
below 46:15
benefits 7:1 13:18 14:1
  78:20,22,23 79:11
best 4:2 23:15 25:5 30:7
  48:2 53:24 54:4,7 71:11
  72:4,16 83:11
between 33:24 39:24 62:7
  69:19
bickering 74:19
bill 60:22,23
bills 60:24
bitch 42:6,19 57:20 58:18

DEPOSITION OF CHARLES EDWARDS

62:3 68:14 70:6,6,12,17
**Blakley** 2:4 17:14 19:3
  20:11 27:13 29:4,6,18
  31:20 33:2 34:15 35:23
  38:5,21 40:22 41:3 42:10
  52:13 55:1,9 58:21
  59:17,24 60:8,13 61:1,4,
  9,24 66:20 67:19 68:8
  69:2,14 80:9 81:24 83:7,
  9
**body** 21:23
**Boston** 13:3
**Both** 20:7,9 33:15 49:3
  77:15 80:22
**Boudreau** 58:7
**Boy** 5:5
**branch** 5:19 73:16
**break** 28:18 66:21
**bring** 16:13,16 48:12 56:4
  74:18
**brought** 16:18 18:11
  39:16,19,23 41:21 50:11
  81:6,7 82:9
**building** 49:2
**bullet** 64:6
**Button-West** 14:10

- C -

**C** 2:4
**California** 11:17
**call** 25:6 26:4 47:18,21
  51:23 52:1 63:13 64:13
  68:2 71:13
**called** 22:14 25:23 48:8
  50:23 51:11 64:8,24
  68:13
**calling** 48:18
**calls** 34:20 60:24 67:15,18
**cap** 79:17
**Capplis** 58:11
**Captain** 11:2
**care** 49:11 50:3,18 63:22
  72:10 79:12
**case** 3:24 5:4,5,14 24:11,
  12 26:2 37:17,19
**cases** 5:4 24:14,16
**Caucasian** 42:19,20
**centered** 39:21 71:22
**cents** 79:16
**certain** 20:15 21:15 25:16
  82:9
**certainly** 4:2 23:18 66:1
**CERTIFICATE** 85:1
**chairman** 28:10
**Chan** 57:16
**change** 45:18 84:4,7
**changes** 13:24
**characteristic** 17:6
**characteristics** 75:13
**characterize** 21:1
**charge** 16:2,3 19:2 21:1,5
**charged** 18:4
**Charles** 2:13 3:2,10 54:24
  84:1 85:6
**check** 59:7
**checked** 59:19

**Chicago** 2:7 7:8 12:13
  17:19 23:21 27:7
**chief** 28:10 65:18
**child** 68:3
**choices** 79:8
**choose** 79:8
**circumstances** 81:4
**claim** 5:12 16:13 17:5
**claimed** 19:22
**claims** 14:9 16:10 34:11
  69:24
**class** 17:3
**Claudette** 19:14
**clear** 44:11
**Clemetson** 77:11 79:24
  80:16 81:2,11
**clerk** 45:17
**Cleveland** 12:14,16,19,21
**clique** 40:21 41:10
**cliques** 40:17 41:6,7,10
**close** 55:19
**closer** 27:19 76:24
**CNA** 2:6 3:20 5:8 7:16
  9:13 10:11,22 11:21
  12:10,19,20 14:12 15:18
  16:2 27:20 30:1,22 34:13
  35:12 60:6 61:14 65:15,
  17 68:17 77:7,17,24
  78:20 79:1
**CNA's** 79:8
**collected** 21:11
**college** 6:3,6
**colloquialism** 52:21
**color** 30:3
**comes** 35:8 56:3 75:12
**command** 11:5
**commander** 10:19 11:1,2,3
**comment** 50:15
**Commission** 3:21 15:22,23
  16:16 26:16,18
**commissioned** 10:19
**commitment** 29:9 36:16
**COMMONWEALTH** 85:2,
  5
**communicated** 66:4,6
**community** 64:12
**comp** 14:1
**company** 10:23 12:1 67:17
  79:3,15 83:10
**compensation** 13:18
**complain** 34:12 53:10
**Complainant** 2:3
**complained** 41:7
**complaining** 53:3
**complaint** 3:19 15:21
  16:19,21 17:16 18:11
  26:16,24 30:24 31:19
  33:1,5,14,18 34:4,18
  35:3,8,22 36:2,5 37:4,8
  39:15,19 41:22 44:12
  47:16 55:24 56:11 57:6
  71:24 72:19 73:23,24
  74:2,7,8,22 75:12 81:6,7
**complaints** 9:20 14:2 23:3
  24:5 25:2,9 26:10,14,15
  27:8 30:8 44:4,14 73:13
  79:21

**complete** 15:14 60:17
**completed** 82:17
**compliance** 36:22
**comply** 13:23 14:3
**complying** 13:16
**concern** 21:19 36:19 53:1
  65:10 71:15 72:4,14
**concerned** 43:9 46:4
**concerns** 40:15 43:8 44:9
  74:13
**conclude** 62:23
**concluded** 22:24 83:17
**conclusion** 23:14 69:11
**conclusions** 23:5,17 24:21
**Conduct** 2:18 20:15,15,16
  21:19 25:17,17 28:5,7,20
  29:10 32:6 36:16 57:5
  65:6 66:11 67:13 80:24
  81:1
**conducted** 7:15 17:21 25:8
**conducting** 9:17 23:3 24:1
**conference** 48:12
**conferences** 6:24 7:4
**confidential** 40:12
**conflict** 37:11 74:12
**conflicting** 20:9,22 21:2,7
  22:5
**conflicts** 39:10,22
**confrontation** 48:6
**Connecticut** 47:19
**Connick** 2:9 3:19 14:18
  15:6 16:11 25:16 26:21
  35:16 39:5,24 42:1,23
  47:17 57:11 59:2 63:8,11
  67:14 68:7,13 69:12,17,
  20,23 70:2,4,8 71:3,7
  75:3,6,22 78:21 82:5,6
**Connick's** 25:8 36:5 37:3,8
  39:15,18 41:22 46:16
  47:4 57:6 59:14,21 72:19
  73:13,22 74:22
**conservative** 56:1
**consider** 61:18
**consistently** 46:24
**constantly** 6:20
**contact** 36:21 47:12
**contacted** 64:12
**context** 52:23
**continually** 28:2
**continue** 3:13 18:3 50:7
  74:7
**continuing** 47:16 82:22,23
**convenient** 66:21
**corporate** 26:7 34:23 35:5,
  12,14,19,22 36:21,24
  37:4,6,9,14,22 38:3,8,18
  51:11,13,16 73:11,19
**corporation** 38:8 66:5
**corroborate** 20:4 68:10,17,
  19
**corroborated** 21:4 59:13,20
**counsel** 3:14 29:11 82:10,
  21 85:10
**couple** 10:17
**course** 6:12,15 18:23 22:7
  66:13
**courses** 7:5,13 56:23

**court** 5:24 16:1 26:19
  85:5
**courts** 26:11
**coworker** 31:1 32:10,18,23
  81:19
**coworkers** 81:5
**Cramer** 14:10
**credibility** 20:8 22:14
**credits** 6:13
**Crider** 2:6
**Cross** 2:12
**CROSS-EXAMINATION**
  83:8
**current** 8:20,21
**currently** 8:5 27:9

- D -

**D** 2:11
**daily** 24:18
**Dale** 2:6
**data** 21:11 45:18
**date** 47:21 77:20
**dates** 12:18 39:20 46:10
  63:12 77:20
**deal** 24:8,20 25:1 71:17
**debates** 33:24
**debating** 32:4
**Debbie** 26:5,6,7 52:3
  53:18,20,23 54:3 55:12
  64:18 65:3 73:8,20 83:12
**December** 34:12
**decide** 22:20
**decided** 65:4 75:8
**define** 22:16 81:4
**defined** 26:10 30:9
**defuse** 75:1
**degree** 6:5
**demoted** 19:19
**denied** 19:24 20:16 25:20,
  20 50:19 72:2
**dental** 78:23 79:1
**denying** 55:24
**department** 7:8,16 8:8
  9:24 15:2 16:11 17:3,19
  23:21 26:8 34:11 39:1,8
  65:5 76:17 81:17 83:11
**depending** 37:20
**deponent** 3:16 85:7
**deposes** 3:3
**deposition** 3:18,22 5:2
  28:23 36:13 83:17 84:1,4
  85:8
**depositions** 5:21
**describe** 16:23 21:20 35:7
  76:20
**Description** 2:17
**designed** 3:23
**DeSimone** 30:19 31:16
  32:9,17,22 33:8
**DeSimone's** 31:18 33:1
**desk** 16:24 20:20 21:24
  49:6 75:7,15,16,20 81:22
**Despite** 61:21
**detail** 25:11
**determination** 38:10 62:13,
  16,17,22,23 68:23 69:4

DEPOSITION OF CHARLES EDWARDS

determinations 22:6
determine 35:3,10 36:1
  43:13,18 44:3,14,20,23
  45:20 62:7 68:24 69:19
determining 44:1
develop 3:23
dialed 60:3 61:8
diametrically 61:21 62:8
  68:23
Diane 30:19
difference 70:18
differences 57:4 76:22
different 21:15 23:5 79:6,9
difficult 21:6 46:18
Direct 2:12 3:4 23:12,18
  74:12
direction 17:20 36:18 66:8
  85:7
director 11:13 51:16
disability 30:3 72:22 73:1
  74:4
discharged 11:18
disciplinary 19:9,15 23:16
  78:4,12 80:15
discipline 34:3 78:7,15
  81:12
disciplined 81:15
discrimination 3:20,21 7:3
  15:22 16:3,17 26:17
  30:2,12,13,14 67:10
  82:18
discuss 53:15
discussed 4:16 40:14 74:9
discussion 3:14 53:23 71:6
  83:4
discussions 39:6 73:10,19
dispersed 49:6
dispute 47:5,24
diversity 7:5,9,23 8:16 9:8
  14:2,5,13
document 4:23 28:17,24
  29:13,15 34:2 36:7,14,15
  38:12,21 82:9,15
documented 19:16
documents 4:19,22 26:23
  29:7,11 33:13 82:11,12,
  16 83:1
dollar 79:16
done 37:15 53:22 73:18
Doris 57:16
down 16:24 25:4,12 31:8
  44:22 57:1 74:15
dropped 74:1,2
duly 3:2 85:6
dumb 48:19
during 8:18 9:10 10:16
  11:10 14:12 15:17 18:23
  22:7 26:11 60:4 62:17,19
  65:16 66:12 69:7 82:20
duties 13:13 15:7,14 19:18

- E -

E 2:11
each 18:20 21:16 28:5
  32:2,2,3 41:9 56:21 57:3
eager 75:14,14

early 75:7
Education 6:4,10,14,15
educational 6:2
Edwards 2:13 3:2,6,10,18
  28:22 36:12 40:9 42:16
  83:16 84:1 85:6
effect 28:3 40:17
effective 46:9,11
efforts 59:7 63:2
eight 10:20
either 5:24 20:5 23:24
  26:10,15 29:15 30:9
  33:14 34:3 54:6 59:20
  76:1
element 61:19
elevate 37:16
elevated 37:6,9 38:9
Elizabeth 85:17
emotion 23:11
Employ 7:1
employed 5:7 9:13 16:9
  77:15,17 80:6 83:12
  85:10
employee 9:20 10:22 13:17
  15:21 16:2,5 17:18,19,24
  19:7,10 23:21 25:24
  30:8,21,21 31:13,14
  32:14 34:10 35:4 39:12
  48:18,20 52:14 53:4,10
  54:7 55:23 63:18,18
  65:21 71:17 73:7,12 74:3
  76:14 78:23 79:1 81:17
  83:10,12 85:11
employee's 16:6 56:14
  74:11
employees 13:20 14:14
  15:18 17:2,4 26:9 27:9
  30:2 38:13 39:2,8 49:3
  56:21 63:14,16,20 65:9,
  15 78:20 79:21 81:11
  82:19
Employment 15:23 26:17
  29:14,21,23,24 77:19,22
  80:8
Employment/Work 29:21
encourage 68:2
end 29:12 32:7 40:3 71:6
engage 67:17
English 22:17
enough 22:4 37:24 66:8
  75:19
entire 50:8 65:5 67:5
entitled 29:20
entry 45:18
environment 5:6,12 16:4,14
  52:2 72:17 75:11
environments 7:2
epithet 42:18
Equal 15:22 26:17 29:14,
  21,23
equate 42:18
Ernest 77:9 81:11
essence 23:8,9 52:7
essentially 24:10,22 25:14
evaluation 47:4
events 20:5,6 59:21,23
  68:22

everybody 67:11
everyone 19:5 21:4
evidence 3:23 25:13
ex-employee 27:6
exactly 18:1 32:4 40:9
  48:22 63:1,19 65:1 79:7
  80:11
EXAMINATION 3:4
example 21:18 63:15
exceeding 46:24 47:8
except 3:15 84:15
Excuse 66:20
Executive 11:22 28:10
exercise 77:5
Exhibit 28:17,21,23 36:11,
  13,17
exhibited 25:18
EXHIBITS 2:16
expect 4:8
expectations 65:6,8,21,23
  66:5,9 67:12 74:16,16
experience 42:17
expertise 6:21 23:20 24:18
  25:6
Explain 15:20 26:13 29:18
  37:10 78:22 82:12
explained 53:13
extent 35:1
eye 55:19

- F -

face 32:13
faced 68:23
facility 5:18 82:20
fact 19:16 42:23 43:9
  53:13 61:21 72:20 80:12
facts 23:11 25:5,5 35:9,10
  49:18
factual 3:23
fair 20:8 21:13,16,17,18
  24:4 25:12 52:20
familiar 8:1 14:16 30:18
  34:6
family 68:3 79:6,6
fan 17:14
far 44:17 75:19
Farmington 47:19
fault 67:4
faxed 73:6
Federal 15:24,24 26:18,19
feel 66:8 81:21
felt 68:22
female 31:12,15,17 41:19
females 31:7 32:1
Ferard 58:15
few 66:14
figure 32:3 45:3 73:20
file 14:14 15:21 16:2
  19:16 26:13 27:6 30:24
  49:2 78:5
filed 3:19 26:9 27:7 30:9
  79:21
files 20:20
find 37:23 43:12 64:9,23
  76:13
Fine 50:6

finish 60:9,14
finished 55:12
fire 75:21,23,24
first 3:2 10:14,17 12:18
  27:11 39:14,18 41:21
  42:12 43:3,6 44:12
  45:12,21,22 47:12
firsthand 9:1,7
five 7:11 20:3,4 21:10
  46:21 47:3
fix 76:9,11
fixes 76:10
fixing 76:16
Fleming 58:1,3
focused 23:4 45:8
focusing 23:11 77:13
follow 23:19
follows 3:3
Force 10:15,15 11:1,9,11,
  16,17,20,24
form 3:15 19:4 20:11 21:4
  27:13 30:1 31:20 33:2
  34:15 35:23 38:5 40:22
  41:3 42:10 52:13 55:1,9
  58:21 61:1,9 67:19 68:8
  69:2,14 80:9 81:24
formalized 56:23
forming 40:17
forth 56:17
fortunately 30:11
forward 37:24 38:3
found 33:21
foundation 35:24 61:2,10
four 6:3 8:19 12:13,17
  46:22
Fox 2:4
fraud 36:20
friends 33:21
frightened 51:18,23
fringe 78:20,22
front 58:18 70:6
fully 4:1 79:3
function 7:12
functioned 8:9
further 4:11 38:11 41:20
  43:2 51:3 57:5 63:2,7
  64:15 66:2 67:2,13 72:18
  74:21 76:17 78:12 83:6,
  14 85:11
future 76:4

- G -

Gail 16:6,7,9,13 26:21,23
garage 49:12 62:3 68:15
  70:7
gave 36:3 37:17,23 49:13
  63:13 65:3
gender 30:5
general 45:17 57:1
George 11:16
Gerard 58:16
Gill 42:2 54:21 55:3,7,8
  71:1 80:4,6 81:14
Gina 58:13
gist 48:23 65:10
give 10:8 21:17 25:7 48:23

**DEPOSITION OF CHARLES EDWARDS**

50:8 54:14 63:15 64:9
65:23
**given** 56:8 68:22 73:19
78:2 85:8
**gives** 36:16,18 38:13
**giving** 38:2 73:16
**Goddard** 77:9 81:11
**going** 12:14 19:3 25:11
31:5 35:11 43:24 48:9
50:17 51:3 55:23 56:15,
15 58:19 62:3 63:20,21
64:5 66:2,3 67:22 68:4,
14 70:7 72:3,6 75:22
82:14
**gone** 8:22 14:11 25:4
55:17 78:18
**Good** 3:6,7 33:21 76:3
81:22 82:3
**got** 19:5,6 31:8,12 32:2
45:1 51:10 52:3 64:8,18
65:2 72:23 75:23
**gotten** 75:19
**Grace** 77:11 79:24 80:16
81:2,11
**graduate** 6:3,4,5,8,12
**Gretta** 54:17 71:3,4 80:2,
18 81:9,10,12
**group** 67:5 74:18
**Grove** 2:4
**guarantee** 72:11,13
**guidance** 25:24
**guidelines** 28:12
**gun** 52:18

- H -

**hall** 49:3
**handle** 7:2
**handling** 24:15
**happened** 33:10 48:16
50:12 53:21 57:5 65:12
80:22
**happening** 18:2,14 66:1
**happens** 22:2,2,4
**happy** 60:15
**harassed** 34:13
**harassing** 20:15 25:16,17
40:21 70:2,9 71:2
**harassment** 3:20 5:13
24:2,5,13 25:9 27:20
28:1,13 29:16,22,24
30:15,24 31:3 34:19
41:2,5 47:17 56:12 57:7
67:10 81:18 82:19
**head** 64:6
**Health** 78:23 79:1
**heard** 4:3 18:13 36:2
49:7,22 52:9 57:20 70:16
**Heather** 42:2,6,7 54:21
55:3,7,8 71:1 80:4,6
81:14
**held** 13:10 39:24
**help** 14:2 18:7 33:13 56:5
**Hengesbaugh** 28:9
**hereunto** 85:13
**High** 6:3 10:12
**himself** 65:20

**history** 6:2 10:8
**HMO's** 79:9
**hold** 13:8 15:3
**home** 50:2 51:19,24 54:13
**honorably** 11:18
**hostile** 5:6,11 7:2 16:4,13
**hotline** 36:22
**hours** 6:4
**How** 3:24 5:9 7:1,2 10:6
12:5,16 13:2 18:9 19:2
20:2 22:16 24:8,15,20
25:1 27:8,11 35:10 36:3
37:8 41:12 43:24 45:3
54:14 55:22 57:2 67:24
73:12,21,22 76:15 79:24
80:18
**Howard** 2:2,2
**However** 37:2 61:3,16
63:12 66:7 67:23 69:5
71:13,20 72:14 74:13
**Human** 5:17 6:16,19 7:12,
17,18 10:1 11:11,12
12:12,14 13:7,13,15
15:14,17 26:12 29:13
38:14 42:16 71:16
**hunter** 11:22
**husband** 50:23 59:14 62:4
68:4 71:8,20

- I -

**I-O-V-E-N** 16:8
**idea** 76:3 81:22 82:3
**identification** 28:21 36:11
**identified** 29:16 36:17
41:13
**identifies** 29:14
**identify** 18:9 28:23 29:9
36:13 41:9,12 77:6
**Illinois** 2:7 6:7
**immediately** 11:21 17:18
43:20 44:23 48:11 51:2,
11 73:6
**important** 61:19
**imposed** 80:16
**incident** 31:22 32:20 33:7,
9 48:5 51:12 52:4 53:21,
24 54:11 65:14 69:18
**incidents** 54:6
**inclined** 75:24
**include** 13:17 14:9
**incorporate** 8:10
**indeterminate** 44:13
**indicated** 29:11 44:11
70:11
**individual** 8:1 30:18 34:4,6
62:1 68:24 69:1
**individually** 67:4
**individuals** 4:17 18:16,20
21:10 40:20 67:2,4 76:4
77:6
**informal** 56:24
**information** 40:14 54:15
65:3
**informed** 55:18 73:17
**ingredients** 74:18
**initially** 82:2

**initiate** 56:22
**initiated** 35:13 36:24 37:4
38:18 71:11,13
**inside** 72:10
**instead** 22:16
**instruct** 43:13 51:22
**instructed** 50:24
**instructions** 37:24 38:13
51:22 52:4 73:16
**insurance** 10:22 78:23
79:2,8
**interferes** 67:23
**internal** 16:19 26:15
**internally** 19:10 26:10 75:3
**international** 17:10
**interview** 18:20 20:2
57:11,14,23 58:1,9
**interviewed** 19:21 82:6
**interviewing** 23:10
**into** 9:20 10:15 11:7 20:24
23:3 25:8 31:8,12 48:12,
14 53:4 57:6 66:15
76:10,16
**introduce** 65:20
**investigate** 33:1,5 35:3,6,22
36:4,23 38:3,15 51:3
63:3 64:1 74:7
**investigated** 35:13 37:8,19
74:8
**investigating** 36:2
**investigation** 14:1 17:20,21,
23 18:10,24 20:24 21:8
22:8 24:9,22 25:8,13
27:2 33:15 34:24 35:7
37:4,12,13,20 48:15
55:14 56:11 57:6 61:19
67:14 73:15 75:20 76:23,
23 82:22,23,24
**investigations** 9:18 23:3
24:1,9 25:2 36:24 38:18
**involved** 13:22 18:13 33:6
51:8 56:5 62:11 63:17
**involvement** 35:1 72:18
**Ioven** 16:6,8,9,13 17:7,16
18:15 20:14 21:9 26:9,21
26:23
**Ioven's** 17:9 20:6 21:1,5
26:23
**issue** 17:18 19:8 20:8
21:19 39:5 47:20 53:7,8
55:22 75:20
**issued** 28:9 81:2
**issues** 7:2,3 14:2 17:24
20:22 24:2,5,21 30:12
39:15,21,21 43:8 55:21
56:8 71:21
**itemized** 61:17
**items** 45:10
**its** 30:2
**itself** 38:22 76:11 84:5

- J -

**Janet** 58:7
**Jean** 58:8
**Jersey** 63:12
**Jim** 65:18
**Joan** 58:5

**job** 8:20,21,21 10:8,14,20
12:7,8,9,10,11 13:13
15:7,14 67:24
**jobs** 10:13 11:13
**judgment** 22:23
**July** 16:15
**June** 80:11
**justify** 46:1

- K -

**Kathy** 14:10
**Kelly** 14:10
**kept** 73:17
**kind** 6:16 59:5
**kinds** 76:16
**knew** 43:10
**knowledge** 9:1,7 38:2 54:8
70:1 71:1 83:11
**known** 62:18,18,20
**knows** 67:9

- L -

**LaBonte** 19:14,21 20:16
21:9 27:3
**LaBonte's** 20:5
**laboratory** 10:18
**Lack** 35:24 61:2,10
**laid** 74:15 81:14
**language** 21:22 64:3
**Larry** 51:14,20 64:9
**last** 11:4 15:8,10 80:19
**later** 3:16 43:22 44:19,21
**Laura** 8:2,4,16,20 10:6
14:23,24 15:3,10,11 39:7
**Laushine** 7:21 8:12,13
10:4 39:4,7 40:1,10
41:21,24 42:5 43:2,5,13
44:12,13,19 47:13,18
48:3 50:9 55:6 65:22
**Law** 2:2,4 7:8,16 9:23
26:7
**lawsuit** 77:24
**lawyer** 26:7
**lawyers** 22:16
**lay** 80:13,14
**lead** 73:14 76:15
**leadership** 7:19 13:23
73:15 76:15
**leading** 73:14
**learn** 11:7 25:1
**learned** 19:8 24:20 25:3
43:22
**least** 18:13 75:14
**leave** 10:12 12:7
**leaving** 50:13
**led** 56:17 77:1
**left** 10:20 11:20 50:11
74:3
**legal** 5:23
**letter** 73:2,5,6
**life** 64:4
**likes** 77:7
**line** 10:1 84:7
**lines** 9:11 39:8 63:19,23
**Lisa** 57:14

listen 43:7
litigation 82:17
little 46:18
local 51:23
location 9:15,16  13:4  14:5
27:9
lodged 71:24
long 5:9  8:20  12:2,5,16
13:2  65:4
longer 27:4  76:14
look 29:7
looked 60:2,5,11,11,20
61:6
looking 24:18  36:15  49:18
76:24
lot 11:12  20:22  41:14
48:10  49:11,17  50:18
58:20
lying 69:1

- M -

mainly 45:8  77:13
maintains 61:14
major 6:4,10  10:14
make 8:18  10:10  11:8
20:19  22:6  23:10  24:17
31:2  38:10  49:23  50:16
52:15  56:6,15  59:7  62:13
65:1,7  66:3  68:23  69:4
70:18  72:9  75:17
makes 46:1  75:12
making 23:4  62:2,21  63:14
71:1  76:12
Management 12:2  73:11
76:24  77:5
manager 5:17  8:21  9:10
12:15  13:7,13,15  14:22,
24  15:4,12,15,18  16:22
17:2,12  19:11  21:20
26:12,15  27:12  28:3
30:10  42:16  55:17  65:23,
24
manager's 19:13
Managers 6:19  10:2  14:6,
11  30:2  36:22  38:13
55:18  81:21
manual 29:13
many 7:10  20:2  27:8,11
30:16  47:2
March 85:19
Margie 58:1,3
Marilyn 34:7,10
marital 30:4
marked 28:17,21,22  36:9,
11,12
marks 84:5
Marlene 14:18,21
Marshfield 3:10
Martin 65:18
Mary 14:16
Mass 3:21  8:8  9:10  15:3,
12,21  16:16  26:16  39:1,
3,8
Massachusetts 2:3  3:11
82:20  85:2,5,18
match 79:15

matter 6:23  35:4,19  38:4
40:10  45:1  63:3  69:6,7
matters 24:5
Maura 58:11
Maybe 28:6,16  44:11
mean 15:20  26:13  31:2
37:11,11,13,20  56:20
means 60:16
meant 16:23  52:11,16
53:13
measure 72:9
medical 10:18
meeting 39:20,24  40:13
45:11,11,12  47:8  65:5,15,
16  66:13  67:5
member 6:19
members 68:3  73:10
memory 60:19
mentioned 41:5  83:10
messing 50:19
meted 34:3
Michigan 5:5,19  12:23
middle 40:3  60:13
might 20:21  29:7  82:2
Millette 58:15
mind 22:3
mine 53:1
Misconduct 2:19  36:10,18
67:10
mistreatment 39:12
mockery 63:14
moment 83:3
money 12:8
months 10:21  12:6,13
more 12:8  25:11  29:6  41:1
46:18  56:18  79:7
morning 3:6,7  59:4
most 7:13  13:22  14:9
24:16  47:4
move 37:24  75:6,15,15,20
moved 12:21  49:1  66:15
moving 38:3  81:21
multiple 29:7
must 35:13  36:24  38:18
myself 35:6  73:2  75:3

- N -

N 2:11  42:20
name 3:8  8:1  12:1,3  14:16
16:5,6  19:13  27:23,24
30:18  31:13  32:10,11,13,
15  34:6
named 41:15
names 14:10  18:15
national 30:4
nature 16:21  31:18  32:20
33:18  34:18  48:19  49:10
64:7
near 49:2
nearby 57:19
nearly 10:16
necessary 51:24  74:17
need 28:18  29:18  35:9
37:17  38:1  45:3,24  46:2
56:4  61:4
needed 12:8  19:10  34:2

37:18  43:7,11,24  44:22
45:20  47:20  49:21  56:22
64:11  65:4  66:5  69:8
73:18  76:13
nervous 64:3
never 41:5  42:5  55:6  60:5
62:18  70:8,16
new 55:16  63:12
next 12:9  47:15  55:13
57:5  63:10  65:12,13
78:14,18
Nicholas 8:2,4,16  10:6
14:23  15:3,10,12  39:7
nods 68:16
none 54:12  63:4  80:17,21
notary 3:17
notations 84:5
note 84:4
notes 27:2
Nothing 83:14
noticed 70:11
now 6:22  15:14  35:3
37:10,19  38:24  56:6
66:23  67:13  79:21  82:4,9
number 60:3  61:8
Nutley 26:5,6,7  52:4
53:18,20  55:12  64:18
73:8,20  83:12

- O -

O 85:17
O'Brien 58:5
oath 4:3
object 19:3  20:11  31:20
33:2  34:15  35:23  38:5
40:22  41:3  42:10  52:13
55:1,9  58:21  61:1,9
67:19  68:8  69:2,14  80:9
81:24
Objection 27:13  59:24
61:24
objections 3:15
obligation 68:22  69:4
observation 81:8
obvious 24:13  57:3
occurred 25:21
odds 21:16
off 40:1  50:3  51:10  64:8
80:13,14  81:14  83:3,4
off-the-record 3:14
offered 7:13
office 8:19  30:12  48:6,14
53:5  64:5
officer 10:19  28:10  65:18
Offices 2:2
often 24:4
Okay 4:9  6:18  22:15,19
30:6  32:17  38:24  40:18
44:17  50:5  56:6  62:6
83:15
once 25:5  54:14
one 11:13  19:8  22:20,21
24:5,10,22  25:14  31:4
32:3  33:22,23  37:7  39:12
41:13  46:21,22,23,24
54:24  55:23,24  56:14

62:1  63:18  65:17  69:8
70:22  72:2  74:11  75:7
76:7,7,12  79:6,9  80:19
81:7  82:15  83:7
ones 7:7  26:20,21  47:2
only 26:20,21  27:8  30:16
37:7  41:6  51:18  61:4
72:22
operation 15:19  47:2
operator 45:19
opinion 74:10
Opportunity 15:23  26:17
29:14
Opportunity/Work 29:24
opposed 61:22  68:24
opposite 62:8
Oral 78:9
order 4:4  35:9  72:24
organization 8:6  11:5,7,23
13:16  14:9,22  15:1,2
27:4  34:21  45:22  58:6
65:19  76:15
orientation 30:4
origin 17:10  30:4
others 4:24  66:18
ought 48:20  64:24
our 8:6,7,10  9:23  14:3,9
17:18  23:19  24:11  26:7
29:9,14  30:12  32:5
34:10,10,24  36:16  45:8,
10  50:24  65:8,8,17  66:10
68:20  72:10  73:7  76:14,
23,24  78:15
ours 75:11
out 10:12  11:9  23:12  28:4
29:15  32:3  34:3  37:23
43:12  45:3  50:13  55:23
64:10,23  72:21  73:21
74:3  76:13,21
outcome 5:14
outside 34:20
over 7:8,11  10:17  34:23
35:4,19  76:7,7
own 37:15  64:12

- P -

package 78:24
Page 2:17  29:20,23  84:7
paid 79:3
paragraph 29:20
parking 48:10  49:11,12
50:18  58:20
part 3:22  23:24  28:12
31:4  34:24  36:15  66:16
72:18  76:14  80:13
participating 6:21
particular 17:3,6  18:15
33:7  41:15  51:17,17
55:22  57:11  65:13  67:3
partner 24:17
party 33:23
past 7:8
Path 3:10  44:22
Paul 71:7,8,14,19  82:4
pay 78:2
pending 78:11  80:15  82:17

DEPOSITION OF CHARLES EDWARDS

people 18:12  21:15  22:1
  40:16  44:10,24  47:2  51:8
  56:24  57:2  65:17  66:14
  68:4  74:18  76:6,12  77:1,
  3,7
per 45:10  79:16
percent 47:3  79:18
performance 19:17  46:16,
  19  47:10  78:8  80:23
perhaps 59:12
period 10:17  72:20
perpetrators 25:20
personal 17:12  28:4  65:6
  67:15,18
personalities 40:15
personality 39:10  57:4
  76:22
personnel 11:14  13:16,24
  19:16  27:6
pertaining 26:23  82:17
phone 34:20  47:18,21  49:8
  50:21  51:10  52:3  60:20
  63:13  64:13,18  65:3
  67:15,18  68:2,5  71:13,14
Photocopy 28:20  36:10
phrase 70:14
physical 31:4
piece 49:9  65:7  70:15
  74:14
pieces 72:22
place 7:5  23:3  25:9  27:21
  28:13  29:21,24  32:6  40:7
  43:24  44:8  45:3,5,7,10
  46:17  49:5  51:19  56:16
  65:8  72:8,10,12  74:15,16
  76:6
placed 78:5
plain 22:17
plan 78:16,17
please 3:9  18:3  26:13
  76:20  84:4
plus 12:8
point 29:15  30:17  35:10
  39:23  41:5  45:9,24  48:15
  50:23  52:5  53:2,22
  55:15,20  56:7,13  64:2,16
  66:7  71:15  72:23  74:4
  75:8,18  77:14
pointed 76:21
pointing 29:19
police 51:23  52:1  64:12,13,
  14
policies 13:16,24  14:3  32:5
  66:10
Policy 2:18,19  23:19
  27:20,23,24  28:2,4,7,21
  29:2,3,10  30:1  35:12
  36:11  50:24
position 5:16  7:19  11:12
  12:24  13:1,6,8,10  14:23
  15:3  38:8  45:16,21  51:15
positions 11:11
possible 15:11  51:4  59:19
  72:9
post 64:5
potential 57:12  76:4
Practices 29:21,23

predecessor 8:14
premises 40:1
preparation 4:19
prepared 24:8
Present 2:8  82:21,23
President 2:6
previously 6:2
principals 20:10
prior 5:2  8:6  39:6
Probably 5:10  7:11  10:14
  16:15  23:15  33:16  37:22
  38:1  56:18,22  77:2
probation 78:16,18
problem 42:7  47:16  75:19
  76:9,11
problems 39:1,3,7  76:5,16,
  17
procedure 50:24
procedures 13:17,24  14:3
  23:19  32:6  66:10
proceed 36:3  52:5
PROCEEDINGS 3:1  5:23
process 3:22  4:4  73:14
  75:7  78:14,15
processing 8:10
production 43:23  44:1,5
  45:2,5,9  46:24  56:16
  65:9  67:24  74:17  78:8
productivity 46:12
Professional 2:18  28:7,20
  29:10  36:16
professionals 7:18  10:1
prohibited 29:17
prohibiting 28:13
prohibits 27:20  30:1
promote 67:17
promotes 67:15
prove 68:19
provide 4:1  13:20  82:11
provided 14:5,13  78:20
Public 84:6
pulling 41:14  43:9,14,19
  44:10,24  46:2
purpose 3:18
pursue 17:23  56:10
put 6:20  7:9,19  9:24
  12:18  27:24  28:4  43:24
  45:3,5,7,9  46:17  56:16
  74:15,16  76:9
putting 76:7,10

- Q -

qualified 11:9
question 4:7,12,13  10:10
  11:13  15:8,10  17:8  19:4
  20:12,13  27:14  31:21
  33:3  34:16  35:24  37:3
  38:6  40:23  41:4  42:11
  52:14,24  55:2,10  58:22
  59:17,18  60:7,15,18  61:2,
  10  67:7,20  68:9,12  69:3,
  15,16  73:21,22  80:10
  82:1
questions 4:1,5  18:1  53:23
  54:2  61:5  66:12,14,16
  67:2,3  83:6  85:8

quickly 50:4
Quincy 9:16  13:4,6,14,21
  14:4,12  15:15,19  26:12
  27:9  28:3  47:2  52:1
  64:13,14  73:11  82:20

- R -

R 2:6
race 5:12  7:3  17:9  27:21
  28:14  29:17  30:3  31:14,
  16  41:18  82:18
racial 3:20,20  25:9  30:12
  49:19  50:14  51:1  53:8
  56:11  57:7  65:7  66:11
racially 70:2,9  71:1
raised 17:18  39:21
rank 11:1,2  14:13
rater 45:14,15,21  46:5
raters 45:8
rather 67:5
rating 46:21  47:10
reach 69:11
reaching 24:21
read 3:16  15:11  28:5
real 17:24  23:11  32:20
  40:15  72:14
realize 45:23  76:22
reason 47:5,24  62:20  84:7
reasons 75:24
receive 10:2  73:2  79:1
received 17:16  47:18  64:13
  73:4,6  82:14
receiving 34:20
recent 47:4
recently 65:19
recess 66:24
recollect 40:19  48:2  59:6
  71:11
recollection 30:8  31:6,7
  33:14  40:6  41:20  43:2
  47:9  49:15  54:4
recommendation 68:20
record 29:19  60:5  83:3,4
  84:16
records 59:8,20  60:2,11,12,
  20  61:7,15
recruiter 10:21  11:22
recruiter/head 11:22
Recruiters 12:2
recruiting 11:24  13:19
recruits 11:6
reduced 85:7
referencing 6:20
Referring 55:3  82:12
refresh 33:13
regarding 33:14  69:23
regional 12:13
reimbursement 79:12
related 82:16  85:10
relates 14:1  36:20  51:1
  66:10  67:9  72:24
relations 7:1  13:17  17:19
  23:21  25:24  73:7,12
  83:11,12
relative 71:18  85:11
religion 5:12  17:9  30:3

reluctant 71:19
remained 77:17
removed 19:18
Repeat 60:18  64:21  68:12
  69:16  70:3
report 32:17  35:16  43:18
reported 32:22  41:24  43:3
  44:3,12,19  51:11  55:6
  58:23  69:10,18,23  70:5,9,
  22  82:21
Reporting 2:19  36:10,18
representative 12:12
request 82:15
requests 82:9,10
require 28:5  68:18
required 84:6
requires 35:12
reserved 3:15
residential 3:8
resolution 18:7  22:14
resolve 34:1  35:11  73:12
  76:8  81:22
resolved 19:2,8  49:21
  73:23,24
resolving 75:19,20
Resource 6:19  7:12  11:11
  26:12  42:16
resources 5:17  6:16  7:17,
  18  10:1  11:12  12:12,14
  13:7,13,15  15:15,17
  29:13  38:14  71:16
respect 38:8  44:15
respective 41:9
respects 21:15
responded 53:24
Respondent 2:5,7
respondent's 82:19
response 47:13  49:23  67:7,
  8  82:15
responsibility 11:8  37:15
responsible 13:15,18
rest 50:3
result 23:5  34:4  46:14
resulted 81:1
results 19:5,6  20:24  21:1
resume 12:4
retaliation 82:18
returns 74:5
review 19:18  46:11,14,16
reviewed 4:19,22
reviews 46:19
Right 16:20  17:13  18:19
  19:20  20:1,16,17  22:11,
  13,22  26:22  28:8  34:1
  44:16  45:13  57:18  63:21
  66:23  68:15  70:13  73:9
  75:9,17
road 25:12
role 65:19  66:3
room 48:12  49:2  50:11

- S -

safe 72:6,8,17
safety 72:12,15
said 14:23  21:15  22:1,2
  27:16  32:5  40:10,11,12

**DEPOSITION OF CHARLES EDWARDS**

48:3,4,9,20,22  50:2,6,9,9,
9,22  52:10  53:5,6,18,19
54:3,13  60:11  63:16,18,
20  69:24  70:5,15,19
71:23  80:21
same  12:22,24  13:1  16:11
25:20  28:2  81:9
sat 49:4
saw 18:13
scaring 32:23
school 6:3  10:13
Schroeder 51:14,20  52:7
64:9
Schroeder's 51:15
search 83:1
second 75:21
Secondly 45:24  49:20
security 34:23  35:5,14,20,
22  36:21  37:1,5,6,9,14,23
38:3,9,19  51:11,13,16
73:11,20
see 6:15  7:15  12:18  14:4
29:4,8  32:13  34:22  36:19
37:2  54:4,14  60:19  66:12
seemed 50:1
seen 60:3
seminars 6:20,24  7:4,9,13
9:24
sent 54:13
separate 76:3
Separating 76:6
September 30:22  33:11
42:24  47:23  61:7  63:10
69:22  71:7
series 3:24
serious 53:7  55:21  56:7
served 10:19  11:10
service 10:24  11:10
services 8:7,8,9  14:22,24
set 45:20  65:5  85:13
several 7:9  11:4  37:10
43:22  44:19,21  53:23
70:12,19
severance 78:2
severe 76:21
sex 5:12  17:9
sexual 5:13  24:2,4,13
27:24  30:3
share 40:13
shared 19:6,6  64:19
sharing 51:20
Shauna 41:17  42:1,5  46:5,
11  47:9  48:6,8  49:7,23
50:5,11  54:20  55:7  57:19
59:7,13,21,22  61:6  62:1,
20  63:16  68:6,13,18
69:12  70:5,15  75:6,21
77:17,24  79:22  81:21
82:5
shoot 52:17
short-term 72:21,24  74:4
shortly 45:10
shot 48:21  52:11,23  53:6
64:6,24
show 28:22  36:7,12  60:24
side 18:5  32:2
sift 21:12

sign 3:16  28:6
Signature 84:18
similar 10:2  42:20
simply 81:10
since 10:8,10,11,12  13:10
14:4  28:3  30:10  60:5
76:18
single 70:4
sir 48:2  52:6  60:7
sit 25:4  31:8  50:10
sits 49:9
sitting 49:7  50:17  51:6
57:1,18  70:6,16
situation 32:8  75:1  81:23
situations 36:23
six 7:11  10:20,20  20:3,4
21:10  79:18
slur 49:19  50:14  53:8
slurs 51:1  65:7  66:11
Society 6:19  7:12
Soncrant 14:17,21
soon 51:4
sorry 18:3  27:18  29:5
32:9  36:8  44:11,21  60:17
Southfield 5:19
speak 17:15  48:13  51:13
71:15
speaking 55:12  59:22,23
60:3  62:2,4
speaks 38:21
specific 23:13,18  33:18
41:1  65:24
specifically 71:17
specifics 31:6  33:12
Spending 41:14
spent 11:16
split 79:5
spoke 21:9,9,10  59:1,13,15
63:10
spoken 19:5
spouse 71:18,21
squadron 11:5
staff 12:13  13:23
standard 45:9  46:15
standards 43:23  44:1,5
45:2,5,7,20,23  46:9,17
47:1  56:16
standpoint 65:9  74:17
Stansbury 57:18,23
started 10:8,11,12  12:19,20
45:4
state 3:8  6:2  15:23,24
20:13  26:18,18  68:22
stated 42:1,5  64:2
statement 50:16,20  53:11
56:8  57:19  62:21  64:9,
19,24  65:2  67:21  70:4,12
74:11
statements 25:17  68:6,11
69:22  70:1,2,9,22,24  71:2
84:16
States 10:15  30:1
status 30:4
stay 12:5,16
stayed 10:16  12:19,22
step 78:14,18
steps 17:23  19:9,15  55:13

56:1  62:6  64:1  75:5
still 9:13  42:12  65:9  76:8
77:15  80:6
Stop 20:18,19  66:22
stops 74:4
storage 27:7
stories 20:9  23:5  61:22
62:8  68:24
story 18:6  32:3  50:13
59:13  68:17
strike 80:19
strong 66:8
student 11:4
studies 6:12  24:12
study 24:12
stuff 21:23  24:18
stupid 48:19
style 76:24  77:5
subject 6:23
such 10:4,13  67:3  75:11
78:21
sued 15:18,20
suggested 18:15,21  75:5,6
suggestions 74:24  76:2
supervisor 8:7  15:1
supervisors 36:22  38:14
Surely 20:14
sworn 3:3  85:6

- T -

table 74:3
take 11:18  12:9  17:23
19:10,15  24:12,13  28:18
33:5  46:19  50:3,3,18
54:16  55:13  56:2,10,23
62:6  63:2  64:1  66:20
72:8  73:4
taken 44:22  49:11  66:24
72:9  74:21  75:1  84:15
takes 78:15
taking 23:11,15
talk 18:4,6  25:11  31:8
35:9  37:21,22  47:20  50:5
51:6  54:10  68:3  71:19,22
74:10
Talked 16:24  18:10  22:1
33:6  48:7  52:3  65:16
71:24
talking 29:2  30:13  33:20
42:12  49:8  70:15  81:10
Tax 60:19
team 67:8  76:16
teaming 56:19,20
teammates 74:14
technician 10:18
technology 8:5
telephone 40:16  41:15
50:16  58:17  59:8,19
60:2,5,11,22,23,24  61:6,
8,14  64:8  67:23
tell 4:8  6:18  7:7  13:13
15:14  17:24  18:12  31:7
32:9,10  37:8  38:7,12
40:9,18,20  41:1,24  43:5
44:24  48:2,17  50:12  52:6
53:18  54:17  57:18  62:18

63:20,21,22  65:20  67:14
68:4  70:20  71:11  72:11
82:5
telling 22:7,10,17,20,24
23:6  47:19  62:1,7,14,24
69:1,12,13,19
temporary 76:9,10
ten 10:16  11:10
term 21:6  72:13
terminate 67:22  68:21
terminated 51:2  68:7  69:9
77:19,21,22,23  78:4,11
80:8,12  81:18
termination 68:18  78:19
terms 24:21  35:6  38:17
40:14  57:1  65:6,24
73:14,15
terrible 52:21
testified 5:2,4,16,20,23
67:13
testimony 4:16,20  69:24
70:8
Thank 3:12  4:15  30:6
70:21  83:15
theft 36:20
there's 28:12  29:6
thereabouts 33:11
these 18:4,8  30:16  36:23,
23  38:17  56:16  62:7
67:2
thing 17:1,12  37:21  52:22
64:21  65:13  75:9,17,21
things 16:24  18:13,14  19:8
66:1  76:1  82:16
think 5:6,13  12:3  19:1
26:20  27:19  30:17  32:16
37:21,23  41:23  46:18
48:22  49:1  50:1,2  51:16
52:17  58:6  60:8,9  74:18
75:8,18  76:3
Thomas 54:17  71:3,4  80:2,
18  81:9,10
thought 11:24  18:6,18
51:24  52:2  55:20  56:7
72:16  82:2
threat 31:4  35:16  36:20
49:20  50:13  53:9  55:3
58:18  59:15  62:2
threaten 77:24
threatened 32:18,19  54:18,
20  55:8
threatening 52:17
threats 35:13  49:23  51:1
66:11  70:1  76:12  81:18
three 65:17
through 7:19  8:22  14:11
21:12  24:12,14  25:3,4
33:20  36:21  48:16  55:17,
18  56:5,24  72:4  78:15
82:21
throw 16:24  20:20
throwing 21:23
time 3:16  5:7,16  8:18  9:10
10:17  11:16  12:2,19
14:4,12  15:17  20:20  21:6
22:2  23:19  26:11  28:18
35:10  38:24  39:6,14,18,

DEPOSITION OF CHARLES EDWARDS

23 41:14,21 42:12 43:3
44:6,13 45:4,9,24 46:7
47:15 50:15,23 53:2,5,8,
16,22 54:17 55:15,20
56:13 57:8,9 58:6 59:1,6
62:9,10,17,19 63:4,5,10
64:2 66:7 67:17 69:5,6,
7,10,10,17,17 71:16,19
72:21,23 74:5,10 75:8,18
78:4,11 81:14 82:21,23
times 13:10 24:4 37:10
70:12,19
Title 11:2 45:17
today 3:18 4:16,20 7:13
13:8 50:10 69:11,18
Todd 57:18,23
together 74:19 76:8
told 15:7 20:14,14 30:7
33:8 37:7 41:6,21 42:5,
17,23 43:7 47:4,12,23
48:5 49:14 50:12,13 52:6
53:20,20,21 54:12,12,24
55:7 58:17 59:11,12 61:7
63:13 64:16 65:2 68:13
71:23
tolerated 66:2
tone 21:23 81:5
took 11:6 19:9 22:23 40:7
44:8 49:5
toward 6:4 42:19 45:4
70:2 82:6
trade 11:7
trained 38:15
training 6:15 7:15,17,20,23
8:16 9:8,17,22,23 10:2,4
11:5,6 13:19,20,22,23
14:5,11,13 23:2,4,8,9,24
24:1,2,8,11,20 25:3 55:17
56:19,20 74:15 75:14
traits 75:13
transcript 3:17 84:5
trash 42:2,6,19 48:9 49:9
50:17 57:20 58:18 62:2
68:14 70:5,6,12,16,17
trashy 42:6
treat 77:3
treated 77:4,8
treating 77:7
tried 18:1 72:7
true 68:20
truth 22:7,10,17,21,24 23:6
62:7,14,19,24 69:1,12,13,
19
try 24:19 25:4 35:8 50:3
62:6 72:3
trying 18:7 23:12 48:23
73:20
tuition 79:12
turn 35:4,19
turned 34:23
two 23:5 27:8 29:16 30:16
31:7,23 32:1 47:5,7,8
61:21 62:7 63:16 66:4
68:23 76:1,4 77:13 79:7
81:11
type 16:24 30:13
types 7:17 13:20 24:9,21

25:1,2 45:7
typewriting 85:7
typically 7:18

- U -

Uh-huh 4:10 6:11
unable 44:3,20
unacceptable 32:7
uncertain 38:17
under 4:3 27:24 29:23
85:7
understand 4:6,8,12 10:10
17:8 39:14 52:11,15,16
71:20
understanding 4:5
understands 67:11
understood 52:20,22 65:1
underwriting 65:18
unit 11:4 14:10 16:22
39:3,22 40:15 44:5 46:17
55:16,19 56:2 65:20,23,
23 66:1,15 67:8 74:20
77:2
United 10:14
units 8:10 11:4
University 6:7
Unprofessional 32:6
unsafe 52:2
unsure 23:20
until 12:22 13:3 27:17
45:23 69:11,18 74:5,5
untruths 76:13
upon 25:6 37:20 56:8
66:10
ups 27:2
upset 48:7 50:2,22 63:24
use 3:23 42:18 67:17 68:2,
5
used 67:21 72:13
using 42:20

- V -

valid 44:4
validate 51:7
Valley 3:10
verbal 78:15 80:21 81:1
version 20:5,6 59:14,21,22
66:9
versus 74:11,19 79:6,9
Vice 2:6
view 34:1
violence 31:4 35:13,16
36:20
violent 54:8
Vision 79:12
volume 84:5
voluntarily 77:23

- W -

wait 54:14
walk 48:16
walked 53:4
want 8:18 10:10 12:2,20
29:7 30:6 31:2 40:13

41:13 50:5,7,8 52:15
59:5 60:17 67:8,11 71:16
75:17 80:11
wanted 33:24 40:12 50:21
54:3,5 56:6 64:20 65:22
66:15 70:17,20 71:15
72:15
warning 78:9,9,10,16 81:2
warnings 80:21
watchful 55:19
way 19:9 21:8 23:20 28:18
30:6 32:21 38:4 42:16
52:9 66:5 67:21 77:3,7
wedding 33:23,23
weeks 43:22 44:19,21
weight 41:14 43:10,14,19
44:10,24 46:2
whatever 49:9 68:4
WHEREOF 85:13
Whereupon 83:17
White 31:15,17 42:2,6,6,19
48:8 49:9 50:16 57:20
58:18 62:2 68:14 70:5,6,
12,16,17
whoever 35:9
whole 37:21 64:21 65:7
74:14 78:24
wife 72:5
Wilgoren 2:2,2,14 3:5,13
28:16 29:5 36:8 60:10,16
66:22 67:1 83:3,5,15
will 3:15,16 4:8 19:8 35:6
37:10,12 40:9 42:7 52:6
68:1
Williams 41:17 42:1 46:5
49:7 57:19 59:22 62:1,4,
20 63:17 68:6,13 69:13,
20,24 70:5 75:21 77:17,
24 79:22
Williams' 41:18 46:12 47:9
59:7,13,22 61:6 68:18
75:6 81:22
within 8:6 15:1 39:22 45:1
73:15 77:1
without 34:24
Witness 2:12 68:16 84:18
85:13
witnesses 18:9,18 20:2,4,10
37:21 51:8 54:10 57:12
62:11 74:9
work 4:4 5:6,11 6:4,16
7:2,5 11:9,20 16:4,13
23:3 25:9 27:21 28:13
32:6 34:14 44:15 45:4
46:16 51:19 55:23 67:24
72:4,8,10,12 74:6 76:6,8
worked 10:17 12:12 16:11
working 10:9,11,12 40:16
74:14
works 8:6
worried 64:5
Wright 57:14
write 27:2
written 78:9,10,16,17
wrong 20:18 44:22 59:6
wrote 4:23

- X -

X 2:11

- Y -

year 12:22
years 6:3,22 7:9,11 8:19
10:16,18,20,20 11:10
12:17 82:20

SCRUNCH™ INDEX



COPY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 OCT 21 P 3:05

DISTRICT OF MASS.

BARBARA CONNICK

**Plaintiff**

v.

CONTINENTAL CASUALTY
COMPANY

**Defendant**

MAGISTRATE JUDGE Dowel

04 . 12208 WGY

CIVIL ACTION NO. _____

AMOUNT $ 150
SUMMONS ISSUED YES
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK JDW
DATE 10/21/04

**COMPLAINT AND DEMAND FOR JURY TRIAL**

### I. INTRODUCTION

This action is brought by Barbara Connick against Continental Casualty Company, her former employer. Barbara Connick alleges that Continental Casualty Company discriminated against her in violation Title VII of the Civil Rights Act, as amended, 42 U.S.C. §2000e, et seq. because the defendant fostered a work environment that allowed her to be harassed based on her race (Caucasian). Defendant further violated the statute by failing to conduct an appropriate investigation into her several complaints of harassment based on her race and failed to take appropriate action to remedy the unlawful racial harassment. Ms. Connick seeks compensation for the grave harm she suffered and continues to suffer as a result of the actions and omissions of the defendant and seeks equitable and injunctive relief.

1

## II.   PARTIES

1.      Plaintiff BARBARA CONNICK, (Hereinafter, "Connick") is a resident of Hull, Plymouth County, Massachusetts.  Plaintiff was an employee of Defendant, Continental Casualty Company for approximately fifteen years until she commenced a medical leave of absence on or about September 1999.

2.      Defendant, CONTINENTAL CASUALTY COMPANY (Hereinafter, "CNA") has an   office located in Quincy, Norfolk County, Massachusetts.

3.      CNA is a "person" within the meaning of Section 701(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(a).

4.      CNA is engaged in an industry affecting commerce and employs 15 or more employees, and is an "employer" within the meaning of Section 701(b) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

## III.   JURISDICTION

5.      This suit is brought and jurisdiction lies pursuant to  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f) and 2000e-5(g), as well as 28 U. S. C. §1331, and 28 U. S. C. §2201 and 2202.

6.      Venue is proper in this district pursuant to   28 U. S. C. §1391(b) and 42 U.S.C. §§ 2000e-5(f) (3) insofar as all the discriminatory employment practices alleged in her complaint were committed within the County of Norfolk in the Commonwealth, the plaintiff resides in the County of Plymouth in the Commonwealth of Massachusetts and the

2

defendant conducts business and has substantial business contacts in the Commonwealth of Massachusetts.

## IV.    STATEMENT OF FACTS

7.    CNA employed Ms. Connick for approximately fifteen years. At all relevant times Ms. Connick performed the functions of her job in a fully satisfactory manner. At all relevant times Abbi Laushine was her direct supervisor.

8.    Ms. Connick was subject to harassment based on her race on an ongoing basis. She reported this conduct to her former supervisor, Laura Nichols, however no action was taken.

9.    In June 1999 Greta Thomas, (African American), a co - worker stared at Ms. Connick during an office party. She also threatened Ms. Connick with physical violence. Ms. Connick reported this misconduct to Abby Laushine, however no action was taken.

10.    Between June 1999 and August 1999 Ms. Connick was subject to continual harassment based on her race. Several African American employees, including Heather Gill Grace Clements, Shauna Williams and Ernie Goddard gathered together on a daily basis. They made demeaning and derogatory comments and mimicked employees based on their race.

11.    During the week August 20, 1999 Grace Clements and Shauna Williams were talking at Shauna's desk. Ms. Connick heard Grace Clements say that she (Ms. Connick) "was pure garbage." Shauna said that,  "Heather would have no problem

3

beating her up." Shauna stated, "White trash bitch, we'll get Heather to beat her up"

12.    Ms. Connick reported the threatening and racially charged statement to her supervisor, Abbi Laushine in a meeting held at a restaurant, at Ms. Connick's request, on or about August 26, 2000.  At this meeting Ms. Connick advised Ms. Laushine that there were "racial issues" in the work unit.  Ms. Connick reminded Ms. Laushine that she had told her the previous June of the incident with Heather Gill.

13.    At the meeting Ms. Connick advised Ms. Laushine that the statement that was made by Ms. Williams was as follows, **"Damn bitch, she talks about us talking all day back and forth and she's never at her desk.  We'll take care of her, white trash bitch.  We'll have Heather take care of her.  Heather will beat her up.  Heather will have no problem beating her up."**  (emphasis supplied).  Ms. Connick also told Ms. Laushine the Grace Clements stated, "That bitch, that bitch was at my desk."

14.    At no time did Ms. Laushine or anyone other representative of the CNA investigate the racial harassment reported by Ms. Connick at her August 26, 1999 meeting with Ms. Laushine.

15.    On or about September 16, 1999 Shauna Williams again threatened Ms. Connick.  In so doing, Williams continued the pattern of racially hostile threats and statements against Ms. Connick.  Williams was on the telephone.  Ms. Connick heard Williams say into the telephone about her, "This white trash bitch that sits in front of me, white trash bitch, I'll have her taken care of, I'll have someone waiting in the garage for her,

4

and you know who I mean."   Ms. Connick feared for her life as a result of the above quoted threat.

16.    Charles Edwards, was CNA's Director of Human Resources, at all times relevant to this matter. Mr. Edwards stated to Ms. Connick and in his deposition in the proceedings before the Massachusetts Commission Against Discrimination that calling a Caucasian "white trash" is just like calling an African American the "n" word

17.    Ms Connick reported this racially harassing statements and threats to her physical safety to Abby Laushine and Charles Edwards.  However, no action was taken to address the racial harassment of threats to her physical safety.

18.    Ms. Connick was in fear for her safety as a result of the conduct of Ms. Williams on September 16, 1999.  Ms. Connick thought she would be killed.

19.    CNA failed to conduct an adequate investigation or to remedy the harassing and threatening conduct.  No disciplinary action was taken against a single employee who engaged in the racially harassing conduct and conduct that reasonably caused Ms Connick to fear for her life.

20.    CNA failed to take any action to eliminate the racially hostile environment. No action was taken to make the work environment safe so that Ms. Connick  could return to work and not be in fear that the threats on her life would not be carried out.

21.    Ms. Connick repeatedly requested that Ms. Williams' desk be moved but this request was denied.  Ms. Laushine told Ms. Connick that she was for this move but that

5

Charles Edwards was against.   Ms. Connick told Ms. Laushine that she felt as though the matter was being swept under the rug. Ms. Connick asked to meet face to face with Shauna Williams behind closed doors to discuss the matter. However Ms. Laushine told her this could not be done because they were afraid of Shauna's aggression.

22.    CNA failed to move Ms. Williams' work location even after the same was suggested by Detective Nancy Coletta of the Quincy Police Department.

23.    Paul Connick, Ms. Connick's husband, asked Charles Edwards during a telephone conference what actions were being taken to give Barbara a safe non-racially hostile work environment.  Charles Edwards responded, "I can't guarantee anything."

24.    CNA failed to talk with witnesses to the events, including but not limited to, Lisa Wright, Doris (Last name unknown) and others as suggested by Ms. Connick. Contrary to CNA's Code of Professional Conduct policy, this matter was never investigated by Corporate. CNA failed to respond to Ms. Connick's suggestion that Shauna's telephone records be checked.

25.    Ms. Laushine admitted that, as of October 4, 1999, "the situation (in the work place) had gotten out of control."   Laushine described the situation stating, "The racial piece was still an issue, and it was affecting Barbie."

26.    Ms. Connick has not been able to work since the end of September 1999. Ms. Connick has suffered, and continues to the present time to suffer, severe emotional and physical injuries caused by CNA's unlawful conduct.  Ms. Connick has suffered constantly from September 27,1999 to the present time from post traumatic stress

6

syndrome, major clinical depression, lack of sleep, anxiety, exhaustion, suicidal ideation, loss of self esteem, side effects from medications, inability to concentrate, nausea, inability to sleep, nightmares and dizziness.

27.    The unlawful conduct of defendant as set forth above has caused Ms. Connick to lose pay, benefits and perquisites of employment.

28.    All conditions precedent under Title VII of the Civil Rights Act of 1964 have been occurred or have been complied with:

a.    A charge alleging discrimination by the defendant on the basis of race was filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the discriminatory actions alleged in the Charge.

b.    Ms. Connick received a Notification of Rights regarding her EEOC charge on July 28, 2004.

c.    This complaint has been filed within 90 days of Ms. Connick's receipt of the Notification of Rights.

**COUNT I**
**DISCRIMINATION BASED ON RACE**
**TITLE VIII OF THE CIVIL RIGHTS ACT, AS AMENDED, 42 U.S.C. §2000E, ET SEQ.**

29.    Plaintiff Barbara Connick repeats the allegations set forth in paragraphs 1 through 28 above, and incorporates those allegation as if fully set forth herein.

30.    The actions and omissions of CNA, as set forth above constitute and cerate a hostile work environment and unlawful discrimination against Ms. Connick based on her race in violation of Title VIII of the Civil Rights Act, as amended, 42

7

U.S.C. §2000e, et seq.

31.    The discriminatory actions and omissions of CNA have caused, continue to cause and will cause Ms. Connick to suffer substantial damages for lost wages and income, the loss of employment benefits, and other pecuniary losses, as well as mental anguish and humiliation, severe emotional distress, the loss of enjoyment of life and other non pecuniary losses.

## PRAYER FOR RELIEF

Plaintiff Barbara Connick prays the court to grant her the following relief:

1.    That the plaintiff be awarded appropriate injunctive relief designed to assure that the defendant discontinue its discriminatory practices.

2.    That the plaintiff be awarded compensatory damages in an amount to be determined at trial in this matter, plus statutory interest on any such award.

3.    That the plaintiff be awarded punitive damages in an amount to be determined at trial in this matter, plus statutory interest on any such award.

4.    That the plaintiff be awarded reasonable attorney's fees together with litigation expenses and costs of this action.

5.    That the plaintiff be awarded such other and further relief as the Court deems just and proper.

8

## DEMAND FOR JURY TRIAL

THE PLAINTIFF IN THE ABOVE ENTITLED ACTION DEMANDS A TRIAL BY JURY.

**BARBARA CONNICK, Plaintiff**
By her Attorney,

HOWARD I. WILGOREN, ESQ.
179 Union Avenue
Framingham, MA 01702
(508) 626 - 8600
BBO No. 527840

DATED: October 21, 2004

9

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

```
***********************************
BARBARA CONNICK                    *
                                   *
         Plaintiff                 *
                                   *
v.                                 *        CIVIL ACTION NO.04-12208WGY
                                   *
CONTINENTAL CASUALTY               *
COMPANY                            *
                                   *
         Defendant                 *
***********************************
```

COPY

## DEFENDANT'S ANSWER TO COMPLAINT

Defendant, Continental Casualty Company ("Defendant" or "CNA"), by its attorneys, Sonnenschein, Nath & Rosenthal LLP, hereby answers Plaintiff Barbara Connick's Complaint as follows:

## I.    INTRODUCTION

This action is brought by Barbara Connick against Continental Casualty Company, her former employer. Barbara Connick alleges that Continental Casualty Company discriminated against her in violation Title VIII [sic] of the Civil Rights Act, as amended, 42 U.S.C. §2000e, et seq. because the defendant fostered a work environment that allowed her to be harassed based on her race (Caucasian). Defendant further violated the statute by failing to conduct an appropriate investigation into her several complaints of harassment based on her race and failed to take appropriate action to remedy the unlawful racial harassment. Ms. Connick seeks compensation for the grave harm she suffered and continues to suffer as a result of the actions and omissions of the defendant and seeks equitable and injunctive relief.

**ANSWER:**

Defendant admits that Plaintiff Barbara Connick, a former CNA employee, brings this action against it pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000e, et seq. ("Title VII"), and that Plaintiff makes the allegations and seeks the compensation described above. CNA denies that it violated Title VII in any way and denies that Plaintiff is entitled to any relief whatsoever in this action.

## II.    PARTIES

1.    Plaintiff BARBARA CONNICK, (Hereinafter, "Connick") is a resident of Hull, Plymouth County, Massachusetts. Plaintiff was an employee of Defendant, Continental Casualty Company for approximately fifteen years until she commenced a medical leave of absence on or about September 1999.

**ANSWER:**

CNA lacks knowledge or information sufficient to form a belief as to whether Plaintiff is a resident of Hull, Plymouth County, Massachusetts, and on that basis denies same. CNA admits that it employed Plaintiff beginning in 1984 and that Plaintiff commenced a medical leave on October 7, 1999 from which she did not return to work. CNA denies the remaining allegations contained in Paragraph 1 of the Complaint.

2.    Defendant, CONTINENTAL CASUALTY COMPANY (Hereinafter, "CNA") has an office located in Quincy, Norfolk County, Massachusetts.

**ANSWER:**

CNA admits the allegations contained in Paragraph 2 of the Complaint.

3.    CNA is a "person" within the meaning of Section 701(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(a).

**ANSWER:**

CNA admits the allegations contained in Paragraph 3 of the Complaint.

4.    CNA is engaged in an industry affecting commerce and employs 15 or more employees, and is an "employer" within the meaning of Section 701(b) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

**ANSWER:**

CNA admits the allegations contained in Paragraph 4 of the Complaint.

### III.    JURISDICTION

5.    This suit is brought and jurisdiction lies pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f) and 2000e-5(g), as well as 28 U.S.C. §1331, and 28 U.S.C. §2201 and 2202.

**ANSWER:**

CNA admits the allegations contained in Paragraph 5 of the Complaint.

6.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §§ 2000e-5(f) (3) insofar as all the discriminatory employment practices alleged in her complaint were committed within the County of Norfolk in the Commonwealth, the plaintiff resides in the County of Plymouth in the Commonwealth of Massachusetts and the defendant conducts business and has substantial business contacts in the Commonwealth of Massachusetts.

**ANSWER:**

CNA admits the allegations contained in Paragraph 6 of the Complaint except to deny

that it engaged in the discriminatory practices alleged in the Complaint.

### IV.    STATEMENT OF FACTS

7.    CNA employed Ms. Connick for approximately fifteen years.  At all relevant times Ms. Connick performed the functions of her job in a fully satisfactory manner.  At all relevant times Abbi Laushine was her direct supervisor.

**ANSWER:**

CNA admits the allegations contained in Paragraph 7 of the Complaint.

8.    Ms. Connick was subject to harassment based on her race on an ongoing basis. She reported this conduct to her former supervisor, Laura Nichols, however no action was taken.

**ANSWER:**

Defendant denies the allegations contained in Paragraph 8 of the Complaint.

9.    In June 1999 Greta Thomas, (African American), a co - worker stared at Ms. Connick during an office party.  She also threatened Ms. Connick with physical violence.  Ms. Connick reported this misconduct to Abby Laushine, however no action was taken.

- 3 -

**ANSWER:**

CNA admits that Plaintiff stated to Abbi Laushine that, during a luncheon on June 24, 1999, co-worker Greta Thomas looked at Plaintiff and asked Plaintiff whether she wanted Thomas to beat her up. CNA lacks knowledge or information sufficient to form a belief as to the truth of Plaintiff's statement and on that basis denies same. CNA denies the remaining allegations contained in Paragraph 9 of the Complaint.

10.  Between June 1999 and August 1999 Ms. Connick was subject to continual harassment based on her race. Several African American employees, including Heather Gill Grace Clements, Shauna Williams and Ernie Goddard gathered together on a daily basis. They made demeaning and derogatory comments and mimicked employees based on their race.

**ANSWER:**

CNA lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10 of the Complaint and on that basis denies same.

11.  During the week August 20, 1999 Grace Clements and Shauna Williams were talking at Shauna's desk. Ms. Connick heard Grace Clements say that she (Ms. Connick) "was pure garbage." Shauna said that, "Heather would have no problem beating her up." Shauna stated, "White trash bitch, we'll get Heather to beat her up"

**ANSWER:**

CNA lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 of the Complaint and on that basis denies same.

12.  Ms. Connick reported the threatening and racially charged statement to her supervisor, Abbi Laushine in a meeting held at a restaurant, at Ms. Connick's request, on or about August 26, 2000. At this meeting Ms. Connick advised Ms. Laushine that there were "racial issues" in the work unit. Ms. Connick reminded Ms. Laushine that she had told her the previous June of the incident with Heather Gill.

**ANSWER:**

CNA admits that during a meeting at a restaurant in August 1999, held at Plaintiff's request, Plaintiff stated to Laushine that, during a luncheon on June 24, 1999, co-worker Greta Thomas looked at Plaintiff and asked Plaintiff whether she wanted Thomas to beat her up and

- 4 -

that there were racial cliques. CNA denies the remaining allegations contained in Paragraph 12 of the Complaint.

13.    At the meeting Ms. Connick advised Ms. Laushine that the statement that was made by Ms. Williams was as follows, **"Damn bitch, she talks about us talking all day back and forth and she's never at her desk. We'll take care of her, white trash bitch. We'll have Heather take care of her. Heather will beat her up. Heather will have no problem beating her up."** (emphasis supplied). Ms. Connick also told Ms. Laushine the Grace Clements stated, "That bitch, that bitch was at my desk."

**ANSWER:**

CNA denies the allegations contained in Paragraph 13 of the Complaint.

14.    At no time did Ms. Laushine or anyone other [sic] representative of the [sic] CNA investigate the racial harassment reported by Ms. Connick at her August 26, 1999 meeting with Ms. Laushine.

**ANSWER:**

CNA denies the allegations contained in Paragraph 14 of the Complaint.

15.    On or about September 16, 1999 Shauna Williams again threatened Ms. Connick. In so doing, Williams continued the pattern of racially hostile threats and statements against Ms. Connick. Williams was on the telephone. Ms. Connick heard Williams say into the telephone about her, "This white trash bitch that sits in front of me, white trash bitch, I'll have her taken care of, I'll have someone waiting in the garage for her, and you know who I mean." Ms. Connick feared for her life as a result of the above quoted threat.

**ANSWER:**

CNA admits that on September 16, 1999, Plaintiff told Charles Edwards that she overheard Williams on the telephone. Defendant denies the existence of a pattern of racially hostile threats and statements against Plaintiff. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 15 of the Complaint and on that basis denies same.

16.    Charles Edwards, was CNA's Director of Human Resources, at all times relevant to this matter. Mr. Edwards stated to Ms. Connick and in his deposition in the proceedings before the Massachusetts Commission Against Discrimination that calling a Caucasian "white trash" is just like calling an African American the "n" word

- 5 -

**ANSWER:**

CNA admits the allegations contained in Paragraph 16 of the Complaint, except to state

that Edwards' title was Vice President of Human Resources at Quincy.

17.    Ms Connick reported this racially harassing statements and threats to her physical safety to Abby Laushine and Charles Edwards.  However, no action was taken to address the racial harassment of threats to her physical safety.

**ANSWER:**

CNA admits that Plaintiff made certain complaints to Laushine and Edwards but denies

that Plaintiff complained of all of the statements and actions alleged in the Complaint.  CNA

denies the remaining allegations contained in Paragraph 17 of the Complaint.

18.    Ms. Connick was in fear for her safety as a result of the conduct of Ms. Williams on September 16, 1999.  Ms. Connick thought she would be killed.

**ANSWER:**

CNA lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 18 of the Complaint and on that basis denies same.

19.    CNA failed to conduct an adequate investigation or to remedy the harassing and threatening conduct.  No disciplinary action was taken against a single employee who engaged in the racially harassing conduct and conduct that reasonably caused Ms Connick to fear for her life.

**ANSWER:**

CNA denies the allegations contained in Paragraph 19 of the Complaint.

20.    CNA failed to take any action to eliminate the racially hostile environment.  No action was taken to make the work environment safe so that Ms. Connick could return to work and not be in fear that the threats on her life would not be carried out.

**ANSWER:**

CNA denies the allegations contained in Paragraph 20 of the Complaint.

21.    Ms. Connick repeatedly requested that Ms. Williams' desk be moved but this request was denied.  Ms. Laushine told Ms. Connick that she was for this move but that Charles Edwards was against.  Ms. Connick told Ms. Laushine that she felt as though the matter was being swept under the rug.  Ms. Connick asked to meet face to face with Shauna Williams

behind closed doors to discuss the matter. However Ms. Laushine told her this could not be done because they were afraid of Shauna's aggression.

**ANSWER:**

CNA admits that Plaintiff suggested that CNA move Shauna Williams' desk. CNA denies the remaining allegations contained in Paragraph 21 of the Complaint.

22.    CNA failed to move Ms. Williams' work location even after the same was suggested by Detective Nancy Coletta of the Quincy Police Department.

**ANSWER:**

CNA denies the allegations contained in Paragraph 22 of the Complaint.

23.    Paul Connick, Ms. Connick's husband, asked Charles Edwards during a telephone conference what actions were being taken to give Barbara a safe non-racially hostile work environment. Charles Edwards responded, "I can't guarantee anything."

**ANSWER:**

CNA admits that in a conversation with Charles Edwards, Plaintiff's husband Paul Connick expressed concerns about Plaintiff's safety. CNA denies the remaining allegations contained in Paragraph 23 of the Complaint.

24.    CNA failed to talk with witnesses to the events, including but not limited to, Lisa Wright, Doris (Last name unknown) and others as suggested by Ms. Connick. Contrary to CNA's Code of Professional Conduct policy, this matter was never investigated by Corporate. CNA failed to respond to Ms. Connick's suggestion that Shauna's telephone records be checked.

**ANSWER:**

CNA denies the allegations contained in Paragraph 24 of the Complaint.

25.    Ms. Laushine admitted that, as of October 4, 1999, "the situation (in the work place) had gotten out of control." Laushine described the situation stating, "The racial piece was still an issue, and it was affecting Barbie."

**ANSWER:**

CNA denies the allegations contained in Paragraph 25 of the Complaint.

26.    Ms. Connick has not been able to work since the end of September 1999. Ms. Connick has suffered, and continues to the present time to suffer, severe emotional and physical injuries caused by CNA's unlawful conduct. Ms. Connick has suffered constantly from September 27, 1999 to the present time from post traumatic stress syndrome, major clinical

- 7 -

depression, lack of sleep, anxiety, exhaustion, suicidal ideation, loss of self esteem, side effects from medications, inability to concentrate, nausea, inability to sleep, nightmares and dizziness.

**ANSWER:**

CNA admits that in October 1999, Plaintiff went on medical leave from which she did not return to work. CNA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 26 of the Complaint and on that basis denies same. CNA further denies that its conduct in any way contributed to Plaintiff's alleged such symptoms.

27.    The unlawful conduct of defendant as set forth above has caused Ms. Connick to lose pay, benefits and perquisites of employment.

**ANSWER:**

CNA denies that it engaged in unlawful conduct and denies the remaining allegations contained in Paragraph 27 of the Complaint.

28.    All conditions precedent under Title VII of the Civil Rights Act of 1964 have been occurred or have been complied with:

a.    A charge alleging discrimination by the defendant on the basis of race was filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the discriminatory actions alleged in the Charge.

b.    Ms. Connick received a Notification of Rights regarding her EEOC charge on July 28, 2004.

c.    This complaint has been filed within 90 days of Ms. Connick's receipt of the Notification of Rights.

**ANSWER:**

CNA lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 of the Complaint and on that basis denies same.

**COUNT I**
**DISCRIMINATION BASED ON RACE**
**TITLE VIII OF THE CIVIL RIGHTS ACT, AS AMENDED, 42 U.S.C. §2000E, ET SEQ.**

29.    Plaintiff Barbara Connick repeats the allegations set forth in paragraphs 1 through 28 above, and incorporates those allegation as if fully set forth herein.

- 8 -

**ANSWER:**

CNA adopts and incorporates as if set forth fully herein its answers to Paragraphs 1 through 28 above.

30.     The actions and omissions of CNA, as set forth above constitute and cerate [sic] a hostile work environment and unlawful discrimination against Ms. Connick based on her race in violation of Title VIII of the Civil Rights Act, as amended, 42 U.S.C. §2000e, et seq.

**ANSWER:**

CNA denies the allegations contained in Paragraph 30 of the Complaint.

31.     The discriminatory actions and omissions of CNA have caused, continue to cause and will cause Ms. Connick to suffer substantial damages for lost wages and income, the loss of employment benefits, and other pecuniary losses, as well as mental anguish and humiliation, severe emotional distress, the loss of enjoyment of life and other non pecuniary losses.

**ANSWER:**

CNA denies the allegations contained in Paragraph 31 of the Complaint.

**PRAYER FOR RELIEF**

Plaintiff Barbara Connick prays the court to grant her the following relief:

1.     That the plaintiff be awarded appropriate injunctive relief designed to assure that the defendant discontinue its discriminatory practices.

2.     That the plaintiff be awarded compensatory damages in an amount to be determined at trial in this matter, plus statutory interest on any such award.

3.     That the plaintiff be awarded punitive damages in an amount to be determined at trial in this matter, plus statutory interest on any such award.

4.     That the plaintiff be awarded reasonable attorney's fees together with litigation expenses and costs of this action.

5.     That the plaintiff be awarded such other and further relief as the Court deems just and proper.

**ANSWER:**

Defendant denies that Plaintiff is entitled to any relief in this action.

## AFFIRMATIVE DEFENSES

Pleading further in accordance with Fed. R. Civ. P. 8, Defendant states the following as affirmative defenses to the Complaint:

### FIRST AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims fail, in whole or in part, because Plaintiff failed to comply with the applicable limitations period(s).

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims fail, in whole or in part, because Plaintiff failed to follow the procedural and/or administrative requirements for the maintenance of a lawsuit under Title VII.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims fail to the extent they exceed the scope of her administrative charge of discrimination.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims fail because Defendant exercised reasonable care to prevent and correct promptly any harassing behavior and Plaintiff unreasonably failed to take advantage of Defendant's preventive or corrective opportunities o r to avoid harm otherwise.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims fail because Defendant acted at all times toward Plaintiff in good faith and for legitimate, non discriminatory, non-retaliatory reasons.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for damages fail because Plaintiff failed to mitigate her damages, if any.

- 10 -

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims fail because workers' compensation provides the exclusive remedy for

Plaintiff's claims.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims fail because the incidents she alleges were provoked by her own actions.

WHEREFORE, Defendant, Continental Casualty Company prays that Plaintiff Barbara

Connick's Complaint be dismissed in its entirety, at Plaintiff's cost, and that Defendant be

granted an award of reasonable attorney's fees and costs, together with such other and further

relief that this Court may deem just and equitable under the circumstances.

Respectfully submitted,

By: _____
One of the attorneys for Defendant
Continental Casualty Company

Jeffrey S. Goldman
Catherine S. Nasser
SONNENSCHEIN NATH & ROSENTHAL LLP
8000 Sears Tower
Chicago, IL 60606
(312) 876-8000
(312) 876-7934 (fax)
cnasser@sonnenschein.com

Jean M. Kelley
MORRISON, MAHONEY & MILLER LLP
115 Commonwealth Avenue
Chestnut Hill, MA 02476
(617) 964-0323
(617) 969-8337 (fax)
jeanmkelley@comcast.net

- 11 -