**EXHIBIT B**

BARBARA C. CONNICK

VERSUS

CONTINENTAL CASUALTY COMPANY

DEPOSITION AND WORD INDEX:  BARBARA C. CONNICK

September 1,  2000

*Leavitt Reporting Service, Inc.*
*86 Washington Street*
*Weymouth, MA 02188*

*Phone:  (781) 335-6791*
*Fax:  (781) 335-7911*
*leavittreporting@att.net*

1

1     COMMONWEALTH OF MASSACHUSETTS
2     COMMISSION AGAINST DISCRIMINATION
3
4  * * * * * * * * * * * * * * * * * * *
5  BARBARA C. CONNICK,   *
       Complainant   *
6      VERSUS     * NO. 00130700
   CONTINENTAL CASUALTY COMPANY,   *
7      Respondent   *
   * * * * * * * * * * * * * * * * * * *
8     DEPOSITION OF **BARBARA C. CONNICK**, a witness called
9  for examination by counsel for the Respondent
   pursuant to the Massachusetts Rules of Civil
10 Procedure before Elaine M. Buckley, Massachusetts
   CSR (No. 137694), Registered Professional Reporter
11 and Notary Public in and for the Commonwealth of
   Massachusetts at the offices of Hale and Dorr, LLP,
12 60 State Street, Boston, Massachusetts, on Friday,
   September 1, 2000, commencing at 10:05 A.M.
13
14 APPEARANCES:
15 ALLISON C. BLAKLEY, ESQ.
   Fox and Grove
16 311 South Wacker Drive
   Suite 6200
17 Chicago, Illinois 60606
   (For the Respondent)
18
   HOWARD WILGOREN, ESQ.
19 Law Offices of Howard Wilgoren
   1661 Worcester Road
20 Framingham, MA 01701
   (For the Complainant)
21
22 ALSO PRESENT:
23 Paul Connick

2

1        I N D E X
2  WITNESS     DIRECT CROSS REDIRECT RECROSS
3  Barbara C. Connick   3   213   225
4
5
6        E X H I B I T S
7  NUMBER    DESCRIPTION      PAGE
8  No. 1  Diagram      107
9  No. 2  Narrative      115
10 No. 3  Group of E-Mail Messages    115
11 No. 4  E-Mail, 11/17/99      115
12 No. 5  Answers to Interrogatories    194
13 No. 6  Charge of Discrimination    194
14 No. 7  Our Commitment to Professional Conduct 216
15
16
17
18
19
20
21
22
23

3

1       P R O C E E D I N G S
2      BARBARA C. CONNICK, Sworn
3      Direct Examination
4    Q. (By Ms. Blakley) Can you state your name for
5  the record, please.
6    A. Barbara Connick.
7    Q. Mrs. Connick, are you currently taking any
8  medications?
9    A. Yes.
10   Q. What medications are you currently taking?
11   A. I have them with me.
12   Q. Would you like to look at them to tell me?
13   A. Yes . Propanolol, Trazodone -- I am not on
14 it. I take it at night.
15   Q. Did you take it last night?
16   A. Yes. Piroxicam, 20 milligrams.
17   Q. What was that?
18   A. Klonopin, 5 milligrams. Tylenol with
19 Codeine, Zoloft, 200 milligrams a day. Flexeril, 10
20 milligrams. Doxycycline, 100 milligrams. The one
21 that I take at night is Trazodone, 100 milligrams.
22   Q. I missed a name. There was Propanolol,
23 Trazodone and before the Klonopin there was

4

1  something.
2    A. Piroxicam, 20 milligrams.
3      MR. WILGOREN: P-I-R-O-X-I-C-A-M.
4    Q. Did you take Tylenol with Codeine today?
5    A. Yes, I did.
6    Q. How much?
7    A. One.
8    Q. What about Flexeril, have you taken that
9  today?
10   A. Yes, I took one. I only take the Flexeril
11 once daily. No, sorry, I take the Flexeril three
12 times a day. The other drug I take once daily, but
13 the Klonopin I take three times a day and the Inderal
14 I take three times a day.
15   Q. The Inderal, that is the Propanolol?
16   A. I think so, yes. I just call it Inderal.
17   Q. Who prescribed the Inderal?
18   A. Doctor Colella.
19   Q. Do you know what condition Doctor Colella is
20 treating with the drug?
21   A. PTS.
22   Q. Post traumatic stress disorder?
23   A. Yes.

**5**

1    Q. Did Doctor Colella also prescribe the
2    Trazodone?
3        A. Yes.
4        Q. For the same condition or a different
5    condition?
6        A. He said that the PTS has developed into
7    major clinical depression.
8        Q. The Piroxicam, who was that prescribed by?
9        A. Doctor Weinberg.
10       Q. What type of doctor is Doctor Weinberg?
11       A. He might be my primary care.
12           MR. WILGOREN: Could we go off the
13    record?
14           (Off-the-record discussion.)
15       Q. What type of doctor is Doctor Weinberg?
16       A. I don't know.  He was a doctor on call in
17    the medical clinic the day after I had a car
18    accident.
19       Q. When was the car accident?
20       A. August 8.
21       Q. Of this year?
22       A. Yes.
23       Q. Do you know what symptom or condition Doctor

**6**

1    Weinberg prescribed the Piroxicam to treat?
2        A. My back.
3        Q. With respect to the Klonopin, was that
4    prescribed by Doctor Colella?
5        A. Yes, it was.
6        Q. Did Doctor Colella tell you what the
7    Klonopin was for?
8        A. Anxiety.
9        Q. The Tylenol with Codeine, was that
10    prescribed by Doctor Weinberg?
11       A. Yes.  No, actually I think that was
12    prescribed by my primary care physician.  That was
13    for pain.  Yes, that was my primary care.
14       Q. Who is that?
15       A. Doctor Sipzener.
16       Q. Was that prescribed before or after your
17    auto accident?
18       A. After it.
19       Q. For pain associated with that accident?
20       A. Yes.
21       Q. Was the Zoloft prescribed by Doctor Colella?
22       A. Yes, it was.
23       Q. Do you know what condition he is treating

**7**

1    with that?
2        A. Depression.
3        Q. The Flexeril, was that prescribed following
4    the car accident?
5        A. Yes.
6        Q. For back problems?
7        A. Yes, by my primary care.
8        Q. The Doxycycline, who prescribed that?
9        A. Doctor Gibney.
10       Q. What type of doctor is Doctor Gibney?
11       A. Dermatologist.
12       Q. Is that for a skin condition?
13       A. Yes.
14       Q. When you saw Doctor Weinberg after your auto
15    accident, did you tell him that you were taking
16    Trazodone and Klonopin and Zoloft?
17       A. Yes.
18       Q. Have you told Doctor Colella that you are
19    taking Piroxicam, Tylenol with Codeine and Flexeril?
20       A. No, not yet.
21       Q. Mrs. Connick, are you currently experiencing
22    back pain?
23       A. A little bit.  More if I don't take the pain

**8**

1    killer; but if I take it, I'm all right.
2        Q. To the best of your knowledge, do any of
3    these medications interfere in any way with your
4    memory?
5        A. I don't know.  I just know that I have
6    strict orders not to drive on them by both the
7    pharmacist and the doctor.
8        Q. You weren't driving during the August 8
9    accident, were you?
10       A. Yes, I was.
11       Q. Where did that accident take place?
12       A. On Otis Street in Hingham.
13       Q. Was it a multiple-vehicle accident?
14       A. Yes.
15       Q. Your car and how many others?
16       A. Me and two others.
17       Q. Who hit who?
18       A. In front of me there was a car, and in front
19    of him there was a car.  He made a quick left-hand
20    turn and so the guy in front of me stopped short and
21    I stopped short, but the guy in back of me didn't and
22    he hit me and pushed me into the guy in front of me.
23       Q. You were sandwiched between two cars?

**9**

1    **A.** Yes.

2    **Q.** Other than the medications prescribed by
3    Doctor Weinberg, have you received treatment for
4    injuries from that accident?

5    **A.** I'm going to be going to physical therapy
6    for my back, and I went to the hospital for a CT
7    Scan, something like that.

8    **Q.** Do you know what if anything the CT Scan
9    showed concerning your injuries?

10    **A.** Something about disk displacement or
11    something like that, a bulging disk, something like
12    that.

13    **Q.** Have you been advised to see any other
14    physician for that condition?

15    **A.** No, just that I have to go back to my
16    primary care in a few weeks.

17    **Q.** You indicated that your doctors and the
18    pharmacist have advised you not to drive with these
19    medications.

20    **A.** Yes.

21·    **Q.** Have any of your doctors or your pharmacist
22    told you that these medications interfere or impair
23    judgment?

**10**

1    **A.** Well, I know they cause dizziness and they
2    cause me to be tired, and I'm going to try as best I
3    can to remember everything you're going to ask me
4    about work because I have tried to block it out for a
5    long time. I'm trying to get by it, you know.

6    **Q.** Sure.

7    MS. BLAKLEY: Off the record.

8    (Off-the-record discussion.)

9    MS. BLAKLEY: Mrs. Connick, in an
10    off-the-record discussion I expressed some concerns
11    about your ability to go forward in terms of memory
12    and judgment, and your attorney has assured me
13    particularly with respect to the drugs you have taken
14    since the auto accident that he feels that your
15    memory since the auto accident is on a par with your
16    memory prior to the auto accident. Based on that
17    assurance and your assurance that you intend to try
18    as hard as you can to remember these difficult
19    events, I am going to go forward today.

20    THE WITNESS: Okay.

21    MS. BLAKLEY: I certainly do not want to
22    cause you any additional distress, either emotional
23    distress or back problems. If you need a break at

**11**

1    any point, tell me that and we will take it slow and
2    we will take as many breaks as you need.

3    THE WITNESS: It's not your fault if I
4    cry. It's just -- it's hard.

5    MS. BLAKLEY: I understand that. I
6    frequently make the same statement to people.
7    Please, don't feel uncomfortable about crying. These
8    are difficult things to talk about. I will try to be
9    as sensitive as I can, but also you need to recognize
10    my job is to ask you questions about these events.

11    THE WITNESS: Okay.

12    **Q.** Now, you're currently out on disability
13    related to the depression and the post traumatic
14    stress disorder?

15    **A.** Yes.

16    **Q.** Doctor Colella is treating you for that, is
17    that right?

18    **A.** That's correct.

19    **Q.** Are you still seeing Kate Taylor?

20    **A.** Yes.

21    **Q.** Ms. Taylor is a clinical social worker?

22    **A.** Trauma specialist.

23    **Q.** How frequently do you see her?

**12**

1    **A.** On a weekly basis.

2    **Q.** When did that start?

3    **A.** The first appointment they got me with Kate
4    was in October.

5    **Q.** October of 1999?

6    **A.** Yes.

7    **Q.** Who referred you to Kate Taylor?

8    **A.** My primary care doctors, somebody in his
9    office. He told me to tell them to get me somebody
10    from Nova Psychiatric. They set up the appointment.

11    **Q.** When did you first see Doctor Colella?

12    **A.** November 2 I believe. No, it was supposed
13    to be November 2 and something happened with my
14    medical insurance and they didn't have the correct
15    authorization number and it had to be postponed until
16    the 5th or 7th.

17    **Q.** Also 1999?

18    **A.** Yes.

19    **Q.** Were you referred to Doctor Colella by your
20    primary care physician?

21    **A.** He told me to try to get an appointment with
22    Doctor Colella or Doctor Hardy. They originally made
23    an appointment with Doctor Hardy, but Colella had a

**13**

1   cancellation.  I mean, yes, Colella had a
2   cancellation, and Doctor Sipzener said I could not
3   wait.  He said, "You can't wait."
4          The appointment they originally gave me
5   with Doctor Hardy was a little bit later.  It was
6   maybe a week or so later.  He said, "You can't wait
7   until then."  So Doctor Colella had an opening and
8   they put me in there.
9       Q.  Before you saw Doctor Colella for the first
10  time, did your primary care physician put you on any
11  kind of an antidepressant or antianxiety drug?
12      A.  Yes, he did.
13      Q.  Do you remember what drug that was?
14      A.  It was Xanax.
15      Q.  Do you remember what month it was that you
16  were prescribed the Xanax?
17      A.  October 7.
18      Q.  Also 1999?
19      A.  Yes.
20      Q.  Did you see your primary care physician on
21  that date?
22      A.  Yes, I did.
23      Q.  What was the purpose of your visit on that

**14**

1   date?
2       A.  Because I was getting dizzy and like I was
3   -- like I was having all sorts of reactions from what
4   was happening to me and it was really -- it was
5   scaring me, and I didn't know if I was okay.  I felt
6   a lot of times like I would black out.  I mean I was
7   like, you know, like dizzy from the anxiety and
8   stuff.
9       Q.  When you went to see your doctor on October
10  7, 1999, your reason for consulting with him on that
11  date was the symptoms that you were experiencing that
12  you associated with this stress and tension in the
13  workplace?
14      A.  Yes.
15      Q.  Do you have an estimated return-to-work
16  date?
17      A.  No.
18      Q.  Do you know whether you have long-term
19  disability benefits available to you?
20      A.  I do.  I purchased that.
21      Q.  Have you made any provisions to apply for
22  long-term disability at this point?
23      A.  No.

**15**

1       Q.  Other than Doctor Colella and Kate Taylor,
2   have you seen any other mental health professionals
3   since August of 1999?
4       A.  No.
5       Q.  Prior to August of 1999 had you ever
6   consulted with a mental health professional?
7          MR. WILGOREN:  I am going to object and
8   instruct the witness not to answer based on the
9   patient/psychotherapist privilege under Massachusetts
10  law.
11         MS. BLAKLEY:  I asked whether she
12  consulted one.  I didn't ask about the purpose of the
13  consultation or the nature of what she said to the
14  person.  The fact of consulting is not protected by a
15  privilege.  Would you like to reconsider your
16  instruction?
17         MR. WILGOREN:  I will let her answer.
18      Q.  Prior to August of 1999 had you ever consulted
19  with a mental health professional?
20      A.  Yes.
21      Q.  Prior to August of 1999 had any physician
22  ever prescribed for you antidepressants?
23      A.  I don't think so.

**16**

1       Q.  Had any physician prescribed for you any
2   type of antianxiety drug?
3       A.  Yes, Xanax.
4       Q.  Do you recall in what year the Xanax was
5   first prescribed for you?
6       A.  I think it was in 1993.
7       Q.  Do you recall who the physician was who
8   prescribed it?
9       A.  Doctor --
10      Q.  If you don't remember, that's okay.
11      A.  I do know.  Doctor Ashburn.
12      Q.  Was Doctor Ashburn your primary care
13  physician at that point?
14      A.  Yes.
15      Q.  Prior to going out on leave in October of
16  1999, had you ever taken a disability leave from
17  work?
18      A.  Yes.
19      Q.  When?
20      A.  October.  I mean I think it was, it was
21  the spring of 1993.
22      Q.  Do you recall how long that leave lasted?
23      A.  It was approximately a year.

**17**

1  Q. What was your job at the time that you began
2  that leave?
3  A. I was a data clerk for all business
4  accounts.
5  Q. What was the nature of your disability?
6  A. Major depression.
7  Q. Did you receive treatment during your leave?
8  A. Yes, I did.
9  Q. Did that treatment in 1993 include any
10  medications?
11  A. Yes.
12  Q. Do you recall what medications?
13  A. Pamelor and Xanax.
14  Q. Was the depressive episode in 1993 related
15  to anything that had happened in the workplace?
16  A. Yes.
17  Q. What had happened in the workplace in 1993?
18  A. Do I have to go back to this? We had been
19  moved into a new area, and there was a division
20  manager, his name was Steve Gallagher. From the time
21  we moved in he was really unhappy and he would
22  complain and say, you know, he was a miserable SOB
23  since we made the move up there and stuff.

**18**

1  He began to like make fun of me and
2  criticize the way I dress and hound me to do more
3  work when I was like buried and doing the best I
4  could. He was stalking me around the building, and I
5  could not -- I couldn't stand up to him.
6  He said to me -- you know, the
7  immediate supervisor that I had was trying to blame
8  me for errors that weren't mine, they were somebody
9  else's. I went to him as her superior, you know, and
10  I said -- I showed him. I said, "This is not even my
11  writing and I'm getting blamed for this." He said,
12  "Your problems don't begin until you start coming in
13  to see me," and then he started, you know, harassing
14  me on a regular basis.
15  I was at my desk one day and I was
16  upset, and he walked by and he said, "See what
17  happens when you wear false eyelashes," and like he
18  was -- like he would give me degrading looks and
19  stuff from head to toe. He always had something to
20  say about the way I dressed, and I dressed very nice
21  I mean for work. You know, he was a big fat guy, and
22  I just -- I couldn't handle him, you know. My
23  husband went in and said something to personnel, but

**19**

1  I never did.
2  Q. You never went to anyone in personnel back
3  in 1993?
4  A. No, I just -- I was so upset. I was
5  hysterical when I left there. I called my doctor and
6  he said, "Come in right now and see me." Then I went
7  to see my doctor, and I told him what was happening.
8  Q. Did you make a worker's compensation claim,
9  do you remember?
10  A. I don't think so. I begged my doctors not
11  to tell them. I was afraid of the man, and I begged
12  them not to tell them what I talked about with them
13  and stuff. They all told me to get a lawyer and
14  everything, but I just was -- you know, I just was
15  afraid and I didn't know what to do.
16  Q. Did you get a lawyer in 1993?
17  A. No. All I wanted to do is do my job, and
18  he'd come by my desk and he would push the folders
19  down and say, "We need to get some of this work
20  done." It was like -- I was doing that. I was
21  buried in work, and I was doing the best I could.
22  Q. Who was your immediate supervisor?
23  A. Margaret Maroney. She was like stalking me

**20**

1  too around the building.
2  Q. When you say stalking you around the
3  building, what do you mean?
4  A. I mean like I would be in the atrium having
5  lunch and like she would come up and they would be
6  like looking around. Then when they saw me they
7  would go back to the elevator, and then I would go on
8  the elevator to take the elevator up to go to work
9  and like they would try to like get out of there like
10  so I couldn't see them. I knew what they were doing.
11  You know, it was like it was so obvious.
12  Q. You felt they were watching what you did?
13  A. Like following me, yes, even to go to the
14  bathroom.
15  Q. At the end of your leave of absence in 1993
16  -- I think you said it lasted about a year?
17  A. Yes.
18  Q. Was it 1994 when you went back to work, do
19  you remember?
20  A. Yes.
21  Q. When you went back to work in 1994, did you
22  go back into the same job?
23  A. Yes.

**21**

1    Q. Did you have the same supervisor?

2    A. No, but he was still there and I figured

3    somehow he knew. Even though I told them, my

4    doctors, not to tell him, I figured he knew somehow.

5    Maybe it was because he went into personnel. My

6    husband went into personnel and told them to tell him

7    to stop harassing me, and he was let go shortly

8    thereafter. I later found out that he had done that

9    to two different other people. He had harassed two

10   other people, and they let him go.

11   Q. Did you have the same immediate supervisor?

12   A. No, she was let go, too.

13   Q. When you came back in 1994, who was your

14   immediate supervisor?

15   A. Joan DeCola.

16   Q. After this division manager was let go, do

17   you know to whom Ms. DeCola reported?

18   A. Yes, to Marlene Soncrant -- S-O-N-C-R-A-N-T.

19   Q. You indicated that your husband went to

20   human resources regarding your treatment in 1993.

21   A. Yes.

22   Q. Do you know who he spoke with?

23   A. He wanted to see Andy Carpenter. They would

**22**

1    not let him in to see Andy so he had to speak to

2    Lenny Varn.

3    Q. Mr. Varn was in human resources, is that

4    right?

5    A. Yes.

6    Q. What was Mr. Carpenter's job?

7    A. He was the --

8    Q. Was he the branch manager?

9    A. Yes.

10   Q. Did your husband report to you what he had

11   said to Mr. Varn and what Mr. Varn had said to him?

12   A. I don't really remember. All I know is that

13   he had to bring in my doctor's note and he asked to

14   speak to him then.

15   Q. Was this leave of absence in 1993 and 1994

16   the only other disability leave you have ever taken?

17   A. Yes.

18   Q. Do you remember at what point in time you

19   stopped taking the Pamelor and Xanax?

20   A. I think it was in June I think of 1994.

21   Q. Between June of 1994 and August of 1999 did

22   you have any recurrence of your symptoms?

23   A. No.

**23**

1    Q. When you began the leave you are currently

2    on, you reported to Abbi Laushine, is that right?

3    A. That's correct.

4    Q. Do you remember when Abbi became your

5    supervisor?

6    A. It was January of 1999, but she was still

7    doing agency work. She was still underwriting at the

8    same time. She wasn't like a full-fledged

9    supervisor. You know what I mean. I mean I think

10   they hired her before January 1999, but she was

11   supposed to become the supervisor in January of that

12   year, 1999.

13   Q. Do you remember Abbi taking maternity leave?

14   A. Yes, I do. It was before she was our

15   supervisor.

16   Q. Was Laura Nicholas your supervisor before

17   Abbi?

18   A. Yes.

19   Q. How long was Laura Nicholas your supervisor?

20   A. A couple of years.

21   Q. Was there any other supervisor between Laura

22   Nicholas and Joan DeCola?

23   A. Yes, Dianna Dawson.

**24**

1    Q. What was her last name?

2    A. Dawson. They let her go.

3    Q. Do you know why?

4    A. Basically she didn't handle the department.

5    She filed her fingernails all day long at her desk.

6    She had high priority files that needed to be worked,

7    and they were hidden under her desk. She didn't do

8    anything.

9    Q. How long was she your supervisor?

10   A. Not long. Maybe six months.

11   Q. What is Joan DeCola's race?

12   A. She is white.

13   Q. Dianna Dawson?

14   A. White.

15   Q. Laura Nicholas?

16   A. White.

17   Q. Abbi Laushine is white?

18   A. Yes, she is white.

19   Q. During the time that Ms. DeCola was your

20   immediate supervisor, did you experience any type of

21   harassment or hostile work environment in your unit?

22   A. There was one time.

23   Q. What was it that happened?

**25**

1    A. She came in in the morning, and it was
2  regarding legal notices.  Heather Gill also worked
3  for the unit, and Heather Gill had done legal notices
4  longer than I had.  I only knew them that long.
5    When we do legal notices, we check with
6  each other to make sure everyone has the right date
7  because you have to give people 30 days and they have
8  to be 30 working days.  You know, when weekends and
9  holidays come about, we always checked to make sure
10 everyone was on the right track.
11   I thought that the legal notice should
12 not include the holidays, and Heather thought it
13 should.  She was standing at my desk and --
14   Q. She who?
15   A. Heather.  I only knew the way I had been
16 taught to do it, and she kept insisting that she knew
17 right.  She kept calling me a dumb bitch, and Joan
18 DeCola came in and came over and said, "What's going
19 on?"  We told her it was about the right date to use
20 on the legal notices, and I told her what I thought
21 it was and Heather told her what she thought it was.
22 Joan said, "So we'll wait until the underwriter comes
23 to work and find out which way it is."

**26**

1    In the meantime Heather walked away
2  from the desk saying dumb bitch, and Joan DeCola
3  said, "Heather, get back here.  I'm not done talking
4  to you."  She kept walking.  She never came back and
5  responded to Joan.  She kept calling her, "Heather, I
6  said to come over here," and Heather just did what
7  she wanted.
8    Then when the underwriter came in and
9  the underwriter clarified that I had been doing it
10 the right way, I said to Heather -- when we were all
11 there with Joan and everything, I said, "Heather, you
12 owe me an apology."  Joan said right away -- you
13 know, she pulled us in the conference room and me,
14 like a stupid idiot, who didn't even do anything
15 wrong said that I'm sorry.
16   I said, "I'm sorry I was a part of
17 this," and Joan and Heather just sat there.  She's
18 the one that should have been apologizing, but she
19 wasn't and I said, you know -- but I knew that Joan
20 knew that.  Joan always stood behind keeping peace in
21 the unit.  So I knew that was the right thing to do.
22   I said, "Sorry if I upset you, Heather.
23 I'm sorry I was a part of that."  She never

**27**

1  apologized or anything.  She never said, "I'm sorry
2  that I called you a stupid bitch," but then we walked
3  away.  That was it.  I didn't hate her or anything
4  like that afterwards.  It was just that, you know,
5  she just undermined management really bad.
6    Q. What was Heather Gill's race?
7    A. She is black.
8    Q. During the time that Mr. DeCola was your
9  supervisor, did you have any other problems with
10 harassment or a hostile work environment?
11   A. No.  In fact I had a lot of -- I had a lot
12 of friends; and Joan, when I told her this was
13 happening to me, she couldn't believe it.  She just
14 couldn't believe it.  I mean I said, "Joan, four big
15 black girls want me dead."  She couldn't believe it
16 because she said, "You never had any interracial
17 problems," and I haven't.  I mean that thing with
18 Heather had nothing to do with race.  It was just
19 that she didn't have any respect, you know.
20   Q. When was it that you told Joan about the
21 threats?
22   A. August.
23   Q. In 1999?

**28**

1    A. Let me think for a second.  No, it was
2  October -- the Friday before October 4.  The same day
3  I called Gladys Kwash, the branch manager's
4  secretary, to make an appointment to see the branch
5  manager because I was instructed to do so.
6    Q. Instructed to do so by whom?
7    A. By Charles Edwards.
8    Q. So this was all after Joan was your
9  supervisor?
10   A. Yes, she was no longer my supervisor.
11   Q. During the period of time that Dianna Dawson
12 was your supervisor, did you experience any type of
13 harassment or hostile work environment?
14   A. That didn't take place with me directly, but
15 there were fights among people in the Mass Auto Unit.
16   Q. When you say the Mass Auto Unit, how big a
17 unit is that?
18   A. At the time there wasn't that many of us.  I
19 don't know, say about 15 maybe, 10.
20   Q. More than 10?
21   A. Yes, a little bit more though, not much.
22   Q. Were the fights between the same people all
23 the time?

**29**

1    A. I don't know. I just remember me and Jackie
2  Offut trying to be peacemakers all the time, trying
3  to help them work it out, you know; but I think the
4  reason there was a lot of stress was because there's
5  a lot -- the department is extremely -- the
6  department is extremely difficult in comparison to
7  business accounts and customer accounts. We just
8  didn't have good supervision. It was very difficult
9  because people were trying to take on more than they
10  could handle. It just was not good.
11    Q. When did you become a member of the Mass
12  Auto Unit?
13    A. In 1986 I think. I have been in Mass Auto
14  longer than anybody there, Commercial Mass Auto. I
15  started in personal lines and then moved up to
16  commercial.
17    Q. You identified yourself and Jackie Offut as
18  the peacemakers in the unit. Were there particular
19  people who you would identify as the troublemakers in
20  the unit during that period of time?
21    A. They weren't troublemakers. I just think
22  that they had pressure on them. You know, Jackie
23  suspected that one of them was, you know, under a lot

**30**

1  of pressure or something at home and the other one
2  was trying to carry the whole unit on her shoulders
3  and it wasn't her responsibility, it was the boss's.
4  She couldn't do it.
5    Q. Who were the individuals who you're making
6  reference to? One of them having issues at home, who
7  was that?
8      THE WITNESS: Do I have to answer that?
9      MR. WILGOREN: Yes.
10    A. One of them was Lisa Wright. She had a baby
11  and I think she was going through postpartum or
12  something.
13    Q. Then you said there was somebody who was
14  trying to carry the unit because the supervisor was
15  not doing her job. Who was that?
16    A. That was Danne Mullen.
17    Q. During the period of time that Dianna Dawson
18  was your supervisor, did you go to anybody in human
19  resources to discuss the condition of the unit?
20    A. No, somebody else in the unit had though. I
21  don't know who.
22    Q. How do you know someone had gone to human
23  resources?

**31**

1    A. Because Dianna had a bad habit of -- she was
2  really rude to people. If somebody was like heavy or
3  overweight, she would make comments and, "Oops, I
4  didn't mean it that way," you know what I mean.
5  Apparently somebody complained about it because I had
6  been to the doctor's a week before for something, and
7  the doctor called me on Sunday and said he wanted me
8  to be in first thing Monday morning. I can't
9  remember what it was. He had suspicions of something
10  that wasn't right. He said he needed me to be
11  tested. So I had no choice but to call in a day.
12    Dianna Dawson was one of those
13  supervisors that went by the book, and she really
14  gave me a hard time about that. She was marking the
15  day against me. I said to her, "I had no choice.
16  The doctor told me I had to come in." She was like
17  really being picky and stuff. She was like, "Did he
18  call you or did you call him?"
19    She made some remark to me about, you
20  know, "Well, look at the way you're dressed and look
21  at the way I'm dressed," something like that. You
22  know, I said to her, "What difference does it make?"
23  I guess she had been spoken to about that and not to

**32**

1  do it anymore because she pulled me behind closed
2  doors. She didn't want anyone to hear that that had
3  happened.
4    I don't know, she basically -- I told
5  her the way I was -- I said, "I don't judge people by
6  the way they dress or what they look like," and I
7  told her about one time when this strange guy came up
8  to me when Paul and I were visiting his parents in
9  Las Vegas and I said, "He ran up to me. He was like
10  a Down's Syndrome kid. He ran up to me and shook my
11  hand like I was a celebrity or something." I had
12  never seen him before. My husband said, "That guy
13  knew you would not reject him. That's why he came to
14  you. He knew you would not pull away and be like get
15  away from me." He said, "He can see that," you know
16  what I mean.
17    I told Dianna she needed to be more
18  sensitive to people. She was shortly gone
19  thereafter. I think she might have learned something
20  from that because she said to me, "You're a lot
21  bigger person than I thought you were," after that
22  meeting, you know.
23    Q. Was that the only conversation that you had

33

1 with Dianna Dawson about the unit while she was your
2 supervisor?
3    A. Yes.
4    Q. When Joan DeCola had been your supervisor
5 and the incident occurred with Heather Gill, did you
6 go to anybody in personnel about that?
7    A. No. I recently told my therapist about that
8 incident --
9    Q. You only need to answer my question.
10   A. Sorry.
11   Q. That's okay. During the period of time that
12 Laura Nicholas was your supervisor, did you
13 experience any harassment or hostile work
14 environment?
15   A. Yes, I did.
16   Q. Do you remember what year it was that Laura
17 Nicholas became your supervisor?
18   A. It had to have been 19 -- I think it was
19 1997.
20   Q. Do you recall when it was under Laura
21 Nicholas that you first experienced any type of
22 harassment or hostile work environment?
23   A. The time of year you mean?

34

1    Q. The time of year, a year.
2    A. It was like not right when she started but
3 not long into that time, maybe say like maybe a half
4 year or something like that.
5    Q. You think it was during the first half of
6 1998?
7    A. Yes, I think so probably.
8    Q. What was it that happened in the work
9 environment in 1998?
10   A. Well, see Grace would have her friends
11 Heather and Greta come over to her desk which was
12 like right near mine during the lunch period, and
13 they would down, berate peers, you know. Like
14 Heather would say -- I mean Grace would say, "Stupid,
15 stupid people," and then Heather would say, "Dumb
16 bitch," and Grace would say -- I mean Grace would
17 say, "Stupid, stupid people," and then Greta would be
18 like, "You know, this one is here nodding her head to
19 me." I was like right there, and it was really
20 annoying and it was going on all the time.
21        It was very distracting. I couldn't
22 get my work done. It wasn't just that they were
23 talking, you know, they were berating the group.

35

1 They were make fun of Doris. She's Chinese, and they
2 were mimicking her and stuff. Doris has a difficult
3 time communicating but Doris is a wonderful person.
4 She's a good worker. I know she's a hard, good
5 worker, and I worked with her for a lot of years and
6 that hurt, you know, when they would do that.
7        I knew they had no respect for me
8 because I had at one time -- at one time I had
9 asked -- one time there was an error that Grace had
10 that was mine and she was parading around saying,
11 "Stupid, stupid." I said, "Grace..." -- she was
12 bringing it to them, these outside girls. I said,
13 "Grace, if it's something of mine like that, please
14 don't do that." I said, "It had nothing to do with
15 those people." I said, "Don't bring them into it."
16 She said, you know, "It's a free country. I'll say
17 what I want to who whoever I want." It wasn't like
18 she would say, "Gee, Barbara, sorry, I didn't mean to
19 hurt your feelings."
20        So I told Laura Nicholas about it
21 because I knew they wouldn't listen to me; and Laura
22 Nicholas' response was, "Well, Barbie, if you have a
23 problem with them, I mean you should say something."

36

1 She said, "You know, if it was me and I was sitting
2 next to people that were doing that, I would say
3 something."
4        It was like saying something to them
5 was like asking them to laugh in my face. If I could
6 handle this on my own, I wouldn't have been telling
7 the boss that. They had no respect for me. Even
8 later when I told Abbi about it, Abbi spoke with them
9 and she said, "I told them not to do it," and as soon
10 as Abbi went to Orlando, they did it again right
11 behind her back. Abbi said that it was wrong, it
12 shouldn't happen.
13   Q. So starting when Laura Nicholas was your
14 supervisor, Grace with Greta and Heather, the three
15 of them were making demeaning comments at Grace's
16 desk?
17   A. Yes.
18   Q. Some of those comments you felt were either
19 about you or directed at you?
20   A. Oh, I knew they were because I was the only
21 one there. Everybody else had gone to lunch and I
22 would eat at my desk which took me five minutes and
23 work. I really worked through my lunch.

**37**

1      Like they would say to Greta -- they
2  would be saying to Greta who was sitting right across
3  from me and Greta would be nodding her head, "This
4  one here?" "Yes, yes, this one here, uh-huh,
5  uh-huh." I knew it was me. There was nobody else
6  around.
7      Q. You said about Doris, they mimicked Doris?
8      A. Yes.
9      Q. Did they say demeaning things about other
10  people in the unit?
11      A. Lisa Wright and Gina Antoine. They called
12  them stupid idiots and stuff, and that hurt because,
13  you know, I mean these are nice people. They worked
14  hard.
15      Q. When Laura Nicholas was your supervisor and
16  Grace and Greta and Heather would make these
17  comments, did they make any racial comments?
18      A. Heather would say white trash. I think it
19  had something to do with, you know, the time that her
20  and I got into it with Joan; but I apologized for
21  that even though I shouldn't have. I mean I didn't
22  do anything wrong, but I apologized anyway just to
23  keep peace but it didn't matter to Heather.

**38**

1      Q. So from the time of the incident under Joan
2  did you feel that Heather didn't like you?
3      A. Oh, yes. They would say funny things
4  like -- I didn't really know any one of those black
5  women at all well. I just knew that I wasn't liked
6  by them.
7          They kind of had their own click, and
8  it was like -- I just knew because I didn't -- I
9  didn't know any of them enough for them to really not
10  like me, but I just knew they didn't. There were a
11  lot of people in the company on the floor that were
12  aware of that particular black click. A lot of
13  people did not like them. They said that they were
14  nasty and mean.
15      Q. From your perspective that click became a
16  problem when Laura was your supervisor?
17      A. That is when it started, yes, because that's
18  when we were all pushed -- they created a strictly
19  Mass Auto Unit.
20      Q. So that was when you first began to sit in
21  proximity to Grace?
22      A. Yes. Grace had been put in the desk over
23  near me, and I told Laura about that. But, you know,

**39**

1  Laura, she was a great lady and she was a really nice
2  boss and stuff, but she wanted everything to be like
3  warm and fuzzy and it wasn't. People on the outside
4  knew it wasn't because when the boss wasn't around
5  all hell would break loose and people saw it. Abbi
6  even told me that people came to her and told her
7  that. I met with Abbi. She said she heard it from
8  outside underwriters.
9      Q. Were there any other people in this black
10  click?
11      A. Ernie.
12      Q. Ernie Goddard?
13      A. Yes, it was Grace Clemetson, Greta Thomas,
14  Shauna Williams and Ernie Goddard. And they weren't
15  the only --
16      Q. And Heather?
17      A. And Heather, yes. They weren't the only
18  black people in the company. There was a couple
19  other ones, but they were nice people. You know what
20  I mean. They weren't like them.
21      Q. When Laura Nicholas told you if you were
22  having a problem with Grace you should say something,
23  did you tell Laura, "I can't do that, I don't feel up

**40**

1  to doing that, I'm not comfortable confronting her"?
2      A. No, I didn't tell her that.
3      Q. Did you ask Laura if she could meet with the
4  two of you together so that you would not have to
5  confront Grace directly on your own?
6      A. No, I just -- I didn't want to confront
7  Grace.
8      Q. Did you go to anyone else in management and
9  say, "I'm having a problem with these employees and
10  my supervisor is not doing something about it"?
11      A. No. Laura had -- I just -- you know, I knew
12  that it wasn't -- there wasn't going to be any
13  subsiding to it because Laura had become very
14  friendly with Grace. She would come in every day,
15  "Good morning, Miss Gracie." She gave her a big fat
16  raise, and I think Laura didn't want to get on their
17  bad side. That's what I think. That's why I don't
18  think she had attempted to approach them on it
19  because she just -- it's like they just wanted to
20  like wash away the problem, forget about it and it
21  will go away, you know. I mean everybody knew there
22  was problems in the unit, everybody. Ask anybody in
23  the company, and they will tell you.

41

1    Q. Was there anyone else in management who you
2    talked to about this problem during the period of
3    time that Laura Nicholas was your supervisor?
4    A. No.
5    Q. Was there anyone in human resources who you
6    talked to about the problem while Laura was your
7    supervisor?
8    A. No, just Laura.
9    Q. Did you just talk to Laura the once?
10   A. I think it was twice.
11   Q. The time that you described for me was when
12   Grace had told you it was a free country and she
13   would say whatever she wanted?
14   A. Yes.
15   Q. Do you remember if that was the first or
16   second time you talked to Laura?
17   A. Laura wasn't -- Grace made that comment to
18   me twice, once when Laura was in charge and once when
19   Abbi was in charge.  She just didn't even -- she
20   said, "I trust only my own people."  That was really
21   uncomfortable.
22   Q. You think that you talked to Laura twice
23   about issues between you and Grace?

42

1    A. Yes.
2    Q. One of those times Grace had made a comment
3    to you about trusting only her own people --
4    A. Yes.
5    Q. -- and it being a free country, is that
6    right?
7    A. Yes.
8    Q. Do you remember whether there was a
9    particular incident or event that caused you to speak
10   to Laura on the other occasion?
11   A. It was when she said that I only trust my
12   own people, it made me nervous.
13   Q. When she said, "I only trust my own people,"
14   was anyone else present?
15   A. Not that I can recall.
16   Q. I asked that question badly so I am going to
17   try again.  When Grace said, "I trust only my own
18   people," was anybody else present?
19   A. Why did you say anybody else?
20   Q. I said she and it wasn't clear who I was
21   talking about.
22   A. No.
23   Q. What did you understand Grace to mean when

43

1    she said, "I trust only my own people"?
2    A. When she said that, I thought -- all I could
3    think of was like if the earth -- say there was an
4    earthquake, and this is just what came to mind and I
5    thought of myself.  I thought if there was two people
6    to save, you know, out of my unit, Grace, a black
7    girl, or say like Lisa, a white girl, I honestly
8    could not say which one I would try to save.
9        When she said that, I felt like she
10   meant like, you know -- I don't know.  For some
11   reason I thought that weird thought, if there was an
12   earthquake --
13   Q. If she was in an earthquake and could only
14   save one she would save one of the black girls?
15   A. Yes, and not me, and it hurt because I mean
16   like, sure, you have your friends and you have your
17   not friends or something but this was a life-or-death
18   situation and I never draw a line on the color.  You
19   know what I mean.  It made me really uncomfortable.
20       I tried to tell her she was wrong.  I
21   said, "Grace, you know, there's a lot of good people
22   in this company and stuff," and she just -- that's
23   the way she is.

44

1    Q. Heather Gill --
2        MR. WILGOREN:   Do you want to take
3    five minutes?
4        MS. BLAKLEY:   You can take a break.
5        THE WITNESS:   No.  I will have to go to
6    the bathroom soon.
7        MR. WILGOREN:   Why don't we do it now.
8    It seems like Allison is going to another topic.  It
9    might be a good -- tell me if I am wrong.
10       MS. BLAKLEY:   Any time is a good time
11   as far as I'm concerned.
12       THE WITNESS:   Am I not doing this good?
13       MR. WILGOREN:   You're doing fine.
14       THE WITNESS:   I know I'm not giving
15   you yes or no answers.  I know I'm telling you
16   stuff --
17       MS. BLAKLEY:   You need to tell me
18   about these things in the way that is most
19   comfortable for you to do it.  You're doing fine.  If
20   you want to break now, fine.  If you want to wait a
21   few minutes before the break because you feel like
22   you want to get a little more of it done, we can do
23   it that way, whatever you want.

**45**

1       THE WITNESS:  If Howard thinks we
2   should take a break now, we probably should.
3       MR. WILGOREN:  I would like to take a
4   break now.
5       MS. BLAKLEY:  Let's take between five
6   and ten minutes.
7       (Break taken from 11:13 to 11:31 A.M.)
8       Q. Mrs. Connick, during our break did you take
9   additional medication?
10      A. I just did right now, yes.
11      Q. What medication did you take?
12      A. I took one Klonopin, one Inderal, one
13  Codeine with Tylenol, and one I think it's Flexeril
14  or something.  Yes, the Flexeril, not the Piroxicam.
15      Q. It's about 11:30 in the morning.  Are you
16  regularly scheduled to take all of those medications
17  at 11:30 in the morning?
18      A. Every four hours on the Codeine and Tylenol,
19  and I had taken it at 7:30 before we left.  So the
20  others are three times daily, usually morning, noon
21  and night.
22      Q. Since you began your disability leave in
23  October of 1999, has your condition improved?

**46**

1       MR. WILGOREN:  Objection to form.
2       A. I don't think so.
3       Q. Do you think it's about the same?  Has it
4   gotten worse?
5       A. It has not gotten worse, but I think it's
6   about the same.  I mean it's like when I think I'm
7   doing okay, then I slip back.  You know what I mean.
8       Q. Are you able to leave the house by yourself?
9       A. Yes, to go to my doctor's appointments,
10  drive to my doctor's appointment.
11      Q. Do you go out alone for anything else?
12      A. Not really, no.
13      Q. Are there particular events that cause you
14  more anxiety?
15      A. Yes.
16      Q. Other than having your deposition taken,
17  what are the events that cause you particular
18  anxiety?
19      A. If I was with my husband or my mother or
20  something like that and we go by my building where I
21  work, like I get a lot anxiety.  If I'm around a lot
22  of black people, I get a lot of anxiety; and I feel
23  real guilty about that, you know, and that upsets me.

**47**

1       Q. Are there any other places or situations
2   that cause you anxiety?
3       A. The nightmares that I have.
4       Q. Do you have nightmares about what happened
5   at work?
6       A. Yes.
7       Q. How frequently?
8       A. It's hard to say.  At least once every two
9   weeks but then sometimes like every day, like a
10  recurring one.  You know what I mean.
11      Q. Is there any particular place or situation
12  that seems to you to be a trigger for the nightmares?
13      A. Well, any kind of violence.  Like I know
14  that one night I was -- I took my pills and I was
15  ready to go to bed.  I don't like to go to bed
16  without my husband because I had one dream she came
17  into my bedroom with a baseball bat and Heather was
18  climbing into bed when Paul left for work.  So I
19  don't like to be in the bed alone anymore.  If I have
20  to sleep, I found a safe spot on my couch which my
21  doctor helped me find, a safe spot when Paul is not
22  there.
23      One night I was like so tired and I was

**48**

1   waiting for him to go to bed because I don't like to
2   go alone, and I had taken my medication about an hour
3   earlier.  I was really, really drowsy, and the movie
4   Accused was on.  It's a movie about a girl that got
5   raped on a pinball machine.  Like I was sitting
6   there, and he was watching it and it was almost over.
7   It was at the end of the movie and I barely watched
8   it -- I had seen it before, I had seen it once or
9   twice before, and it never had any effect on me.
10      I was like closing my eyes in and out
11  but I saw the part where she got raped and stuff, but
12  I wasn't even really watching the movie.  I just was
13  waiting for him.  That night I had a dream she was
14  raping me on my desk, and like the weird thing about
15  it is in the dream they are holding the girl's mouth
16  and they are holding her hands back and I remember
17  Shauna doing that to me.  Then I just remember, I
18  remember trying to tell my supervisors and they kept
19  saying, "Barbie, she can't rape you.  She doesn't
20  have a penis."
21      I don't remember anything -- like I
22  don't remember the rape actually happening, just the
23  violence of holding me down on the desk with my hands

**49**

1  and covering my mouth and stuff like that. My
2  therapist said I can't watch any violence like that.
3  She said that will trigger it. I told her, I said,
4  "It's not like I watched the movie. I just caught a
5  glimpse of it." Like any kind of violence or
6  something, you know, will trigger it.
7       Q. In your dream who was raping you, which of
8  these women?
9       A. Shauna was.
10      Q. You said you had a dream that someone came
11  into your home with a baseball bat. Who was in the
12  dream?
13      A. I had a dream Shauna and Heather -- it was
14  like when I first went out and they first had given
15  me like the medications and stuff and I was sleepy.
16  Paul had gone to work, and I was really, really tired
17  and I was still like in the dream stages even though
18  it was in the morning. As he left my bed, Shauna was
19  standing at the bedroom door with the baseball bat
20  and Heather was crawling into the bed.
21           After that point I couldn't sleep alone
22  in my bed without my husband. I just -- it affected
23  me so bad I just could never sleep alone in there

**50**

1  anymore.
2       Q. Have any of your doctors or therapists
3  discussed with you whether they think that you're
4  paranoid?
5       A. No.
6       Q. Has anyone told you they think you're
7  obsessional?
8       A. No.
9       Q. Has anybody told you they think you're
10  prejudiced against black people?
11      A. No.
12      Q. Do you remember calling the CNA claim unit
13  to make your short-term disability claim?
14      A. Yes.
15      Q. Do you remember talking to a woman named
16  Susan O'Hearn about your claim?
17      A. That probably was her name. I don't
18  remember that well.
19      Q. You don't remember the name but you remember
20  speaking to somebody?
21      A. Yes, and I remember telling -- I remember
22  people asking what my symptoms were and I remember
23  telling her.

**51**

1       Q. Do you remember telling her that you had
2  been threatened at work?
3       A. Yes.
4       Q. What do you remember telling her about the
5  threats?
6       A. I probably told her the whole thing. I
7  probably told her the whole thing. I can't remember
8  word for word what she said.
9       Q. Do you remember telling her your problems
10  started to get worse towards the end of the summer?
11      A. No, I don't remember that.
12      Q. Is it possible you said that?
13      A. I don't know.
14      Q. Did Heather Gill work in the Mass Auto Unit?
15      A. No, she did not.
16      Q. Did she ever work in the same unit that you
17  did?
18      A. Yes, for a brief time.
19      Q. Was that before 1999?
20      A. Yes.
21      Q. Was that back when you had the incident with
22  her, were you working in the same unit?
23           MR. WILGOREN:  Objection to form.

**52**

1       A. Yes, because we were doing the same work.
2       Q. But at the time that these incidents
3  occurred in 1999, she was not working in your unit?
4       A. No.
5       Q. Am I correct that Heather Gill left CNA's
6  employment in June 1999?
7       A. Yes.
8       Q. Do you know was that part of a larger
9  reduction in force?
10      A. Yes.
11      Q. Were there a number of people that left on
12  the same day.
13      A. Yes.
14      Q. Was there a going-away party for those
15  people?
16      A. Yes. We threw it for them. The remainder of
17  us, people that were still had jobs, we gave it for
18  them.
19      Q. While she was at CNA, did Heather Gill
20  herself ever threaten you with physical violence?
21      A. No.
22      Q. Have you seen Heather Gill at all since she
23  left CNA in June 1999?

**53**

1    A. No, I think she may have come into the
2    company once maybe just to say hi to her friends or
3    something, but, no, I don't really remember -- I
4    don't think I have seen her since, no.
5    Q. When Heather Gill was working at CNA, you
6    said she didn't threaten you with physical violence.
7    Did she threaten you in any other way?
8    A. No, she just called me like a dumb bitch,
9    you know, dumb white bitch.
10   Q. Other than the incident we have gone over
11   when Joan DeCola was your supervisor, did you ever
12   discuss with any supervisor that Heather Gill behaved
13   in a way that made you uncomfortable?
14   A. I didn't see her that much. No, I didn't,
15   because we weren't working close. I wasn't around
16   her enough.
17   Q. Now, Mr. Goddard was already working at CNA
18   when you started, is that right?
19   A. Yes.
20   Q. You worked together in the same unit for a
21   number of years?
22   A. Yes.
23   Q. Do you recall when you and Mr. Goddard

**54**

1    started working together?
2    A. I think it might have been 1990 or 1991
3    maybe.
4    Q. Did Mr. Goddard ever threaten you?
5    A. No.
6    Q. Did you ever hear Mr. Goddard make any
7    racial comment about you?
8    A. No, I mean he used to be my friend.
9    Q. Up until when did you consider Mr. Goddard
10   to be your friend?
11   A. Until he told Shauna that I told him I
12   didn't work Saturday overtime anymore because Shauna
13   and Grace talked all day, and he brought it back to
14   them and that's when Shauna and Grace started
15   threatening that Heather would beat me up.
16   Q. We are going to talk more about that in a
17   minute. Did you ever hear Mr. Goddard make any
18   disparaging or demeaning comments about you?
19   A. Yes.
20   Q. Did you ever hear him make a disparaging or
21   demeaning comment about you before August of 1999?
22   A. Yes.
23   Q. Did you ever hear Mr. Goddard make a racial

**55**

1    comment about any other employee?
2    A. No.
3    Q. Did you ever have any type of a physical
4    altercation with Mr. Goddard?
5    A. No.
6    Q. Was it in August of 1999 that you had the
7    conversation with Mr. Goddard about why you no longer
8    worked Saturday overtime?
9    A. Yes, it was. It was towards the end of
10   August. It might have been the second or third week
11   in August.
12   Q. Prior to that you considered him to be a
13   friend?
14   A. Yes. I mean he used to -- I think he had a
15   nickname for me or something. He called me little
16   girl or something like that.
17   Q. Did you consider that to be disparaging or
18   demeaning?
19   A. No, because I knew -- I can tell when
20   somebody -- I can tell when it's meant friendly and
21   when it's not meant friendly, and it was friendly.
22   Q. Is Mr. Goddard an older man?
23   A. Yes.

**56**

1    Q. When you heard Mr. Goddard make disparaging
2    comments about you, were those comments about you or
3    about the quality of your work?
4    A. It was really about the work.
5    Q. Did Mr. Goddard ever make comments that you
6    heard where he called you by any profane names?
7    A. No. He would never -- I had a lot of
8    respect for Ernie. I thought Ernie was always a hard
9    worker and dedicated and stuff. Somewhere along the
10   line he became involved with Grace, and that changed
11   everything.
12   Q. You don't know exactly when it was that he
13   became involved with Grace?
14   A. I would bet money that a lot of my peers do,
15   but I don't know. I must have been stupid. I was
16   the last one to find that out, and it was too late
17   then.
18   Q. If you had known that Mr. Goddard was
19   involved with Grace, would you have changed your
20   behavior towards him?
21   A. No.
22   Q. Did you ever make any complaint to any
23   manager or supervisor about Mr. Goddard?

**57**

1    A. I didn't have to. Abbi noticed abrasive
2   behavior with Ernie towards me, and she asked me --
3   it was after I had been threatened by Heather during
4   the last few days that I was there hanging by a
5   thread and she asked me for permission to speak to
6   him about the way he treats me. She said, "I don't
7   like the way he throws files at your desk and is very
8   abrasive with you." I told her, yes, that she could
9   talk to him about it because he became very nasty
10  towards me after he got involved with Grace.
11   Q. So in August and September of 1999
12  Mr. Goddard was abusive towards you?
13   A. Yes.
14   Q. But not before August of 1999?
15   A. No, I don't think so.
16   Q. You said you didn't have to complain to a
17  supervisor about him and that Abbi noticed his
18  treatment of you. Did you ever complain to a
19  supervisor about him?
20   A. Yes.
21   Q. To which supervisor?
22   A. Abbi.
23   Q. Was that before or after she asked you

**58**

1   whether she could talk to him about this?
2    A. That was before.
3    Q. How long before?
4    A. That was on August 26, the day I met with
5   Abbi off the grounds.
6    Q. During your meeting at The Fours was Ernie
7   Goddard's treatment one of the things you talked
8   about?
9    A. Yes.
10   Q. Was that the first time that you complained
11  to a supervisor about Mr. Goddard?
12   A. Yes.
13   Q. Was that the only time you complained to a
14  supervisor about Mr. Goddard?
15   A. Yes, except for the day on the 16th after
16  Abbi had the meeting and told people not to call
17  people names, and he did it again. Doris was in
18  front of me. She said, "Did you hear that? Listen
19  to him."
20       I turned around and said, "Don't do
21  that." I said, "It's rude." He was real angry at me
22  for saying something. Abbi said, "Barbie is right."
23  The police asked me if he was any line of management

**59**

1   in order to say something like that. I said no.
2    Q. On September 16 you made a comment directly
3   to Mr. Goddard about his remarks?
4    A. Yes.
5    Q. And Abbi heard you make the comment?
6    A. Yes.
7    Q. She endorsed or agreed with your comment?
8    A. Yes.
9    Q. Did you also separately complain to Abbi on
10  that date about Ernie's behavior?
11   A. No.
12   Q. Do you remember when Greta Thomas started at
13  CNA?
14   A. She was there before me. I think she's been
15  there maybe 17 years.
16   Q. Did you work in the same unit with her?
17   A. No.
18   Q. Did you report to the same supervisor?
19   A. No.
20   Q. Do you know who she reported to?
21   A. I think she reported to Ruby Simmons, the
22  commercial insurance manager, I'm not sure.
23   Q. Are you basing that on where her desk was?

**60**

1    A. Yes, because I didn't really know her that
2   well.
3    Q. When there would be a huddle in your unit --
4   do you know what a huddle is?
5    A. Yes.
6    Q. Was Greta at the huddles?
7    A. No, because she's not a part of the unit.
8    Q. During the time that you were at CNA, did
9   Greta Thomas ever threaten you with physical
10  violence?
11   A. Yes.
12   Q. On how many occasions?
13   A. Once on June 24.
14   Q. Was that at the good-bye party?
15   A. Yes.
16   Q. Is that the only time she threatened you
17  with physical violence?
18   A. Yes, I made sure to stay away from her. I
19  wouldn't even -- I wouldn't go to the ladies room
20  near her. I wouldn't go to the exit door when it was
21  near her desk. I stayed away. I don't know where it
22  came from. I don't know what it was for, and she
23  scared me. She's bigger than me, too.

**61**

1    Q. Prior to June 24, 1999, had you ever heard
2  Greta Thomas make any disparaging comment about you?
3        A. She would agree with Grace when Grace was
4  putting me down, and she would like go along with
5  Grace. I remember like the harassment. They wanted
6  me to hear it. They made sure I heard it. Then when
7  they had to break up, they would say something like,
8  "We have lots to talk about tonight on the phone."
9    Q. Prior to June 24, 1999, did you speak with
10 anyone in supervision at CNA about Greta Thomas?
11       A. Not in supervision, but I told Jean
12 Beaudreau.
13   Q. Jean Beaudreau was a worker in another unit?
14       A. Yes. Did you say prior?
15   Q. I said prior to June 24, before the party.
16       A. No.
17   Q. Between June 24 and August 26 did you talk
18 to Jean Beaudreau about it?
19       A. Yes.
20   Q. Did you talk to anyone in management about
21 it during that period of time?
22       A. No.
23   Q. At some point did you report Greta Thomas'

**62**

1  behavior to management?
2        A. I told Abbi about it when we met on the
3  26th. Then she apparently told Charles that because
4  when I met with Charles on the speaker phone on the
5  16th I referenced that time and Abbi said, "You
6  remember, Charles, I told you about that." So
7  through Abbi Charles knew it I guess.
8    Q. Did you ever hear Greta Thomas make any
9  racial comment about you?
10       A. No, I don't think so.
11   Q. Did you ever have any type of physical
12 altercation with Greta?
13       A. No, I didn't know her that well.
14   Q. The good-bye party on June 24, was that for
15 the people who were being rifted?
16       A. Yes, that was for accounting, the accounting
17 people. We had thrown parties for processing and
18 business accounting and all the other people, and it
19 was like -- I remember it was kind of getting
20 expensive because one girl had asked the branch
21 manager if he would throw them a cook-out. He said,
22 "I'm not going to spend money on people that aren't
23 going to work for me anymore," which was kind of

**63**

1  rotten because they worked hard. They went through
2  two years of conversions, and it wasn't right that
3  they didn't have something so we threw them
4  something.
5        Accounting had kind of like done their
6  own thing, and Louise Grover, a woman mentally
7  challenged -- the day they were having the party, you
8  could smell the food and everything. I had already
9  had my lunch. When they had Louise's party a couple
10 of weeks earlier, a week earlier, she wasn't doing
11 very well. She kind of just didn't enjoy her own
12 party. You know what I mean. So I said, "Why don't
13 you go over and get some food, they'll let you."
14       The parties we threw for processing, we
15 collected money from people, and some of the people
16 that make the most money in the company didn't give a
17 dime to it. But when it came down to the party, you
18 know, I invited everyone. I said, "Come on in, there
19 is plenty for everyone."
20       When it was their party, I said,
21 "Louise, why don't you go over and get something."
22 She kept saying, "It really smells good." I said,
23 "Go on. If I had not already eaten my lunch, I would

**64**

1  go over." I knew that like those people would accept
2  me anyway because I always brought in food for their
3  department anyway. Like I'll bring in a bag or
4  something. You know, like if I was over their
5  department and they had pretzel sticks or something,
6  I would take one and always bring in something too
7  and just like leave it on the desk early in the
8  morning. Sometimes they didn't know who did it, but
9  then they figured out who it was leaving the food.
10       I said, "Come on, Louise, you can go
11 over." She kept saying, "No, no, I can't." I said,
12 "Come on, I'll go with you." So I got her a plate.
13 She's very, very shy. I said -- you know, I said,
14 "What do you feel like?" I started helping her get
15 some food and everything.
16       Greta was staring at us. Like she
17 literally stopped eating and she was staring at us.
18 She was about as close as I am to you. She was like
19 staring hatefully and I said to her, "Greta, is there
20 a problem?" She jumped up from her chair and said,
21 "What, do you want to beat me up right here, right
22 now?" I was like really thrown by the statement.
23 You know, and the people around were too. I mean

**65**

1 people jumped back.  They went like this
2 (indicating), and people thought there was going to
3 be a fight on the floor.  I just -- like I was real
4 like dumbfounded as to why she would even say that.
5 I said, "No, I don't want to fight with you."
6         We just got our food and later -- then
7 this other girl -- I remember Tracy Wood said you
8 know, "My, God, Barbie," she said, "I thought there
9 was going to be a fight over there."  I said, you
10 know, "I'm sorry," but I said, you know, I just -- I
11 said, "When people are mean to people like Louise
12 that are less fortunate I just -- I stick up for
13 them."  You know what I mean.
14         Like she was just being really -- she
15 was being mean because Louise didn't belong there in
16 her opinion, although Greta had been invited to
17 Louise's party and helped herself.  She didn't give a
18 dime to pay for it or anything, but I said to people,
19 "Come on in."  There was plenty of food.  I said,
20 "Come on in everybody."
21     Q. When you said she was being really mean
22 because Louise didn't belong there, were you talking
23 about Greta?

**66**

1     A. Yes.  Like she had given us the look like we
2 didn't belong there.  I wasn't taking any food from
3 there.  I was helping Louise, you know.  Greta had
4 this deep-down dislike for me.  I just -- how else do
5 you explain?  I never even knew this woman, never
6 talked to her.  You know what I mean.  She was very
7 tight with Grace.
8         A lot of people on the floor would
9 reference to like Grace and Greta, you know, like,
10 "Oh, boy, stay away from them."  Like they were
11 scary.  Do you know what I mean?
12     Q. What was scary about them?
13     A. They grouped together and they were cruel
14 and vicious I mean, and anybody who worked up there
15 knew that.  If you didn't know it, you heard about it
16 from people.  They just were really, really cruel and
17 vicious.
18     Q. Verbally?
19     A. Yes.
20     Q. Physically?
21     A. I don't know if I can say physically really
22 because I'm sure if a physical fight broke out you
23 would be fired.

**67**

1     Q. You're not aware of any physical fight that
2 ever broke out with Grace or Greta?
3     A. No.
4     Q. The party that you have described on June
5 24, was that actually on the work floor in the area
6 where the accounting people sat?
7     A. Yes.
8     Q. You said there were a number of witnesses.
9 One of the ones you mentioned was Tracy Wood.
10     A. Ward.
11     Q. Ward.  Who else besides Tracy Ward?
12     A. That witnessed it?
13     Q. Yes.
14     A. Give me a minute.  Wendy Helfinch --
15 H-E-L-F-I-N-C-H.  I can't remember.  It might have
16 been -- God, I can't think of these people's names.
17 I forget.  I mean it was the whole accounting
18 department.  I can't believe it's only been, you
19 know, June, a year.  I can't believe I can't remember
20 them.
21     Q. Do you have any recollection as to whether
22 any supervisor witnessed what happened?
23     A. No, I don't know who the supervisor was over

**68**

1 there.  So maybe he did, maybe he didn't or she.  I
2 don't know who it was.
3     Q. Your supervisor was not in the area?
4     A. No. Louise Grover witnessed it.
5     Q. Did anyone from human resources witness it
6 to the best of your knowledge?
7     A. See, the accounting group was right near
8 human resources.  Although Charles is the only one in
9 personnel, he could not have been too far from there.
10 Maybe he stopped by earlier and got something and
11 didn't stick around.
12     Q. Do you know whether Charles was even in the
13 office that day?
14     A. No, I don't.  I can't remember names.
15     Q. If they come back to you, you can let me
16 know.
17     A. It's so frustrating.
18     Q. When this incident occurred at the party in
19 June, did you feel physically threatened?
20     A. Oh, yes.
21     Q. Why?
22     A. Because first of all I didn't know -- I was
23 caught off guard; and if you could have seen the look

**69**

1   of hate on her face, you know, it just threw me. I
2   just -- I didn't expect the comment. I didn't
3   expect -- when she said it, the people around her
4   jumped up from their chairs and went running like
5   there was going to be a fight and stuff. It's not
6   like her and I were arguing about something. I just
7   was like -- I was scared.
8           She sat near the ladies room, and I
9   know that the day before she had taken Grace
10  Clemetson to the hospital for an emergency
11  hysterectomy and she had driven Grace and Grace
12  almost died. She lost five pints of blood. Her
13  heart was beating, and there was no more blood in
14  there. We all felt very badly for her for that. I
15  gave her my condolences when it happened.
16          Greta had taken Grace to the hospital
17  that day before. She was under stress apparently;
18  but why she came after me with it, I don't know. For
19  the rest of that day her desk was near the ladies
20  room and near the exit door, and I would not go near
21  the ladies room and I did not exit there. I made
22  sure from now on I came out the other side. Then
23  they moved her desk onto the other side so now I

**70**

1   would go out the other way. I wouldn't go near her.
2       Q. That day in June, did you tell anyone in
3   supervision what had happened?
4       A. Jean Beaudreau is supervisor for -- I think
5   she was supervisor for custom accounts I think or it
6   might be business accounts. She was like -- they
7   didn't have really supervisors. They had team
8   leaders. I told her, I told Jean that, but I also
9   came back to my unit and I told Bernadette Joyce and
10  Shauna. They were both sitting there. I told them
11  both. I said, "My, God, I can't believe it." I told
12  them. Bernadette had a stupid look on her face, and
13  I don't know what Shauna said about it.
14      Q. Was Bernadette Joyce a supervisor?
15      A. No, she was the underwriter in the
16  department.
17      Q. Shauna Williams was not a supervisor?
18      A. No.
19      Q. Jean was team leader in another area?
20      A. Yes.
21      Q. Was there any supervisor who you told about
22  this on June 24?
23      A. No.

**71**

1       Q. Did you report the incident to human
2   resources on June 24?
3       A. Not on June 24, no.
4       Q. Did you ever report the incident to
5   corporate security?
6       A. No.
7       Q. Did you ever report any incident directly to
8   corporate security?
9       A. No. You see in the 15 years I've been at
10  that company, that only became an issue about two
11  years ago for the first time in all the years I have
12  been there. They passed around this thing on that
13  and wrongful conduct and all this other stuff. It
14  had never been brought up again. It wasn't like I
15  had the phone number at my desk. It wasn't like this
16  happens once every six months. I just was like -- I
17  was in a state of shock. That never even crossed my
18  mind. I just -- it wasn't -- it didn't seem to me to
19  be an option. I didn't even -- I wasn't thinking
20  about it.
21          It's not something they stressed, not
22  something they really put face value on. They
23  brought it up once two years ago like they had to,

**72**

1   and this year I know that they brought it up in
2   January or something and I just know it was because
3   of what happened to me. I just know that. I don't
4   think they ever would have referenced it again
5   because they did not reference it on an annual basis.
6       Q. When they first brought the program out, did
7   you receive a copy of a written document with the
8   code of corporate conduct?
9       A. Yes.
10      Q. Did you get to keep that?
11      A. Yes, it's at home.
12      Q. Do you remember that document making
13  reference to a compliance hot line?
14      A. Not really. I remember them talking about
15  giving you different numbers to call like if you
16  thought the guy next to you was paying out fraud or
17  something like kickbacks and stuff like that which my
18  department -- we did Pepsi and Coca-Cola. We handled
19  both of those accounts and Keebler, and they used to
20  send us like chocolate and candy and all that stuff.
21  When the box came, we just would say thank you and we
22  didn't know until later on that that could be
23  kickbacks. Laura told us that. We didn't know.

**73**

1  Q. When the code of corporate conduct -- I
2  don't know if I'm calling it the right name. We both
3  know what I am talking about.
4      A. Yes.
5      Q. When that document was issued to you, was
6  there any kind of a meeting at which it was
7  discussed?
8      A. Yes, we had a meeting up on the fourth
9  floor -- no, the eighth floor, and they had somebody
10 kind of go over it real quickly. It was really weird
11 too because we had -- I mean in all the years I'd
12 ever been there, I'd never seen anything like that
13 ever come out. Nothing like that was ever discussed.
14 You know what I mean.
15     Q. From your perspective the first time you
16 were aware there was a policy like that was when they
17 first passed that document out?
18     A. Yes.
19     Q. Was that the beginning of 1998, does that
20 sound about right?
21     A. Yes.
22     Q. You say that it was brought up to people
23 again this year?

**74**

1      A. Yes, through e-mail.
2      Q. Through e-mail?
3      A. Yes.
4      Q. While you were on leave or before that?
5      A. While I was on leave.
6      Q. How do you know?
7      A. Because several friends that I have in the
8  office that knew what had happened to me called me to
9  tell me that, and every one of them said I swear that
10 you know the only reason this is going around is
11 because of what happened to you.
12     Q. Do you know whether it went around in
13 offices other than the Quincy office?
14     A. I don't know. I know they did something
15 where you could win certificates if you answered the
16 right answer to a question or something like that,
17 but I don't know -- I have no idea if the other
18 offices got it. I just know they brought it out two
19 years ago and never reiterated on it again the
20 following year, not until now; and I do believe that
21 it's because of what happened to me.
22     Q. When the incident occurred on June 24, did
23 you believe that Greta thought you and Louise

**75**

1  shouldn't be at the party?
2      A. Yes. I mean she -- it was just for
3  accounting I mean so to speak. I mean because the
4  file room had had their party and processing had had
5  their part and business accounts had had their party;
6  and we, the people in Mass Auto, and the remaining
7  underwriters, we were getting strained.
8      I remember I was coming home and asking
9  my husband, "I need five bucks this week, we're
10 throwing another party." He was getting mad. He was
11 like, "Jesus." We had to do something for them, you
12 know, so each area had this party where we all kind
13 of chipped in and paid for it.
14     Accounting was a smaller group. So
15 they kind of did their own thing, and it was kind of
16 really mean because all of a sudden people just
17 smelled the food cooking and it was like, "Hey,
18 what's up?" It's like we just had this party; and
19 even though people didn't put anything in the
20 jackpot, we invited them, "Please come in and eat.
21 There's plenty. It will go to waste if you don't."
22     I knew that the reason she was staring
23 at us was because she felt that we didn't belong

**76**

1  there.
2      Q. Because you were not members of the
3  accounting department?
4      A. Yes, and it was for that party, although
5  many of my friends from that department and one that
6  I am trying to remember her name had invited me over,
7  I had said, "Thank you very, very much but I had
8  already brought my lunch." I brought Louise over and
9  said, "That will be fine, I'm sure they won't mind."
10     Q. Did you believe that Greta thought you
11 didn't belong there because you were white?
12     A. No, because there were other white people in
13 the unit.
14     Q. Do you remember when Grace Clemetson started
15 at CNA?
16     A. I think it was in 19 --
17     THE WITNESS: Paul, what year did you
18 get --
19     MR. WILGOREN:  He can't testify.
20     Q. Do you remember whether it before or after
21 you got married?
22     A. We were married.
23     Q. Do you remember if it was before Laura

77

1  Nicholas was your supervisor?

2      A. Yes.

3      Q. So sometime in the first part of the 1990s,

4  does that sound right?

5      A. I think it was more like the late '80s.

6      Q. Did you work in the same unit with Grace?

7      A. Yes.

8      Q. How long did you work in the same unit?

9      A. Not very long.  Grace had been hired to take

10  my job, and I was going to be moved onto another job.

11     Q. Grace had been moved into Mass Auto to take

12  your job?

13     A. Yes.

14     Q. She already worked for the company?

15     A. No, she was hired outside.

16     Q. Okay, I'm confused.

17     A. And I was moved into AQC, automated quality

18  control.

19     Q. That was back when she was first hired?

20     A. Yes.

21     Q. When you went out on leave, were you and

22  Grace working in the same unit?

23     A. Yes.

78

1      Q. How long had you worked together in that

2  unit?

3      A. Let me think a minute.  Since it had started

4  really which was probably 1997, 1997.

5      Q. How long had her desk been near yours?

6      A. Almost two years.  It wasn't in the

7  beginning, but then it was moved down and a Chinese

8  woman sat across from me.

9      Q. Did Grace Clemetson ever physically threaten

10  you?

11     A. She made a comment to me once saying that --

12  she was talking about where she was from, Jamaica,

13  and she told me in so many words, "Don't ever go to

14  Jamaica because I know people there, and in Jamaica

15  you can shoot somebody for no reason at all and the

16  police won't investigate," something like that.  I

17  told Abbi that, and it made me really nervous.

18     Q. Do you remember when it was that Grace made

19  this comment to you?

20     A. In the spring of 1999.

21     Q. When was it that you told Abbi about it?

22     A. At our meeting.

23     Q. Did you tell anyone in supervision about it

79

1  between the spring when Grace made the comment and

2  telling Abbi at The Fours?

3      A. No.

4      Q. Was that the only time that Grace threatened

5  with you physical violence?

6      A. Her directly, yes, but she conspired with

7  Shauna to have Heather beat me up.

8      Q. Did Grace ever make any racial comments to

9  you?

10     A. No, just disparaging.

11     Q. And those disparaging remarks were remarks

12  about being stupid?

13     A. Yes.

14     Q. Any other kinds of disparaging remarks?

15     A. Yes, I know she did.  I know she did.  There

16  was lots of them.  I can't think of them.

17     Q. Did Grace make any racial comments in your

18  presence about other white employees?

19     A. Yes.

20     Q. What racial comments did Grace make in your

21  presence?

22     A. She mimicked Doris, and she used to try to

23  get me to aggravate Doris.  See, Doris has a language

80

1  barrier.  She gets frustrated when she's trying to

2  get her point across and you don't understand.  I can

3  understand her for the most part; but when she raises

4  her voice, it's not that she's mad or wants to start

5  a fight, she just gets frustrated with her own self.

6      Grace and Shauna would always make fun

7  of her, and it just wasn't right.  They used to --

8  you know, like when Laura Nicholas first took over

9  the department, you know, she had a thing for beanie

10  babies.  So we used to do Halloween and stuff where

11  everybody got dressed up.  She wanted everybody to be

12  a beanie baby.  She started naming names and stuff.

13  Ernie was Grunt the Razor Back because he always

14  grunted all the time.  Grace was Grace the Swan, and

15  Doris was Doris the Duck.  My friend Jackie Offut had

16  got this really cute duck for one of her nieces and

17  nephews.  When you squeezed it, it went quack, quack,

18  quack.

19      I told her I wanted two for my nephews

20  for Easter.  Jackie brought it in and she gave it to

21  me.  One day, you know, when she gave it to me and I

22  beeped it and stuff, you know, it was like Mike

23  Revisi who is an underwriter who is a friend of

81

1  Doris' said, "Doris, that sounds just like you."
2         So just for like kicks and stuff I used
3  to squeeze it once in a while, and everybody would
4  laugh and stuff. See, I didn't know -- at the time I
5  didn't know that was offending Doris. I thought she
6  thought it was funny like everyone else. When I
7  found that out, I felt terrible. I said, "Doris,
8  I'm sorry," I said, "I didn't mean to hurt you."
9         Grace wanted me to continue to do the
10 duck thing and I said, no, because it really hurts
11 her. Any time Doris would get into like a
12 conversation on the phone -- like the way she
13 talks -- like she said to Laura Nicholas, "Why they
14 no ask me and Lisa for witness," do you know what she
15 meant by that?
16     Q. You're here to answer the questions, not ask
17 them.
18     A. Her way of -- you know, her way of talking,
19 it's just different. It's just not proper English.
20 It's different, you know.
21     Q. But from your perspective if someone tried
22 they could understand what she was talking about?
23     A. Yes. Myself, Lisa and Jean, we all knew

82

1  that communication was a struggle for Doris and tried
2  to help her through that. We had to work with her,
3  but Grace used to put her down all the time for it
4  and make fun of her and so did Shauna.
5         Shauna even made fun of Gerard Millette
6  who was a stroke victim, and he had a speak
7  impediment. He has a real bad speech impediment.
8  She was making fun of him one day.
9      Q. Was your meeting with Abbi at The Fours the
10 first time that you talked to anybody in supervision
11 about the comments that Grace was making?
12     A. No, no.
13     Q. Was it the first time you talked to Abbi
14 about the comments Grace was making?
15     A. Yes. Did you say the first time in
16 supervision?
17     Q. Right.
18     A. Well, Jean Beaudreau.
19     Q. Other than team leaders had you talked to
20 anybody about Grace's disparaging remarks before you
21 met with Abbi at The Fours?
22     A. No.
23     Q. Was September 16 the first time that you

83

1  talked to Charles Edwards?
2      A. Yes.
3      Q. Prior to September 16 did you tell anyone in
4  human resources that Grace was making disparaging
5  remarks that made you uncomfortable?
6      A. Charles was the only one in human resources.
7      Q. Before Charles you mentioned earlier Lenny
8  Varn. Who were the other people who worked in human
9  resources while you were there?
10     A. In the 15 years I was there?
11     Q. How about just since 1990.
12     A. Boy --
13         MR. WILGOREN:  If you remember.
14     A. I can see her face, but I can't think of her
15 name.
16     Q. A manager or human resources rep, do you
17 remember?
18     A. Lenny Varn, I think Simone Leary. There was
19 this other woman that got fired. I can't remember.
20     Q. You told us earlier about a conversation you
21 had with Lenny Varn. Did you only speak to Mr. Varn
22 on the one occasion? Actually, you didn't have it.
23 Did Paul have it?

84

1      A. That wasn't me.
2      Q. Did you ever talk to Lenny Varn about your
3  work environment?
4         MR. WILGOREN:  Objection to form.
5      A. I don't remember. See, I was afraid. I
6  remember when I went to my doctors and I had my
7  sessions, I was afraid. I begged them not to tell
8  CNA the reason I was there because I was afraid I
9  would get fired.
10     Q. During the time that Charles Edwards was
11 human resource manager up until September 16, 1999,
12 you never spoke with him about your concerns about
13 your coworkers or environment, is that right?
14     A. That's correct.
15         MS. BLAKLEY:    Off the record.
16         (Off-the-record discussion.)
17     Q. Mrs. Connick, do you recall when it was that
18 Shauna Williams came to CNA?
19     A. Let me think a minute. When I started to
20 have problems with her, it was about a year and a
21 half, two years, something like that. Say two years.
22     Q. She had been there --
23     A. For that amount of time, yes. So now it

85

1 would be going on three years or something like that.
2     Q. For the first year and a half or so or two
3 years that she was there you didn't really have a
4 problem?
5     A. No.
6     Q. Did you work in the same unit during that
7 time?
8     A. Yes.
9     Q. Your problem with her started sometime in
10 1999?
11     A. Yes.
12     Q. Do you recall what month?
13     A. No. I know that when -- this is going to
14 sound crazy. When she first moved into that area,
15 Grace didn't like her at all. Grace referred to her
16 as pure garbage because she talked all day and
17 distracted those of us around her trying to do work.
18     Laura Nicholas asked me to go approach
19 her on it and say something to her about it, you
20 know, like in a buddy-buddy effort like, "Hey, we're
21 a team, you should carry your weight." I couldn't do
22 that. I just couldn't do it. If you could hear the
23 way the woman spoke on the phone and the way her

86

1 voice changed, she was just like a different person.
2 It was like I knew there was a different side of her.
3     Jackie Offut said -- when she first
4 came into our unit, she said, "There's something
5 about that girl, I don't know what it is but there's
6 something about her." It just turned out to be that
7 she was a big troublemaker.
8     Q. You don't recall --
9     A. I couldn't be phony and go up to her and act
10 like, you know -- no, somebody else did it. Laura
11 Nicholas asked me to do it. It wasn't -- my boss
12 should have been telling her that, "You talk too
13 much, get work done." I couldn't do it. Somebody
14 else did.
15     Q. Did there come a period or point in time
16 when you actually started to experience a conflict
17 between you and Shauna Williams?
18     A. Yes.
19     Q. That was in 1999?
20     A. Yes.
21     Q. Do you know what month?
22     A. It was August, the week of August 20.
23     Q. Prior to the week of August 20, 1999, had

87

1 Shauna Williams ever threatened you with physical
2 violence?
3     A. No, she had not threatened me, but she hated
4 the relationship that I had with Jackie before Jackie
5 left. She just -- I don't know. Jackie and I were
6 really good friends, and she just couldn't stand it.
7     Jackie had -- you know, Jackie would
8 like say to me, "Hey, girlfriend," and have like
9 slang names. It was all in fun and love, but Shauna
10 hated it. Shauna wanted to be Jackie's best friend,
11 and she hated it when Jackie would have anything like
12 that to do with me.
13     Q. Did Shauna say something to you that made
14 you --
15     A. She gave body language. She would roll her
16 eyes and go (indicating) like that, you know.
17     Q. Did she ever actually say anything to you
18 about your relationship with Jackie?
19     A. At one time I'm sure she did. I know around
20 the time -- it was around the time of Jackie's
21 surprise birthday party. Jackie is a twin. She has
22 a twin brother, and it was after the party and I
23 said, "Jackie, if I could have made it, I would have

88

1 crashed your party." Jackie was like, "You should
2 have, my family would have loved you." Shauna made
3 some remark about like, you know, like the thought
4 was totally horrifying that I would think of doing
5 something like that, like I didn't belong there. You
6 know what I mean.
7     Q. Do you remember what she said?
8     A. She said something like, "You would have
9 crashed it?" She's like, "Oh," like that, like she
10 disapproved of that, like I wouldn't belong there.
11 You know what I mean.
12     Q. But she didn't come out and say you would
13 not belong there, that was just the impression you
14 got from her body language?
15     A. Oh, yeah, yeah, because she was just like,
16 you know --like it didn't have anything to do with
17 her. She just showed her disapproval of it.
18     Q. Do you recall when that was?
19     A. Jackie's birthday was in February. February
20 19 I think.
21     Q. Was this in February of 1999?
22     A. Yes.
23     Q. Prior to the week of August 20, 1999, did

**89**

1 Shauna Williams make any racial comments to you?
2 A. No, not directly.
3 Q. Did she make racial comments about others in
4 your presence?
5 A. Yes, she used to -- she would put down
6 Doris and mimic Doris, the Chinese woman. They used
7 to comment on Lisa's weight all the time. The thing
8 of it is I knew she didn't like me, I just knew it.
9 You just know. So I mean like I had nothing to do
10 with her, but I still treated her with the respect
11 that is expected of me as an employee.
12 Q. Did Shauna Williams before the week of
13 August 20, 1999, make disparaging remarks to you?
14 A. No, not that I can think of.
15 Q. When employees were let go in the reduction
16 in force in June of 1999, am I correct that you did
17 not agree with some of the decisions about who should
18 be selected?
19 A. No, you're not correct. I don't think you
20 understand what happened. Let me explain to you.
21 The branch manager had a meeting downstairs, and he
22 said that all business accounts were going to be
23 moved to Orlando, Florida, and that all of processing

**90**

1 and the typing and the agency bill accounting would
2 also be moved down there. It was kind of a shock,
3 and he said with the exception of Mass Auto. He
4 said, "But those of you who are in Mass Auto, don't
5 think just because you're in Mass Auto you have a job
6 because CNA is going to pick the cream of the crop to
7 remain representing this branch in Mass Auto."
8        That never happened because when Laura
9 Nicholas left the department, they asked Laura
10 Nicholas if there were any problems and Laura
11 Nicholas said, no, there were not any problems in
12 that unit. Anybody within the vicinity over the past
13 five, ten, six years could tell you there were
14 problems in this unit; and I think that Laura bailed
15 because she didn't want to deal with the
16 personalities in the unit.
17 Q. Were there people in the Mass Auto Unit who
18 you felt did not represent what you called the cream
19 of the crop?
20 A. Correct.
21 Q. Did you feel if the company was going to
22 select the cream of the crop to keep in Mass Auto
23 that there were employees who were let go who should

**91**

1 have been retained?
2 A. Yes.
3 Q. And employees who were retained who should
4 have been let go?
5 A. Yes.
6 Q. Who were the employees retained who you
7 thought should have been let go?
8 A. Well, I couldn't give an exact answer on
9 that, but I think what they needed to do at the time
10 was to take and put standards in place in order for
11 them to see who was most valuable to the company.
12        I knew I carried my weight, and I knew
13 I went beyond that, well above and beyond that. I
14 knew certain ones around me, but I knew that there
15 were people that did not carry their weight.
16 Directly the one that I knew that didn't was Shauna
17 and I didn't -- I was unaware that Grace didn't carry
18 her weight because Grace was a rate tech and the
19 raters knew a little more about that, but I was told
20 by Lisa and Doris Chan that Grace was not carrying
21 her weight either and that Ernie was working at an
22 extremely slow pace so he could get overtime and a
23 lot of overtime because Ernie lived in the place. In

**92**

1 all the years Ernie worked there, he put in as many
2 hours a week overtime as did he for base pay which
3 was like 35 hours a week. If they let him work a
4 hundred hours a week overtime, he would work it.
5 Q. So Shauna, Grace and Ernie were three
6 employees who were not carrying their weight?
7 A. Shauna, Grace, and Ernie, that's correct.
8 Q. Anyone else?
9 A. Yes, Margaret Mullane -- M-U-L-L-A-N-E --
10 Judy Beck, and Bob Oliver and that was it.
11 Q. Were any of those people let go in the
12 reduction in force?
13 A. No.
14 Q. Did you tell anyone in management that you
15 thought that Shauna, Grace and Ernie were not
16 carrying their weight?
17 A. When I met with Charles in his office on --
18 I need to look at a calendar, is that okay?
19 Q. Sure.
20 A. When I met with Charles in his office, I
21 asked him -- I said, "Charles, why weren't..." -- I
22 said, "When they announced the closing a year ago,
23 they said they were going to keep the best people for

**93**

1  Mass Auto." I had always been a member of Mass Auto
2  my whole career at CNA, Commercial Mass Auto.
3         I said, "Charles, they said they were
4  going to keep the best people there," and I said,
5  "What happened to that?" They should have, I think,
6  because they would have made those people in Mass
7  Auto make sure they were doing the best that they
8  could, carry their weight to the fullest and do the
9  best they could. I said, "How come they didn't do
10 that?"
11        Charles Edwards said to me, "It sounds
12 to me like we have the wrong employees working in
13 Mass Auto." I said, "That's correct," and I said,
14 "How come they didn't do that?" He said, "Because
15 Laura said there were no problems in that unit."
16    Q. Did you identify to Charles by name any of
17 these wrong employees?
18    A. Only Shauna. I didn't know at that time,
19 not until after the fact that like Ernie and Grace
20 weren't carrying their weight. I didn't know at that
21 time.
22    Q. When you say you didn't know at that time,
23 what point in time was that?

**94**

1    A. That was when I spoke with Charles on August
2  -- I can't find my calendar book I had.
3         THE WITNESS: I don't think you have it,
4  Paul. You do?
5    A. August -- it was in September. It was on
6  the 30th, September 30.
7    Q. You met with Charles in his office?
8    A. Correct, on speaker phone.
9    Q. He wasn't in his office, you were?
10   A. Yes, and I told him then.
11   Q. Did you ever meet with Charles face to face?
12   A. Over this?
13   Q. In 1999 did you ever meet with Charles face
14 to face?
15   A. Yes. If I worked late and he was hungry, he
16 would come by my desk and I would offer him -- I
17 would say, "Help yourself," and open my cooler
18 because I always brought tons of food to work. I
19 always said, "Does anyone want anything?" I had
20 lunch packs of this, this and other thing. "Who
21 wants it?"
22        Sometimes I would play a guessing game,
23 "Who knows what day today is in history," something

**95**

1  like that. You know what I mean, like Lincoln's
2  birthday and the winner would get munchies, whatever;
3  but I started to like lose my appetite and I wasn't
4  eating my lunch like I used to.
5         Charles knew I always had a lunch pail
6  at my desk so he would come by starving like at six
7  o'clock. It was me and Doris there, and I would open
8  it up and say, "Take what you want." He was grateful
9  as anything. He'd take like a nectarine or peach.
10 He was grateful.
11   Q. Was September 30 the only day that you met
12 with Mr. Edwards in his office?
13        MR. WILGOREN:   Objection as to form.
14   A. No, I met with him on the speaker phone
15 before.
16   Q. On September 16?
17   A. Yes.
18   Q. Were September 16 and September 30 the only
19 conference calls you had with Mr. Edwards?
20   A. He called me on Sunday night, the 19th, to
21 my voice mail. He just wanted to know how I was. I
22 believe those were the only two times that I spoke
23 with him, but they were in length, those

**96**

1  conversations.
2    Q. On the 16th and 30th?
3    A. The 16th not so much, the 30th.
4    Q. You're referring to a planner of some sort,
5  is that right?
6    A. It's just a calendar.
7    Q. Does it have things written in it?
8    A. Yes, just things like to help me remember
9  because it only starts in September and there was
10 stuff that happened in August that I didn't want to
11 leave out.
12   Q. What year is it a planner for?
13   A. It starts September 1999 and goes through
14 2001.
15   Q. The notes that are in there, were those
16 written by you?
17   A. Yes.
18   Q. The notes that relate to incidents that came
19 before September of 1999, when did you put those
20 notes in?
21   A. This morning.
22   Q. When did you put the rest of the notes in?
23   A. This morning.

**97**

1    Q. So this is something you created this
2    morning as an aid for yourself during the deposition?
3    A. Yes.
4    Q. Did anyone help you?
5    A. No, it's really crummy.
6    Q. Did you work from any other document to put
7    this together?
8    A. Yes, I worked from my document that I
9    originally mailed to Howard because at the time that
10   I wrote that it was all fresh in my head. I've been
11   trying to block it out for a long time, although I
12   mean I know it and I think I can sit here and tell
13   you the entire story. I didn't want to give you
14   wrong dates.
15   Q. Was that document that you sent to Howard
16   the only document that you used in putting together
17   the planner?
18   A. Yes.
19       MS. BLAKLEY: I'm going to make a
20   request for that.
21       MR. WILGOREN: Sure.
22       THE WITNESS: You won't be able to
23   read it.

**98**

1        MR. WILGOREN: I have never seen it
2    before today. I didn't realize she had the notes.
3        MS. BLAKLEY: She made them today to
4    help herself testify.
5        MR. WILGOREN: I thought she was
6    referring to the calendar, the dates.
7        MS. BLAKLEY: I don't need it right
8    now.
9    Q. The week of August 20 did something change
10   in your work environment?
11   A. Yes.
12   Q. What changed?
13   A. Things became violent.
14   Q. When you say things became violent, what do
15   you mean?
16   A. I mean there wasn't just harassment anymore.
17   Now there was threats, threats on my life. It was
18   during that week in August -- I know August 20 I
19   think was Friday, and it happened sometime in that
20   week, I'm not sure of the date, but Ernie had asked
21   me why I don't come in on Saturdays anymore.
22   Q. When had you stopped coming in on Saturdays?
23       MR. WILGOREN: Excuse me. Are you

**99**

1    done with your answer to the prior question?
2        THE WITNESS: Yes.
3        MR. WILGOREN: I thought she had
4    something else to say.
5    Q. Had you stopped working overtime on
6    Saturdays at some point?
7    A. Yes.
8    Q. When was that?
9    A. I can't remember the exact date.
10   Q. Was it in 1999?
11   A. Yes, 1999. It was during the summer of
12   1999.
13   Q. In this week of August 20 Ernie Goddard
14   asked you why you had stopped coming in on Saturdays?
15   A. Yes.
16   Q. Where were you and Ernie Goddard when that
17   conversation took place?
18   A. I was at my desk, and he was at his. We sat
19   across from each other. We were alone. It was early
20   in the morning.
21   Q. What did you tell him?
22   A. I said no. He said, "Why don't you come
23   in?" I said, "You want to know why I don't come in?"

**100**

1    I said, "I don't come in because," I said, "Shauna
2    and Grace talk all day and I can't get anything
3    done." I said, "It's hard enough throughout the
4    week." I said, "I'm not going to give up a Saturday
5    unless I can..."
6        You know, it was always tough to work
7    on a Saturday, but at least if you came to work
8    Monday and you're further ahead, it was a good
9    feeling, great. I would not get ahead, I would fall
10   behind; and I just wasn't going to subject myself to
11   that. I told Ernie, I said -- you know, I said,
12   "Unless I can come in here and turn out Monday with
13   productive results, I'm not going to do it anymore."
14       I mean I have a life, too. I may not
15   have six kids at home, but I have a husband and it
16   was like I wasn't going to do that. I know that they
17   had been spoken to also by Laura Nicholas who would
18   occasionally walk in there on a Saturday, and I was
19   there one time when she told Ernie -- she said, "Is
20   this what CNA pays you for overtime, to come in and
21   talk to Grace all day?"
22       This is what they did on Saturdays, and
23   to me it was pointless. I would start at five in the

101

1  morning if I could to get work done.
2      Q. At any time prior to that conversation with
3  Mr. Goddard had you told Abbi Laushine why you were
4  not working Saturdays?
5      A. No, she never asked.
6      Q. And you never volunteered that to her?
7      A. No, but after this started happening and
8  after the 16th, I was like sleepless. I was awake at
9  three in the morning. I couldn't sleep anyway. If I
10  could have gone to work at that hour to do the job, I
11  would have; but the machines don't work at that time.
12      So instead of starting at 6:30, I was
13  coming in at 6:00 in the morning; and I asked Abbi if
14  I could leave at her time, 4 o'clock with her instead
15  of 4:30 because I felt safe. I didn't want to be
16  there without Abbi. I was trying as much as I could
17  to put in overtime so to speak because I knew I was
18  falling behind, but I didn't feel it was right to put
19  in for overtime because the reason I was behind was
20  because I was constantly in with my supervisor and
21  personnel and management trying to get this situation
22  resolved and my work was not getting done. I didn't
23  feel that it was right to. I felt I should work on

102

1  my own time to bring that up, you know.
2      Q. Between the time you heard Laura Nicholas
3  talk to Ernie on a Saturday about personal
4  conversations with Grace and August of 1999, are you
5  aware of whether any supervisor or manager spoke to
6  Shauna, Grace or Ernie about having personal
7  conversations on a Saturday?
8      A. I think that they were spoken to. Joanie
9  O'Brien who was working on a Saturday is a friend of
10  mine. I wasn't working Saturdays at that point. She
11  was a part of business accounts, and they had offered
12  people in business accounts if they worked overtime
13  for three weekends in a row or something 27 days
14  straight they would get an extra bonus on top of
15  their severance. They were all in their working, and
16  she told me that Laura Nicholas had come in and said
17  something about it.
18      Of course, nobody expected to see Laura
19  Nicholas in there on a Saturday. It was just,
20  "Surprise, guess who just walked in," you know. I
21  saw it once when I worked there, and other people had
22  told me they had seen it also.
23      Q. When you worked Saturdays in 1999 before the

103

1  summer, were there supervisors or managers in the
2  office on Saturday?
3      A. No, and I made the suggestion to Abbi
4  because that money -- it's like the amount of money
5  it costs to run Mass Auto and the amount of money
6  Mass Auto gets in premiums determines a lot about our
7  unit, and I had given Abbi the sheets that I had had.
8  Another boss had used them, and I said, "Abbi, why
9  don't we have people fill these out," you know,
10  marking Saturday that I worked from what time to what
11  time and what did you do.
12      Q. Like a time ladder?
13      A. Yes. I said, "I have an old copy of one an
14  old manager used years ago." She thanked me for it.
15  She ended up implementing that in the end. Not for a
16  long time -- for a long time she never did it. I
17  never saw it, and then in the end she ended up
18  implementing that. Now she has so you have to meet
19  so many standards before you can say that you want to
20  work overtime. So like instead of making your work
21  go really, really slow so that you will have the
22  overtime, you can't do that anymore. You have to
23  prove that you're putting out during the week. You

104

1  know what I mean.
2      Q. And you know that because that is what
3  people have told you while you have been out, is that
4  correct?
5      A. No, I knew that because that is what
6  happened when I was there.
7      Q. It happened before you went out on leave?
8      A. Yes.
9      Q. When did Abbi put the production standards
10  in place?
11      A. I can't remember. I think it was sometime
12  in August, maybe September.
13      Q. The personal conversations between Grace and
14  Shauna on Saturdays, where would those conversations
15  take place?
16      A. Right at their desk.
17      Q. Grace sat --
18      A. Across from Shauna.
19      Q. Where did Grace sit relative to you?
20      A. There was a wall here, and Shauna sat in
21  back of me. Like Howard and she sat across from
22  Shauna and so I couldn't see Grace, but she was right
23  there.

**105**

1    Q. We have to try and describe this in some way
2  so if somebody reads about it they will know what we
3  said.  There was a divider between you and Grace,
4  Grace was to your left?
5    A. Yes.  I couldn't see Grace unless I looked
6  around the divider either way.
7    Q. Shauna was right next to you?
8    A. Right in back of me like facing this way.
9    Q. If you were facing north, she was facing
10  south? You faced opposite directions, back to back,
11  you and Shauna?
12    A. No, we both faced north.  She would be
13  turned talking to Grace all day on the other side of
14  the credenza like.
15    Q. There was a credenza that separated Shauna
16  and Grace?
17    A. Yes.  It didn't separate here though, it was
18  like overhead on each side.  You know what I mean.
19    Q. You had to look around a credenza to see
20  Grace?
21    A. Yes.  Like the central part of it that held
22  up the file cabinets overhead, there is a central
23  part.  Like I used that corner to put reports and

**106**

1  stuff in there.  Like if I wanted to talk to Grace,
2  she could hear me but I couldn't see her.  I had to
3  look around the central partition that was right
4  there in the center of say like the four desks.
5    Q. Who sat immediately to your left?
6    A. Immediately to my left if I faced forward?
7    Q. Yes.
8    A. Ernie.
9    Q. In this group of four it was you, Ernie to
10  your left, Shauna behind you and Grace was to
11  Shauna's left?
12    A. Wait a minute, sorry.
13    Q. Would it be easier to draw it?
14    A. Yes.
15    Q. Let me give you a piece of paper.
16    A. I know my left from right, but I don't know
17  why -- this is what it looks like. This is Abbi, this
18  is Bernadette, this is Shauna and this was Jackie
19  Offut's old desk.  It had remained empty, but I think
20  Jackie is back at it now.  This was my desk, and the
21  front desk was Doris'.  I made the front desk a
22  little big.  This was Ernie, and this was Lisa.
23  Grace sat right here across from Shauna, and Margaret

**107**

1  Mullane sat across from Jackie and Bob Oliver sat
2  across from Abbi.  Right here was Judy Beck.
3    Q. Can you just draw an arrow pointing the
4  direction that people were facing?
5    A. The boss is in the back.
6        MS. BLAKLEY:  We will have the court
7  reporter mark that as Exhibit No. 1.
8        (Exhibit No. 1 marked for
9  identification.)
10        (Off-the-record discussion.)
11    Q. I am going to give you what has been marked
12  for identification as Exhibit 1.  While we were off
13  the record I tried to redraw your diagram of where
14  people sat.  Can you take a look at that and tell me
15  if that is accurate in terms of where the individuals
16  sat in your unit?
17    A. That is correct.
18    Q. There is an arrow pointing to the top of the
19  page.  That is the direction in which people faced?
20    A. That's correct.
21    Q. And between your desk and Ernie's desk there
22  was an aisle where people could walk?
23    A. Yes.

**108**

1    Q. When Joan DeCola was your supervisor, had
2  you ever been criticized for holding lengthy personal
3  conversations at your desk?
4    A. No, I was criticized once, not criticized
5  but I was called into conference for a telephone call
6  that I had taken that was a very long conversation.
7  I think I refused to sign -- I was reprimanded for
8  it.  I think I refused to sign it without an
9  explanation.
10        My brother had been burned badly,
11  two-thirds of his body, and he was in the hospital
12  for 12 weeks.  It was a family issue but my family,
13  siblings and I were trying to get my parents to put
14  him into Shriner's.  It had just happened, and I
15  probably should have taken time off to be away from
16  work instead of trying to deal with it at work.  I
17  never used the phone like that abusively, but it was
18  an emergency situation that had taken place.
19    Q. Apart from that emergency with your brother,
20  there was never a time that you were criticized or
21  counseled by Ms. DeCola for personal conversations in
22  the workplace?
23    A. Correct.

**109**

1    Q. During the period of time that Joan DeCola
2  was your supervisor, did you put any of your
3  complaints or concerns about the workplace in
4  writing?
5    A. No, I don't think so.
6    Q. Did you maintain any kind of journal or
7  diary where you made notes of things that happened in
8  the workplace?
9    A. No.
10    Q. When Laura Nicholas was your supervisor, did
11  you ever put any of your complaints or concerns about
12  the workplace into writing?
13    A. No.
14    Q. Did you keep a journal or diary in which you
15  would make notes about things that happened at work?
16    A. Once in a while I would jot things in my
17  calendar, but I mean is that normal procedure, is
18  that something that everyone should do? I don't know.
19    Q. I am not asking whether you were expected or
20  required to do it. I am asking what you did.
21    A. No.
22    Q. During the time that Abbi Laushine was your
23  supervisor, prior to August 20, 1999, did you put any

**110**

1  complaints or concerns about your work environment
2  into writing?
3    A. No.
4    Q. Did you start making any notes or keeping a
5  journal or calendar in which you wrote down things
6  that happened at work?
7    A. No, I began to keep track of that the day I
8  called Abbi on the 20th of August.
9    Q. Was the 20th of August the first time that
10  you made notes for yourself of what was happening at
11  work?
12    A. Yes.
13    Q. Prior to August 20, 1999, were you subject
14  to any racial slurs in the workplace other than
15  things you have already told me about here today?
16    A. I don't think so. Prior to June, no.
17    Q. Between June 24 and August 20 of 1999 were
18  you subject to any racial slurs in the workplace that
19  we have not already talked about today?
20    A. No. I mean except at their
21  gatherings. Their gatherings took place on almost
22  like a daily basis. It wasn't like a once-a-month
23  thing. They did it all the time.

**111**

1    Q. When you say they did it all the time, the
2  click that you identified?
3    A. Yes.
4    Q. Those five employees would speak to each
5  other on a daily basis in a group, Ernie, Grace,
6  Greta, Shauna and Heather?
7    A. Ernie didn't sit with them all the time, but
8  yes.
9    Q. Then when Heather left it was just Grace,
10  Greta and Shauna?
11    A. Yes.
12    Q. So you would observe these three individuals
13  talking together on a daily basis?
14    A. Yes.
15    Q. They talked on a daily basis at a location
16  where you could overhear what they said?
17    A. Yes.
18    Q. And they said demeaning and derogatory
19  things about people who worked in the unit?
20    A. Yes.
21    Q. Between June 24 and August 20, 1999, were
22  the things they said racial? Did they describe
23  people by their races in talking about them?

**112**

1    A. Well, they mimicked Doris for her race.
2    Q. They mimicked Doris' manner of speaking?
3    A. Right, and Heather referred to me as white
4  trash.
5    Q. That was before Heather left?
6    A. Right.
7    Q. Between when Heather left and August 20 were
8  there racial statements?
9    A. Not that I can recall.
10    Q. Was August 20 or the week of August 20 the
11  first time that you went to Abbi Laushine with a
12  concern about your work environment?
13    A. That was the first time I phoned her about
14  it. I phoned her from home.
15    Q. Had you previously spoken to her about it in
16  the office?
17    A. No, this was the first time.
18    Q. So the first conversation you had with Abbi
19  about your work environment you had over the phone?
20    A. That's correct.
21    Q. That was on Friday, August 20?
22    A. August 20.
23    Q. You worked a flex time schedule?

**113**

1   **A.** Yes.

2   **Q.** So Friday was your regular day off?

3   **A.** Yes.

4   **Q.** Prior to talking to Abbi by phone on August

5  20, you had not gone to anyone in human resources

6  about your work environment, is that right?

7   **A.** That's correct.

8   **Q.** Prior to August 20 when you spoke with Abbi

9  by phone, you had not contacted corporate security

10  about your work environment, is that right?

11   **A.** No.  I almost -- like that didn't even come

12  into play.

13   **Q.** It's something you did not do?

14   **A.** Right.

15   **Q.** Prior to August 20 when you spoke with Abbi

16  by phone, you had never picked up the phone and

17  called the company hot line number about your work

18  environment?

19   **A.** No. Like I said, they brought that out two

20  years ago and never touched it again.  It didn't even

21  come into my mind.

22   **Q.** The human resources manager, Mr. Edwards, is

23  African-American, is that right?

**114**

1   **A.** Correct.

2   **Q.** Did that fact, the fact that he was an

3  African-American man, make you uncomfortable in terms

4  of approaching him about these issues?

5   **A.** No.  In fact I thought Charles and I were

6  goods friends and my feeling about it was, you know,

7  this is good because he understands because when I

8  met with him he said, "Barbara, do you understand how

9  serious this is? This is no different than you

10  calling her a nigger." I thought he was my friend

11  and I thought he cared about me, but the rest of your

12  question again --

13   **Q.** I just asked you whether you were

14  uncomfortable going to him because he was an African-

15  American man.

16   **A.** Not up until that point. Afterwards, yes.

17   **Q.** Did you feel that Mr. Edwards when you did

18  speak with him about your workplace took your concern

19  seriously?

20   **A.** Yes.

21   **Q.** Did you feel that Mr. Edwards when you spoke

22  with him about your concerns treated you with

23  respect?

**115**

1   **A.** Yes.

2   **Q.** Did there come a point in time where you

3  felt that you no longer wished to discuss concerns

4  about your workplace with Mr. Edwards?

5   **A.** No, I was told by Mr. Edwards that it was

6  out of his hands and I had to speak to the branch

7  manager, Chris Dye.

8     (Exhibits 2, 3 and 4 marked for

9  identification.)

10   **Q.** Mrs. Connick, let me give you a document

11  marked for identification as Exhibit 2. Can you tell

12  me, take your time to look at it, whether this is a

13  document that you prepared?

14   **A.** Yes, it is.

15   **Q.** When did you prepare it?

16   **A.** After I left work.

17   **Q.** I didn't hear you.

18   **A.** After I left work.

19   **Q.** Did you personally prepare the entire

20  document?

21   **A.** My friend helped me type it.

22   **Q.** Who was that?

23   **A.** Kim McGuire.

**116**

1   **Q.** Did anyone help you with the wording of it?

2   **A.** No.  She use the spell check.  Paul showed

3  us how to use the spell check on it, you know, in

4  case you spelled a word wrong or something.

5   **Q.** When you wrote this, how soon was it after

6  you had left work?

7   **A.** When it was completed you mean?

8   **Q.** Strike that.  Did you write this in stages?

9   **A.** No, I had it -- I had different points

10  written on like a paper like this (indicating).  It

11  was totally illegible.  My girlfriend said she would

12  help me put it on the computer.  I more or less told

13  her; and as I told her what happened, she put it on.

14   **Q.** You had handwritten notes that you had made

15  at some other point in time?

16   **A.** Yes.

17   **Q.** On a pad of paper or pieces of paper?

18   **A.** Yes.

19   **Q.** You decided to put the whole sequence of

20  events in one document?

21   **A.** Correct.

22   **Q.** You had a friend who typed help you do that?

23   **A.** Yes.

**117**

1    Q. The way that the two of you worked is you
2    would look at the notes that you had made and you
3    would tell her what to type?
4    A. Yes. My notes were like all over the place.
5    It was like they weren't even in order. It was like
6    I would run out of room here so I would flip over.
7    It was just a mess. Some of it was on a paper plate.
8    I mean it was pathetic. I just told her; and as I
9    told her, she put it down for me. I think -- I
10    remember saying I should have had a tape-recorder to
11    tape it because I just -- it just came out of me.
12    Q. A stream of consciousness?
13    A. Yes, like -- it was like there was no pauses
14    anywhere with it. It was very vivid in my head.
15    Q. What is her name, your friend?
16    A. Kim.
17    Q. When Kim helped you to get all of your
18    thoughts together on paper -- this document is I
19    think more than 20 pages long, is that right?
20    A. Yes.
21    Q. Did the two of you put this entire document
22    together on one day or did you get together over a
23    period of time to do it?

**118**

1    A. No, it took more than -- it took a while to
2    do it because, you know, she could only come to my
3    house so much.
4    Q. You started that process when you were out
5    on leave, is that right?
6    A. Yes, and I couldn't give it to her to do at
7    her place because you couldn't read it. Nobody could
8    read it but me. It was a mess.
9    Q. So it was sometime in October when the two
10    of you started working on this together?
11    A. Let me see. Yes, I think it had to have
12    been almost.
13    Q. Almost November?
14    A. Yes, it was late October. Yes, I think it
15    was late October.
16    Q. Did you finish it before Thanksgiving, if
17    you remember?
18    A. Yes. Yes. That is just like getting it
19    done. It was already on the paper before, like that
20    kind of paper.
21    Q. The notes that you had that were on various
22    pieces of paper and a paper plate, you said they were
23    difficult to follow. Where are those notes today?

**119**

1    A. I junked them.
2    Q. When did you junk them?
3    A. Last fall.
4    Q. At the time that you were working on the
5    preparation of Exhibit 2?
6    A. When it was done.
7    Q. At the time that you prepared Exhibit 2, had
8    you hired a lawyer?
9    A. Yes.
10    Q. When Exhibit 2 was completed, did you show
11    it to anyone with whom you had worked at CNA?
12    A. No.
13    Q. Did you show it to anyone other than your
14    lawyer?
15    A. No.
16    Q. Did you ever show it to Paul?
17    A. Yes.
18    Q. While you were working on Exhibit 2, did you
19    call anybody you had worked with to verify dates or
20    to make sure that your recollection of events was the
21    same as someone else's?
22    A. No.
23    Q. When is the most recent time that you

**120**

1    actually read this document all the way through?
2    A. The most recent time?
3    Q. Yes.
4    A. Last night. I never read this thing again
5    until after I finished it. I never want to read it
6    again.
7    Q. You read it last night?
8    A. Yes.
9    Q. And you put together your little planner
10    notes this morning?
11    A. Yes. I only just wanted to remember the
12    dates because it was funny, I could remember the
13    dates and stuff in my head for a long time; but then,
14    you know, after you get into the new year, I forgot.
15    Q. Were there any other documents that you
16    reviewed to prepare for your deposition?
17    A. Howard had given me a piece of paper.
18    MR. WILGOREN: Stop, I'm going to
19    direct the witness not to answer about any things
20    that I directed her to do as being privileged,
21    attorney/client privilege.
22    MS. BLAKLEY: I am not asking her
23    anything about your direction.

121

1    MR. WILGOREN:   She was starting to
2  answer the question in that fashion.
3    MS. BLAKLEY:   I take it you have no
4  problem with the question, "Identify the documents
5  that you reviewed for your deposition"?
6    MR. WILGOREN: No.
7    MS. BLAKLEY: You just want to admonish
8  your witness not to --
9    MR. WILGOREN: Any conversations between
10  you and I are privileged.
11    MS. BLAKLEY: I am only asking what you
12  looked at, not what Howard told you. Don't tell me
13  what Howard told you to do; but if you looked at
14  documents, I want to know what the documents are you
15  looked at.
16    A. It told all about an interrogation or
17  whatever this is.
18    Q. A deposition?
19    A. Yes.
20    Q. Was it just some basic instructions for a
21  witness about what a deposition is?
22    A. Yes.
23    Q. Are there any other documents that you

122

1  looked at?
2    A. No.
3    Q. We will get back to Exhibit 2. Let me show
4  you Exhibit 3.
5    MS. BLAKLEY:   Howard, I'm sorry. That
6  is one I don't have a copy of.
7    Q. Mrs. Connick, you have a document that is
8  marked for identification as Connick Deposition 3.
9  This document contains six separate sheets of paper
10  that have printouts of e-mail communications between
11  yourself and Abbi Laushine.
12    A. Yes.
13    Q. These particular pieces I will represent for
14  the record were produced to us by your lawyer in
15  response to our request for production of documents.
16  Take the time to look at them.  What I would like to
17  know is do you have in your possession -- not
18  necessarily here with you today but do you have in
19  your possession or have you given your lawyer any
20  other e-mails between yourself and Abbi Laushine?
21    A. No.
22    Q. These are the only e-mails you have between
23  yourself and Abbi?

123

1    A. Yes.
2    Q. Did you have e-mail communications with
3  anyone else at CNA concerning your work environment?
4    A. No.
5    Q. Did you have e-mail communications with
6  anyone else at CNA concerning your complaint of
7  racial harassment?
8    A. No.
9    Q. Did you have any e-mail communications on
10  any subject with Mr. Edwards?
11    A. No.
12    Q. Did you have other e-mail communications
13  with Abbi Laushine about these subjects but you just
14  don't have the e-mails anymore?
15    A. There is another e-mail.
16    Q. Between you and Abbi?
17    A. No, this is it right here I think.  Yes,
18  this is it.
19    Q. So this exhibit has all of the e-mails
20  between you and Abbi?
21    A. I believe so.
22    Q. The earliest e-mail between you and Abbi was
23  Monday, August 23, 1999, is that right?

124

1    A. That's correct.
2    Q. That was an e-mail that Abbi sent you as a
3  result of the phone conversation that the two of you
4  had on Friday, the 20th?
5    A. The earliest e-mail -- I called her on
6  Friday from my house, August 20.  I told her it was
7  urgent.  I didn't tell her why or what it was about,
8  and I asked her to keep it very confidential.  I
9  said, "I can't meet with you in the building or
10  anywhere near coworkers," because I didn't want
11  anyone to know I was meeting with her.  I was hoping
12  that she would give me an appointment first thing
13  Monday, and she didn't.  Then the 23rd she sent me
14  the e-mail.
15    Q. That was that Monday?
16    A. I think, yes, saying how about this week.  I
17  think she said Thursday.
18    Q. So the e-mail that she sent you on the
19  morning of August 23 saying how about Wednesday or
20  Thursday, you can look at it, it's the first page of
21  the exhibit?
22    A. Yes, that's it.
23    Q. That was the first e-mail that Abbi sent you

125

1 about this whole topic?
2    **A.** Yes.
3    **Q.** You had not at that point sent her any
4 e-mail?
5    **A.** No.
6    **Q.** Your only communication with her at that
7 point had been your phone call to her on Friday, the
8 20th?
9    **A.** That's correct.
10    **Q.** During which you told her that it was urgent
11 that you meet with her but you did not tell her the
12 reason why you wanted the meeting, did you?
13    **A.** No, I didn't.
14       MS. BLAKLEY:  Off the record.
15       (Off-the-record discussion.)
16    **Q.** Let me quickly ask you to look at what has
17 been marked for identification as Exhibit 4 before I
18 forget that I marked it.  This was another document
19 that was produced to us in discovery.  This document
20 was printed out by Lisa Wright, is that what it means
21 when her name appears at the top?
22    **A.** Yes.
23    **Q.** You are listed as one of the people it is

126

1 addressed to.
2    **A.** Correct.
3    **Q.** But you were not working in November 1999,
4 is that right?
5    **A.** That's right.
6    **Q.** And you obtained this from Ms. Wright?
7    **A.** Yes.
8    **Q.** Have you obtained any other documents from
9 Ms. Wright while you have been on leave?
10    **A.** No, she said she had something else for me
11 that she thought I should see, and it was what the
12 company came out with after the new year again on
13 company conduct and I had already gotten the
14 document.  Two other people had said to me, "There's
15 something I have that I want you to see."  So I had
16 already gotten that from somebody else.
17    **Q.** Let me ask you then to go back to Connick
18 Deposition Exhibit No. 2 which is this lengthy
19 narrative statement.  You said you reread the
20 document last night, is that right?
21    **A.** That's correct.
22    **Q.** When you reread it last night, did you
23 determine that there was anything inaccurate about

127

1 it?
2    **A.** Yes.
3    **Q.** What?
4    **A.** On the 16th when --
5    **Q.** Of September?
6    **A.** Yes.  On the 16th -- let me see.
7       MS. BLAKLEY:  Only the pages that came
8 from the fax version are numbered.  We faxed pages
9 where we were missing lines.  Maybe we should --
10       MR. WILGOREN:  We can mark it.  They
11 are marked at the bottom.
12       MS. BLAKLEY:  Mine isn't.
13    **A.** There were two things I found.
14       MR. WILGOREN:  The one that was marked
15 had marks on it.
16       MS. BLAKLEY:  We are working off
17 different versions because my copies didn't come.
18    **Q.** You said there was an inaccuracy with
19 respect to September 16?
20    **A.** Yes.
21    **Q.** Do you know what page it was on?
22       MS. BLAKLEY:  Off the record.
23       (Off-the-record discussion.)

128

1       (Reporter read back the record.)
2    **A.** On Page 6.
3    **Q.** What was inaccurate here?
4    **A.** When I went back to her shortly thereafter,
5 I went into the file room to pull my file and there
6 in front of the entrance was Ernie telling all this
7 to Shauna.
8       MS. BLAKLEY: Let me stop you for a
9 second.  I want to let you know that when we read we
10 tend to talk more quickly than if we are talking
11 extemporaneously.  So you need to just be sensitive
12 to that so you don't go too quickly for the reporter.
13       THE WITNESS: Okay.
14    **Q.** You were talking about in the file room
15 shortly thereafter --
16    **A.** Yes.  When I saw Ernie telling this to
17 Shauna -- and I knew what he was doing because she
18 looked at me with hate in her eyes -- I was angry
19 with him and nervous about her hateful reaction.  I
20 couldn't believe he was gossiping to her about this
21 after what happened last time he did this.
22       I looked at him and I said, "You should
23 be shot," and I meant, you know, all that other stuff

**129**

1  that I said in there, that he should be ashamed of
2  himself. Then he said to me, "You stay away from
3  me," and Shauna put her finger in my face and said,
4  "You're messing with the wrong bitch."
5    Q. You left something out?
6    A. Yes. Shauna, I remember her pointing her
7  finger at me because I was real scared. I was real
8  scared, and I went into the file room and just -- I
9  was like, "Oh, God, this is it." He told her
10  something else now, and she said, "You better watch
11  it. You're messing with the wrong bitch," and she
12  held her finger up and she was really mad.
13        The other thing was on the day that
14  Paul called -- Monday, on the 20th, that is Page
15  12 -- when Paul got off the phone, he asked me -- I
16  said, "Paul, they are not going to move my desk, are
17  they?" I had a real issue with them not moving my
18  desk. I had told Abbi reasons why weeks before.
19        When he got off the phone, he said to
20  me -- Paul said to me, he said that I want them to
21  move her desk away from you, Abbi wants them to move
22  your desk, the police want them to move the desk but
23  Charles thinks it will create more aggression on her

**130**

1  behalf but the final say is Abbi's.
2    Q. So where it says then, "He told me Abbi
3  wanted to move her away from me," it should be he
4  told you that Charles said that Abbi and the
5  police --
6    A. Abbi and the police and Paul, all three
7  agreed.
8    Q. But Charles was afraid it would create more
9  aggression?
10    A. Right.
11    Q. Was there anything else as you went through
12  this?
13    A. That I saw that I left off?
14    Q. Right.
15    MR. WILGOREN:  Well, if I can
16  interject, I think she also testified that Charles
17  said that it was up to Abbi. I don't think --
18    MS. BLAKLEY:  I heard that part. I
19  didn't repeat it back.
20    Q. You have added something with respect to the
21  September 16 incident. You have added something with
22  respect to what Paul told you when he got off the
23  phone with Charles. When you reviewed this document

**131**

1  last night, was there any other incident or detail
2  that came into your mind that was not included in the
3  document?
4    A. No, I thought that I had forgotten -- the
5  last day I met with Abbi, I thought that I had
6  forgotten to tell her that they had that obligation
7  to me to investigate it. But I did tell her that and
8  I found that in here, that I did tell her that. Abbi
9  said to me, "Well, I don't know anything about that."
10  I swear I thought I saw it in here.
11    Q. So when you were reading through it last
12  night you thought you had left something out where
13  you had told Abbi that the company had an obligation
14  to you to investigate it and she had said, "I don't
15  know anything about that"?
16    A. Yes. I said, "Why didn't they do that,
17  Abbi?" She said, "Oh, I don't know anything about
18  that."
19    Q. Then you thought that you had found it in
20  here somewhere but now sitting here you can't find it
21  again?
22    A. No, I can't. What I'm looking at is at the
23  top of the page. I told her that Charles had not

**132**

1  questioned any of the witnesses that I had given him
2  the names of, and I told her that I could not
3  understand why. I told her I couldn't understand any
4  of it, why Charles had told me about not being able
5  to pull her phone record and that the company
6  promoted personal phone call use and that he couldn't
7  protect me from being harassed because he had told me
8  all of that. I told her the day before I was driving
9  home from work I felt like I had to pull over and
10  throw up.
11    Q. But your testimony is that you also told her
12  that the company had a duty or obligation to
13  investigate?
14    A. Correct.
15    Q. And she said, "I don't know anything about
16  that"?
17    A. That's correct.
18    Q. Did you say something else on that topic?
19    A. No, I just -- I just remember Jim Martin
20  saying something about if somebody needs help to help
21  them because you don't want to regret it because I
22  remember feeling like that.
23    Q. You remember Jim saying that at the unit

**133**

1  meeting?
2    **A.** Yes.
     **Q.** Do you remember Jim talking about a friend
4  of his -- strike that.  Do you remember Jim talking
5  about an incident where somebody had committed
6  suicide?
7    **A.** Yes, and I think at the time I felt like I
8  was the only one in the room that that hit home with.
9    **Q.** The first date you actually refer to in this
10 narrative is June 24, 1999, the date of the
11 accounting good-bye party, is that right?
12   **A.** Yes.
13   **Q.** Does this narrative discuss each race
14 related incident involving you in the workplace from
15 June 24, 1999, until you went out on leave?
16   **A.** Does what narrative?
17   **Q.** This entire document that you wrote, this 28
18 pages.
19   **A.** Finish the question.
20   **Q.** Were there any racial incidents involving
21 you at the workplace from June 24, the day of the
22 accounting party, to the day you went out on leave
23 that are not discussed in Exhibit 2?

**134**

1    **A.** No.
2    **Q.** From June 24, 1999, until the date that you
3  went out on leave were there any threats against you
4  of physical violence at work that are not included in
5  Exhibit 2 with the addition of the comment that you
6  told me about Shauna making, "You're messing with the
7  wrong bitch"?
8    **A.** No.
9    **Q.** So everything is here?
10   **A.** Yes.
11   **Q.** During the period of time that you were an
12 active CNA employee, did you ever make any anonymous
13 complaints concerning conditions in the workplace?
14   **A.** No, but somebody did.
15   **Q.** Why do you say somebody did?
16   **A.** Because Abbi got an e-mail on her desk
17 describing somebody in the unit.  They would not say
18 who it was, but that person was way out of line when
19 Abbi left the unit unattended.  I remember Abbi being
20 really angry that whoever it was didn't have the
21 courage to come to her and face her and tell her that
22 instead of leaving an e-mail like that.
23   **Q.** Do you know who wrote that e-mail?

**135**

1    **A.** No, none of us do.  Abbi said, "This is
2  nothing," and she ripped it up and said, "I'm not
3  going to pay any attention because I have no idea who
4  they are talking about and I have no idea who it's
5  from."
6    **Q.** We are going to discuss some of the events
7  that are in the narrative.  Your narrative is very
8  detailed.  I may not ask questions about all of the
9  details because there may be parts of it where I feel
10 like I understood reading it and I don't need to ask
11 questions.  I don't want you to feel like you can't
12 explain things to me, but you don't need to feel that
13 you have to tell me everything in here or we could be
14 here all weekend.
15   **A.** Right.
16   **Q.** When you told Abbi over the phone on August
17 20 that you wanted to meet with her, you did not tell
18 her on the phone that your physical safety had been
19 threatened, is that right?
20   **A.** No, I did not.
21   **Q.** You did not tell her in the phone
22 conversation that you were being racially harassed at
23 work?

**136**

1    **A.** No.
2    **Q.** On August 26 when you met with Abbi at The
3  Fours, you told her that there was a racial issue in
4  the unit, is that right?
5    **A.** Yes.
6    **Q.** Did you tell her that there were racial
7  clicks?
8    **A.** Yes.  I told her about Grace and Ernie and
9  Shauna and Greta, and I said, "Remember in the
10 springtime, Abbi, that time I pointed it out to you?"
11 I said, "Did you ever talk to them then," and she
12 said, "Yes, I did."  I said, "I never knew that until
13 now because," I said, "they went right back to doing
14 it."  As soon as she went to Orlando, Florida, they
15 went right back to it.
16   **Q.** You said when Abbi was sitting with you in
17 the spring, this is the spring of 1999?
18   **A.** Yes.
19   **Q.** After she took over as supervisor for the
20 unit?
21   **A.** Yes.
22   **Q.** Did she sit with you for a day to learn your
23 job?

**137**

1  **A.** She sat with me for a while. There's no way
2  she could learn in a day. She kind of observed it,
3  you know, and I was always at my desk. Like, you
4  know, it wasn't like, "Okay, I've been at lunch now,"
5  because I didn't really take a lunch. I ate at my
6  desk.
7          She said, "Can I come over now?" I
8  said, "Sure." Those girls were grouping and, you
9  know, I said to her, "Abbi, listen to this," I
10  whispered to her.
11     **Q.** She was at your desk with you?
12     **A.** Yes.
13     **Q.** And you said these girls were grouping?
14     **A.** Yes.
15     **Q.** What do you mean?
16     **A.** They were all sitting around like, you know,
17  talking.
18     **Q.** They who?
19     **A.** They Grace, Greta, Shauna, and that's it.
20  No, and Heather. Ernie did sometimes but not all the
21  time.
22     **Q.** When Abbi was with you at your desk and you
23  pointed it out to her as it was happening, was it

**138**

1  Grace, Greta and Shauna?
2     **A.** Yes.
3     **Q.** Was Heather there?
4     **A.** And Heather.
5     **Q.** Was Ernie a part of that group when you
6  pointed it out to Abbi on that particular day?
7     **A.** Was he there? I don't think so. I don't
8  remember though.
9     **Q.** When Abbi was at your desk and you pointed
10  this group out to her, could you hear what the group
11  was saying?
12     **A.** See, when they would talk -- it's like Ernie
13  is from Barbados, Grace is from Jamaica Plain,
14  Heather is from Barbados and Greta, I don't know
15  where she is from. Like they put this, I don't know
16  if it's like an accent or what into their voice so
17  that it's like almost disguised. Do you know what I
18  mean?
19     **Q.** Could you hear them?
20     **A.** Yes.
21     **Q.** Could you understand what they were saying?
22     **A.** No, and I knew that they -- I knew what they
23  had done. I knew what they were doing, and I knew

**139**

1  that they were putting us down and stuff. I said to
2  Abbi, "Listen to this," and I said, "They do this all
3  the time."
4     **Q.** When you say you knew that they were putting
5  you down but you couldn't understand the words they
6  were saying --
7     **A.** I could understand some of them. I could
8  understand some of them like, you know, white trash
9  and garbage and stupid idiots. I could understand
10  some of that but not all of it because they put like,
11  I don't know, a slang to it or something. It's like
12  they have their own lingo or something.
13     **Q.** When Abbi was with you at your desk in the
14  spring of 1999 and you pointed this out to her, did
15  she sit at your desk and listen with you?
16     **A.** She was sitting here and I said to her,
17  "Abbi, listen, listen to this."
18     **Q.** When you say she was sitting here -- we need
19  to be making a picture on the record -- she was
20  sitting right next to you?
21     **A.** Yes, at my desk. I whispered to her,
22  "Listen..." -- I said, "Listen to this," and I
23  pointed in the direction where it was coming from,

**140**

1  what was going on. I said, "Listen, they're putting
2  us all down. They do this every day." I said, "It's
3  really bad for morale and," I said, "it's so
4  distracting." She said, "I will speak to them about
5  it, Barbie."
6     **Q.** On that particular occasion when Abbi was
7  close enough to you that you knew that she could hear
8  what they were saying, did you overhear any racial
9  comments?
10     **A.** I did. I don't know if Abbi did though.
11     **Q.** What was the racial comment that you
12  overheard on that occasion?
13     **A.** White trash.
14     **Q.** And Abbi told you she would speak with them?
15     **A.** Yes.
16     **Q.** When the two of you met at The Fours, did
17  Abbi tell you that she had spoken with them?
18     **A.** I asked her about it. I said, "Abbi,
19  remember that time in the spring?," I said, "Did you
20  ever talk to them?" She said, "Yes, I did Barbie."
21  I said, "I never knew that until now," because that
22  week, very same week as soon as she went to Orlando,
23  Florida, they went right back to doing it. She told

**141**

1 them from now on if you want to group and talk about
2 people at your lunch, go do it elsewhere.
3     Q. When was it that she talked to them?
4     A. I think it was like that day or the next
5 day.
6     Q. Right when you told her about the problem?
7     A. Yes, because the second day they didn't do
8 it. Then the third day Abbi went away and they did
9 it again. They were back to doing it. So I thought
10 for a minute there I was relieved from it, but they
11 had no respect for Abbi.
12     Q. You believed Abbi when she told you she
13 talked to them?
14     A. Oh, yeah.
15     Q. You just didn't think it had been effective?
16     A. Yes. I mean I wondered if she had because
17 they had the audacity to go back and do it. I don't
18 know, as long as I've been there, you do what your
19 superiors tell you to do, no questions asked.
20     Q. When you met with Abbi at The Fours on
21 August 26, did you tell her about any racial slurs?
22     A. Yes.
23     Q. Did you tell her about any particular events

**142**

1 involving racial slurs?
2     A. Yes.
3     Q. What particular events involving racial
4 slurs did you tell Abbi about on the 26th?
5     A. I told her that the week before Shauna had
6 returned and referred to me as white trash bitch and
7 that she would have Heather beat me up and she said,
8 "Heather will beat her up." She said, "White trash
9 bitch, white trash bitch. Heather will beat her up."
10 She said, "Heather will have no problem beating her
11 up." That is exactly what she said.
12     Q. That is what you told Abbi?
13     A. Yes.
14     Q. Was there any other incident involving a
15 racial slur that you told Abbi about on August 26?
16     A. No, but I told her about Greta threatening
17 to beat me up.
18     Q. At the June 24 party?
19     A. Yes, and I told her about Grace saying,
20 "It's a free country. I'll say what I want to
21 whomever I want." I told her about Grace saying, "I
22 only trust my own people," and talking about, you
23 know, the thing in Jamaica and it really made me

**143**

1 nervous.
2         It just wasn't -- I don't know. Maybe
3 it's me. It just wasn't right, that kind of talk.
4 It made me nervous. I told her that, and I told her
5 I feared from these women. That is why I met off
6 campus with her. I did not want them to see me
7 speaking to her because I knew they would know I was
8 telling her about it.
9     Q. Any other racial slurs that you recall
10 telling Abbi about when you met with her on August 26
11 at The Fours?
12     A. No.
13     Q. When you met with Abbi Laushine at The Fours
14 on August 26, did you tell her that you believed
15 Shauna's conduct towards you had been caused by this
16 conversation you had with Ernie about not working
17 Saturdays?
18     A. Yes, definitely.
19     Q. Do you know for a fact that Shauna learned
20 what you said to Ernie about why you didn't work on
21 Saturdays?
22     A. Yes.
23     Q. How do you know that?

**144**

1     A. Because right before she called me that she
2 said, "Damn bitch, she talks about us talking all day
3 back and forth and she's never at her desk." She
4 went, "We'll take care of her, white trash bitch,
5 white trash bitch. We'll have Heather take care of
6 her. Heather will beat her up. Heather will have no
7 problem beating her up."
8         They said it loud enough for me to
9 hear. I got really, really scared. They wanted me
10 to hear it. It was like I tried so hard not to think
11 about it and do my job, and I couldn't. I had to get
12 away.
13         I went downstairs and I saw my friend
14 Margie. I just had to get out of there. Then I
15 stayed gone for a while; and when I came back, they
16 continued it. It was like -- you know, it was like
17 they made their point. I wanted so bad to turn
18 around and say to them, "If you think you're scaring
19 me, you're not," but I couldn't. I was afraid. I
20 couldn't. So I know that's where it came from.
21     Q. On the first page of Exhibit 2 --
22     A. There was -- wait a minute. There was one
23 other thing that happened in the meeting I forgot to

**145**

1  put in there that I told Abbi that when Grace was out
2  having her hysterectomy she came back and she was
3  going through her desk and saying, "That bitch, that
4  bitch was in my desk.  That bitch was in my desk."  I
5  told Abbi I think that was me she was talking about,
6  and I said, "Abbi, I never went near her desk."  I
7  told her about that at The Fours.  That's something
8  else I forgot to put in there.
9      Q. If you had not been in Grace's desk, why did
10  you think she was talking about you?
11     A. Because all of their hateful talk had just
12  been focusing on me.
13     Q. Did Grace or Greta call anyone other than
14  you a bitch?
15     A. No, not that I know of.
16     Q. Did Shauna call anyone other than you a
17  bitch?
18     A. No.
19     Q. The first page of Exhibit 2 says that you
20  had spoken several times with Jean Beaudreau.
21     A. Yes.
22     Q. Jean was a team leader in a different area,
23  is that right?

**146**

1      A. Yes.
2      Q. You had spoken with Jean during what time
3  frame?
4      A. I spoke with Jean right after Greta
5  threatened me.  Jean had been saying to me that -- I
6  was talking to her and she was saying -- Jean was
7  getting all the endorsements that were being sent to
8  Florida that had to come back to be done correctly,
9  and I would have to get them from Jean.  Jean was
10  making a lot of trips to my desk dumping work on my
11  desk.  She would ask me, "How is it going over here?"
12     I never talked to Jean at my desk.  One
13  time when I was over at her desk I said to her, I
14  said, "It's out of control."  She goes, "I know."
15  She said, "People are talking about it over there."
16  She goes, "What's going on?"  I said -- I just told
17  her my situation and said, "I'm not kidding.  Greta
18  threatened to beat me up and Shauna and Grace
19  threatened to have Heather come after me now."
20  That's when she said to me, "You've got to tell Abbi
21  this."  I said, "I can't."  I said, "That poor girl
22  just moved in."
23     None of them wanted Abbi to take over

**147**

1  the unit.  They were furious when Abbi became the
2  boss.  I don't know why; but when they found out they
3  picked Abbi, Abbi seemed like a pretty fair, decent
4  person.  They were mad at that.  They hated that.  I
5  said to, "Jean, I can't do that to her."  I said, you
6  know, "The poor thing has no idea what she had walked
7  into in that unit."  There had been problems for
8  years with it, the racial click and stuff for years.
9  I said that I can't.  Jean said to me, "Barbie, she
10  knows there are problems.  She knows there are
11  problems, but nobody will tell her."  She said,
12  "Believe me, she will appreciate it."
13     I thought about that.  Like I didn't
14  want to be the one that raises problems in the unit.
15  She was new there.  I didn't want to be the one that
16  raised it, but I had no choice.  I had to tell her.
17  I didn't know what I expected her to do about it, but
18  I had to tell her.  I was afraid, and that's what I
19  told her.  I said, "I just have to tell you this."  I
20  said, "I hate to but," I said, "Abbi, I fear for my
21  life with these women."  She said, "What are you
22  asking me to do?"  I said, "I don't know.  If they
23  know I told you this, they are going to come after

**148**

1  me."  I said, "I don't know, Abbi, but I have to tell
2  you this because it was affecting my job."
3     MS. BLAKLEY: Let me stop you for a
4  minute. Would you read back my question, please.
5     (Reporter read back the record.)
6     Q. The question was about when did you talk to
7  Jean about these issues.
8     A. I started right after Heather threatened me
9  right up until the time when I called Abbi on the
10  20th.  I spoke to Jean on that day too, the 20th.
11     Q. Right after Heather threatened you or right
12  after Greta threatened you?
13     A. I went to Jean right after Greta threatened
14  me.
15     Q. That was back in June?
16     A. Right.  I told her about that incident.
17  Then when they threatened to have Heather beat me up,
18  I told Jean about that, too.
19     Q. That was something that took place --
20     A. During the week of the 20th.
21     Q. Earlier in the week of August 20?
22     A. Yes.  The 20th I think was -- I know it was
23  a Friday.  I know I spoke to her that Thursday, and

**149**

1  she gave me the confidence to call Abbi and talk to
2  her about it. I went home, and before I called Abbi
3  I think I even talked to Jean that day on the phone.
4  I called Jean and she said, "She already knows there
5  are problems there. She knows so she's not going to
6  be shocked. She will appreciate it if you tell her."
7     Q. Do you remember which day of the week Shauna
8  threatened you?
9     A. No.
10    Q. Do you know what time of day it was?
11    A. Yes, it was in the morning, mid morning.
12    Q. Who is the first person that you told that
13  Shauna had threatened you?
14    A. The first person? You mean on the 16th?
15    Q. No.
16    A. When she threatened to have Greta beat me
17  up, Heather beat me up?
18    Q. In your narrative you say that the week
19  before the 26th Shauna had stated to Grace that I was
20  white trash and they could get Heather Gill to beat
21  me up. Was that something that had happened during
22  the week of August 20?
23    A. Yes.

**150**

1     Q. During the week of August 20 did you
2  overhear Shauna Williams say to Grace Clemetson,
3  something like, "That white trash bitch, we should
4  get Heather Gill to beat her up"?
5     A. Yes.
6     Q. And it was mid morning?
7     A. Yes, I would say about 10, maybe 10:30.
8     Q. But you don't remember which day of the
9  week?
10    A. No.
11    Q. My question is: Who was the first person
12  you told about that incident?
13    A. Margie Fleming.
14    Q. When did you tell Margie Fleming?
15    A. Right after it happened.
16    Q. The same day?
17    A. Yes, because I had to get away from my desk.
18  She worked down on the 5th floor, and I called her.
19  She said to me, "You need a break," and I said yes.
20    Q. On the day that it happened did you tell
21  anyone other than Margie Fleming?
22    A. I know I told Jean. I can't remember if I
23  told Lisa or not. I think I did tell Lisa because

**151**

1  Ernie had caused it. So I did tell Lisa. Yes, I
2  did. Lisa knew about it.
3     Q. Was June 24th the only date when Greta
4  threatened you?
5     A. Yes.
6     Q. Then were there two separate occasions when
7  Shauna threatened you?
8     A. Yes.
9     Q. One was during the week of August 20?
10    A. Right.
11    Q. The other was September 16?
12    A. Right.
13    Q. Were those the only two occasions on which
14  Shauna physically threatened you?
15    A. Yes. I mean --
16    Q. Am I correct that with respect to both of
17  those incidents, the one during the week of August 20
18  and the one on September 16, Shauna's comment was not
19  made directly to you, it was made to somebody else
20  and you overheard?
21    A. She wanted me to overhear it.
22    Q. She made the comment to someone else?
23    A. She made it to Grace.

**152**

1     Q. And made it loud enough and in a manner that
2  led you to believe she wanted you to overhear it?
3     A. She intended to scare me, yes. She wanted
4  to scare me.
5     Q. On both of those occasions, the occasion in
6  August and the occasion in September, the basic
7  language of the threat was the same on both
8  occasions, she made reference to white trash bitch
9  and having Heather beat you up, is that right?
10    A. Yes. One of them was to have Heather beat
11  me up, and the other one she said she would have
12  somebody take care of me in the garage.
13    Q. Did Grace ever threaten you with physical
14  violence?
15    A. No.
16    Q. Did Ernie?
17    A. No.
18    Q. So were these three incidents the only three
19  times on which you were threatened with physical
20  violence?
21    A. Yes, but remember Shauna also threatened me
22  with Grace. She threatened me with Heather and she
23  threatened me with Grace also.

**153**

1  Q. When you say Shauna threatened you with
2  Grace also, what do you mean?
3      A. That was the morning -- that was the morning
4  that I called Ernie on what he said, and he went and
5  reported it to her. I said to him, "You should be
6  shot," and she got in my face and said, "You're
7  messing with the wrong bitch," and then got back to
8  her desk and said, "You just wait. Grace is going to
9  rip you up. Wait until Grace gets hold of you. She
10 will be all over you," threatening me with Grace. It
11 had nothing to do with Grace. It had nothing to do
12 with her. It was between me and Ernie.
13      I told that to Abbi, but see that was
14 the problem with these guys. See, they grouped
15 together; and if one had a grievance, it was like
16 they would gang up on you or something. I mean I
17 never had any problems with Grace or Ernie in the
18 past. You know, I mean Grace has always been touchy
19 about her errors and stuff and she didn't do all of
20 her job; but I mean, God, I never had any violence
21 with her.
22      Q. When you spoke with Abbi at The Fours on
23 August 26, did you ask her to take any specific

**154**

1  action?
2      A. She asked me, "What are you asking me to
3  do," and I said, "I don't know, Abbi." I said, "I
4  don't know what I'm asking you to do." This had
5  never happened to me before. I said, "I am just
6  petrified and you have to know what is going on
7  because, A, it's affecting my job and, B, because I
8  don't know what is going to happen." I said, "I am
9  really afraid of them." I said, "I fear for my life
10 with them." It's not like in my 20 years of being
11 employed I ever had anything like this happen to me
12 before.
13      Q. Is it fair to say you did not specifically
14 ask Abbi to take any action on August 26?
15      A. No, I did not specifically ask her not to.
16 I wanted her to do something but not as a result of
17 me telling her because I knew they would come after
18 me.
19      Q. You wanted her to do something?
20      A. Yes.
21      Q. Did you tell her what that something was?
22      A. I didn't know what that something was.
23      Q. You didn't tell her?

**155**

1      A. No. She said, "What are you asking me to
2  do?" I said I don't know. I mean it's not like I
3  can say, "Yes, well, I know I worked for Raytheon
4  three years ago and this is what they did in the
5  situation." I didn't know what to tell her to do. I
6  am an employee that never had this happen to me
7  before.
8      Q. I am not trying to upset you. I wanted to
9  know whether there was anything specific you asked
10 her to do for you.
11     A. I didn't know. No, I didn't know what to
12 tell her to do.
13     Q. Did you ask her not to bring your name into
14 anything that she did?
15     A. No. When I called her I said, "Don't let on
16 that I'm calling," and I said, "Please, don't let it
17 slip out that I'm meeting with you," because I knew
18 they would know, they would know I was telling her.
19     Q. That was what you told her when you talked
20 to her on the 20th over the phone?
21     A. Yes.
22     Q. When you met with her on the 26th, did you
23 ask her to not let anybody know the two of you had

**156**

1  met?
2      A. Yes, I did. I didn't want her to tell the
3  black girls. I didn't want the black girls to know
4  that.
5      Q. Because you were afraid of them?
6      A. Yes, I was afraid they would come after me.
7      Q. On the fourth page of Exhibit 2 you say that
8  you told Abbi that the unit was out of control.
9      A. That's correct, at the meeting.
10     Q. Then your narrative says, "This was very
11 hard to accept because as of August 20, 1999, several
12 good employees had been let go as the result of
13 relocating job responsibilities to the state of
14 Florida."
15     A. Right.
16     Q. Who were the good employees you were
17 referring to?
18     A. Just people that I know. I can't specify.
19 Just there are so many people I know that have worked
20 there, you know, the length of time I worked there
21 and have endured the buy-out of Continental and all
22 the turn-overs and everything and I know that they
23 are good, hardy workers and I was working at the time

**157**

1 with a bunch of bozos that were -- excuse me, but
2 they were, you know, screwing the company and not
3 doing -- you know, we all represent each other. You
4 know what I'm saying. It's like we are a team. It
5 was like they weren't pulling their weight, and they
6 were disgruntled and they kept looking for jobs
7 elsewhere and I told Abbi, "I just wish they would go
8 and let us find somebody who wants to work here and
9 will be committed."
10    Q. When you told Abbi you wished they would go
11 and let you find somebody to work there who wanted to
12 be committed, did you use the word they or did you
13 use actual people's names?
14    A. I said they, but I had told her the ones
15 that were disgruntled.
16    Q. Who had you identified?
17    A. As being disgruntled?
18    Q. As being part of they.
19    A. Bob Oliver, Margaret Mullane, Shauna, that's
20 it. Judy Beck was another one. You know, she was --
21 but she didn't really show her disgruntledness [sic].
22    Q. On either of the two occasions in September
23 when you spoke with Charles Edwards, did he give you

**158**

1 information about the company's employee assistant
2 program?
3    A. No.
4    Q. Do you remember him giving the name and
5 phone number of someone at Archeus?
6    A. No.
7    Q. Were you aware that the company had an
8 employee assistance program?
9    A. No.
10    Q. You never saw that anywhere?
11    A. No.
12    Q. And no one told you that?
13    A. No.
14    Q. The fourth page of your narrative has a
15 number that is three, Item No. 3 in your narrative,
16 do you see that?
17    A. Yes.
18    Q. You talk about Grace being moved out of her
19 seat and being thrilled to see Grace and Shauna split
20 up?
21    A. Yes.
22    Q. Then you say, "Just prior to the move
23 Bernadette Joyce tried to make the suggestion to move

**159**

1 my desk and put Grace into it."
2    A. Right.
3    Q. To whom did Bernadette Joyce make that
4 suggestion?
5    A. She made that suggestion to Doris and tried
6 to get Doris to push the idea on to Abbi.
7    Q. Bernadette was not a supervisor?
8    A. No, she was an underwriter.
9    Q. Doris was not a supervisor?
10    A. No.
11    Q. Doris was a coworker?
12    A. Correct.
13    Q. Did Bernadette to the best of your knowledge
14 suggest directly to Abbi that Grace be moved to your
15 desk?
16    A. Bernadette is real cute. You know, like
17 she's real sneaky. That's why she tried to put Doris
18 up to it. Doris said, "No way, they talk all day."
19 I went to Abbi that morning when I had heard that and
20 said, "Abbi, you're not going to move my desk, are
21 you," because Bernadette was a quiet worker, Doris
22 was a quiet worker and Grace used to be quiet until
23 she moved in and these three goof off all day and

**160**

1 make noise.
2    Q. When you say these three, would you give
3 their names for the record?
4    A. Judy, Margaret, Bob. They sell Avon, they
5 make plans over the phone, do anything but work. I
6 have to have concentration. My job involves going
7 into five different systems to do one transaction,
8 and I cannot be distracted. And Abbi told me, "No, I
9 am not going to move your desk, only the ones that
10 need to make room."
11    Grace was like the odd ball over here,
12 and the underwriters were going to come in here.
13 They moved Grace up here, and I was thrilled because
14 now -- outside of her phone calls, now she wouldn't
15 -- it was going to be a little easier. Besides, she
16 kept saying she was going to be leaving and I told
17 Abbi that. I said, "Any day now she could get a
18 job." She was sending out resumes all over the
19 place.
20    Q. Who was sending out resumes?
21    A. Shauna was, but it was important to me with
22 respect to the job I do that I stayed where I was at.
23 I also do work for every one of these rater techs,

**161**

1  and I am constantly -- I don't know what you call it,
2  inter --
3      Q. Interacting?
4      A. -- interacting with them with their work.
5  You know what I mean.
6      Q. You did not want to be moved?
7      A. Correct.
8      Q. Because your location was from your
9  perspective the best one to allow you to perform your
10  job?
11     A. Correct, for various reasons. And Abbi
12  said, "Barbie, I have no intention of moving you."
13     Q. To the best of your knowledge did Bernadette
14  Joyce suggest directly to Abbi Laushine that Grace be
15  moved to your desk?
16     A. I think she did because Doris then went to
17  Abbi and said, "If you move Barbie's desk, you move
18  mine too." If Abbi didn't say that, what would have
19  made Doris say that to her? I don't know.
20     Q. How did you learn that Doris had said to
21  Abbi if you move, what, Grace's desk?
22     A. Doris told me that.
23     Q. Doris told you she said to Abbi, "If you

**162**

1  move Barbie" --
2      A. You move me, too.
3      Q. -- "you move me too"?
4      A. Yes. She said, "Barbie is a good worker,
5  she should stay where she is at. If you move her,
6  you move me."
7      Q. Because Doris told you about that
8  conversation, you believed that Bernadette Joyce had
9  suggested that Grace be moved to your desk?
10     A. I know she had because Bernadette had told
11  that to Doris, and Doris would not lie to me.
12     Q. Bernadette asked Doris to push the idea with
13  Abbi, is that right?
14     A. Yes.
15     Q. But my question is whether Bernadette talked
16  directly to Abbi about it.
17     A. I think she did.
18     Q. You think that because of what Doris told
19  you?
20     A. Yes, and Doris had said to Bernadette, "No
21  way, I'm not going to have anything to do with
22  pushing that on Abbi." I know Doris had no part of
23  pushing it on Abbi. It must have just been

**163**

1  Bernadette.
2          In fact I remember Bernadette saying,
3  "Why don't we keep the raters together," and in doing
4  that that would have meant putting Grace right in my
5  desk. "I think it's a good idea to keep the raters
6  together," but see Abbi wasn't that stupid. She
7  knew the two of them went off all day long, and I
8  know she approached -- I know she approached Abbi on
9  it and I know Doris said flat out, "You're the boss,
10  the decision is yours; but if you move Barbie, you
11  move me, too." I begged her not to. I said, "Please
12  don't move my desk." She said, "I have no intention
13  of moving your desk."
14     Q. Did you personally hear Bernadette --
15     A. No.
16     Q. -- ask Abbi to move Grace to your desk?
17     A. No.
18     Q. Did you personally hear anybody ask Abbi to
19  move Grace to your desk?
20     A. No, but I know it came up to Abbi. Somebody
21  did and I know it had to have been Bernadette, and I
22  know the excuse she used to make it happen.
23     Q. What was that?

**164**

1      A. She thought it would work better if they put
2  all the raters together, but Abbi was too smart for
3  her. Abbi knows Bernadette's a sneak. She had been
4  warned about her.
5      Q. The meeting that took place on September 15
6  in the unit which you describe starting at Page 5 of
7  your narrative, you say that Abbi addressed some of
8  the issues we talked about in our private meeting.
9      A. Right.
10     Q. Are you making a reference there to the
11  meeting you had with her at The Fours?
12     A. Yes.
13     Q. But she did not disclose the two of you had
14  met?
15     A. No.
16     Q. To the best of your knowledge as of this
17  September 15 unit meeting was anyone in your unit
18  other than you and Abbi aware that you had met at The
19  Fours?
20     A. Yes. I had told Lisa and I had told Doris
21  that -- let me see, I had met with Abbi on the 26th,
22  and I think the following week I had told them both.
23  They both missed me, and I had left like abruptly and

**165**

1  they didn't know where I had gone.  I had told them
2  -- first I told Lisa, and then I told Doris and I
3  told them we were going to have a unit meeting. See I
4  didn't tell either one of them about like the racial
5  stuff.
6      Q. But you told both of them that you had met
7  off site with Abbi?
8      A. Yes.
9      Q. And you told both of them that you were
10  going to have a unit meeting?
11      A. Yes, that the team was going to have a
12  huddle.
13      Q. How did you know the team was going to have
14  a huddle?
15      A. Abbi said it.  She told me that in the
16  meeting we had.
17      Q. When you met with Abbi on August 26, she
18  told you we are going to have a unit meeting about
19  this?
20      A. Yes.  She said the unit was out of control.
21  She said she had been told by people, outsiders on
22  the floor that don't work there it's out of control.
23      Q. She told you there was going to be a meeting

**166**

1  of the unit because the unit was out of control?
2      A. Yes.
3      Q. When you told that to Doris and --
4      A. Lisa.
5      Q. -- Lisa, you did not disclose to them that
6  you had discussed racial issues with Abbi, is that
7  right?
8      A. Not right away.  I didn't right away because
9  I really -- it wasn't that I didn't trust Lisa and
10  Doris.  I just -- it was just something that I just
11  didn't want out.  Do you know what I mean?  I just --
12  it wasn't something that, you know, like I told her
13  she kicked my desk or something like that.  I didn't
14  right away, but eventually I did tell them.
15      See, I kind of felt sneaky around my
16  friend, peers, my friends like that because I went
17  and did that, I met off the premises with the boss
18  and they didn't know about it.  You know what I mean.
19  When they found out I did, they said, "Good.
20  Somebody needed to tell Abbi what's going on," and I
21  told them.
22      Q. Did you tell Lisa Wright prior to September
23  15 that during your off-site meeting at The Fours

**167**

1  with Abbi Laushine you had told Abbi there were
2  racial issues or problems in the unit?
3      A. Yes.
4      Q. Did you tell Doris Chan before September 15
5  that when you had met off site with Abbi at The Fours
6  you had told Abbi that there were racial issues or
7  problems in the unit?
8      A. Yes.  It wasn't like I had to tell them
9  though.  They knew.
10      Q. They knew you had told Abbi?
11      A. No, they knew there were racial problems in
12  the unit.
13      Q. I want to make sure you understand my
14  question.  My question wasn't about whether they knew
15  there were racial problems.  My question is whether
16  you told Lisa Wright that you had brought racial
17  problems to Abbi's attention when you met with Abbi
18  at The Fours.
19      A. Yes.
20      Q. Before the September 15 unit meeting, you
21  met with Abbi on August 26.  About three weeks later
22  you had a unit meeting, is that right?
23      A. Yes.

**168**

1      Q. During that three-week period did you tell
2  Lisa Wright, "When I met with Abbi at The Fours, I
3  told her there was a racial problem in the unit"?
4      A. Yes, I did.
5      Q. Did you make the same comment to Doris Chan
6  during that period of time?
7      A. Yes, I did.
8      Q. Did you tell anyone else at CNA during that
9  period between August 26 and September 15 that you
10  had told Abbi there was a racial problem in the unit?
11      A. No.
12      Q. Did you ever tell anyone at CNA other than
13  Lisa and Doris that you had told Abbi there was a
14  racial problem in the unit?
15      A. No.
16      Q. At the meeting on September 15 there was no
17  discussion of racial issues, was there?
18      A. No.
19      Q. How long did the meeting last, do you
20  remember?
21      A. No, I don't.  I remember, I remember about
22  that meeting Abbi having to repeat herself, and Abbi
23  was really mad.  I remember her being really mad.

169

1    Q. How did you know she was mad?
2    A. Because I could see it in the meeting and
3    then after the meeting she said it to Lisa Wright.
4    Her and Lisa Wright are friends and she said, "You
5    know, maybe it's my impression but I feel like I'm so
6    undermined up there with the whole back row," and the
7    back row is all the blacks and Bernadette.
8    Q. When Abbi made that comment to Lisa Wright,
9    were you present?
10   A. No.
11   Q. Was that something you heard afterward from
12   Lisa Wright?
13   A. Lisa told me that, yes.
14   Q. So when I asked you how you knew Abbi was
15   mad, it was because of what you observed in Abbi's
16   behavior, not because Lisa Wright told you?
17   A. And at the meeting, yes, they made her
18   repeat everything twice. She was getting mad. They
19   acted like they didn't understand what she was trying
20   to say.
21   Q. I understand what they were doing. My
22   question though is: Was there something about what
23   Abbi was doing that made you infer she was mad?

170

1    A. Right.
2    Q. What was it in what Abbi was doing?
3    A. Her body language.
4    Q. What about her body language?
5    A. She was getting frustrated. She was
6    standing in front of a group of people, and she had
7    repeated herself three times. The same people, the
8    blacks in the back row kept raising their hands
9    saying, "Do you mean you want us to do this or that?"
10   She was like, "No, that is not what I'm saying." She
11   kept repeating herself; and when we walked out of the
12   meeting, Lisa said to the new girl, she said, "I've
13   never seen anything like it." She said, "What a
14   bunch of kindergartens. Abbi had to repeat herself
15   three times." Lisa said, "Don't you get it?
16   They didn't like the answer, that's what they are
17   like."
18        You could tell Abbi was mad. She was
19   flustered in the face and she was, you know -- she
20   was angry. She was upset. She was raising her
21   hands. You could tell.
22   Q. Anything else?
23   A. No.

171

1    Q. On the morning of September 16 you were
2    involved in a verbal exchange with Ernie Goddard, is
3    that right?
4    A. That's correct.
5    Q. And Abbi was present in the unit when that
6    happened?
7    A. Yes. She was at her desk.
8    Q. Bernadette was present in the unit when it
9    happened?
10   A. Yes.
11   Q. Was Bernadette at her own desk?
12   A. Yes. Ernie was standing here, and Doris and
13   I were at our desks.
14   Q. Ernie was standing between Abbi and
15   Bernadette?
16   A. Yes.
17   Q. You were at your desk?
18   A. Yes.
19   Q. Doris was at her desk?
20   A. Correct.
21   Q. You heard Ernie make a derogatory comment,
22   is that right?
23   A. Yes, Doris and I both heard it.

172

1    Q. I'm only asking you what you heard. You
2    heard him make a derogatory comment, is that right?
3    A. That's correct.
4    Q. The comment that you heard was, "These
5    dummies in this place, dummies, dummies in here"?
6    A. That's correct.
7    Q. Then Doris said something to you, is that
8    right?
9    A. Yes. Doris said, "Do you believe him back
10   there? Listen to that." Abbi had just discussed it
11   the day before.
12   Q. I want to separate what Doris said to you
13   from what you were thinking.
14   A. Okay.
15   Q. Doris said to you, "Did you hear him back
16   there, listen to him"?
17   A. Yes.
18   Q. Did Doris also say to you, "Abbi talked to
19   the unit about this just yesterday"?
20   A. No.
21   Q. That is what you were thinking?
22   A. Yes, that's correct.
23   Q. Your narrative then says, "I turned around

**173**

1  and said to him, "Stop calling your peers dummies.
2  It's rude and I don't want to hear it. I don't care
3  if it's me or her or her or her," and you were
4  pointing at people in the unit, is that right?
5     **A.** Yes.
6     **Q.** Then you said, "It's rude and you guys do it
7  all the time"?
8     **A.** That's correct.
9     **Q.** Did you raise your voice?
10    **A.** I didn't have to raise it that much. They
11 were in close proximity of me.
12    **Q.** Did you raise it a little bit?
13    **A.** Yes, I turned and said -- yes, I raised my
14 voice.
15    **Q.** Did you stand up?
16    **A.** No, I just turned my chair around.
17    **Q.** Did you start to stand up?
18    **A.** No, I don't think so. Just my chair, I
19 rolled it around.
20    **Q.** When you made that comment, the next person
21 in the unit who you heard speak was Abbi, is that
22 right?
23    **A.** Yes.

**174**

1     **Q.** And Abbi said what?
2     **A.** Barbie is right, there will be no name
3  calling.
4     **Q.** Then you have written, "The underwriter then
5  said, 'I don't do it all the time.'" is that
6  Bernadette Joyce?
7     **A.** Yes.
8     **Q.** Then you said, "I didn't say you,
9  Bernadette"?
10    **A.** Yes.
11    **Q.** Then in parentheses in your narrative it
12 says, "When I said you guys, I meant it to Ernie and
13 he knew what I meant because he and Grace did it
14 consistently."
15    **A.** Correct.
16    **Q.** Is that something that you said out loud on
17 the morning of September 16 or is that something you
18 were thinking?
19    **A.** That is something I was thinking.
20    **Q.** "I went back to work." Did everybody go
21 back to work at that point or did the discussion
22 continue?
23    **A.** No, it was over.

**175**

1     **Q.** Shortly thereafter I went to the file room
2  to pull a file, and there right in front of the
3  entrance was Ernie telling all of this to Shauna"?
4     **A.** Correct.
5     **Q.** She had not even made it to her desk yet?
6     **A.** Yes.
7     **Q.** Shauna was not present in the unit for the
8  earlier incident, is that right?
9     **A.** Right, she had not come into work yet.
10    **Q.** You looked at Ernie and said, "You should be
11 shot"?
12    **A.** That's correct.
13    **Q.** That is what you actually said?
14    **A.** Yes.
15    **Q.** You have here, "I meant you should be
16 ashamed of yourself," is that right?
17    **A.** Yes. I didn't say that, but that is what I
18 meant.
19    **Q.** Then you have, "The last time he gossiped to
20 her she threatened to have Heather Gill beat me up,
21 and I told him never to do that again."
22    **A.** That's correct.
23    **Q.** Is that a reference to the time in August

**176**

1  when you believed that --
2     **A.** Yes, it is. I know what you're saying.
3        MR. WILGOREN: Wait for the question.
4        MS. BLAKLEY:  I need to get the
5  question out.
6     **Q.** That was when you had told Ernie why you
7  didn't come in on Saturdays anymore and he had, you
8  thought, repeated that to Shauna?
9     **A.** Yes.
10    **Q.** That is what that was a reference to?
11    **A.** That's correct.
12    **Q.** "He then said, pointing to me, you stay away
13 from me"?
14    **A.** Right.
15    **Q.** That is Ernie talking to you?
16    **A.** Right.
17    **Q.** Is that when Shauna pointed her finger and
18 said, "You're messing with the wrong bitch"?
19    **A.** Yes.
20    **Q.** Your narrative says, "He was mad at me,"
21 that is Ernie, right?
22    **A.** That's correct.
23    **Q.** "Because my reaction to his insults caused

**177**

1  the boss to address him on such."
2      A. Yes.
3      Q. That is your inference that you drew from
4  what he said?
5      A. Oh, yes, I knew it.
6      Q. How did you know it?
7      A. Because Ernie doesn't like to be called on
8  anything.  I just I know these people.  I worked with
9  Ernie for I don't know how many years.  I just knew
10 it.
11     Q. Was there anything he did or said other than
12 what is in your narrative that you can tell me that
13 is one of the things that contributed to you knowing
14 that?
15     A. Just the last time he had done it and after
16 it happened, the very next day after Shauna
17 threatened me I said to him, "Don't you ever do that
18 again," and he didn't even ask, "What are you talking
19 about?"  He knew what I was talking about.  I knew he
20 knew what I was talking about because they were back
21 there saying exactly what he had said.  "She says we
22 talk together all day."  I mean where did it come
23 from?  It came from him, I knew it.  I said, "Don't

**178**

1  ever do it again."  I don't know if he realized that
2  it caused her to threaten me with violence.
3      Q. You pulled your file and went back to your
4  desk, is that right?
5      A. Yes.
6      Q. This is still the morning of the 16th?
7      A. Yes.
8      Q. And it says, "Shauna is now seated behind
9  me."
10     A. Yes.
11     Q. While you were in the file room, Shauna had
12 made it to her desk?
13     A. Correct.
14     Q. She was now sitting down at her desk?
15     A. Correct.
16     Q. She made a comment to you about Grace?
17     A. That's correct.
18     Q. Grace had not come in yet that morning?
19     A. Right, she doesn't start until about 10:00,
20 9:30 maybe.
21     Q. You say that Shauna said, "Wait until Grace
22 gets hold of this, she's going to be all over you,
23 she is going to rip you up.  Oh, you just wait," is

**179**

1  that right?
2      A. That's correct.
3      Q. Do you remember anything else Shauna said or
4  was that pretty much it?
5      A. That was pretty much it at that point, and I
6  turned around -- and I think that's when I turned
7  around and I wanted to ask her to go behind closed
8  doors and, you know, settle it because it was like
9  one of the worst things I had ever seen that happened
10 in the office.  That's when Abbi came over.
11     Q. Your narrative says, "I was so upset I
12 turned around, and Abbi saw there could be a fight so
13 she stepped in before I said anything."
14     A. Right.
15     Q. What makes you believe that Abbi saw there
16 could be a fight?
17     A. Because she saw the aggression on Shauna.
18     Q. Did Abbi say to you, "Barbie, I stepped in
19 because I was afraid there was going to be a fight"?
20     A. No, she just knew it.  She came right over
21 to the two desks, and she just knew it.
22     Q. Did she say anything about the possibility
23 for a fight?

**180**

1      A. Yes.
2      Q. What did she say about a fight?
3      A. She said, "I can't afford to have a fight
4  break out on the floor because if it does you'll both
5  be fired."  She said, "We have to remember we are in
6  the office, and we can't have a fight break out."
7  Then one by one she called us in the conference room.
8      Q. Did she say that to the two of you together
9  while you were still on the floor?
10     A. Yes.
11     Q. Then she --
12     A. Then she said, "Barbie, can I speak with
13 you," and she called me into the conference room.
14     Q. Was this the first one-on-one meeting you
15 had had with Abbi since August 26?
16     A. Yes.
17     Q. How long did this session with Abbi last?
18     A. About I think a half hour maybe.
19     Q. What was her demeanor?
20     A. I don't know if I understand.
21     Q. What was her manner, was she angry, did she
22 seem upset?
23     A. She was upset.  She had tears in her eyes.

**181**

1  She felt really bad and she said you know, "Barbie,
2  please," she goes, "I can't lose you. You're a good
3  employee. I know there is tension there with you and
4  her." She said, "If a fight breaks out on the floor,
5  it's not going to be between black and white. I am
6  going to have to fire you both."
7          She said, "I don't want to lose you."
8  She gave me advice. She said, "If she gets under
9  your skin or tries to provoke you, I need you to
10  leave your desk. Go for a half hour, an hour, two
11  hours, I don't care. Just get away. Come see me if
12  you need to to vent." She said, "Go get Lisa and
13  have a cigarette or something with Lisa. If Lisa is
14  not around, come see me to vent." I said okay. She
15  said -- I agreed to -- I promised her there would not
16  be a fight, and then she called Shauna in.
17      Q. While you were still in the room?
18      A. No.
19      Q. Is that everything that you remember?
20      A. About that meeting?
21      Q. Yes.
22          MR. WILGOREN:   Let her finish the
23  question.

**182**

1          THE WITNESS: I'm sorry.
2      A. Yes, I think so.
3      Q. Your narrative says, "I was upset. I said
4  to her, 'Abbi, this was between Ernie and I.'"
5      A. That too, yes.
6          MR. WILGOREN:  Again, let her finish
7  the question.
8      Q. Why don't you take a minute to read over
9  Page 7 because it actually goes into more detail.
10  What I'm going to ask you after you have read over
11  Page 7 is whether you remember anything else that you
12  and Abbi said to each other during the half hour you
13  were together in the conference room.
14          MR. WILGOREN:   Off the record.
15          (Break taken from 4:22 to 4:27 P.M.)
16          MR. WILGOREN: Did you read the two
17  pages?
18          THE WITNESS: Yes.
19      Q. You have now reviewed your narrative with
20  respect to the meeting between you and Abbi Laushine
21  in the conference room on September 16, is that
22  right?
23      A. Yes.

**183**

1      Q. And everything that is in the narrative is
2  what you remember happening?
3      A. That's correct.
4      Q. And everything that is in quotes is what you
5  remember saying or hearing said to you?
6      A. Correct.
7      Q. You don't remember anything that was said
8  that is not in this narrative?
9          MR. WILGOREN:    Objection.
10          MS. BLAKLEY:    What is your objection?
11          MR. WILGOREN:    The form.
12      A. No, I don't think so.
13      Q. You don't remember saying anything that is
14  not in this narrative?
15      A. No.
16      Q. When you were excused from the conference
17  room, Abbi called Shauna in, is that right?
18      A. Yes.
19      Q. Shauna was there for you say five minutes?
20      A. Right.
21      Q. Did you time it?
22      A. No. It might have been less than five, I
23  don't know. She was in and out.

**184**

1      Q. Then you say, "Shauna came out, returned to
2  her desk ranting and raving again to me"?
3      A. Correct.
4      Q. "You wait, just wait"?
5      A. Correct.
6      Q. When you say ranting and raving again --
7      A. The first time was when she said, "You just
8  wait, Grace is going to rip you up."
9      Q. Earlier that same day?
10      A. Correct.
11      Q. At the top of Page 8 of your narrative you
12  say you had never in your life been in a situation
13  where you thought you would be killed.
14      A. Correct.
15      Q. Are you saying that on the morning of
16  September 16 when this was going on you thought that
17  you were going to be murdered?
18      A. Yes.
19      Q. By whom?
20      A. I didn't know whom. She was on the phone
21  with somebody, and I thought whoever that somebody
22  was -- she said to them, "You know who," like she
23  knew -- like they knew somebody that would do it.

185

1  Q. When she said you know who I mean?
2  A. That's correct.
3  Q. Is what appears in quotes here, "This white
4  trash bitch that sits in front of me, white trash
5  bitch, I'll have her taken care of, I'll have someone
6  waiting in the garage for her and you know who I
7  mean..." --
8  A. That is what she said.
9  Q. Is that all you remember her saying?
10 A. Yes.
11 Q. On the bottom part of Page 8, the bottom
12 half you're discussing or writing about your
13 conference with Mr. Edwards when he was on the phone
14 and you were in his office, is that right?
15 A. Yes, in the middle.
16 Q. Did Abbi stay with you for the conference or
17 was it just you and Mr. Edwards?
18 A. Well, Abbi stayed with me.
19 Q. So she was actually physically with you in
20 his office?
21 A. Correct.
22 Q. You have a parenthesis here that says,
23 "Jackie was the best and we got along like sisters"?

186

1  A. Yes.
2  Q. Did you see where that starts?
3  A. Yes.
4  Q. Where does that parenthesis end, on the next
5  page?
6  A. On that same page after coworkers.
7  Q. It's just not written in but that is where
8  it would end?
9  A. Yes.
10 Q. That part that is in parentheses about
11 Jackie that ends after coworkers, did you actually
12 say that?
13 A. No.
14 Q. This was what you were feeling?
15 A. Yes.
16 Q. When you went to the Quincy Police Station
17 on Saturday, the 18th of September -- it's Page 11 if
18 you need to look at it -- you say, "Officer Joe
19 O'Reilly took Shauna's name, title and
20 description" --
21 A. Correct.
22 Q. -- "he took Ernie's name and title, Abbi's
23 name and title, Charles' name and title, etcetera.

187

1  He also took Greta's name and the statement she
2  made..." --
3  A. Yes.
4  MR. WILGOREN:    Statement she said.
5  You said the statement she made.
6  Q. "The statement she said to me referencing
7  beating me up," did you provide Officer O'Reilly with
8  a physical description of anyone other than Shauna?
9  A. No, I don't believe so.
10 Q. Did you provide Officer O'Reilly with
11 Heather Gill's name?
12 A. Yes.
13 Q. Did you provide him with Heather Gill's
14 description?
15 A. Yes, I told him they were all big girls.
16 Q. Did you give him any other physical
17 description for Heather Gill other than she was a big
18 girl?
19 A. No.
20 Q. Did you give him a more detailed description
21 than that of Shauna?
22 A. I told him I thought she was a very
23 attractive black woman.

188

1  Q. Did you give him information about her
2  height or weight?
3  A. I couldn't really say because I can never
4  tell that. I know she was taller than me, and I
5  think she weighed maybe close to 200 pounds or
6  something.
7  Q. Is that what you told him?
8  A. No, I told him I can't guess on that stuff.
9  Q. Did he ask you Shauna's height and weight?
10 A. Yes, he did.
11 Q. Did he ask you Heather's height and weight?
12 A. I don't remember that.
13 Q. Did he ask you Greta's height and weight?
14 A. I don't remember that either.
15 Q. Have you reviewed the police report with
16 respect to the incident?
17 A. Yes.
18 Q. Did you obtain a copy of the report at the
19 time you made it or just later?
20 A. Later.
21 Q. Between September 16 and September 27 you
22 were not at work, is that right?
23 A. Correct.

**189**

1    Q. So you left on the 16th which was --
2    A. A Thursday.
     Q. -- a Thursday and you took the next day off
4    that was your usual customer based hours day off and
5    the following week, the week of the 20th you were on
6    vacation?
7    A. Yes.
8    Q. That vacation had been scheduled before this
9    incident happened?
10   A. Yes.
11   Q. Between September 16 when you left the CNA
12   office and when you returned to work on Monday,
13   September 27, did you talk to any of your coworkers
14   about what had happened?
15   A. No, we were at a place without a phone.
16   Except the day it happened after I came home from the
17   Quincy Police Department I called Todd Stansbury. He
18   was one of the underwriters. I thought they might
19   question it, and that was it. I had seen Maura
20   Capplis, and I had seen Doris Chan and Jean
21   Beaudreau. All them knew what had happened that day.
22      I think I may have -- I may have called
23   Lisa that day. Abbi called me at home in the

**190**

1    afternoon, and I might have called Lisa. She said,
2    "What happened to you? You just disappeared." I
3    told her what happened, and that was it.
4    Q. When you say all of them knew what happened,
5    did all of them know what Shauna had said to you
6    after she came out from meeting with Abbi?
7    A. Yes.
8    Q. Did they all know what she had said on the
9    phone that you had overheard?
10   A. Sorry. No, all of them did not because when
11   I saw Maura and I saw Doris and Jean I just kept
12   saying to them, "I've got to go." I didn't have the
13   time to give them details. I said that I was
14   threatened, and the same thing with Todd and with
15   Lisa too. I said I was threatened and they told me
16   to leave.
17   Q. So you didn't tell any of those people what
18   it was actually that you heard Shauna say?
19   A. Correct.
20   Q. Between September 16 and September 27 did
21   you seek any kind of medical attention?
22   A. No.
23   Q. When you came back to work on the 27th, you

**191**

1    asked Abbi why Shauna had not been moved, is that
2    right?
3    A. Yes, I went right to her desk.
4    Q. You understood at that point from what Paul
5    told you Mr. Edwards had said that would be up to
6    Abbi, is that right?
7    A. Right, and I knew Abbi wanted to move her so
8    I thought she would be moved.
9    Q. You knew Abbi wanted to move her because
10   that is what Paul told you Mr. Edwards had said to
11   him?
12   A. Correct.
13   Q. That was not something Abbi had personally
14   said to you?
15   A. No.
16   Q. Between September 27 and your last day of
17   work before you went on leave, did any CNA employee
18   threaten you?
19   A. No. Well, not directly. Shauna made
20   comments.
21   Q. Let's break it down. Between September 27
22   and the day you went out on leave, nobody directly
23   threatened you with physical violence, is that right?

**192**

1    A. That's right.
2    Q. During that same period of time Shauna made
3    some comments that made you uncomfortable?
4    A. Yes.
5    Q. Did anyone other than Shauna make comments
6    during that period of time that made you
7    uncomfortable?
8    A. Yes.
9    Q. Who besides Shauna?
10   A. Grace.
11   Q. Anyone besides Grace and Shauna?
12   A. No.
13   Q. Between September 27 when you returned to
14   work and going out on leave, did anyone at CNA make
15   racial remarks to you?
16   A. No.
17   Q. Between September 27 and when you went out
18   on leave, on how many occasions did Shauna say or do
19   things that made you feel uncomfortable?
20   A. It was about two or three times. I can't
21   remember why. That's what I'm looking for.
22   Q. Are they in your narrative?
23   A. Yes, they are in here. You'll find them.

193

1  Q. They are all in here?
2  A. Yes.
3  Q. How many occasions were there between
4  September 27 and you going out on leave that Grace
5  made you feel uncomfortable or unsafe?
6  A. At least once. It might be twice.
7  Q. Are those in here, too?
8  A. Yes.
9  Q. Since you have been out on leave, have you
10 had any contact at all with Shauna Williams?
11 A. No.
12 Q. With Grace Clemetson?
13 A. No.
14 Q. With Greta Thomas?
15 A. No.
16 Q. With Ernie Goddard?
17 A. No.
18 Q. Have you ever been the victim of a violent
19 crime?
20 A. No.
21 Q. Have you ever been assaulted?
22 A. No.
23 Q. Have you ever been robbed?

194

1  A. No.
2  Q. Have you ever been raped or sexually
3  molested?
4  A. No.
5  Q. Earlier today I asked you about situations
6  that caused you anxiety.
7  A. Yes.
8  Q. You indicated that you feel anxiety around
9  African-Americans now, is that right?
10 A. Yes.
11 Q. Was that true prior to August of 1999?
12 A. No.
13     MS. BLAKLEY: Let's go off the record.
14     (Break taken from 4:51 to 4:54 P.M.)
15     (Exhibits No. 5 and 6 marked for
16 identification.)
17 Q. Let me ask you, Mrs. Connick, to look at
18 what has been marked as Exhibit 5 to your deposition.
19 Those are some responses to interrogatories that
20 Mr. Wilgoren served on my office. On either the last
21 page or second to last page there is a signature that
22 appears to be yours. Can you look at that and tell
23 me if that is yours.

195

1  A. Yes.
2  Q. You signed those?
3  A. Yes.
4  Q. At the time you signed them, did you read
5  the questions and the responses to make sure they
6  were accurate?
7  A. I think so, yes.
8  Q. Can I have it back for a moment. You
9  indicate in response to the first interrogatory that
10 there is someone named Gina Antoine who is aware of
11 ongoing racial harassment.
12 A. Yes.
13 Q. Who is Ms. Antoine?
14 A. She's an employee of Commercial Mass Auto.
15 Q. Commercial Mass Auto?
16 A. That's correct.
17 Q. What about Gerard Millette?
18 A. He's an employee in Commercial Mass Auto.
19 Q. You indicate that Mr. Chris Dye is aware of
20 all the threats and racially hostile conduct I was
21 subjected to during the course of my employment.
22 A. Yes.
23 Q. Then you say Chris Dye told me, "I know all

196

1  about the situation," is that right?
2  A. Yes.
3  Q. Is that correct?
4  A. That's correct.
5  Q. Did you ever personally tell Mr. Dye what
6  had happened to you in the workplace?
7  A. No, I was directed to go see Mr. Dye through
8  Charles Edwards. Charles said it was out of his
9  hands and if I could not do my job I had to speak to
10 Chris Dye. I made an appointment to see him, and
11 Chris Dye -- I don't know what you call it -- blew
12 off the appointment.
13 Q. My question is whether you personally told
14 Chris Dye what happened to you.
15 A. No.
16 Q. Were you present when anyone else told Chris
17 Dye what had happened to you?
18 A. No.
19 Q. When you say that Chris Dye is aware of all
20 the things that happened to you, is that based solely
21 on him having said to you, "I know all about the
22 situation"?
23 A. Yes.

**LEAVITT REPORTING SERVICE, INC.**

**197**

1    Q. When you say that Greta Thomas threatened
2  you with physical violence during the party in June,
3  what were the actual words of her threat?
4    A. She said, "What do you want to beat me up
5  right here, right now?"
6    Q. What do you want to beat me up right here,
7  right now?
8    A. That's correct.
9    Q. In Interrogatory No. 8 you are asked -- and
10  I will give it back to you after I get the question
11  out -- to identify with particularity and describe
12  what occurred after you reported the concerns raised
13  in your charge to Abbi Laushine and Charles Edwards.
14      The answer says, "No action was taken
15  to eliminate the racially hostile environment, no
16  action was taken to make the work environment safe so
17  that I can return to work and not be in fear that the
18  threats on my life would not be carried out," and
19  then the response goes on and on.  I will give it
20  back to you so you can see it.
21      What is the basis for your statement
22  that nothing has been done to correct the racially
23  hostile environment?

**198**

1    A. The basis is that they didn't do an
2  investigation.  They didn't question any witnesses.
3  They didn't investigate the phone records like I
4  asked them to.  They didn't look at any of the things
5  I said.  They just sort of swept it under the rug,
6  and I know that the problems continued because
7  coworkers told me that after I left.  She still had
8  problems with hostility on the work front with the
9  blacks that work in there.
10    Q. She, Abbi?
11    A. That's correct.
12    Q. Who told you that?
13    A. Lisa Wright told me that, Margie Fleming
14  told me that, Doris Chan told me that, that's it.
15    Q. When you say they didn't conduct any
16  investigation, did you identify to Charles Edwards
17  specific individuals who had witnessed threats
18  against you?
19    A. Yes, I did.
20    Q. Do you know which of those individuals
21  Mr. Edwards did or did not speak with?
22    A. He spoke with none of them.
23    Q. Who did you identify to him?

**199**

1    A. Todd Stansbury, Lisa Wright, Doris Chan,
2  Maura Capplis, Jean Beaudreau, Gerard Millette, and
3  Vita Falzone -- V-I-T-A F-A-L-Z-O-N-E.
4    Q. Was Todd Stansbury physically present and
5  within earshot --
6    A. Yes, he was.
7      MS. BLAKLEY:  You need to let me finish
8  the question.
9      THE WITNESS:  I thought you were done.
10  I'm sorry.
11    Q. Was Todd Stansbury physically present and
12  within earshot when Greta Thomas threatened you on
13  June 24, 1999?
14    A. No, Todd wasn't anywhere near.
15    Q. Was Lisa Wright physically present during
16  that incident?
17    A. No.
18    Q. Was Doris Chan physically present during
19  that incident?
20    A. No.
21    Q. Was Maura Capplis physically present during
22  the incident?
23    A. No.

**200**

1    Q. Was Jean Beaudreau physically present during
2  the incident?
3    A. I believe Jean was.
4    Q. Did Jean work in the department where that
5  party was being held?
6    A. Yes, I told them the whole accounting
7  department was a witness to that.
8    Q. You need to answer my question.  Was Gerard
9  Millette physically present when Greta Thomas
10  threatened you on June 24, 1999?
11    A. He might have been, I'm not sure.
12    Q. Was Vita Falzone physically present when
13  Greta Thomas threatened you on June 24, 1999?
14    A. No.
15    Q. Was Todd Stansbury physically present when
16  Shauna Williams made a threatening comment in your
17  presence during the week of August 20?
18    A. No.
19    Q. What about Lisa Wright?
20    A. No.
21    Q. Doris Chan?
22    A. Doris, I think she was.
23    Q. Maura Capplis?

**201**

1  A. No.
2  Q. Jean Beaudreau?
3  A. No.
4  Q. Gerard Millette?
5  A. No.
6  Q. Vita Falzone?
7  A. No.
8  Q. Was Todd Stansbury physically present when
9  Shauna Williams made a threatening comment to you or
10  in your presence on September 16?
11  A. Yes.
12  Q. Was Lisa Wright physically present when
13  Shauna made a threatening comment to you or in your
14  presence on September 16?
15  A. Yes.
16  Q. What about Doris Chan?
17  A. Yes.
18  Q. Maura Capplis?
19  A. Yes.
20  Q. Joan Beaudreau?
21  A. Yes.
22  Q. What was Jean Beaudreau doing in your unit
23  at that time?

**202**

1  A. She was over by the file room and she was
2  there when I came out.  She said, "What happened?"
3  Q. She said what happened because she was not
4  present when Shauna made the threat to you, is that
5  right?
6  A. Right.
7  Q. Maura Capplis was also not present when
8  Shauna made the threat?
9  A. Right.
10  Q. Doris Chan was not present?
11  A. Yes, you're right.  They were not present
12  there, but they saw me come out of personnel.
13  Q. Todd Stansbury, Lisa Wright, those are both
14  people to whom you said, "I have been threatened, my
15  life has been threatened"?
16  A. Yes.
17  Q. But neither one of them was present when the
18  threat was made?
19  A. Todd was.
20  Q. Todd was present for the threat on September
21  16?
22  A. Yes, and Doris Chan was also.  She sits
23  right in front of me.

**203**

1  Q. And she was at her desk?
2  A. Yes.
3  Q. Did she ever tell you that she heard the
4  threat?
5  A. No.
6  Q. Did Todd Stansbury ever tell you he heard
7  the threat?
8  A. No.
9  Q. Where was he when the threat was made?
10  A. Right next to her.
11  Q. Right next to who?
12  A. Shauna.
13  Q. Seated, standing?
14  A. Seated, on the phone.
15  Q. Sorry, I can't hear you.
16  A. He was on the phone.
17  Q. At which of the desks?
18  A. Sorry, at Grace's old desk right here.
19  Q. So Todd Stansbury was on the phone at the
20  desk marked in Exhibit 1 as Grace's desk when Shauna
21  made the threatening statement on September 16?
22  A. That's right.
23  Q. Did you tell Charles Edwards you thought

**204**

1  that Todd had not heard the statement because he was
2  on the phone?
3  A. I said he might have heard the statement.
4  Q. Did you tell him Todd was on the phone?
5  A. I didn't know that Todd was on the phone.  I
6  said that he may have been on the phone, I'm not sure
7  but I said he might have been on the phone because he
8  was always on the phone.
9  Q. Did you have a conversation with Todd
10  Stansbury in which he told you he had not heard any
11  comment, that he had been on the phone?
12  A. Yes.
13  Q. Was Gerard Millette physically present when
14  Shauna Williams made a threatening statement on
15  September 16?
16  A. No.
17  Q. Was Vita Falzone physically present when
18  Shauna Williams made a threatening statement on
19  September 16?
20  A. No.
21  Q. Were there any other witnesses you
22  identified to Mr. Edwards?
23  A. I told him the accounting party.

**205**

1  Q. Anyone else?
2  A. No. He denied I even gave him any witnesses.
3  Q. Let me ask you to look at Exhibit 6 which is
4  the charge. Is that a copy of the discrimination
5  charge you filed in March of this year?
6  A. Yes.
7  Q. In the second to last paragraph you said,
8  "Despite reporting the above conduct of threats and
9  the ongoing hostile work environment based on race,
10  the respondent has continued to fail and refuse on an
11  ongoing basis to investigate the hostile work
12  environment and has failed to take any corrective
13  action," is that right?
14  A. That is.
15  Q. Do you have any further basis for that
16  statement than what you just told me?
17      MR. WILGOREN:  Objection to form.
18  Q. Do you understand my question?
19  A. Yes, but I'm trying to remember everything I
20  just told you so that --
21      MR. WILGOREN:  Maybe I can elucidate
22  my objection. It's a compound question in that that
23  statement goes to both the investigation of the

**206**

1  complaint and the corrective action. So perhaps as a
2  suggestion if you broke it out separately it might be
3  more clear.
4      MS. BLAKLEY:  Thank you for the
5  suggestion. It's a single allegation.
6  Q. You just told me the reasons why you thought
7  there had been no investigation, is that right?
8  A. That's correct.
9  Q. Because your understanding is Mr. Edwards
10  did not talk to any of those people?
11  A. That's correct.
12      MR. WILGOREN:  Objection.
13  Q. Do you have any other basis for saying there
14  was no investigation?
15  A. Yes.
16  Q. What else?
17  A. After I was out of work and I found the
18  pamphlet on employee conduct, I realized that a
19  threat should be reported immediately to corporate
20  security and not handled within the branch by
21  personnel.
22      At no point at all was I ever told that
23  they were even involved with it; and as far as

**207**

1  Charles doing an investigation, Charles blew it. I
2  mean she, Shauna, thought because she was black and
3  because he was black she was all set on that.
4  Q. Did you think that, too?
5  A. No, I didn't, but Shauna did. Charles
6  Edwards had this meeting and he said, "One person
7  gives me witnesses and I can't even ask that person
8  questions because it's the other one's best friend,"
9  and I was highly insulted when he had said that
10  because my feeling is in a professional investigation
11  if I coaxed somebody -- and I was insulted he would
12  think I would have somebody trying to lie for me.
13      If he knew how to investigate or it was
14  a professional, they know how to ask the right
15  questions to get the right answers to know whether I
16  told somebody to say something. I mean of course she
17  was going to deny it. He even admitted that. He
18  said of course she was going to deny it. She was
19  going to get fired if she didn't.
20      My husband told me that Charles said in
21  so many words the day he talked to him that they know
22  she did it but they can't prove it. My feelings is
23  they may have been able to prove it if they had taken

**208**

1  correct procedures to handle the situation, and they
2  did not.
3  Q. You don't really know what Charles Edwards
4  did, do you?
5  A. I didn't until the other day.
6  Q. You know what he testified he did?
7  A. Yes.
8  Q. And that is what you learned last week when
9  he was deposed?
10  A. I had an idea but, yes, that is what I
11  learned last week, basically that he did nothing.
12  Q. Do you have any reason to believe that he
13  was lying about the things that he said he did?
14  A. I think he embellished when he said he did a
15  thorough investigation because I don't believe that
16  he did. I think he was really embarrassed at the
17  point when he was asked what about the phone records.
18  He tried to tell me that was an impossible task, and
19  I begged them, begged them and begged them to pull
20  the phone records because I wanted to know. I
21  thought since my life was threatened I had a right to
22  know who the third-party was involved.
23  Q. When you met with Abbi Laushine, you asked

**209**

1  her about phone records, is that right?
2  　　A. Yes. After the 16th, yes, I did.
3  　　Q. On the 16th when you talked to Abbi?
4  　　A. Yes, I did.
5  　　Q. Didn't you tell Abbi that she needed to look
6  at phone records to tell who was spending a lot of
7  time on personal calls?
8  　　A. No, I did not.
9  　　Q. You didn't say that?
10  　　A. No, I didn't.
11  　　Q. You told her you needed her to look at phone
12  records so you could tell who Shauna had talked to?
13  　　A. I asked her can't they pull Shauna's phone
14  record. I said, "Abbi, I want to know who she was
15  talking to."
16  　　Q. Is that all you said to Abbi on the subject
17  of phone records?
18  　　A. No, I said, "If they pulled Shauna's phone
19  record, that alone would get her fired."
20  　　Q. Did you say anything else on the subject of
21  phone records?
22  　　A. No, I don't think so.
23  　　Q. Shauna Williams told Charles that she had

**210**

1  been talking to her husband. Is that what you
2  understand?
3  　　A. Do I believe that?
4  　　Q. Not do you believe that that is who she was
5  talking to but do you believe that is what she told
6  Charles?
7  　　A. Yes, I do.
8  　　Q. Do you have any reason to believe that she
9  was talking to someone other than her husband?
10  　　A. Absolutely. I've heard the way she speaks
11  to her husband. She degrades him like he's a piece
12  of dirt, like no woman should ever speak to her
13  husband. That is how she speaks to her husband.
14  There was no fear in that woman that day, and there
15  was no upsetness [sic] in that woman that day. There
16  was only anger and viciousness, and it was vented at
17  me.
18  　　Q. Was it because of what she said that you
19  didn't believe she was on the phone with her husband?
20  　　A. I don't follow you.
21  　　Q. You said you didn't believe that the person
22  she was talking to was her husband?
23  　　A. Correct.

**211**

1  　　Q. And you said because of the way that she
2  talked to her husband --
3  　　A. Because that is the way I have heard her
4  talk to her husband. Now, Charles said here last
5  week that she had called her husband because she was
6  upset. That did not take place. That definitely is
7  not the phone call that took place in back of me.
8  　　Q. I am not asking you about why she did it or
9  whether she was upset. I am asking you what it was
10  that you actually heard that causes you to say that
11  was not her husband.
12  　　A. I didn't hear anything in particular.
13  　　Q. She didn't refer to the husband by name?
14  　　A. No.
15  　　Q. "The respondent has failed to take any
16  corrective action," when you make that allegation,
17  you testified earlier today that it was your
18  understanding that the company had done something to
19  reissue its Code of Professional Conduct earlier this
20  year, is that right?
21  　　A. Yes.
22  　　Q. And it's your belief, whether or not it's
23  true, that that is somehow related to your situation,

**212**

1  is that right?
2  　　A. Sorry. Can you say it again?
3  　　Q. Do you believe the company's reissuance of
4  its Code of Professional Conduct was a result of your
5  situation?
6  　　A. I do.
7  　　Q. Would you consider that to be a corrective
8  action?
9  　　A. I think -- no, I would consider that to be a
10  way of them trying to cover up that they don't do the
11  right things because they sent that out. "Look, see
12  how corporate we are. Look, we are a professional
13  company. Look, we send this all out the time."
14  　　　They never sent it out before, and I
15  think they were sending it out intentionally to use
16  it as a basis for when we investigated or whatever.
17  I don't think -- I don't think that it was used to --
18  if that was the case, why didn't they send it out
19  immediately after it happened?
20  　　Q. Is it your understanding they sent it out
21  before March 11 of this year?
22  　　A. Yes, I believe so.
23  　　Q. So it was before you filed your charge?

**213**

1    A. Yes. I don't know the date of it.
2    Q. But it's your belief it was before you filed
3 your charge?
4    A. Yes.
5       MS. BLAKLEY:   Why don't you ask your
6 questions.
7       MR. WILGOREN:   Are you done?
8       MS. BLAKLEY:   I will know after you
9 finish your questions.
10       MR. WILGOREN: I'll wait.
11       MS. BLAKLEY:   I may have redirect
12 after your questions.
13       MR. WILGOREN:   Okay.
14       Cross-Examination
15    Q. (By Mr. Wilgoren) When did you first meet
16 with me, do you remember?
17    A. On the 8th I believe, Friday, October 8.
18    Q. 1999?
19    A. Yes.
20    Q. Did you receive a copy of a letter that I
21 wrote to Mr. Edwards --
22    A. Yes.
23    Q. -- on that same day?

**214**

1    A. Yes, I did.
2    Q. How long from that day when Mr. Edwards -- I
3 sent it by fax, do you remember that?
4    A. Yes.
5       MS. BLAKLEY:  Do you want to testify
6 rather than asking question?
7       MR. WILGOREN:   Is there an objection?
8       MS. BLAKLEY:   If you want to represent
9 for the record that you sent Mr. Edwards a fax on
10 October 8, fine, she doesn't know.
11       THE WITNESS:   Yes, I do.
12    Q. How do you know I sent a fax?
13    A. I was in your office when you did it.
14    Q. Thank you. How many months after I sent that
15 fax, that letter to Mr. Edwards on October 8 did CNA
16 issue this policy that was just referred to?
17    A. At least five, maybe six months.
18    Q. While we are on policies, did you receive
19 from CNA a policy book entitled Our Commitment to
20 Professional Conduct?
21    A. Yes, I did.
22    Q. When did you receive that?
23    A. Two years ago.

**215**

1    Q. That was a policy that had a nice cover
2 letter from Dennis Chookaszian, Chairman and Chief
3 Executive Officer?
4    A. Yes.
5    Q. Did it also have a section for reporting
6 misconduct?
7    A. Yes, it did.
8       MS. BLAKLEY:   Objection to form.
9    Q. Did you review that policy --
10    A. Yes, I did.
11    Q. -- on reporting misconduct?
12    A. Yes.
13    Q. Based on your review of that policy, did it
14 advise you who would be the recipients of complaints
15 concerning workplace harassment?
16    A. Yes.
17       MS. BLAKLEY:   Objection to the form of
18 the question.
19    A. It said the recipient would be corporate
20 security and that the branch itself is not supposed
21 to get involved.
22    Q. I am asking about recipients of complaints
23 of workplace harassment.

**216**

1       MS. BLAKLEY:   He was not asking about
2 threats.  He was asking about workplace harassment.
3 Would you like to show her the policy or would you
4 like to tell her that it's human resources?
5       MR. WILGOREN:   I will conduct my
6 examination, thank you.
7    Q. Let me do it this way.  Let me show you the
8 policy book, Our Commitment to Professional Conduct,
9 and call your attention to Page 5.
10       MS. BLAKLEY:   Dated what date?
11       MR. WILGOREN:   It's undated.
12       MS. BLAKLEY:   There is no release date
13 anywhere on it?  It's not the same version we
14 produced in discovery.  I don't have that one.
15       THE WITNESS: That is the only one that
16 they ever came out with in a book like that. It was
17 around two years ago.
18       MS. BLAKLEY:   If you're going to show
19 it to her, we might as well mark it as an exhibit and
20 then we will have a record of what she saw.
21       MR. WILGOREN:   I will be happy to mark
22 it.
23       (Exhibit No. 7 marked for

**217**

1  identification.)
2        MS. BLAKLEY:   If you tell me which
3  page you're going to show her, then I don't have to
4  look at the whole thing.
5        MR. WILGOREN:   (Indicating .)
6        MS. BLAKLEY:  The Box on Page 5.
7        Q. Let me show you what has been marked as
8  Deposition Exhibit No. 7.  Tell me if you can
9  identify this document.
10       A. This is the book they passed out two years
11 ago.
12       Q. Who is they?
13       A. The branch manager in personnel.  They had a
14 meeting on it.
15       Q. Aside from this document, did you receive
16 any other documents with company policies which told
17 you how to report misconduct including discrimination
18 complaints and workplace harassment complaints?
19       A. I didn't receive it, but it was sent through
20 the office about five or six months after what
21 happened to me.
22       Q. That was the policy that counsel asked you
23 about?

**218**

1        A. Yes.
2        Q. Which would have been distributed sometime
3  in February or January 2000?
4        A. Yes.  I think I might have gave that to you
5  or I have it at home.  One of my friends gave it to
6  me.
7        Q. Now, let me call your attention to Page 5
8  and this box.  Does it give you any guidance as to
9  who you can report or who you are to call when you
10 have complaints of discrimination in the workplace?
11       A. That phone number, manager of human
12 resources representative.
13       Q. Anyone else?
14       A. No.  A supervisor.
15       Q. The supervisor in your case would be Abbi
16 Laushine?
17       A. Yes.
18       Q. Now, what was your purpose in meeting with
19 Abbi Laushine on August 26, 1999?
20       A. Because I had to tell her about the racial
21 harassment and threats that were taking place
22 involving me.
23       Q. Now, how would you describe how you got

**219**

1  along with people at work during your 15-year career?
2        A. Great.
3        Q. Would that include people of all races and
4  religions?
5        A. Yes.
6        Q. Would you consider that you had friends,
7  African-American friends and white friends at work?
8        A. Yes, a lot of them.
9        Q. Tell me some of the African-American friends
10 you had at work.
11       A. Over the years?
12       Q. Yes.
13       A. Jackie Offut was the most recent before she
14 left, but there was Jean Beaudreau -- not Jean
15 Beaudreau.  The was Jeannie Mack.  There was Lisa --
16 I mean Mary Fuqua -- F-U-Q-U-A -- Leila Robinson, she
17 was an older woman.
18       Q. Who?
19       A. Muriel Cummings, she thinks I'm going to go
20 to heaven.  She always tells me that I'm blessed.
21 Muriel loves me.  When she sees me, she'll come up
22 and hug and kiss me.
23       Q. Who is Betty Wheeler?

**220**

1        A. Betty Wheeler is a long-time worker in
2  personal lines.  She is also black and a friend of
3  mine.  When Betty had her luncheon, her anniversary,
4  she said that she would never have it without having
5  me there.
6        Q. Did you ever associate with any African-
7  American employees outside of work?
8        A. A long time ago we used to go out after
9  work.  We used to meet at a place called Cherries in
10 Quincy Square.  It's now changed.  Yes, we used to go
11 out, a whole bunch of us after work and have like a
12 buffet spread and it was called Cherries because they
13 played old music like '50s and stuff.  Me and Mary
14 Fuqua used to be the first ones on the dance floor
15 and stuff.  She would say, "Come on," she's got a
16 real deep voice.  She's a hot ticket.  She's a good
17 friend.
18       Q. Did you ever go out socially with Jackie
19 Offut?
20       A. No, we never had the chance to, but we
21 always talked about it.  We would always talk about
22 going out dancing together, and in fact Jackie had a
23 birthday party that was a surprise that her family

**221**

1  threw for her, her and her twin brother. Jackie was
2  telling me about it on Monday, and I said, "I wished
3  I would have known, Jackie, I would have come to it."
4  She said, "Girl, you should have come." She said,
5  "You would have loved my family and they would have
6  loved you too." Shauna was really up in arms over
7  it.
8      Q. Did you have occasion to dance with Jackie
9  at a company-sponsored function?
10     A. Yes, and I kept saying, "Jackie, let me show
11 you how to dance," and Jackie would say, "You know,
12 you're not bad for a white girl, Barbie." It was all
13 in fun. There was no --
14     Q. Was that different from -- did you take that
15 to be a racially derogatory statement?
16     A. God, no.
17     Q. Now, counsel asked you before about certain
18 individuals that you had identified who had been
19 retained after the layoff who you felt were
20 disgruntled and you listed --
21     A. Bob Oliver.
22     Q. -- Bob Oliver, Shauna Williams and --
23     A. Margaret Mullane.

**222**

1      Q. -- Judy Beck. We know Shauna is African-
2  American.
3      A. Right.
4      Q. What are the races of the other three?
5      A. White, all three of them.
6      Q. At the very beginning counsel asked you
7  about a skin condition. Could you describe what the
8  skin condition is that you are referring to?
9      A. That I have?
10     Q. Right.
11     A. I've had it since the end of the summer.
12 It's a break-out all over my chest.
13     Q. Who is treating or who was treating that?
14     A. Doctor Gibney. She's still treating me.
15     Q. Did Doctor Gibney indicate what caused that
16 condition?
17     A. She said it could directly be related to the
18 stress I was under. I told her what was going on. I
19 asked her if it could be related to stress. She said
20 absolutely.
21     Q. You also testified in response to a question
22 that you went and had a discussion with Laura
23 Nicholas regarding the problems with Grace. Why did

**223**

1  you have such a discussion?
2      A. Because they were grouping and berating my
3  peers and I found it very offensive, and I knew if I
4  went over and told them they would not have respect
5  for me. They just think they are above everything,
6  and I knew that if I approached them on it I would
7  get laughed at.
8      Q. Now, you testified that Grace at one point
9  said, "I trust only my own people," and that you
10 reported that to Abbi Laushine.
11     A. Yes.
12     Q. When was that statement made?
13     A. That was made in the spring of 1999.
14     Q. Did you learn at a subsequent time that Abbi
15 Laushine told Charles Edwards about your meeting on
16 August 26?
17     A. When I was in the meeting on the 16th and
18 Charles said to me, "Tell me what happened, Barbie,"
19 and I told him what Shauna said to me word for word,
20 and I don't know how he missed it but he said I never
21 used the word bitch. I told him word for word that
22 she said, "I'm going over Abbi's head on this one,
23 I'm going to go see Charles and this white trash

**224**

1  bitch, white trashy bitch that sits in front of me,
2  I'll have her taken care of, I'll have somebody
3  waiting for her in the garage." There was absolutely
4  no way that I left that out, and he says that I
5  never, ever told him that.
6          He asked me, "Have you ever been
7  threatened at any other time," and I told him yes. I
8  said, "Greta Thomas threatened me at the accounting
9  party on June 24." He said, "Were there any
10 witnesses," and I said, "The whole accounting party."
11 He asked me if there were witnesses for the Shauna
12 threat, and I told him yes. I said that Todd
13 Stansbury was there. I said, "I'm not sure he heard
14 it, Charles, but he was the only one within a
15 distance that would have heard it."
16         Then I just said to Abbi -- she was
17 sitting there and I said that there was a third one
18 and I said, "Abbi, you remember I told you at our
19 meeting what the third one was," which was when Grace
20 and Shauna were conspiring to have Heather beat me
21 up. I drew a blank, I couldn't remember it. Abbi
22 said to me -- I mean Abbi said, "Charles, you
23 remember I told you about that incident over that

**225**

1  speaker phone," and he said, "Yes, okay, I know about
2  that."
3  　　Q. Mr. Edwards said that?
4  　　A. Yes.
5  　　　　MR. WILGOREN:   I have no further
6  questions.
7  　　　　Redirect Examination
8  　　Q. (By Ms. Blakley) You were in Mr. Wilgoren's
9  office on October 8, 1999, is that right?
10  　　A. Yes.
11  　　Q. Were you in Mr. Edwards' office at any point
12  on that day?
13  　　A. No.
14  　　Q. With respect to the Commitment to
15  Professional Conduct pamphlet that has been marked
16  for identification as Exhibit 7, was it before June
17  of 1999 that you received this?
18  　　A. Yes.
19  　　Q. With respect to your African-American
20  friends from work, did you ever have any of your
21  African-American friends from work over to your
22  house?
23  　　A. We talked about it, but it never transpired.

**226**

1  　　Q. Were you ever at the home of any of your
2  African-American friends from work?
3  　　A. Almost.  I mean we --
4  　　Q. You talked about it but it never happened?
5  　　A. Yes.  We would make plans like if somebody
6  was having like a candle party or something like
7  that; and, you know, it just was a matter of not
8  being able to get there.
9  　　Q. In response to some questions that
10  Mr. Wilgoren asked you, you said they were grouping,
11  they just think they are above everything.  Was that
12  again a reference to the blacks?
13  　　A. Yes.
14  　　Q. You said Doctor Gibney said that your skin
15  condition could be related to stress?
16  　　A. She said most definitely.
17  　　Q. When did that skin condition start?
18  　　A. I noticed it when we went away for a week
19  down the Cape.
20  　　Q. So that week during September?
21  　　A. Yes.  It was like it just was -- I had never
22  seen it so bad like that before.  It just was
23  completely broken out.

**227**

1  　　Q. Have you suffered from that condition
2  continually since September 1999 --
3  　　A. Yes, but never before.
4  　　　　MS. BLAKLEY: Please wait until my
5  question is out because I am not sure I have an
6  answer.
7  　　　　THE WITNESS: Sorry.
8  　　Q. From September 1999 to today, have you
9  suffered continuously from that skin condition?
10  　　A. Yes.
11  　　Q. When you were in Mr. Edward's office and you
12  had blanked on this third episode or third
13  threatening incident and you said to Abbi Laushine,
14  "You remember I told you about it when we met in
15  August," or whatever, did you actually describe the
16  incident at that moment or did you just say, "I told
17  you about it when we met"?
18  　　A. No, because she said, "Yes, he knows, I told
19  him about it."  No, I didn't because she said,
20  "Charles, you know about it, correct?  Remember I
21  told you about that?"
22  　　Q. What was it that you said about the incident
23  to identify it, anything other than, "Abbi, I already

**228**

1  told you about it"?
2  　　A. I said, "Abbi, remember I talked about it at
3  our meeting," because at the time of our meeting it
4  was just the one from Greta and the other one from
5  Heather -- Shauna and Grace threatening to have
6  Heather beat me up.  This was now Shauna trying to
7  arrange somebody else to take care of me.  I don't
8  know.  I don't know.  I don't know what she was
9  doing.  I don't know, I don't know.
10  　　Q. I am only asking for your best recollection.
11  On September 16 when you and Abbi were in Charles'
12  office and he was on the speaker phone, you could not
13  remember one of the three incidents?
14  　　A. Right.
15  　　Q. The one you couldn't remember is the one
16  that you say happened the week of August 20?
17  　　A. That's right.
18  　　Q. And you said in Mr. Edwards' office on
19  September 16, "You remember, Abbi, I told you about
20  it when we met in August," is that right?
21  　　A. Yes.
22  　　Q. In Mr. Edwards' office on September 16 did
23  you say anything else to describe what had actually

**229**

```
1   happened during the week of August 20?
2        A. No, because I was led to believe he knew.
        Q. Okay.
4              MS. BLAKLEY:   I don't have anything
5   further.
6              MR. WILGOREN:   I have nothing further.
7              (Whereupon, the deposition was
8   adjourned at 5:42 P.M.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

**230**

```
2   COMMONWEALTH OF MASSACHUSETTS:
3   COUNTY OF                    :
4
5        I,_____, a Notary Public
6   within and for the Commonwealth of Massachusetts do
7   hereby certify that on the _____ day of
8   _____, 2000, there personally appeared before
9   me _____, the within named
10  deponent, who read and subscribed the foregoing
11  deposition and made such corrections, if any,
12  recorded herein before me:
13
14
15        _____
16        Notary Public
17
18
19        My Commission Expires:
20        _____
22
23        _____
          Barbara C. Connick
```

**231**

```
2            C E R T I F I C A T E
    COMMONWEALTH OF MASSACHUSETTS:
3   BARNSTABLE, SS.:

4        I, ELAINE M. BUCKLEY, a Notary Public in and for
    the Commonwealth Massachusetts, do hereby certify:

5        That the witness in the foregoing deposition was
6   present at the time and place therein stated;

7        That the said proceeding was taken before me as a
    Notary Public at the said time and place and was
8   taken down in shorthand writing by me;

9        That I am a Registered Professional Reporter, that
    the said proceeding was thereafter under my direction
10  transcribed into computer-assisted transcription, and
    that the foregoing transcript constitutes a full,
11  true, and correct report of the proceedings which
    then and there took place;

12       IN WITNESS WHEREOF, I have hereunto subscribed my
13  hand and affixed my official seal this 13th day
    of September 2000.

14

15       _____
16       ELAINE M. BUCKLEY

17       My commission expires:
18       November 23, 2001

19
20
21
22
23
```

**From '50s to Attempted**

'50s [1] 220:13
'80s [1] 77:5
'Abbi [1] 182:4
'No [1] 64:11

**0**

00130700 [1] 1:5
01701 [1] 1:19

**1**

1 [6] 1:12 2:8 107:7-8,
12 203:20
10 [4] 3:19 28:19-20
150:7
100 [2] 3:20-21
107 [1] 2:8
10:00 [1] 178:19
10:05 [1] 1:12
10:30 [1] 150:7
11 [2] 186:17 212:21
11/17/99 [1] 2:11
115 [3] 2:9-11
11:13 [1] 45:7
11:30 [2] 45:15,17
11:31 [1] 45:7
12 [2] 108:12 129:15
137694 [1] 1:10
13th [1] 231:13
15 [10] 28:19 71:9 83:
10 164:5,17 166:23 167:
4,20 168:9,16
15-year [1] 219:1
16 [26] 59:2 82:23 83:3
84:11 95:16,18 127:19
130:21 151:11,18 171:1
174:17 182:21 184:16 188:
21 189:11 190:20 201:10,
14 202:21 203:21 204:15,
19 228:11,19,22
1661 [1] 1:19
16th [13] 58:15 62:5
96:2-3 101:8 127:4,6 149:
14 178:6 189:1 209:2-3
223:17
17 [1] 59:15
18th [1] 186:17
19 [3] 33:18 76:16 88:20
194 [2] 2:12-13
1986 [1] 29:13
1990 [2] 54:2 83:11
1990s [1] 77:3
1991 [1] 54:2
1993 [10] 16:6,21 17:9,
14,17 19:3,16 20:15 21:
20 22:15
1994 [6] 20:18,21 21:
13 22:15,20-21
1997 [3] 33:19 78:4
1998 [3] 34:6,9 73:19
1999 [65] 12:5,17 13:
18 14:10 15:3,5,18,21
16:16 22:21 23:6,10,12
27:23 45:23 51:19 52:3,
6,23 54:21 55:6 57:11,
14 61:1,9 78:20 84:17
85:10 86:19,23 88:21,23
89:13,16 94:13 96:13,19
99:10-12 102:4,23 109:
23 110:13,17 111:21 123:
2 136:17 139:14 156:11
194:11 199:13 200:10,13
213:18 218:19 223:13 225:
9,17 227:2,8
19th [1] 95:20

**2**

2 [16] 2:9 12:12-13 115:
8,11 119:5,7,10,18 122:
3 126:18 133:23 134:5
144:21 145:19 156:7
20 [34] 3:16 4:2 86:22-
23 88:23 89:13 98:9,18
99:13 109:23 110:13,17
111:21 112:7,10,21-22
113:5,8,15 117:19 124:6
135:17 148:21 149:22 150:
1 151:9,17 154:10 156:
11 200:17 228:16 229:1
200 [2] 3:19 188:5
2000 [4] 1:12 218:3
230:8 231:13
2001 [2] 96:14 231:17
20th [11] 110:8-9 124:
4 125:8 129:14 148:10,
20,22 155:20 189:5
213 [1] 2:3
216 [1] 2:3
225 [1] 2:3
23 [3] 123:23 124:19
231:17
23rd [1] 124:13
24 [22] 60:13 61:1,9,15,
17 62:14 67:5 70:22 71:
2-3 74:22 110:17 111:21
133:10,15,21 134:2 142:
18 199:13 200:10,13 224:
9
24th [1] 151:3
26 [15] 58:4 61:17 136:
2 141:21 142:15 143:10,
14 153:23 154:14 165:17
167:21 168:9 180:15 218:
19 223:16
26th [5] 62:3 142:4 149:
19 155:22 164:21
27 [9] 102:13 188:21
189:13 190:20 191:16,21
192:13,17 193:4
27th [1] 190:23
28 [1] 133:17

**3**

3 [6] 2:3,10 115:8 122:
4,8 158:15
30 [5] 25:7-8 94:6 95:
11,18
30th [3] 94:6 96:2-3
311 [1] 1:15
35 [1] 92:3

**4**

4 [5] 2:11 28:2 101:14
115:8 125:17
4:22 [1] 182:15
4:27 [1] 182:15
4:30 [1] 101:15
4:51 [1] 194:14
4:54 [1] 194:14

**5**

5 [8] 2:12 3:18 164:6
194:15,18 216:9 217:6
218:7
5:42 [1] 229:8
5th [2] 12:16 150:18

**6**

6 [4] 2:13 128:2 194:15
205:3
60 [1] 1:11
60606 [1] 1:16
6200 [1] 1:16
6:00 [1] 101:13

**6:30** [1] 101:12

**7**

7 [8] 2:14 13:17 14:10
182:9,11 216:23 217:8
225:16
7:30 [1] 45:19
7th [1] 12:16

**8**

8 [9] 5:20 8:8 184:11
185:11 197:9 213:17 214:
10,15 225:9
8th [1] 213:17

**9**

9:30 [1] 178:20

[1] 230:7

[1] 231:15

[3] 230:15,20,
22

**A**

A.M. [1] 1:12
Abbi [206] 23:2,4,13,
17 24:17 36:8,10-11 39:
5,7 41:19 57:1,17,22 58:
5,16,22 59:5,9 62:2,5,7
78:17,21 79:2 82:9,13,
21 101:3,13,16 103:3,7-
8 104:9 106:17 107:2 109:
22 110:8 112:11,18 113:
4,8,15 122:11,20,23 123:
13,16,20,22 124:2,23
129:18,21 130:2,4,6,17
131:5,8,13,17 134:16,19
135:1,16 136:2,10,16
137:9,22 138:1,9 139:2,
13,17 140:6,10,14,19,18
141:8,11-12,20 142:4,12,
15 143:10,13 145:1,5-6
146:20,23 147:1,3,20
148:1,9 149:1-2 153:13,
22 154:3,14 158:8 159:7,
10 159:6,14,19-20 160:8,
17 161:11,14,17-18,21,
23 162:13,16,22-23 163:
6,8,16,18,20 164:2-3,7,
18,21 165:7,15,17 166:6,
20 167:1,5-6,10,17,21
168:2,10,13,22 169:8,14
172:10,18 173:21 174:1
179:10,12,15,18 180:15,
17 182:12,20 183:17 185:
16,18 189:23 190:6 191:
1,6-7,9,13 197:13 198:
10 208:23 209:3,5,14,16
218:15,19 223:10,14 224:
16,18,21-22 227:13,23
228:2,11,19
Abbi's [5] 130:1 167:
17 169:15 186:22 223:22
Ability [1] 10:11
Able [5] 46:8 97:22
132:4 207:23 226:8
Abrasive [2] 57:1,8
Abruptly [1] 164:23
Absence [2] 20:15 22:15
Absolutely [3] 210:10
222:20 224:3
Abusive [1] 57:12
Abusively [1] 108:17
Accent [1] 138:16
Accept [2] 64:1 156:11
Accident [13] 5:18-19
6:17,19 7:4,15 8:9,11,
13 9:4 10:14-16

Accounting [17] 62:16,
18 63:5 67:6,17 68:7 75:
3,14 76:3 90:1 133:11,
22 200:6 204:23 224:8,10
Accounts [10] 17:4 29:
7 70:5-6 72:19 75:5 89:
22 102:11-12
Accurate [2] 107:15
195:6
Accused [1] 48:4
Act [1] 86:9
Acted [1] 169:19
Action [8] 154:1,14
197:14,16 205:13 206:1
211:16 212:8
Active [1] 134:12
Actual [2] 157:13 197:3
Added [2] 130:20-21
Addition [1] 134:5
Additional [1] 10:22
45:9
Address [1] 177:1
Addressed [2] 126:1
164:7
Adjourned [1] 229:8
Admitted [1] 207:17
Admonish [1] 121:7
Advice [1] 181:8
Advise [1] 215:14
Advised [2] 9:13,18
Affected [1] 49:22
Affecting [2] 148:2
154:7
Affixed [1] 231:13
Afford [1] 180:3
Afraid [12] 19:11,15
84:5,7-8 130:8 144:19
147:18 154:9 156:5-6 179:
19
African [8] 113:23 114:
3,14 194:9 219:7,9 220:
6 222:1
African-American
[7] 113:23 114:3 219:7,9
225:19,21 226:2
African-Americans
[1] 194:9
Afternoon [1] 190:1
Afterwards [2] 27:4
114:16
Agency [2] 23:7 90:1
Aggravate [1] 79:23
Aggression [3] 129:23
130:9 179:17
Ago [11] 71:11,23 74:19
92:22 103:14 113:20 155:
4 214:23 216:17 217:11
220:8
Agree [2] 61:3 89:17
Agreed [3] 59:7 130:7
181:15
Ahead [1] 100:8-9
Aid [1] 97:2
Aisle [1] 107:22
Allegation [2] 206:5
211:16
Allison [2] 1:14 44:8
Allow [1] 161:9
Almost [9] 48:6 69:12
78:6 110:21 113:11 118:
12-13 138:17 226:3
Alone [7] 46:11 47:19
48:2 49:21,23 99:19 209:
18
Altercation [2] 55:4
62:12
American [7] 113:23
114:3,15 219:7,9 220:7

222:2
Americans [1] 194:9
Amount [3] 84:23 103:4-
5
Andy [2] 21:23 22:1
Anger [1] 210:16
Angry [5] 58:21 128:18
134:20 170:20 180:21
Anniversary [1] 220:3
Announced [1] 92:22
Annoying [1] 34:20
Annual [1] 72:5
Anonymous [1] 134:12
Answer [15] 8:17 30:
8 33:9 74:16 81:16 91:8
99:1 120:19 121:2 170:16
197:14 200:8 227:6
Answered [1] 74:15
Answers [3] 2:12 44:15
207:15
Antianxiety [2] 13:
11 16:2
Antidepressant [1]
13:11
Antidepressants [1]
15:22
Antoine [3] 37:11 195:
10,13
Anxiety [9] 6:8 14:7
46:14,18,21-22 47:2 194:
6,8
Anyway [4] 37:22 64:2-
3 101:9
Apart [1] 108:19
Apologized [3] 27:1
37:20,22
Apologizing [1] 26:18
Apology [2] 26:12
APPEARANCES [1] 1:13
Appeared [1] 230:8
Appetite [1] 95:3
Apply [1] 14:21
Appointment [10] 12:
3,10,21,23 13:4 28:4 46:
10 124:12 196:10,12
Appointments [1] 46:9
Appreciate [2] 147:12
149:6
Approach [2] 40:18 85:
18
Approached [3] 163:8
223:6
Approaching [1] 114:4
AQC [1] 77:17
Archeus [1] 158:5
Area [7] 17:19 67:5 68:
3 70:19 75:12 85:14 145:
22
Arguing [1] 69:6
Arms [1] 221:6
Arrange [1] 228:7
Arrow [2] 107:3,18
Ashamed [2] 129:1 175:
16
Ashburn [2] 16:11-12
Aside [1] 217:15
Assaulted [1] 193:21
Assistance [1] 158:8
Assistant [1] 158:1
Associate [1] 220:6
Associated [2] 6:19
14:12
Assurance [1] 10:17
Assured [1] 10:12
Ate [1] 137:5
Atrium [1] 20:4
Attempted [1] 40:18

## From Attention to Comments

**Attention** [5] 135:3 167:17 190:21 216:9 218:7
**Attorney** [1] 10:12
**Attorney/client** [1] 120:21
[ractive [1] 187:23
[acity [1] 141:17
**August** [75] 5:20 8:8 15:3,5,18,21 22:21 27:24 56:21 55:6,10-11 57:11,14 58:4 61:17 86:22-23 88:23 89:13 94:1,5 96:10 98:9,18 99:13 102:4 104:12 109:23 110:8-9,13,17 111:21 112:7,10,21-22 113:4,8,15 123:23 124:6,19 135:16 136:2 141:21 142:15 143:10,14 148:21 149:22 150:1 151:9,17 152:6 153:23 154:14 156:11 165:17 167:21 168:9 175:23 180:15 194:11 200:17 218:19 223:16 227:15 228:16,20 229:1
**Authorization** [1] 12:15
**Auto** [30] 6:17 7:14 10:14-16 28:15-16 29:12-14 38:19 51:14 75:6 77:11 90:3-5,7,17,22 93:1-2,7,13 103:5-6,19 195:14-15,18
**Automated** [1] 77:17
**Available** [1] 14:19
**Avon** [1] 160:4
**Awake** [1] 101:8
**Aware** [9] 38:12 67:1 73:16 102:5 158:7 164:18 195:10,19 196:19

## B

[ies [1] 80:10
[y [2] 30:10 80:12
[ad [10] 27:5 31:1 40:17 49:23 82:7 140:3 144:17 181:1 221:12 226:22
**Badly** [2] 42:16 69:14 108:10
**Bag** [1] 64:3
**Bailed** [1] 90:14
**Ball** [1] 160:11
**Barbados** [2] 138:13-14
**Barbara** [8] 1:4,8 2:3 3:2,6 35:18 114:8 230:23
**Barbie** [17] 35:22 48:19 58:22 65:8 140:5,20 147:9 161:12 162:1,4 163:10 174:2 179:18 180:12 181:1 221:12 226:22
**Barbie's** [1] 161:17
**Barely** [1] 48:7
**BARNSTABLE** [1] 231:3
**Barrier** [1] 80:1
**Base** [1] 92:2
**Baseball** [3] 47:17 49:11,19
**Based** [6] 10:16 15:8 189:4 196:20 205:9 215:13
**Basic** [2] 121:20 152:6
**Basing** [1] 59:23
**Basis** [13] 12:11 14:18 72:5 110:22 111:5,13,15 197:21 198:1 205:11,15 206:13 212:16
[at [3] 47:17 49:11,19
[hroom [2] 20:14 44:17
**Beanie** [2] 80:9,12
**Beat** [21] 54:15 64:21 79:7 142:7-9,17 144:6 146:18 148:17 149:16-17,

20 150:4 152:9-10 175:20 197:4,6 224:20 228:6
**Beating** [2] 69:13 142:10 144:7 187:7
**Beaudreau** [14] 61:12-13,18 70:4 82:18 145:20 189:21 199:2 200:1 201:2,20,22 219:14-15
**Became** [10] 23:4 33:17 38:15 56:10,13 57:9 71:10 98:13-14 147:1
**Beck** [4] 92:10 107:2 157:20 222:1
**Become** [3] 23:11 29:11 40:13
**Bed** [8] 47:15,18-19 48:1 49:18,20,22
**Bedroom** [2] 47:17 49:19
**Beeped** [1] 80:22
**Began** [6] 17:1 18:1 23:1 38:20 45:22 110:7
**Begged** [7] 19:10-11 84:7 163:11 208:19
**Begin** [1] 18:12
**Beginning** [3] 73:19 78:7 222:6
**Behalf** [1] 130:1
**Behaved** [1] 53:12
**Behavior** [5] 56:20 57:2 59:10 62:1 169:16
**Behind** [9] 26:20 32:1 36:11 100:10 101:18-19 106:10 178:8 179:7
**Belief** [2] 211:22 213:2
**Belong** [6] 65:13 66:22 2 75:23 76:11 88:5,10,13
**Benefits** [1] 14:19
**Berate** [1] 34:13
**Berating** [2] 34:23 223:2
**Bernadette** [26] 70:9,12,14 106:18 158:23 159:3,7,13,16,21 161:13 162:8,10,12,15,20 163:1-2,14,21 169:7 171:8,11,15 174:6,9
**Bernadette's** [1] 164:3
**Best** [17] 8:2 10:2 18:3 19:21 68:6 87:10 92:23 93:4,7,9 159:13 161:9,13 164:16 185:23 207:8 228:10
**Bet** [1] 56:14
**Better** [2] 129:10 164:1
**Betty** [3] 219:23 220:1,3
**Between** [37] 8:23 22:21 23:21 28:22 43:23 45:5 61:17 79:1 86:17 102: 104:13 105:3 107:21 110:17 111:21 112:7 121:9 122:10,20,22 123:16,20,22 153:12 168:9 171:14 181:5 182:4,20 188:21 189:11 190:20 191:16,21 192:13,17 193:3
**Beyond** [2] 91:13
**Big** [8] 18:21 27:14 28:16 40:15 86:7 106:22 107:15,17
**Bigger** [2] 32:21 60:23
**Bill** [1] 90:1
**Birthday** [4] 87:21 88:19 95:2 220:23
**Bit** [4] 7:23 13:5 28:21 173:12
**Bitch** [29] 25:17 26:2 27:2 34:16 53:8-9 129:4,11 134:7 142:6,9 144:2,4-5 145:3-4,14,17 150:3

152:8 153:7 176:18 185:4-5 223:21 224:1
**Black** [18] 14:6 27:7,15 38:4,12 39:9,18 43:6,14 46:22 50:10 156:3 181:5 187:23 207:2-3 220:22
**Blacks** [4] 169:7 170:8 198:9 226:12
**Blakley** [50] 1:14 3:4 10:7,9,21 11:5,15 11:44:4,10,17 45:5 84:15 97:18 98:3,7 107:6 120:22 121:3,7,11 122:5 125:14 127:7,12,16,22 128:8 130:18 148:3 176:4 183:10 194:13 199:7 206:1 215:5,8,11 214:5,8 215:9,17 216:11,10,12,18 217:2,6 225:8 227:4 229:4
**Blame** [1] 18:7
**Blamed** [1] 18:11
**Blank** [1] 224:21
**Blanked** [1] 227:12
**Blessed** [1] 219:20
**Blew** [2] 196:11 207:1
**Block** [2] 10:4 97:11
**Blood** [2] 69:12-13
**Bob** [6] 92:10 107:1 157:19 160:4 221:21-22
**Body** [5] 87:15 88:14 108:11 170:3-4
**Bonus** [1] 102:14
**Book** [6] 31:13 94:2 214:19 216:8,16 217:10
**Boss** [10] 36:7 39:2,4 86:11 103:8 107:5 147:2 163:9 166:17 177:1
**Boss's** [1] 30:3
**Boston** [1] 1:11
**Bottom** [3] 127:11 185:11
**Box** [3] 72:21 217:6 218:11
**Boy** [2] 66:10 83:12
**Bozos** [1] 157:1
**Branch** [10] 22:8 28:3-4 62:20 89:21 90:7 115:6 206:20 215:20 217:13
**Break** [17] 10:23 39:5 44:4,20-21 45:2,4,7-8 61:7 150:19 180:4,6 182:15 191:21 194:14 222:12
**Break-out** [1] 222:12
**Breaks** [2] 11:2 181:4
**Brief** [1] 51:18
**Bring** [6] 22:13 35:15 64:3,6 102:1 155:13
**Bringing** [1] 35:12
**Broke** [6] 66:22 67:2 206:2
**Broken** [1] 226:23
**Brother** [4] 87:22 108:10,19 221:1
**Brought** [14] 54:13 64:2 71:14,23 72:1,6 73:22 74:18 76:8 80:20 94:18 113:19 167:16
**Buckley** [3] 1:9 231:4,15
**Bucks** [1] 75:9
**Buddy** [1] 85:20
**Buddy-buddy** [1] 85:20
**Buffet** [1] 220:12
**Building** [5] 18:4 20:1,3 46:20 124:9
**Bulging** [1] 9:11
**Bunch** [5] 157:1 170:14 220:11
**Buried** [2] 18:3 19:21

**Burned** [1] 108:10
**Business** [8] 17:3 29:7 62:18 70:6 75:5 89:22 102:11-12
**Buy** [1] 156:21
**Buy-out** [1] 156:21

## C

**Cabinets** [1] 105:22
**Calendar** [6] 92:18 94:2 96:6 98:6 109:17 110:5
**Campus** [1] 143:6
**Cancellation** [2] 13:1-2
**Candle** [1] 226:6
**Candy** [1] 72:20
**Cannot** [1] 160:8
**Cape** [1] 226:19
**Capplis** [6] 189:20 199:2,21 200:23 201:18 202:7
**Car** [6] 5:17,19 7:4 8:15,18-19
**Care** [18] 5:11 6:12-13 7:7 9:16 12:8,20 13:10,20 16:12 144:4-5 152:12 173:2 181:11 185:5 224:2 228:7
**Cared** [1] 114:11
**Career** [2] 93:2 219:1
**Carpenter** [1] 21:23
**Carpenter's** [1] 22:6
**Carried** [2] 91:12 197:18
**Carry** [6] 30:2,14 85:21 91:15,17 93:8
**Carrying** [4] 91:20 92:6,16 93:20
**Cars** [1] 8:23
**Case** [3] 116:4 212:18 218:15
**CASUALTY** [1] 1:6
**Caught** [2] 49:4 68:23
**Caused** [7] 42:9 143:15 151:1 176:23 178:2 194:6 222:15
**Causes** [1] 211:10
**Celebrity** [3] 32:11
**Center** [1] 106:4
**Central** [3] 105:21-22 106:3
**Certain** [2] 91:14 221:17
**Certainly** [1] 10:21
**Certificates** [1] 74:15
**Certify** [2] 230:7 231:4
**Chair** [3] 64:20 173:16,18
**Chairman** [1] 215:2
**Chairs** [1] 69:4
**Challenged** [1] 63:7
**Chan** [1] 91:20 167:4 168:5 189:20 198:14 199:1,18 200:21 201:16 202:10,22
**Chance** [1] 220:20
**Change** [1] 98:9
**Changed** [5] 56:10,19 86:1 98:12 220:10
**Charge** [8] 2:13 41:18-19 197:13 205:4-5 212:22 213:3
**Charles** [50] 28:7 62:3-4,6-7 68:8,12 83:1,6-7 84:10 92:17,20-21 93:3,11,16 94:1,7,11,13 95:5 114:5 129:23 130:4,8,16,23 131:23 132:4 157:23

196:8 197:13 198:16 203:23 207:1,5,20 208:3 209:23 210:6 211:4 223:15,18,23 224:14,22 227:20
**Charles'** [2] 186:23 228:11
**Check** [3] 25:5 116:2-3
**Checked** [1] 25:9
**Cherries** [2] 220:9,12
**Chest** [1] 222:12
**Chicago** [1] 1:16
**Chief** [1] 215:2
**Chinese** [3] 35:1 78:7 89:6
**Chipped** [1] 75:13
**Chocolate** [1] 72:20
**Choice** [3] 31:11,15 147:16
**Chookaszian** [1] 215:2
**Chris** [8] 115:7 195:19,23 196:10-11,14,16,19
**Cigarette** [1] 181:13
**Civil** [1] 1:9
**Claim** [4] 19:8 50:12-13,16
**Clarified** [1] 26:9
**Clear** [4] 42:20 206:3
**Clemetson** [6] 39:13 69:10 76:14 78:9 150:2 193:12
**Clerk** [1] 17:3
**Click** [6] 38:7,12,15 39:10 111:2 147:8
**Clicks** [1] 136:7
**Climbing** [1] 47:18
**Clinic** [1] 5:17
**Clinical** [2] 5:7 11:21 140:7 173:11 188:5
**Close** [1] 53:15 64:18
**Closed** [2] 32:1 179:7
**Closing** [2] 48:10 92:22
**CNA** [25] 50:12 52:19,23 53:5,17 59:13 60:8 61:10 76:15 84:8,18 90:6 93:2 100:20 119:11 123:3,6 134:12 168:8,12 189:11 191:17 192:14 214:15,19
**CNA's** [1] 52:5
**Coaxed** [1] 207:11
**Coca** [1] 72:18
**Coca-Cola** [1] 72:18
**Code** [4] 72:8 73:1 211:19 212:4
**Codeine** [6] 3:19 4:4 6:9 7:19 45:13,18
**Cola** [1] 72:18
**Colella** [16] 4:18-19 5:1 6:4,6,21 7:18 11:16 12:11,19,22-23 13:1,7,9 15:1
**Collected** [1] 63:15
**Color** [1] 43:18
**Comfortable** [2] 40:1 44:19
**Coming** [6] 18:12 75:8 98:22 99:14 101:13 139:23
**Commencing** [1] 1:12
**Comment** [30] 41:17 42:2 54:7,21 55:1 59:2,5,7 61:2 62:9 69:2 78:11,19 79:1 89:7 134:5 140:11 151:18,22 168:5 169:8 171:21 172:2,4 173:20 178:16 200:16 201:9,13 204:11
**Comments** [29] 3:1 36:15,18 37:17 54:18 56:2,

## From Comments to Doctor

5 79:8,17,20 82:11,14
89:1,3 140:9 191:20 192:
3,5
Commercial [7] 29:14,
16 59:22 93:2 195:14-15,
18
Commission [3] 1:2
230:19 231:17
Commitment [4] 2:14
214:19 216:8 225:14
Committed [3] 133:5
157:9,12
Commonwealth [6] 1:2,
10 230:2,6 231:2,4
Communicating [1] 35:
3
Communication [2] 82:
1 125:6
Communications [5]
122:10 123:2,5,9,12
Company [23] 1:6 38:11
39:18 40:23 43:22 53:2
63:16 71:10 77:14 90:21
91:11 113:17 126:12-13
131:13 132:5,12 157:2
158:7 211:18 212:13 217:
16 221:9
Company's [2] 158:1
212:3
Company-sponsored
[1] 221:9
Comparison [1] 29:6
Compensation [1] 19:8
Complain [4] 17:22 57:
16,18 59:9
Complainant [2] 1:5,
20
Complained [3] 31:5
58:10,13
Complaint [3] 56:22
123:6 206:1
Complaints [9] 109:3,
11 110:1 134:13 215:14,
22 217:18 218:10
Completed [2] 116:7
119:10
Completely [1] 226:23
Compliance [1] 72:13
Compound [1] 205:22
Computer [1] 116:12
Computer-assisted
[1] 231:10
Concentration [1]
160:6
Concern [2] 112:12 114:
18
Concerned [1] 44:11
Concerning [5] 9:9
123:3,6 134:13 215:15
Concerns [8] 10:10 84:
12 109:3,11 110:1 114:
22 115:3 197:12
Condition [16] 4:19 5:
4-5,23 6:23 7:12 9:14
30:19 45:23 222:7-8,16
226:15,17 227:1,9
Conditions [1] 134:13
Condolences [1] 69:15
Conduct [16] 2:14 71:
13 72:8 73:1 126:13 143:
15 195:20 198:15 205:8
206:18 211:19 212:4 214:
20 216:5,8 225:15
Conference [10] 26:13
95:19 108:5 180:7,13 182:
13,21 183:16 185:13,16
Confidence [1] 149:1
Confidential [1] 124:
8
Conflict [1] 86:16

Confront [2] 40:5-6
Confronting [1] 40:1
Confused [1] 77:16
Connick [17] 1:4,8,22
2:3 3:2,6-7 7:21 10:9
45:8 84:17 115:10 122:7-
8 126:17 194:17 230:23
Consciousness [1]
117:12
Consider [5] 54:9 55:
17 212:7,9 219:6
Considered [1] 55:12
Consistently [1] 174:
14
Conspired [1] 79:6
Conspiring [1] 224:20
Constantly [1] 101:20
161:1
Constitutes [1] 231:
10
Consultation [1] 15:
13
Consulted [3] 15:6,12,
18
Consulting [2] 14:10
15:14
Contact [1] 193:10
Contacted [1] 113:9
Contains [1] 122:9
Continental [2] 1:6
156:21
Continually [1] 227:2
Continue [2] 81:9 174:
22
Continued [1] 144:16
198:6 205:10
Continuously [1] 227:
9
Contributed [1] 177:
13
Control [6] 77:18 146:
14 156:8 165:20,22 166:1
Conversation [33] 32:
23 55:7 81:12 83:20 99:
17 101:2 108:6 112:18
124:3 135:22 143:16 162:
8 204:9
Conversations [8] 96:
1 102:4,7 104:13-14 108:
3,21 121:9
Conversions [1] 63:2
Cook [1] 62:21
Cook-out [1] 62:21
Cooking [1] 75:17
Cooler [1] 94:17
Copies [1] 127:17
Copy [6] 72:7 103:13
122:6 188:18 205:4 213:20
Corner [1] 105:23
Corporate [8] 71:5,8
72:8 73:1 113:9 206:19
212:12 215:19
Correct [70] 11:18 12:
14 23:3 52:5 84:14 89:
16,19 90:20 92:7 93:13
94:8 104:4 107:17,20 108:
23 112:20 113:7 114:1
116:21 124:11 125:9 126:2,
21 132:14,17 151:16 156:
9 159:12 161:7,11 171:14,
20 172:3,6,22 173:8 174:
15 175:4,12,22 176:11,
22 178:13,15,17 179:22
183:3,6 184:3,5,10,14
185:2,21 186:21 188:23
190:19 191:12 195:16 196:
3-4 197:8,22 198:11 206:
8,11 208:1 210:23 227:
20 231:11
Corrections [1] 230:

11
Corrective [4] 205:12
206:1 211:16 212:7
Correctly [1] 146:8
Costs [1] 103:5
Couch [1] 47:20
Counsel [4] 1:8 217:22
221:17 222:6
Counseled [1] 108:21
Country [4] 35:16 41:
12 42:5 142:20
COUNTY [1] 230:3
Couple [3] 23:20 39:18
63:9
Courage [1] 134:21
Course [4] 102:18 195:
21 207:16,18
Court [1] 107:6
Cover [2] 212:10 215:1
Covering [1] 49:1
Coworker [1] 159:11
Coworkers [6] 84:13
124:10 186:6,11 189:13
198:7
Crashed [2] 88:1,9
Crawling [1] 49:20
Crazy [1] 85:14
Cream [3] 90:6,18,22
Create [2] 129:23 130:8
Created [2] 38:18 97:1
Credenza [3] 105:14-
15,19
Crime [1] 193:19
Criticize [1] 18:2
Criticized [4] 108:2,
4,20
Crop [3] 90:6,19,22
CROSS [1] 2:2
Cross-Examination
[1] 213:14
Crossed [1] 71:17
Cruel [2] 66:13,16
Crummy [1] 97:5
Cry [1] 11:4
Crying [1] 11:7
CSR [1] 1:10
CT [2] 9:6,8
Cummings [1] 219:19
Custom [1] 70:5
Customer [2] 29:7 189:
4
Cute [2] 80:16 159:16

D

Daily [7] 4:11-12 45:
20 110:22 111:5,13,15
Damn [1] 144:2
Dance [3] 220:14 221:8,
11
Dancing [1] 220:22
Danne [1] 30:16
Data [1] 17:3
Date [16] 13:21 14:1,
11,16 25:6,19 59:10 98:
20 99:9 133:9-10 134:2
151:3 213:1 216:10,12
Dated [1] 216:10
Dates [5] 97:14 98:6
119:19 120:12-13
Dawson [3] 23:23 24:2,
13 28:11 30:17 31:12 33:
1
Days [4] 25:7-8 57:4
102:13
Dead [1] 27:15
Deal [2] 90:15 108:16

Death [1] 43:17
Decent [1] 147:3
Decided [1] 116:19
Decision [1] 163:10
Decisions [1] 89:17
DeCola [2] 21:15,17
33:22 24:19 25:18 26:2
27:8 33:4 53:11 108:1,
21 109:1
DeCola's [1] 24:11
Dedicated [1] 56:9
Deep [2] 66:4 220:16
Deep-down [1] 66:4
Definitely [3] 143:18
11:6 226:16
Degrades [1] 210:11
Degrading [1] 18:18
Demeaning [6] 36:15
37:9 54:18,21 55:18 111:
18
Demeanor [1] 180:19
Denied [1] 205:2
Dennis [1] 215:2
Deny [2] 207:17-18
Department [15] 24:4
29:5-6 64:3,5 67:18 70:
16 72:18 76:3,5 80:9 90:
9 189:17 200:4,7
Deponent [1] 230:10
Deposed [1] 208:9
Deposition [14] 1:8
46:16 97:2 120:16 121:5,
18,21 122:8 126:18 194:
18 217:8 229:7 230:11
231:5
Depression [4] 5:7 7:
2 11:13 17:6
Depressive [1] 17:14
Dermatologist [1] 7:
11
Derogatory [4] 111:18
171:21 172:2 221:15
Describe [8] 105:1
111:22 164:6 197:11 218:
23 222:7 227:15 228:23
Described [2] 41:11
67:4
Describing [1] 134:17
Description [2] 2:7
186:20 187:8,14,17,20
Desk [86] 18:15 19:18
24:5,7 25:13 26:2 34:11
36:16,22 38:22 48:14,23
57:7 59:23 60:21 64:7 69:
19,23 71:15 78:15 94:16
95:6 99:18 104:16 106:
19-21 107:21 108:3 129:
16,18,21-22 134:16 137:
3,6,11,22 138:9 139:13,
15,21 144:3 145:3-4,6,9
146:10-13 150:17 153:8
159:1,15,20 160:9 161:
15,17,21 162:9 163:5,12-
13,16,19 166:13 171:7,
11,17,19 175:5 178:4,12,
14 181:10 184:2 191:3
203:1,18,20
Desks [4] 106:4 171:13
179:21 203:17
Despite [1] 205:8
Detail [2] 131:1 182:9
Detailed [1] 135:8
187:20
Details [2] 135:9 190:
13
Determine [1] 126:23
Determines [1] 103:6
Developed [1] 5:6
Diagram [2] 2:8 107:13
Dianna [8] 23:23 24:13

28:11 30:17 31:1,12 32:
17 33:1
Diary [2] 109:7,14
Died [1] 69:12
Difference [1] 31:22
Different [3] 5:4 21:
9 72:15 81:19-20 86:1-2
114:9 116:9 127:17 145:
22 160:7 221:14
Difficult [6] 10:18
11:8 29:6,8 35:12 118:23
Dime [2] 63:17 65:18
Direct [3] 2:2 3:3 120:
19
Directed [3] 36:19
120:20 196:7
Direction [5] 107:4,
19 120:23 139:23 231:9
Directions [1] 105:10
Directly [14] 28:14
40:5 59:2 71:7 79:6 89:2
91:16 151:19 159:14 161:
14 162:16 191:19,22 222:
1
Dirt [1] 210:12
Disability [8] 11:12
14:19,22 16:16 17:5 22:
16 45:22 50:13
Disappeared [1] 190:2
Disapproval [1] 88:17
Disapproved [1] 88:10
Disclose [2] 164:13
166:5
Discovery [2] 125:19
216:14
Discrimination [5] 1:
2 2:13 205:4 217:17 218:
10
Discuss [5] 30:19 53:
12 115:3 133:13 135:6
Discussed [6] 50:3 73:
7,13 133:23 166:6 172:10
Discussing [1] 185:12
Discussion [5] 5:14
10:8,10 84:16 107:10
125:15 127:13 168:17 174:
21 222:22 223:1
Disgruntled [4] 157:
6,15,17 221:20
Disgruntledness [1]
157:21
Disguised [1] 138:17
Disk [2] 9:10-11
Dislike [1] 66:4
Disorder [4] 4:22 11:
14
Disparaging [11] 54:
18,20 55:17 56:1 61:2
79:10-11,14 82:20 83:4
89:13
Displacement [1] 9:10
Distance [1] 224:15
Distracted [2] 85:17
160:8
Distracting [2] 34:
21 140:4
Distress [2] 10:22-23
Distributed [1] 218:2
Divider [2] 105:3,6
Division [2] 17:19 21:
16
Dizziness [1] 10:1
Dizzy [2] 14:2,7
Doctor [45] 4:18-19 5:
1,9-10,15-16,23 6:4,6,
10,15,21 7:9-10,14,18 8:
7 9:3 11:16 12:11,19,22-
23 13:2,5,7,9 14:15 16:1
16:9,11-12 19:5,7 31:7,

## From Doctor to Friendly

16 47:21 222:14-15 226:
14
**Doctor's [4]** 22:13 31:
6 46:9-10
**Doctors [7]** 9:17,21
19:10 21:4 50:2 84:8
**iument [26]** 72:7,12
5,17 97:6,8,15-16
115:10,13,20 116:20 117:
18,21 120:1 122:7,9 125:
18-19 126:14,20 130:23
131:3 133:17 217:9,15
**Documents [8]** 120:15
121:4,14,23 122:15 126:
8 217:16
**Done [21]** 19:20 21:8
25:3 26:3 34:22 44:22 63:
5 86:13 99:1 100:3 101:1,
22 118:19 119:6 138:23
146:8 177:15 197:22 199:
9 211:18 213:7
**Door [3]** 49:19 60:20
69:20
**Doors [2]** 32:2 179:8
**Doris [66]** 35:1-3 37:7
50:17 79:22-23 80:15 81:
1,5,7,11 82:1 89:6 91:
20 95:7 112:1 159:5-6,9,
11,17-18,21 161:16,19-
20,22-23 162:7,11-12,18,
20,22 163:9 164:20 165:
2 166:3,10 167:4 168:5,
13 171:12,19,23 172:7,9,
12,15,18 189:20 190:11
198:14 199:1,18 200:21-
22 201:16 202:10,22
**Doris' [3]** 81:1 106:21
112:2
**Dorr [1]** 1:11
**Down [20]** 19:19 34:13
48:23 61:4 63:17 66:4 78:
7 82:3 89:5 90:2 110:5
.9 139:1,5 140:2 150:
178:14 191:21 226:19
xsī:8
**Down's [1]** 32:10
**Downstairs [2]** 89:21
144:13
**Doxycycline [2]** 3:20
7:8
**Draw [3]** 43:18 106:13
107:3
**Dream [8]** 47:16 48:13,
15 49:7,10,12-13,17
**Dress [2]** 18:2 32:6
**Dressed [5]** 18:20 31:
20-21 80:11
**Drew [2]** 177:3 224:21
**Drive [4]** 1:15 8:6 9:
18 46:10
**Driven [1]** 69:11
**Driving [2]** 8:8 132:8
**Drowsy [1]** 48:3
**Drug [5]** 4:12,20 13:11,
13 16:2
**Drugs [1]** 10:13
**Duck [3]** 80:15-16 81:10
**Dumb [5]** 25:17 26:2 34:
15 53:8-9
**Dumbfounded [1]** 65:4
**Dummies [4]** 172:5 173:1
**Dumping [1]** 146:10
**During [49]** 8:8 17:7
24:19 27:8 28:11 29:20
30:17 33:11 34:5,12 41:
\5:8 57:13 58:6 60:8 61:
84:10 85:6 97:2 98:
99:11 103:23 109:1,
22 125:10 134:11 146:2
148:20 149:21 150:1 151:
9,17 166:23 168:1,6,8
172:1 195:21 196:21

197:2 199:15,18,21 200:
1,17 219:1 226:20 229:1
**Duty [1]** 132:12
**Dye [10]** 115:7 195:19,
23 196:5,7,10-11,14,17,
19

**E**

**E-mail [20]** 2:10-11 74:
1-2 122:10 123:2,5,9,12,
15,22 124:2,5,14,18,23
125:4 134:16,22-23
**E-mails [4]** 122:20,22
123:14,19
**Earliest [2]** 123:22
124:5
**Early [4]** 64:7 99:19
**Earshot [2]** 199:5,12
**Earth [1]** 43:3
**Earthquake [3]** 43:4,
12-13
**Easier [2]** 106:13 160:
15
**Easter [1]** 80:20
**Eat [2]** 36:22 75:20
**Eaten [1]** 63:23
**Eating [2]** 64:17 95:4
**Edward's [1]** 227:11
**Edwards [32]** 28:7 83:1
84:10 93:11 95:12,19
113:22 114:17,21 115:4-
5 123:10 157:23 185:13,
17 191:5,10 196:8 197:
13 198:16,21 203:23 204:
2 206:9 207:6 208:3 213:
21 214:2,9,15 223:15
225:3
**Edwards' [3]** 225:11
228:18,22
**Effect [1]** 48:9
**Effective [1]** 141:15
**Effort [1]** 85:20
**Eighth [1]** 73:9
**Either [8]** 10:22 36:18
91:21 105:6 157:22 165:4
188:14 194:20
**Elaine [3]** 1:9 231:4,15
**Elevator [3]** 20:7-8
**Eliminate [1]** 197:15
**Elsewhere [2]** 141:2
157:7
**Elucidate [1]** 205:21
**Embarrassed [1]** 208:
16
**Embellished [1]** 208:
14
**Emergency [3]** 69:10
108:18-19
**Emotional [1]** 10:22
**Employed [1]** 154:11
**Employee [1]** 55:1 89:
11 134:12 155:6 158:1,8
181:3 191:17 195:14,18
206:18
**Employees [13]** 40:9
79:18 89:15 90:23 91:3,
6 92:6 93:12,17 111:4
156:12,16 220:7
**Employment [2]** 52:6
195:21
**Empty [1]** 106:19
**End [19]** 20:15 48:7 51:
10 55:9 103:15,17 186:4,
8 222:11
**Ended [2]** 103:15,17
**Endorsed [1]** 59:7
**Endorsements [1]** 146:
5
**Ends [1]** 186:11

**Endured [1]** 156:21
**English [1]** 81:19
**Enjoy [1]** 63:11
**Entire [4]** 97:13 115:
19 117:21 133:17
**Entitled [1]** 214:19
**Entrance [2]** 128:6
175:3
**Environment [21]** 24:
21 27:10 28:13 33:14,22
34:9 84:3,13 98:10 110:
1 112:12,19 113:6,18
123:3 197:15-16,23 205:
9,12
**Episode [2]** 17:14 227:
12
**Ernie [54]** 39:11-12,14
56:8 57:2 58:6 80:13 91:
21,23 92:1,5,7,15 93:19
98:20 99:13,16 100:11,
19 102:3,6 106:8-9,22
111:5,7 128:6,16 136:8
137:20 138:5,12 143:16,
20 151:1 152:16 153:4,
12,17 171:2,12,14,21
174:12 175:3,10 176:6,
15,21 177:7,9 182:4 193:
16
**Ernie's [3]** 59:10 107:
21 186:22
**Error [1]** 35:9
**Errors [2]** 18:8 153:19
**ESQ [2]** 1:14,18
**Estimated [1]** 14:15
**Etcetera [1]** 186:23
**Event [1]** 42:9
**Events [9]** 10:19 11:10
46:13,17 116:20 119:20
135:6 141:23 142:3
**Eventually [1]** 166:14
**Exact [2]** 91:8 99:9
**Exactly [5]** 56:12 142:
11 177:21
**Examination [4]** 1:8 3:
3 216:6 225:7
**Except [5]** 58:15 110:
20 189:16
**Exception [1]** 90:3
**Exchange [1]** 171:2
**Excuse [5]** 98:23 157:1
163:22
**Excused [1]** 183:16
**Executive [1]** 215:3
**Exhibit [26]** 107:7-8,
12 115:11 119:5,7,10,18
122:3-4 123:19 124:21
125:17 126:18 133:23 134:
5 144:21 145:19 156:7
194:18 203:20 205:3 216:
19,23 217:8 225:16
**Exhibits [2]** 115:8
194:15
**Exit [3]** 60:20 69:20-21
**Expect [2]** 69:2-3
**Expected [4]** 89:11
102:18 109:19 147:17
**Expensive [1]** 62:20
**Experience [4]** 24:20
28:12 33:13 86:16
**Experienced [1]** 32:21
**Experiencing [2]** 7:
21 14:11
**Expires [2]** 230:19 231:
17
**Explain [1]** 66:5 89:20
135:12
**Explanation [1]** 108:9
**Expressed [1]** 17:16
**Extemporaneously**

[1] 128:11
**Extra [1]** 102:14
**Extremely [3]** 29:5-6
91:22
**Eyelashes [1]** 18:17
**Eyes [4]** 48:10 87:16
128:18 180:23

**F**

**Face [13]** 36:5 69:1 70:
12 71:22 83:14 94:11,13-
14 129:3 134:21 153:6
170:19
**Faced [4]** 105:10,12
106:6 107:19
**Facing [4]** 105:8-9 107:
19
**Fact [9]** 15:14 27:11
92:19 114:2,5 143:19 163:
2 220:22
**Fail [1]** 205:10
**Failed [2]** 205:12 211:
15
**Fair [2]** 147:3 154:13
**Fall [2]** 100:9 119:3
**Falling [1]** 101:18
**False [1]** 18:17
**Falzone [5]** 199:3 200:
12 201:6 204:17
**Family [5]** 88:2 108:12
120:23 221:5
**Far [3]** 44:11 68:9 206:
23
**Fashion [1]** 121:2
**Fat [2]** 18:21 40:15
**Fault [1]** 11:3
**Fax [5]** 127:8 214:3,9,
12,15
**Faxed [1]** 127:8
**Fear [4]** 147:20 154:9
197:17 210:14
**Feared [1]** 143:5
**February [4]** 88:19,21
218:3
**Feelings [2]** 35:19
207:22
**Felt [16]** 14:5 20:12
36:18 43:9 69:14 75:23
81:7 90:18 101:15,23
115:3 132:9 133:7 166:15
181:1 221:19
**Few [9]** 9:16 44:21 57:4
**Fight [16]** 65:3,5,9 66:
22 67:1 69:5 80:5 179:
12,16,19,23 180:2-3,6
181:4,16
**Fights [2]** 28:15,22
**Figured [3]** 21:2,4 64:9
**File [11]** 75:4 105:22
128:5,14 129:8 175:1-2
178:3,11 202:1
**Filed [4]** 24:5 205:5
212:23 213:2
**Files [2]** 24:6 57:7
**Fill [1]** 103:9
**Final [1]** 130:1
**Fine [5]** 44:13,19-20
76:9 214:10
**Finger [4]** 129:3,7,12
176:17
**Fingernails [1]** 24:5
**Finish [6]** 118:16 133:
19 181:22 182:6 199:7
213:9
**Finished [1]** 120:5
**Fire [1]** 181:6
**Fired [6]** 66:23 83:19
84:9 180:5 207:19 209:19
**First [17]** 12:3,11 13:

[1] 128:11
**Five [13]** 36:22 44:3
45:5 69:12 75:9 90:13
100:23 111:4 160:7 183:
19,22 214:17 217:20
**Flat [1]** 163:9
**Fleming [4]** 150:13-14,
21 198:13
**Flex [1]** 112:23
**Flexeril [8]** 3:19 4:8,
10-11 7:3,19 45:13-14
**Flip [1]** 117:6
**Floor [12]** 38:11 65:3
66:8 67:5 73:19 150:18
165:22 180:4,9 181:4 220:
14
**Florida [5]** 89:23 136:
14 140:23 146:8 156:14
**Flustered [1]** 170:19
**Focusing [1]** 145:12
**Folders [1]** 19:18
**Follow [2]** 118:23 210:
20
**Following [5]** 7:3 20:
13 74:20 164:22 189:5
**Food [10]** 63:8,13 64:2,
9,15 65:6,19 66:2 75:17
94:18
**Force [2]** 52:9 89:16
92:12
**Foregoing [3]** 230:10
231:5,10
**Forget [3]** 40:20 67:17
125:18
**Forgot [3]** 120:14 144:
23 145:8
**Forgotten [2]** 131:4,6
**Form [8]** 46:1 51:23 84:
4 95:13 183:11 205:17
215:8,17
**Forth [1]** 144:3
**Fortunate [1]** 65:12
**Forward [3]** 10:11,19
106:6
**Four [4]** 27:14 45:18
106:4,9
**Fours [11]** 58:6 79:2
82:9,21 136:3 140:16 141:
20 143:11,13 145:7 153:
22 164:11,19 166:23 167:
5,18 168:2
**Fourth [3]** 73:8 156:7
158:14
**Fox [1]** 1:15
**Frame [1]** 146:3
**Framingham [1]** 1:19
**Fraud [1]** 72:16
**Free [4]** 35:16 41:12
42:5 142:20
**Frequently [3]** 11:6,
23 47:7
**Fresh [1]** 97:10
**Friday [10]** 1:11 28:2
98:19 120:21 113:2 124:4,
6 125:7 148:23 213:17
**Friend [37]** 54:8,10 55:
10 80:15,23 87:10 102:9
114:10 115:21 116:22 117:
15 133:3 144:13 166:16
207:8 220:2,17
**Friendly [4]** 40:14 55:

## From Friendly to Investigated

20-21
Friends [19] 27:12 34:
10 43:16-17 53:2 74:7
76:5 87:6 114:6 166:16
169:4 218:5 219:6-7,9
225:20-21 226:2
Front [14] 8:18,20,22
58:18 106:21 128:6 170:6
175:2 185:4 198:8 202:23
224:1
Frustrated [3] 80:1,5
170:5
Frustrating [1] 68:17
Full [1] 231:10
Full-fledged [1] 23:8
Fullest [1] 93:8
Fun [8] 18:1 35:1 80:6
82:4-5,8 87:9 221:13
Function [1] 221:9
Funny [3] 38:3 81:6
120:12
Fuqua [3] 219:16 220:14
Furious [1] 147:1
Fuzzy [1] 39:3

**G**

Gallagher [1] 17:20
Game [1] 94:22
Gang [1] 153:16
Garage [3] 152:12 185:
6 224:3
Garbage [2] 85:16 139:9
Gatherings [2] 110:21
Gee [1] 35:18
Gerard [6] 82:5 195:17
199:2 200:8 201:4 204:13
Gibney [5] 7:9-10 222:
14-15 226:14
Gill [14] 25:2-3 33:5
44:1 51:14 52:5,19,22
53:5,12 149:20 150:4 175:
20 187:17
Gill's [3] 27:6 187:11,
13
Gina [2] 37:11 195:10
Girl [12] 43:7 48:4 55:
16 62:20 65:7 86:5 146:
21 170:12 187:18 221:4,
12
Girl's [1] 48:15
Girlfriend [2] 87:8
116:11
Girls [8] 27:15 35:12
43:14 137:8,13 156:3 187:
15
Given [6] 49:14 66:1
103:7 120:17 122:19 132:1
Gladys [1] 28:3
Glimpse [1] 49:5
God [6] 65:8 67:16 70:
11 129:9 153:20 221:16
Goddard [25] 39:12,14
53:17,23 54:4,6,9,17,23
55:4,7,22 56:1,5,18,23
57:12 58:11,14 59:3 99:
13,16 101:3 171:2 193:16
Goddard's [1] 58:7
Going-away [1] 52:14
Good-bye [3] 60:14 62:
14 133:11
Goods [1] 114:6
Goof [1] 159:23
Gossiped [1] 175:19
Gossiping [1] 128:20
Grace [135] 34:10,14,
16 35:9,11,13 36:14 37:
16 38:21-22 39:13,22 40:
5,7,14 41:12,17,23 42:2,
4 43:4,21 54:13-14 55:
10,21

56:10,13,19 57:10 61:3,
5 66:7,9 67:2 69:9,11,
16 76:14 77:6,9,11,22
80:6,14 81:9 82:3,11,14
83:4 85:15 91:17-18,20
92:5,7,15 93:19 100:2,
21 102:4,6 104:13,17,19,
22 105:3-5,13,16,20 106:
1,10,23 111:5,9 136:8
137:19 138:1,13 142:19,
21 145:1,13 146:18 149:
19 150:2 151:23 152:13,
22-23 153:2,8-11,17-18
158:18-19 159:1,14,22
160:11,13 161:14 162:9
163:4,16,19 174:13 178:
16,18,21 184:8 192:10-
11 193:4,12 222:23 223:
8 224:19 228:5
Grace's [6] 36:15 82:
20 145:9 161:21 203:18,
20
Gracie [1] 40:15
Grateful [2] 95:8,10
Great [3] 39:1 100:9
219:2
Greta [47] 34:11,17 36:
14 37:1-3,16 39:13 59:
12 60:6,9 61:2,10,23 62:
8,12 64:16,19 65:16,23
66:3,9 67:2 69:16 74:23
76:10 111:6,10 136:9 137:
19 138:1,14 142:16 145:
13 146:4,17 148:12-13
149:16 151:3 193:14 197:
1 199:12 200:9,13 224:8
228:4
Greta's [2] 187:1 188:
13
Grievance [1] 153:15
Grounds [1] 58:5
Group [11] 2:10 34:23
68:7 75:14 106:9 111:5
138:5,10 141:1 170:6
Grouped [2] 66:13 153:
14
Grouping [4] 137:8,13
223:2 226:10
Grove [1] 1:15
Grover [2] 63:6 68:4
Grunt [1] 80:13
Grunted [1] 80:14
Guard [1] 60:23
Guess [4] 31:23 62:7
102:20 188:8
Guessing [1] 94:22
Guidance [1] 218:8
Guilty [1] 46:23
Guy [7] 8:20-22 18:21
32:7,12 72:16
Guys [3] 153:14 173:6
174:12

**H**

Habit [1] 31:1
Hale [1] 1:11
Half [3] 34:3,5 84:21
85:2 180:18 181:10 182:
12 185:12
Halloween [1] 80:10
Hand [2] 32:11 231:13
Handle [5] 18:22 24:4
29:10 36:6 208:1
Handled [2] 72:18 206:
20
Hands [6] 48:16,23 115:
6 170:8,21 196:9
Handwritten [1] 116:
14
Hanging [1] 57:4

Happy [1] 216:21
Harassed [3] 21:9 132:
7 135:22
Harassing [2] 18:13
21:7
Harassment [14] 24:21
27:10 28:13 33:13,22 61:
5 98:16 123:7 195:11 215:
15,23 216:2 217:18 218:
21
Hard [11] 10:18 11:4
31:14 35:4 37:14 47:8 56:
8 63:1 100:3 144:10 156:
11
Hardy [4] 12:22-23 13:
5 156:23
Hate [4] 27:3 69:1 128:
18 147:20
Hated [4] 87:3,10-11
147:4
Hateful [2] 128:19 145:
11
Hatefully [1] 64:19
Head [7] 18:19 34:18
37:3 97:10 117:14 120:13
223:22
Health [3] 15:2,6,19
Hear [4] 32:2 54:6,17,
20,23 58:18 61:6 62:8
85:22 106:2 115:17 138:
10,19 140:7 144:9-10
163:14,18 172:15 173:2
215:3 211:12
Heard [28] 39:7 56:1,6
59:5 61:1,6 66:15 102:2
130:18 159:19 169:11 171:
21,23 172:1-2,4 173:21
190:18 203:3,6 204:1,3,
10 210:10 211:3,10 224:
13,15
Hearing [1] 183:5
Heart [1] 69:13
Heather [72] 25:2-3,
12,15,21 26:1,3,5-6,10-
11,17,22 27:6,18 33:5
34:11,14-15 36:14 37:16,
18,23 38:2 39:16-17 44:
1 47:17 49:13,20 51:14
52:5,19,22 53:5,12 54:
15 57:3 79:7 111:6,9 112:
3,5,7 137:20 138:3-4,14
142:7-10 144:5-6 146:19
148:8,11,17 149:17,20
150:4 152:9-10,22 175:
20 187:11,13,17 224:20
228:5-6
Heather's [1] 188:11
Heaven [1] 219:20
Heavy [1] 31:2
Height [4] 188:2,9,11,
13
Held [3] 105:21 129:12
200:5
Helfinch [2] 67:14-15
Hell [1] 39:5
Help [11] 29:3 82:2 94:
17 96:8 97:4 98:4 116:1,
12,22 132:20
Helped [4] 47:21 65:17
115:21 117:17
Helping [2] 64:14 66:3
Hereby [2] 230:7 231:4
Herein [1] 230:12
Hereunto [1] 231:12
Herself [7] 52:20 65:
17 98:4 168:22 170:7,11,
14
Hi [1] 53:2
Hidden [1] 24:7
High [1] 24:6
Highly [1] 207:9

Himself [1] 129:2
Hingham [1] 8:12
Hired [5] 23:10 77:9,
15,19 119:8
History [1] 94:23
Hit [3] 8:17,22 133:8
Hold [2] 153:9 178:22
Holding [4] 48:15-16,
23 108:2
Holidays [2] 25:9,12
Home [14] 30:1,6 49:11
72:11 75:8 100:15 112:14
132:9 133:8 149:2 189:16,
23 218:5 226:1
Honestly [1] 43:7
Hoping [1] 124:11
Horrifying [1] 80:4
Hospital [1] 9:6 69:
10,16 108:11
Hostile [10] 24:21 27:
10 28:13 33:13,22 195:
20 197:15,23 205:9,11
Hostility [1] 198:8
Hot [3] 72:13 113:17
220:16
Hound [1] 19:3
Hour [6] 48:2 101:10
180:18 181:10 182:12
Hours [6] 45:18 92:2-4
181:11 189:4
House [4] 46:8 118:3
124:6 225:22
Howard [10] 1:18 45:1
97:9,15 104:21 120:17
121:12-13 122:5
Huddle [4] 60:3-4 165:
12,14
Huddles [1] 60:6
Hug [1] 219:22
Human [17] 21:20 22:3
30:18,22 41:5 68:5,8 71:
1 83:4,6,8,16 84:11 113:
5,22 216:4 218:11
Hundred [1] 92:4
Hungry [1] 94:15
Hurt [5] 35:6,19 37:12
43:15 81:8
Hurts [1] 81:10
Husband [3] 18:23 21:
6,19 22:10 32:12 46:19
47:16 49:22 75:9 100:15
207:20 210:1,9,11,13,19,
22 211:2,4-5,11,13
Hysterectomy [2] 69:
11 145:12
Hysterical [1] 19:5

**I**

Idea [8] 74:17 135:3-4
147:6 159:6 162:12 163:5
208:10
Identification [9]
107:9,12 115:9,11 122:8
125:17 194:16 217:1 225:
16
Identified [5] 29:17
111:2 157:16 204:22 221:
16
Identify [8] 29:19 93:
16 121:4 197:11 198:16,
23 217:9 227:23
Idiot [1] 26:14
Idiots [2] 37:12 139:9
Illegible [1] 116:11
Illinois [1] 1:16
Immediate [5] 18:7 19:
22 21:11,14 24:20
Immediately [4] 106:
5-6 206:19 212:19

Impair [1] 9:22
Impediment [2] 82:7
Implementing [2] 103:
15,18
Important [1] 160:21
Impossible [1] 208:18
Impression [2] 88:13
169:5
Improved [1] 45:23
Inaccuracy [1] 127:18
Inaccurate [2] 126:23
128:3
Incident [29] 33:5,8
38:1 42:9 51:21 53:10 68:
18 71:1,4,7 74:22 130:
21 131:1 133:5,14 142:
14 148:16 150:12 175:8
180:16 189:9 196:19,
22 200:2 224:23 227:13,
16,22
Incidents [6] 52:2 96:
18 133:20 151:17 152:18
228:13
Include [3] 17:9 25:12
219:3
Included [2] 131:2
134:4
Including [1] 217:17
Inderal [5] 4:13,15-
17 45:12
Indicate [3] 195:9,19
222:15
Indicated [3] 9:17 21:
19 194:8
Indicating [4] 65:2
87:16 116:10 217:5
Individuals [6] 30:5
107:15 111:12 198:17,20
221:18
Infer [1] 169:23
Inference [1] 177:3
Information [2] 158:1
188:1
Injuries [2] 9:4,9
Insisting [1] 25:16
Instead [5] 101:12,14
103:20 108:16 134:22
Instruct [1] 15:8
Instructed [2] 28:5-6
Instruction [1] 15:16
Instructions [1] 121:
20
Insulted [2] 207:9,11
Insults [1] 176:23
Insurance [2] 12:14
59:22
Intend [1] 10:17
Intended [1] 152:3
Intention [2] 161:12
163:12
Intentionally [1]
212:15
Inter [1] 161:2
Interacting [2] 161:
3-4
Interfere [2] 8:3 9:23
Interject [1] 130:16
Interracial [1] 27:16
Interrogation [1]
121:16
Interrogatories [2]
2:12 194:19
Interrogatory [2]
195:9 197:9
Investigate [7] 78:
16 131:7,14 132:13 198:
3 205:11 207:13
Investigated [1] 212:

## From Investigated to Middle

16
Investigation [8]
198:2,16 205:23 206:7,
14 207:1,10 208:25
Invited [4] 63:18 65:
5:20 76:6
olved [8] 56:10,13,
57:10 171:2 206:23
208:22 215:21
Involves [1] 160:6
Involving [6] 133:14,
20 142:1,3,14 218:22
Issue [5] 71:10 108:12
129:17 136:3 214:16
Issued [1] 73:5
Issues [9] 30:6 41:23
114:4 148:7 164:8 166:6
167:2,6 168:17
Item [1] 158:15
Itself [1] 215:20

**J**

Jackie [29] 29:1,17,22
80:15,20 86:3 87:4-5,7,
11,18,21,23 88:1 106:18,
20 107:1 185:23 186:11
219:13 220:18,22 221:1,
3,8,10-11
Jackie's [3] 87:10,20
88:19
Jackpot [1] 75:20
Jamaica [3] 78:12,14
138:13 142:23
January [5] 23:6,10-
11 72:2 218:3
Jean [36] 61:11,13,18
70:4,8,19 81:23 82:18
145:20,22 146:2,4-6,9,
12 147:5,9 148:7,10,13,
^0,149:3-4 150:22 189:
90:11 199:2 200:1,3-
01:2,22 219:14
Jeannie [1] 219:15
Jesus [1] 75:11
Jim [4] 132:19,23 133:3-
4
Joan [23] 21:15 23:22
24:11 25:17,22 26:2,5,
11-12,17,19-20 27:12,14,
20 28:8 33:4 37:20 38:1
53:11 108:1 109:1 201:20
Joanie [2] 102:8
Job [22] 11:10 17:1 19:
17 20:22 22:6 30:15 77:
10,12 90:5 101:10 136:
23 144:11 148:2 153:20
154:7 156:13 160:6,18,
22 161:10 196:9
Jobs [2] 52:17 157:6
Joe [1] 186:18
Jot [1] 109:16
Journal [3] 109:6,14
110:5
Joyce [7] 70:9,14 198:
23 159:3 161:14 162:8
174:6
Judge [1] 32:5
Judgment [2] 9:23 10:
12
Judy [5] 92:10 107:2
157:20 160:4 222:1
Jumped [3] 64:20 65:1
69:4
  ne [35] 22:20-21 52:
  8 60:13 61:1,9,15,17
  14 67:4,19 68:19 70:
  2,22 71:2-3 74:22 89:16
110:16-17 111:21 133:10,
15,21 134:2 142:18 148:
15 151:3 197:2 199:13
200:10,13 224:9 225:16

Junk [1] 119:21
Junked [1] 119:1

**K**

Kate [4] 11:19 12:3,7
15:1
Keebler [1] 72:19
Keep [10] 37:23 72:10
90:22 92:23 93:4 109:14
110:7 124:8 163:3,5
Keeping [2] 26:20 110:4
Kept [13] 25:16-17 26:
4-5 48:18 63:22 64:11
157:6 160:16 170:8,11
190:11 221:10
Kickbacks [2] 72:17,23
Kicked [1] 166:13
Kicks [1] 81:2
Kid [1] 32:10
Kidding [1] 146:17
Kids [1] 100:15
Killed [1] 184:13
Killer [1] 8:1
Kim [3] 115:23 117:16-17
Kind [20] 13:11 38:7
47:13 49:5 62:19,23 63:
5,11 73:6,10 75:12,15
90:2 109:6 118:20 137:2
143:3 166:15 190:21
Kindergartens [1]
170:14
Kinds [1] 79:14
Kiss [1] 219:22
Klonopin [7] 3:18,23
4:13 6:3,7 7:16 45:12
Knowing [1] 177:13
Knowledge [5] 8:2 60:
6 159:13 161:13 164:16
Known [7] 94:23 147:10
149:4-5 164:3 227:18
Knows [7] 94:23 147:10
149:4-5 164:3 227:18
Kwash [1] 28:3

**L**

Ladder [1] 103:12
Ladies [4] 60:19 69:8,
19,21
Lady [1] 39:1
Language [6] 79:23 87:
15 88:14 152:7 170:3-4
Larger [1] 52:8
Las [1] 32:9
Last [24] 3:15 24:1 56:
16 57:4 119:3 120:4,7
126:20,22 128:21 131:1,
5,11 168:19 175:19 177:
15 180:17 191:16 194:20-
22 205:7 208:8,11 211:4
Lasted [2] 16:22 20:16
Late [5] 56:16 77:5 94:
15 118:14-15
Laugh [2] 36:5 81:4
Laughed [1] 223:7
Laura [45] 23:16,19,21
24:15 33:12,16,20 35:20-
21 36:13 37:15 38:16,23
39:1,21,23 40:3,11,13,
16 41:3,6,8-9,16-18,22
42:10 72:13 76:23 80:8
81:13 85:18 86:10 90:8-
10,14 93:15 100:17 102:
2,16,18 109:10 222:22
Laushine [19] 23:2 24:
17 101:3 109:22 112:11
122:11,20 123:13 143:13
161:14 167:1 182:20 197:
13 208:23 218:16,19 223:
10,15 227:13
Law [2] 1:18 15:10

Lawyer [6] 19:13,16
119:8,14 122:14,19
Layoff [1] 221:19
Leader [2] 70:19 145:22
Leaders [2] 70:8 82:19
Learn [4] 136:22 137:2
161:20 223:14
Learned [4] 32:19 143:
19 208:8,11
Leary [1] 83:18
Least [4] 47:8 100:7
193:6 214:17
Leave [32] 16:15-16,22
17:2,7 20:15 23:15-16
23:1,13 45:22 46:8 64:7
74:4-5 77:21 96:11 101:
14 104:7 118:5 126:9 133:
15,22 134:3 181:10 190:
16 191:17,22 192:14,18
193:4,9
Leaving [3] 64:9 134:
22 160:16
Led [2] 152:2 229:2
Left [31] 19:5 45:19
47:18 49:18 52:5,11,23
87:5 90:9 105:4 106:5-6,
10-11,16 111:9 112:5,7
115:16,18 116:6 129:5
130:13 131:12 134:19 164:
23 189:1,11 198:7 219:
1 224:4
Left-hand [1] 8:19
Legal [5] 25:2-3,5,11,
20
Leila [1] 219:16
Length [2] 95:23 156:20
Lengthy [2] 108:2 126:
18
Lenny [5] 82:2 83:7,18,
21 84:2
Less [3] 65:12 116:12
183:22
Letter [3] 213:20 214:
15 215:2
Lie [2] 162:11 207:12
Life [9] 43:17 98:17
100:14 147:21 154:9 184:
12 197:18 202:15 208:21
Life-or-death [1] 43:
17
Lincoln's [1] 95:1
Line [6] 43:18 56:10
58:23 72:13 113:17 134:
18
Lines [3] 29:15.127:9
220:2
Lingo [1] 139:12
Lisa [42] 30:10 37:11
43:7 81:14,23 91:20 106:
22 125:20 150:23 151:1-
2 164:20 165:2 166:4-5,
9,22 167:16 168:2,13
169:3-4,8,12-13,16 170:
12,15 181:12-13 189:23
190:1,15 198 200:19 212:
219:15
Lisa's [1] 89:7
Listed [2] 125:23 221:
20
Listen [12] 35:10 58:
18 137:9 139:2,15,17,22
140:1 172:10,16
Literally [1] 64:17
Lived [1] 91:23
LLP [1] 1:11
Location [2] 111:15
161:8
Long-term [2] 14:18,22
Long-time [1] 220:1

Look [27] 3:12 31:20
32:6 66:1 68:23 70:12 92:
18 105:19 106:3 107:14
115:12 117:2 122:16 124:
20 125:16 186:18 194:17,
22 198:4 205:3 209:5,11
212:11-13 217:4
Looked [6] 105:5 121:
12-13,15 122:1 128:18,
22 178:10
Looking [4] 20:6 131:
22 157:6 192:21
Looks [2] 18:18 106:17
Loose [1] 39:5
Lose [3] 95:3 181:2,7
Lost [1] 69:12
Loud [3] 144:8 152:1
174:16
Louise [10] 63:6,21 64:
10 65:11,15,22 66:3 68:
4 74:23 76:8
Louise's [2] 63:9 65:
17
Love [1] 87:9
Loved [3] 88:2 221:5-6
Loves [1] 219:21
Lunch [13] 20:5 34:12
36:21,23 63:9,23 76:8
94:20 95:4-5 137:4-5
141:2
Luncheon [1] 220:3
Lying [1] 208:13

**M**

Machine [1] 48:5
Machines [1] 101:11
Mack [1] 219:19
Mad [12] 75:10 80:4 129:
12 147:14 168:23 169:1,
15,16,23 170:18 176:20
Mail [4] 2:11 95:21
123:9 124:14
Mailed [1] 97:9
Maintain [1] 109:6
Major [2] 5:7 17:6
Man [4] 19:11 55:22 134:
3,15
Management [8] 27:5
40:8 41:1 58:23 61:20 62:
1 92:14 101:21
Manager [16] 17:20 21:
16 22:8 25:5 56:23 59:
22 62:21 83:16 84:11 89:
21 102:5 103:14 113:22
115:7 217:13 218:11
Manager's [1] 28:3
Managers [1] 103:1
Manner [3] 112:2 152:1
180:21
March [2] 205:5 212:21
Margaret [6] 19:23 92:
9 106:23 157:19 160:4
221:23
Margie [5] 144:14 150:
13-14,21 198:13
Mark [4] 107:7 127:10
216:19,21
Marked [15] 107:8,11
115:8,11 122:8 125:17-
18 127:11,14 194:15,18
203:20 216:23 217:7 225:
15
Marking [2] 31:14 103:
10
Marks [1] 127:15
Marlene [1] 21:18
Maroney [1] 19:23
Married [2] 76:21-22
Martin [1] 132:19

Mary [2] 219:16 220:13
Mass [3] 28:15-16 29:
11,13-14 38:19 51:14 75:
6 77:11 90:3-5,7,17,22
93:1-2,6,13 103:5-6 195:
14-15,18
Massachusetts [10] 1:
2,9,11 15:9 230:2,6 231:
2,4
Maternity [1] 23:13
Matter [2] 37:23 226:7
Maura [7] 189:19 190:
11 199:2,21 200:23 201:
18 202:7
McGuire [1] 115:23
Mean [84] 13:1 14:6 16:
20 18:21 20:3-4 23:9 27:
14:14,16 35:18,23 37:13,
21 38:14 39:20 40:21 42:
23 43:15,19 46:6-7 47:
10 54:8 55:14 63:12 64:
23 65:11,13,15,21 66:6,
11,14 67:17 73:11,14 75:
2-3,16 81:8 88:6,13 89:1
9 95:1 97:12 98:15-16
100:14 104:1 105:18 109:
17 110:20 116:7 117:8
137:15 138:18 141:16 149:
14 151:15 153:2,16,18,
20 155:2 161:5 166:11,
19 170:9 177:22 185:1,7
207:2,16 219:16 224:22
226:5
Means [1] 125:20
Meant [10] 43:10 55:20-
21 81:15 128:23 163:4
174:12-13 175:15,18
Meantime [1] 26:1
Medical [5] 5:17 12:14
190:21
Medication [3] 45:9,
11 48:2
Medications [10] 3:8,
10 8:3 9:2,19,22 17:10,
12 45:16 49:15
Meet [9] 40:3 94:11,13
103:18 124:9 125:11 135:
17 213:15 220:9
Meeting [45] 32:22 58:
6,16 73:6,8 78:22 82:9
89:21 124:11 125:12 133:
1 144:23 155:17 156:9
164:5,8,11,17 165:3,10,
16,18,23 166:23 167:20,
22 168:16,19,22 169:2-3,
17 170:12 180:14 181:20
182:20 190:6 207:6 217:
14 218:18 223:15,17 224:
19 228:3
Member [2] 29:11 93:1
Members [1] 76:2
Memory [4] 8:4 10:11,
15-16
Mental [3] 15:2,6,19
Mentally [1] 63:6
Mentioned [2] 67:9 83:
7
Mess [2] 117:7 118:8
Messages [1] 210:12
Messing [5] 129:4,11
134:6 153:7 176:18
Met [34] 39:7 58:4 62:2,
4 82:21 92:17,20 94:7
95:11,14 114:8 131:5 136:
10,13 155:22 156:1 164:
14,18,21 165:6,17 166:
17 167:5,17,21 168:2
208:23 227:14,17 228:20
Mid [2] 149:11 150:6
Middle [1] 185:15

**LEAVITT REPORTING SERVICE, INC.**

**From Might to Peers**

Might [17] 5:11 32:19
44:9 54:2 55:10 67:15 70:
6 103:22 189:18 190:1
191:6 200:1 204:3,7 206:
2 216:19 218:4
Mike [1] 80:22
Millette [6] 82:5 195:
17 199:2 200:9 201:4 204:
13
Milligrams [7] 3:16,
18-21 4:2
Mimic [1] 89:6
Mimicked [4] 37:7 79:
22 112:1-2
Mimicking [1] 35:2
Mind [5] 43:4 71:18 76:
9 113:21 131:2
Mine [8] 18:8 34:12 35:
10,13 102:10 127:12 161:
18 220:3
Minute [9] 54:17 67:14
78:3 84:19 106:12 141:10
144:22 148:4 182:8
Minutes [5] 36:22 44:3,
21 45:4 183:19
Misconduct [3] 215:6,
11 217:17
Miserable [1] 17:22
Miss [1] 40:15
Missed [3] 3:22 164:23
223:20
Missing [1] 127:9
Molested [1] 194:3
Moment [2] 195:8 227:16
Monday [9] 31:8 100:8,
12 123:23 124:13,15 129:
14 189:12 221:2
Money [7] 56:14 62:22
63:15-16 103:4-5
Month [4] 13:15 85:12
86:21 110:22
Months [5] 24:10 71:16
214:14,17 217:20
Morale [1] 140:3
Morning [28] 25:1 31:8
40:15 45:15,17,20 49:18
64:8 96:21,23 97:2 99:
20 101:1,9,13 120:10
124:19 149:11 150:6 153:
3 159:19 171:1 174:17
178:6,18 184:15
Most [8] 44:18 63:16
80:3 91:11 119:23 120:2
219:13 226:16
Mother [1] 46:19
Mouth [2] 48:15 49:1
Move [5] 17:23 129:16,
21-22 130:3 158:22-23
159:20 160:9 161:17,21
162:1-3,5-6 163:10-12,
16,19 191:7,9
Moved [21] 17:19,21 29:
15 69:23 77:10-11,17 78:
7 85:14 89:23 90:2 146:
22 158:18 159:14,23 160:
11,16:6,15 162:9 191:1,
8
Movie [5] 48:3-4,7,12
49:4
Moving [3] 129:17 161:
12 163:13
Mullane [5] 92:9 107:1
157:19 221:23
Mullen [1] 30:16
Multiple [1] 8:13
Multiple-vehicle
[1] 8:13
Munchies [1] 95:2
Murdered [1] 184:17
Muriel [2] 219:19,21

Music [1] 220:13
Must [2] 56:15 162:23

N

Name [22] 3:4,22 17:20
24:1 50:17,19 73:2 76:6
83:15 93:16 117:15 125:
21 155:13 158:4 174:2
186:19,22-23 187:1,11
211:13
Named [3] 50:15 195:10
230:9
Names [9] 56:6 58:17
67:16 68:14 80:12 87:9
132:2 157:13 160:3
Naming [1] 80:12
Narrative [24] 2:9
126:19 133:10,13,16 135-
7 149:18 156:10 158:14-
15 164:7 172:23 174:11
176:20 177:12 179:11 182:
3,19 183:1,8,14 184:11
192:22
Nasty [2] 38:14 57:9
Nature [2] 15:13 17:5
Near [14] 34:12 38:23
60:20-21 68:7 69:8,19-
20 70:1 78:5 124:10 145:
6 199:14
Necessarily [1] 122:
18
Nectarine [1] 95:9
Need [21] 10:23 11:2,9
19:19 33:9 44:17 75:9 92:
18 98:7 128:11 135:10,
12 139:18 150:19 160:10
176:4 181:9,12 186:18
199:7 200:8
Needed [7] 24:6 31:10
32:17 91:9 166:20 209:5,
11
Needs [1] 132:20
Nephews [2] 80:17,19
Nervous [5] 42:12 78:
17 128:19 143:1,4
Never [53] 19:1-2 26:4,
23 27:1,16 32:12 43:18
48:9 49:23 56:7 66:5 71:
14,17 73:12 74:19 84:12
90:8 98:1 101:5-6 103:
16-17 108:17,20 113:16,
20 120:4-5 136:12 140:
21 144:3 145:6 146:12
153:17,20 154:5 155:6
158:10 170:13 175:21 184:
12 188:3 212:14 220:4,
20 223:20 224:5 225:23
226:4,21 227:3
New [5] 17:19 120:14
126:12 147:15 170:12
Next [11] 36:2 72:16
105:7 139:20 141:4 173:
20 177:16 186:4 189:3
203:10-11
Nice [6] 18:20 37:13
39:1,19 215:1
Nicholas [26] 23:16,
19,22 24:15 33:12,17,21
35:20 36:13 37:15 39:21
41:3 77:1 80:8 81:13 85:
18 86:11 90:9-11 100:17
102:2,16,19 109:10 222:
3
Nicholas' [1] 35:22
Nickname [1] 55:15
Nieces [1] 80:16
Nigger [1] 114:10
Night [14] 3:14-15,21
45:21 47:14,23 48:13 95:
20 120:4,7 126:20,22
131:1,12
Nightmares [3] 47:3-4,

12
Nobody [5] 37:5 102:18
118:7 147:11 191:22
Noise [1] 160:1
None [3] 135:1 146:23
198:22
Noon [1] 45:20
Normal [1] 109:17
North [2] 105:9,12
Notary [5] 1:10 230:5,
16 231:4,7
Note [1] 22:13
Notes [15] 96:15,18,20
22 98:2 109:7,15 110:4,
10 116:14 117:2,4 118:
21,23 120:21-22
Nothing [10] 27:18 35:
14 73:13 89:9 135:2 153:
11 197:22 208:11 229:6
Notice [1] 25:11
Noticed [3] 57:1,17
226:18
Notices [11] 25:2-3,5,
20
Nova [1] 12:10
November [5] 12:12-13
118:13 126:3 231:17
Number [10] 2:7 12:15
52:11 53:21 67:8 71:15
113:17 158:5,15 218:11
Numbered [1] 127:8
Numbers [2] 72:15

O

O'Brien [1] 102:9
O'clock [2] 95:7 101:14
O'Hearn [1] 50:16
O'Reilly [3] 186:19
187:7,10
Object [1] 15:7
Objection [12] 46:1
51:23 84:4 95:13 183:9-
10 205:17,22 206:12 214:
7 215:8,17
Obligation [3] 131:6,
13 132:12
Observe [1] 111:12
Observed [2] 137:2
169:15
Obsessional [2] 50:7
Obtain [1] 188:18
Obtained [2] 126:6,8
Obvious [1] 20:11
Occasion [7] 42:10 83:
22 140:6,12 152:5-6 221:
8
Occasionally [1] 100:
18
Occasions [8] 60:12
151:6,13 152:5,8 157:22
192:18 193:3
Occurred [5] 33:5 52:
3 68:18 74:22 197:12
October [16] 12:4-5 13:
17 14:9 16:15,20 28:2
45:23 118:9,14-15 213:
17 214:10,15 225:9
Odd [1] 160:11
Off-site [1] 166:23
Off-the-record [7] 5:
14 10:8,10 84:16 107:10
125:15 127:23
Offending [1] 81:5
Offensive [1] 223:3
Offer [1] 94:16
Offered [1] 102:11
Office [25] 12:9 68:13
74:8,13 92:17,20 94:7,9

95:12 103:2 112:16 179:
10 180:6 185:14,20 189:
12 194:20 214:13 217:20
225:9,11 227:11 228:12,
18,22
Officer [4] 186:18 187:
7,10 215:3
Offices [4] 1:11,18
74:13,18
Official [1] 231:13
Offut [6] 29:2,17 80:
15 86:3 219:13 220:19
Offut's [1] 106:19
Old [5] 103:13-14 106:
19 203:18 220:13
Older [5] 55:22 219:17
157:19 221:21-22
Once [4] 4:11-12 41:9,
18 47:8 48:8 53:2 60:13
71:16,23 78:11 81:3 102:
21 108:4 109:16 110:22
193:6
Once-a-month [1] 110:
22
One [94] 3:20 4:7,10 15:
12 18:15 24:22 26:18 29:
23 30:1,6,10 31:12 32:7
34:18 35:8-9 36:21 37:4
38:4 42:2 43:8,14 45:12-
13 47:10,14,16,23 56:16
58:7 62:20 64:6 67:9 68:
8 74:9 76:5 80:16,21 82:
8 83:6,22 87:19 91:16
100:19 103:13 116:20 117:
22 122:6 125:23 127:14
133:8 144:22 146:12 147:
14-15 151:9,17-18 152:
10-11 153:15 157:20 158:
12 160:7,23 161:9 165:4
177:13 179:9 180:7,14
189:18 202:17 207:6 216:
14-15 218:5 223:8,22
224:14,17,19 228:4,13,15
One's [1] 207:8
One-on-one [1] 180:14
Ones [6] 39:19 67:9 91:
14 157:14 160:9 220:14
Ongoing [3] 195:11 205:
9,11
Oops [1] 31:3
Open [2] 94:17 95:7
Opening [1] 13:7
Opinion [1] 65:16
Opposite [1] 105:10
Option [1] 71:19
Order [3] 59:1 91:10
117:5
Orders [1] 8:6
Originally [1] 12:22
13:4 97:9
Orlando [4] 36:10 89:
23 136:14 140:22
Otis [1] 8:12
Outside [6] 35:12 39:3,
8 77:15 160:14 220:7
Outsiders [1] 165:21
Overhead [2] 105:18,22
Overhear [5] 111:16
140:8 150:2 151:21 152:2
Overheard [3] 140:12
151:20 190:9
Overs [1] 156:22
Overtime [13] 54:12
55:8 91:22-23 92:2,4 99:
5 100:20 101:17,19 102:
12 103:20,22
Overweight [1] 31:3
Owe [1] 26:12
Own [18] 36:6 38:7 40:5

41:20 42:3,12-13,17 43:
1 63:6,11 75:15 80:5
102:1 139:12 142:22 171:
11 223:9

P

Pace [1] 91:22
Packs [1] 94:20
Pad [1] 116:17
Page [25] 2:7 107:19
124:20 127:21 128:2 129:
14 131:23 144:11 155:19
156:7 158:14 164:6 182:9,
11 184:11 185:11 186:5-
6,17 194:21 216:9 217:3,
6 218:7
Pages [5] 117:19 127:7-
8 133:18 182:17
Paid [1] 75:13
Pail [1] 95:5
Pain [4] 6:13,19 7:22-
23
Pamelor [2] 17:13 22:19
Pamphlet [2] 206:18
225:15
Paper [12] 106:15 116:
10,17 117:7,18 118:19-
20,22 120:17 122:9
Par [1] 10:15
Parading [1] 35:10
Paragraph [2] 185:12
Paranoid [1] 50:4
Parentheses [2] 174:
11 186:10
Parenthesis [2] 185:
22 186:4
Parents [2] 32:8 108:13
Part [17] 26:16,23 48:
11 52:8 60:7 75:5 77:3
80:3 102:11 105:21,23
130:18 138:5 187:18 216:
7 218:1 186:10
Particular [13] 29:18
30:12 42:9 46:13,17 47:
11 122:13 138:6 140:6
141:23 142:3 211:12
Particularity [1]
197:11
Particularly [1] 10:
13
Parties [2] 62:17 63:14
Partition [1] 106:3
Parts [1] 135:9
Party [33] 52:14 60:14
61:15 62:14 63:7,9,12,
17,20 65:17 67:4 68:18
75:1,4-5,10,12,18 76:4
87:21-22 88:1 133:11,22
142:18 197:2 200:5 204:
23 208:22 220:23 224:9-
10 226:6
Passed [2] 71:12 73:17
217:10
Past [2] 90:12 153:18
Pathetic [1] 117:8
Patient/psychothera
pist [1] 15:9
Paul [18] 1:22 32:8 47:
18,21 49:16 76:17 83:23
94:4 116:2 119:16 129:14-
16,20 130:6,22 191:4,10
Pauses [1] 117:13
Pay [3] 65:18 92:2 135:3
Paying [1] 72:16
Pays [1] 100:20
Peace [2] 26:20 37:23
Peacemakers [2] 29:2,
18
Peach [1] 95:9
Peers [5] 34:13 56:14

166:16 173:1 223:3
**Penis** [1] 48:20
**People** [99] 11:6 21:9-10 25:7 28:15,22 29:9,19 31:2 32:5,18 34:15,35:15 36:2 37:10,13,1,13 39:3,5-6,9,18-22 52:11,15,17 58:16-17 62:15,17-18,22 58:15 64:1,23 65:1-2,11,18 66:8,16 67:6 69:3 73:22 75:6,16,19 76:12 78:14 83:8 90:17 91:15 92:11,23 93:4,6 102:12,21 103:9 104:3 107:4,14,19,22 111:19,23 125:23 126:14 141:2 142:22 146:15 156:18-19 165:21 170:6-7 173:4 177:8 190:17 202:14 206:10 219:1,3 223:9
**People's** [2] 67:16 157:13
**Pepsi** [1] 72:18
**Perform** [1] 161:9
**Perhaps** [1] 206:1
**Period** [16] 28:11 29:20 30:17 33:11 34:12 41:2 61:21 86:15 109:1 117:23 134:11 168:1,6,9 192:2,6
**Permission** [1] 57:5
**Person** [13] 15:14 32:21 35:3 86:1 134:18 147:4 149:12,14 150:11 173:20 207:6-7 210:21
**Personal** [9] 29:15 102:3,6 104:13 108:2,21 132:6 209:7 220:2
**Personalities** [1] 90:16
**sonally** [7] 115:19,14,18 191:13 196:5,13 230:8
**Personnel** [10] 18:23 19:2 21:5-6 33:6 68:9 102:21 202:12 206:21 217:13
**Perspective** [4] 38:15 73:15 81:21 161:9
**Petrified** [1] 154:6
**Pharmacist** [3] 8:7 9:18,21
**Phone** [57] 61:8 62:4 71:15 81:12 85:23 94:8 95:14 108:17 112:19 113:4,9,16 124:3 125:7 129:15,19 130:23 132:5-6 135:16,18,21 149:3 155:20 158:5 160:5,14 184:20 185:13 189:15 190:9 198:3 203:14,16,19 204:2,4-8,11 208:17,20 209:1,6,11,13,17-18,21 210:19 211:7 218:11 225:1 228:12
**Phoned** [2] 112:13-14
**Phony** [1] 86:9
**Physical** [19] 9:5 52:20 53:6 55:3 60:9,17 62:11 66:22 67:1 79:5 87:1 134:4 135:18 152:13,19 187:8,16 191:23 197:2
**Physically** [19] 66:20-21 68:19 78:9 151:14 185:19 199:4,11,15,18,21 200:1,12,15 201:8,12,13,17
**sician** [9] 6:12 9:14,12:20 13:10,20 15:21 16:1,7,13
**Pick** [1] 90:6
**Picked** [2] 113:16 147:3
**Picky** [1] 31:17
**Picture** [1] 139:19
**Piece** [3] 106:15 120:17 210:11
**Pieces** [3] 116:17 118:22 122:13
**Pills** [1] 47:14
**Pinball** [1] 48:5
**Pints** [1] 69:12
**Piroxicam** [7] 3:16 4:2-3 5:8 6:1 7:19 45:14 47:11 91:10,23 99:17 104:10,15 108:18 110:22 117:4 118:7 148:19 160:9 164:5 172:5 189:15 211:6-7 220:13 221:20:6-7,11
**Places** [1] 47:1
**Plain** [1] 138:13
**Planner** [4] 96:4,12 97:17 120:9
**Plans** [2] 160:5 226:5
**Plate** [3] 64:12 117:7 118:22
**Play** [1] 94:22 113:12
**Played** [1] 220:13
**Plenty** [3] 63:19 65:19 75:21
**PM** [3] 182:15 194:14 229:8
**Point** [24] 11:1 14:22 16:13 22:18 49:21 61:23 80:2 86:15 93:23 99:6 102:10 114:16 115:2 116:5 125:3,7 144:17 174:5 179:5 191:4 206:22 208:17 223:8 225:11
**Pointed** [7] 136:10 137:23 138:6,9 139:14,23 176:17
**Pointing** [5] 107:3,18 129:6 173:4 176:12
**Pointless** [1] 100:23
**Points** [1] 116:9
**Police** [8] 58:23 78:16 129:22 130:5-6 186:16 188:15 189:17
**Policies** [2] 214:18 217:16
**Policy** [9] 73:16 214:16,19 215:1,9,13 216:3,8 217:22
**Poor** [2] 146:21 147:6
**Possession** [2] 122:17,19
**Possibility** [1] 179:22
**Possible** [1] 51:12
**Post** [2] 42:2 11:13
**Postpartum** [1] 30:11
**Postponed** [2] 12:15
**Pounds** [1] 188:5
**Prejudiced** [1] 50:10
**Premises** [1] 166:17
**Premiums** [1] 103:6
**Preparation** [1] 119:5
**Prepare** [3] 115:15,19 120:16
**Prepared** [2] 115:13 119:7
**Prescribe** [1] 5:1
**Prescribed** [16] 4:17 5:8 6:1,4,10,12,16,21 7:3,8 9:2 13:16 15:22 16:1,5,8 9:2
**Presence** [6] 79:18,21 89:4 200:17 201:10,14
**Present** [28] 1:21 42:14,18 169:9 171:5,8 175:7 196:16 199:4,11,15,18,21 200:1,9,12 201:8 203:1,9,12 204:13,17 231:6
**Pressure** [2] 29:22 30:1
**Pretty** [3] 147:3 179:4-5
**Pretzel** [1] 64:5
**Previously** [1] 112:15
**Primary** [10] 5:11 6:12-13 7:7 9:16 12:8,20 13:10,20 16:12
**Printed** [1] 125:20
**Printouts** [1] 122:10
**Priority** [1] 24:6
**Private** [1] 164:8
**Privilege** [3] 15:9,15 120:21
**Privileged** [2] 120:20 121:10
**Problem** [18] 35:23 38:16 39:22 40:9,20 41:2,6 64:20 85:4,9 121:4 141:6 142:10 144:7 153:14 168:3,10,14
**Problems** [26] 7:6 10:23 18:12 27:9,17 40:22 51:9 84:20 90:10-11,14 93:15 147:7,10-11,14 149:5 153:17 167:2,7,11,15,17 198:6,8 222:23
**Procedure** [2] 1:9 109:17
**Procedures** [1] 208:1
**Proceeding** [2] 231:7,9
**Proceedings** [1] 231:11
**Process** [1] 118:4
**Processing** [4] 62:17 63:14 75:4 89:23
**Produced** [3] 122:14 125:19 216:14
**Production** [2] 104:9 122:15
**Productive** [1] 100:13
**Profane** [1] 56:6
**Professional** [13] 1:10 2:14 15:6,19 207:10,14 211:19 212:4,12 214:16 220:16 225:15 231:9
**Professionals** [1] 15:2
**Program** [3] 72:6 158:2,8
**Promised** [1] 181:15
**Promoted** [1] 132:6
**Propanolol** [3] 3:13,22 4:15
**Proper** [1] 81:19
**Protect** [1] 132:7
**Protected** [1] 15:14
**Prove** [5] 103:23 207:22-23
**Provide** [5] 187:7,10,13
**Provisions** [1] 14:21
**Provoke** [1] 181:9
**Proximity** [2] 38:21 173:11
**Psychiatric** [1] 12:10
**PTS** [2] 4:21 5:6
**Public** [5] 1:10 230:5,16 231:4,7
**Pull** [7] 32:14 128:5 132:5,9 175:2 208:19 209:13
**Pulled** [4] 26:13 32:1
178:3 209:18
**Pulling** [1] 157:5
**Purchased** [1] 14:20
**Pure** [1] 85:16
**Purpose** [3] 13:23 15:12 218:18
**Pursuant** [1] 1:9
**Push** [3] 19:18 159:6 162:12
**Pushed** [2] 8:22 38:18
**Pushing** [2] 162:22-23
**Put** [34] 13:8,10 38:22 71:22 75:19 82:3 89:5 91:10 92:1 96:19,22 97:6 101:17-18 104:9 105:23 108:13 109:2,11,23 116:12-13,19 117:9,21 120:9 129:3 138:15 139:10 145:1,8 159:1,17 164:1
**Putting** [7] 61:4 97:16 103:23 139:1,4 140:1 163:4
<br>

**Q**

**Quack** [3] 80:17-18
**Quality** [2] 56:3 77:17
**Questioned** [1] 132:1
**Questions** [13] 11:10 81:16 135:8,11 141:19 195:5 207:8,15 213:6,9,12 225:6 226:9
**Quick** [1] 8:19
**Quickly** [4] 73:10 125:16 128:10,12
**Quiet** [3] 159:21-22
**Quincy** [4] 74:13 186:16 189:17 220:10
**Quotes** [2] 183:4 185:3
<br>

**R**

**Race** [6] 24:11 27:6,18 112:1 133:13 205:9
**Races** [3] 111:23 219:3 222:4
**Racial** [39] 37:17 54:7,23 62:9 79:8,17,20 89:1,3 110:14,18 111:22 112:8 123:7 133:20 136:3,6 140:8,11 141:21 142:1,3,15 143:9 147:8 165:4 166:6 167:2,6,11,15-16 168:3,10,14,17 192:15 195:11 218:20
**Racially** [5] 135:22 195:20 197:15,22 221:15
**Raise** [4] 40:16 173:9-10,12
**Raised** [3] 147:16 173:13 197:12
**Raises** [2] 80:3 147:14
**Raising** [2] 170:8,20
**Ran** [2] 32:9-10
**Ranting** [2] 184:2,6
**Rape** [2] 48:19,22
**Raped** [3] 48:5,11 194:2
**Raping** [2] 48:14 49:7
**Rate** [1] 91:18
**Rater** [1] 160:23
**Raters** [4] 91:19 163:3,5 164:2
**Rather** [1] 214:6
**Raving** [2] 184:2,6
**Raytheon** [1] 155:3
**Razor** [1] 80:13
**Reaction** [2] 128:19 176:23
**Reactions** [1] 14:3
**Read** [5] 97:23 118:7-8,10,14,1-4,5,7 120:1,7
148:4-5 182:8,10,16 195:4 230:10
**Reading** [1] 131:11 135:10
**Reads** [1] 105:2
**Ready** [1] 47:15
**Real** [11] 46:23 58:21 65:3 73:10 82:7 129:7,17 159:16-17 220:16
**Realize** [1] 98:2
**Realized** [2] 178:1 206:18
**Really** [61] 14:4 17:21 22:12 27:5 31:2,13,17 34:19 36:23 38:4,9 39:1 41:20 43:19 46:12 48:3,12 49:16 53:3 56:4 60:1 63:22 64:22 65:14,21 66:16,21 70:7 71:22 72:14 73:10 75:16 78:4,17 80:1 81:10 85:3 87:6 97:5 103:21 129:12 130:20 137:5 140:3 142:23 144:9 154:9 157:21 166:9 168:23 181:1 188:3 208:3,16 221:6
**Reason** [11] 14:10 29:4 43:11 74:10 75:22 78:15 84:8 101:19 125:12 208:12 210:8
**Reasons** [3] 129:18 161:11 206:6
**Receive** [7] 17:7 72:7 213:20 214:18,22 217:15,19
**Received** [9] 9:3 225:17
**Recent** [3] 119:23 120:2 219:13
**Recently** [1] 33:7
**Recipient** [1] 215:19
**Recipients** [2] 215:14,22
**Recognize** [1] 11:9
**Recollection** [3] 67:21 119:20 228:10
**Reconsider** [1] 15:15
**Record** [20] 3:5 5:13 10:7,10 84:15 107:13 122:14 125:14 127:22 128:1 132:5 139:19 148:5 160:3 182:14 194:13 209:14,19 214:9 216:20
**Recorded** [1] 230:12
**Records** [8] 198:3 208:17,20 209:1,6,12,17,21
**RECROSS** [1] 2:2
**Recurrence** [1] 22:22
**Recurring** [1] 47:10
**Redirect** [3] 2:2 213:11 225:7
**Redraw** [1] 107:13
**Reduction** [3] 52:9 89:15 92:12
**Refer** [2] 133:9 211:13
**Reference** [9] 30:6 66:9 72:5,13 152:8 164:10 175:23 176:10 226:12
**Referenced** [2] 62:5 72:4
**Referencing** [1] 187:6
**Referred** [6] 12:7,19 85:15 112:3 142:6 214:16
**Referring** [4] 96:4 98:6 156:17 222:8
**Refuse** [1] 205:10
**Refused** [2] 108:7-8
**Regarding** [3] 21:20 25:2 222:23
**Registered** [2] 1:10

# From Registered to Spoken

231:9
Regret [1] 132:21
Regular [2] 18:14 113:2
Regularly [1] 45:16
Reissuance [1] 212:3
Reissue [1] 211:19
Reiterated [1] 74:19
Reject [1] 32:13
Relate [1] 96:18
Related [7] 11:13 17:
14 133:14 211:23 222:17,
19 226:15
Relationship [2] 87:
4,18
Relative [1] 104:19
Release [1] 216:12
Relieved [1] 141:10
Religions [1] 219:4
Relocating [1] 156:13
Remain [1] 90:7
Remainder [1] 52:16
Remained [1] 106:19
Remaining [1] 75:6
Remark [2] 31:19 88:3
Remarks [8] 59:3 79:11,
14 82:20 83:5 89:13 192:
15
Remember [108] 10:3,
18 13:13,15 16:10 19:9
20:19 22:12,18 23:4,13
29:1 31:9 33:16 41:15 42:
8 48:16-18,21-22 50:12,
15,18-19,21-22 51:1,4,7,
9,11 53:3 59:12 61:5 62:
6,19 65:7 67:15,19 68:
14 72:12,14 75:8 76:6,
14,20,23 78:18 83:13,17,
19 84:5-6 88:7 96:8 99:
9 104:11 117:10 118:17
120:13-22 129:6 132:19,
22-23 133:3-4 134:19
136:9 138:8 140:19 149:7
150:8,22 152:21 158:4
163:2 168:20-21,23 179:
3 180:5 181:19 182:11
183:2,5,7,13 185:9 188:
12,14 190:21 205:19 213:
16 214:3 224:18,21,23
227:14,20 228:2,13,15,19
Rep [1] 83:16
Repeat [4] 130:19 168:
22 169:18 170:14
Repeated [2] 170:7
176:8
Repeating [1] 170:11
Report [11] 61:23 71:1,4,7 180:
18 61:23 71:1,4,7 180:
15,18 217:17 218:9 231:
11
Reported [8] 21:17 23:
2 59:20-21 153:5 197:12
206:19 223:10
Reporter [6] 1:10 107:
7 128:1,12 148:5 231:9
Reporting [3] 205:8
215:5,11
Reports [1] 105:23
Represent [4] 90:18
122:13 157:3 214:8
Representative [1]
218:12
Representing [1] 90:7
Reprimanded [1] 108:7
Request [2] 97:20 122:
15
Required [1] 109:20
Reread [2] 126:19,22
Resolved [1] 101:22
Resource [1] 84:11
Resources [16] 21:17

22:3 30:19,23 41:5 68:5,
8 71:2 83:4,6,9,16 113:
5,22 216:4 218:12
Respect [1] 6:3 10:13
27:19 35:7 36:7 56:8 89:
10 114:23 127:19 130:20,
22 141:11 151:16 160:22
182:20 188:16 223:4 225:
14,19
Responded [1] 26:5
Respondent [5] 1:6,8,
17 205:10 211:15
Response [6] 35:22
122:15 195:9 197:19 222:
21 226:9
Responses [2] 194:19
195:5
Responsibilities
[1] 156:13
Responsibility [1]
30:3
Rest [3] 69:19 96:22
114:11
Result [4] 124:3 154:
16 156:12 212:4
Results [1] 100:13
Resumes [2] 160:18,20
Retained [4] 91:1,3,6
221:19
Return [2] 14:15 197:17
Return-to-work [1]
14:15
Returned [4] 142:6
184:1 189:12 192:13
Review [2] 215:9,13
Reviewed [5] 120:16
121:5 130:23 182:19 188:
15
Revisi [1] 80:23
Rifted [1] 62:15
Rip [3] 153:9 178:23
184:8
Ripped [1] 135:2
Road [1] 1:19
Robbed [1] 193:23
Robinson [1] 219:16
Roll [1] 87:15
Rolled [1] 173:19
Room [21] 26:13 60:19
69:8,20-21 75:4 117:6
128:5,14 129:8 133:8 160:
10 175:1 178:11 180:7,
13 181:17 182:13,21 183:
17 202:1
Rotten [1] 63:1
Row [4] 102:13 169:6-7
170:8
Ruby [1] 59:21
Rude [4] 31:2 58:21
173:2,6
Rug [1] 198:5
Rules [1] 1:9
Run [2] 103:5 117:6
Running [1] 69:4

## S

Safe [4] 47:20-21 101:
15 197:16
Safety [1] 135:18
Sandwiched [1] 8:23
Sat [15] 26:17 67:6 69:
8 78:8 99:18 104:17,20-
21 106:5,23 107:1,14,16
137:1
Saturday [12] 54:12
55:8 100:4,7,18 102:3,7,
9,19 103:2,10 186:17
Saturdays [12] 98:21-
22 99:6,14 100:22 101:4

102:10,23 104:14 143:17,
21 176:7
Save [4] 43:6,8,14
Saw [19] 7:14 13:9 20:6
39:5 48:11 102:21 103:17
128:16 130:13 131:10 144:
13 158:10 179:12,15,17
190:11 202:12 216:20
Scan [2] 9:7-8
Scare [2] 152:3-4
Scared [5] 60:23 69:7
129:7-8 144:9
Scaring [2] 14:5 144:18
Scary [2] 66:11-12
Schedule [1] 112:23
Scheduled [2] 45:16
189:8
Screwing [1] 157:2
Seal [1] 231:13
Seat [1] 158:19
Seated [3] 178:8 203:
13-14
Second [7] 28:1 41:16
55:10 128:9 141:7 194:21
205:7
Secretary [1] 28:4
Section [1] 215:5
Security [5] 71:5,8
113:9 206:20 215:20
See [51] 9:13 11:23 12:
11 13:20 14:9 18:13,16
19:6-7 20:10 21:23 22:12
28:4 32:15 34:10 53:14
68:7 71:9 79:23 81:4 83:
14 84:5 91:11 102:18 104:
22 105:5,19 106:2 118:
11 126:11,15 127:6 138:
12 143:6 153:13-14 158:
16,19 163:6 164:21 165:
3 166:15 169:2 181:11,
14 186:2 196:7,10 197:
20 212:11 223:23
Seeing [1] 11:19
Seek [1] 190:21
Seem [2] 71:18 180:22
Sees [1] 219:21
Select [1] 90:22
Selected [1] 89:18
Self [1] 80:5
Sell [1] 160:4
Send [2] 72:20 212:13,
18
Sending [3] 160:18,20
212:15
Sensitive [3] 11:9 32:
18 128:11
Sent [15] 97:15 124:2,
13,18,23 125:3 146:7
212:11,14,20 214:3,9,12,
14 217:19
Separate [4] 105:17
122:9 151:6 172:12
Separated [1] 105:15
Separately [2] 59:9
206:2
September [59] 1:12
57:11 59:2 82:23 83:3 84:
11 94:5-6 95:11,16,18
96:9,13,19 104:12 127:5,
17 130:21 151:11,18 152:
6 157:22 164:5,17 166:
22 167:4,20 168:9,16
171:1 174:17 182:21 184:
16 186:17 188:21 189:11,
13 190:20 191:16,21 192:
13,17 193:4 201:10,14
202:20 203:21 204:15,19
226:20 227:2,8 228:11,
19,22 231:13
Sequence [1] 116:19
Serious [1] 114:9

Seriously [1] 114:19
Served [1] 194:20
Session [2] 180:17
Sessions [1] 84:7
Set [2] 12:10 207:3
Settle [1] 179:8
Several [3] 74:7 145:
20 156:11
Severance [1] 102:15
Sexually [1] 194:2
Shauna [113] 39:14 48:
17 49:9,13,18 54:11-12,
14 70:10,13,17 79:7 80:
6 82:4-5 84:18 86:17 87:
1,9-10,13 88:2 89:1,12
91:16 92:5,7,15 93:18
100:1 102:6 104:14,18,
20,22 105:7,11,15 106:
10,18,23 111:6,10 128:7,
17 129:3,6 134:6 136:9
137:19 138:1 142:5 143:
19 145:16 146:18 149:7,
13,19 150:2 151:7,14
152:21 153:1 157:19 158:
19 160:21 175:3,7 176:8,
17 177:16 178:8,11,21
179:3,17 181:16 183:17,
19 184:1 187:8,21 190:5,
18 191:1,19 192:2,5,9,
11,18 193:10 200:16 201:
9,13 202:4,8 203:12,20
204:14,18 207:2,5 209:
12,23 221:6,22 222:1
223:19 224:11,20 228:5-6
Shauna's [7] 106:11
143:15 151:18 186:19 188:
9 209:13,18
Sheets [2] 103:7 122:9
Shock [2] 71:17 90:2
Shocked [1] 149:6
Shook [1] 32:10
Shoot [1] 78:15
Short [3] 8:20-21 50:13
Short-term [1] 50:13
Shorthand [1] 231:8
Shortly [5] 21:7 32:18
128:4,15 175:1
Shot [3] 128:23 153:6
175:11
Shoulders [1] 30:2
Show [11] 119:10,13,16
122:3 157:21 216:3,7,18
217:3,7 221:10
Showed [4] 9:9 18:10
88:17 116:2
Shriner's [1] 108:14
Shy [1] 64:13
Siblings [1] 108:13
Sic [2] 157:21 210:15
Side [6] 40:17 69:22-
23 86:2 105:13,18
Sign [2] 108:7-8
Signature [1] 194:21
Signed [2] 195:2,4
Simmons [1] 59:21
Simone [1] 83:18
Single [1] 206:5
Sipzener [2] 6:15 13:2
Sisters [1] 185:23
Sit [6] 38:20 97:12 104:
19 111:7 136:22 139:15
Site [3] 165:7 166:23
167:5
Sits [3] 185:4 202:22
224:1
Sitting [12] 36:1 37:2
48:5 70:10 131:20 136:16
137:16 139:16,18,20 178:
14 224:17

Situation [12] 43:18
47:11 101:21 108:18 146:
17 155:5 184:12 196:1,
22 208:1 211:23 212:5
Situations [2] 47:1
194:5
Six [8] 24:10 71:16 90:
13 95:6 100:15 122:9 214:
17 217:20
Skin [7] 7:12 181:9
222:7-8 226:14,17 227:9
Slang [2] 87:9 139:11
Sleep [4] 47:20 49:21,
23 101:9
Sleepless [1] 101:8
Sleepy [1] 49:15
Slip [2] 46:7 155:17
Slow [3] 11:1 91:22
103:21
Slur [1] 142:15
Slurs [6] 110:14,18
141:21 142:1,4 143:9
Smaller [1] 75:14
Smart [1] 164:2
Smell [1] 63:8
Smelled [1] 75:17
Smells [1] 63:22
Sneak [1] 164:3
Sneaky [2] 159:17 166:
15
SOB [1] 17:22
Social [1] 11:21
Socially [1] 220:18
Solely [1] 196:20
Someone [9] 30:22 49:
10 81:21 119:21 151:22
158:5 185:5 195:10 210:9
Sometime [6] 77:3 85:
9 98:19 104:11 118:9 218:
2
Sometimes [4] 47:9 64:
8 94:22 137:20
Somewhere [2] 56:9
131:20
Soncrant [2] 21:18
Soon [5] 36:9 44:6 116:
5 136:14 140:22
Sorry [19] 4:11 26:15-
16,22-23 27:1 33:10 35:
18 65:10 81:8 106:12 122:
5 182:1 190:10 199:10
203:15,18 212:2 227:7
Sort [2] 96:4 198:5
Sorts [1] 14:3
Sound [3] 73:20 77:4
85:14
Sounds [2] 81:1 93:11
South [1] 1:15 105:10
Speaker [5] 62:4 94:8
95:14 225:1 228:12
Speaking [3] 50:20
112:2 143:7
Speaks [2] 210:10,13
Specialist [1] 11:22
Specific [3] 153:23
155:9 198:17
Specifically [2] 154:
13,15
Specify [1] 156:18
Speech [2] 82:7
Spell [2] 116:2-3
Spelled [1] 116:4
Spend [1] 62:22
Spending [1] 209:6
Split [1] 158:19
Spoken [7] 31:23 100:
17 102:8 112:15 140:17

## From Spoken to Unit

145:20 146:2
Sponsored [1] 221:9
Spot [2] 47:20-21
Spread [1] 220:12
Spring [8] 16:21 78:20 136:17 139:14 140: 23:13
Springtime [1] 136:10
Square [1] 220:10
Squeeze [1] 81:3
Squeezed [1] 80:17
SS [1] 231:3
Stages [2] 49:17 116:8
Stalking [3] 18:4 19: 23 20:2
Stand [4] 18:5 87:6 173:15,17
Standards [3] 91:10 103:19 104:9
Standing [6] 25:13 49: 9 170:6 171:12,14 203: 13
Stansbury [11] 189:17 199:1,4,11 200:15 201:8 202:13 203:6,19 204:10 224:13
Staring [4] 64:16-17, 19 75:22
Start [8] 12:2 18:12 80:4 100:23 110:4 173:17 178:19 226:17
Started [21] 18:13 29: 15 34:2 38:17 51:10 53: 18 54:1,14 59:12 64:14 76:14 78:3 80:12 84:19 85:9 86:16 95:3 101:7 118:4,10 148:8
Starting [4] 36:13 101:12 121:1 164:6
Starts [3] 96:9,13 186: 2
Starving [1] 95:6
State [4] 1:11 3:4 71: 17 156:13
Statement [17] 11:6 64:22 126:19 187:1,4-6 197:21 203:21 204:1,3, 14,18 205:16,23 221:15 223:12
Statements [1] 112:8
Station [1] 186:16
Stay [6] 60:18 66:10 129:2 162:5 176:12 185:16
Stayed [4] 60:21 144: 15 160:22 185:18
Stepped [2] 179:13,18
Steve [1] 17:20
Stick [2] 65:12 68:11
Sticks [1] 64:5
Still [12] 11:19 21:2 23:6-7 49:17 52:17 89: 10 178:6 180:9 181:17 198:7 222:14
Stood [1] 26:20
Stop [5] 21:7 120:18 128:8 148:3 173:1
Stopped [8] 8:20-21 22:19 64:17 68:10 98:22 99:5,14
Story [1] 97:13
Straight [1] 102:14
Strained [1] 75:7
Strange [1] 32:7
Scream [1] 117:12
Street [1] 1:11 8:12
Stress [8] 4:22 11:14 14:12 29:4 69:17 222:13 226:15
Stressed [1] 71:21

Strict [1] 8:6
Strictly [1] 38:18
Strike [2] 116:8 133:4
Stroke [1] 82:6
Struggle [1] 82:1
Stuff [34] 14:8 17:23 18:19 19:13 31:17 35:2 37:12 39:2 43:22 44:16 48:11 49:1,15 56:9 69:5 71:13 72:17,20 80:10,12, 22 81:2,4 96:10 106:1 120:13 128:23 139:1 147: 8 153:19 165:5 188:8 220: 13,15
Stupid [14] 26:14 27:2 34:14-15,17 35:11 37:12 56:15 70:12 79:12 139:9 163:6
Subject [6] 100:10 110: 13,18 123:10 209:16,20
Subjected [1] 195:21
Subjects [1] 123:13
Subscribed [2] 230:10 231:12
Subsequent [1] 223:14
Subsiding [1] 40:13
Sudden [1] 75:16
Suffered [2] 227:1,9
Suggest [2] 159:14 161: 14
Suggested [1] 162:9
Suggestion [6] 103:3 158:23 159:4-5 206:2,5
Suicide [1] 133:6
Suite [1] 1:16
Summer [4] 51:10 99:11 103:1 222:11
Sunday [2] 31:7 95:20
Superior [1] 18:9
Superiors [1] 141:19
Supervision [7] 29:8 61:10-11 70:3 78:23 82: 10,16
Supervisor [59] 18:7 19:22 21:1,11,14 23:1,9, 11,15-16,19,21 24:9,20 27:9 28:9-10,12 30:14, 18 33:2,4,12,17 36:14 37:15 38:16 40:10 41:3, 7 53:11-12 56:23 57:17, 19,21 58:11,14 59:18 67: 22-23 68:3 70:4-5,14,17, 21 77:1 101:20 102:5 108: 1 109:2,10,23 138:19 159:7,9 218:14-15
Supervisors [4] 31: 13 48:18 70:7 103:1
Supposed [3] 12:12 23: 11 215:20
Surprise [3] 87:21 102:20 220:23
Susan [1] 50:16
Suspected [1] 29:23
Suspicions [1] 31:9
Swan [1] 80:14
Swear [2] 74:9 131:10
Swept [1] 198:5
Sworn [1] 3:2
Symptom [1] 5:23
Symptoms [3] 14:11 22: 22 50:22
Syndrome [2] 32:10
Systems [1] 160:7

**T**

Talks [2] 81:13 144:2
Taller [1] 108:4
Tape [1] 117:11
Tape-recorder [1]
117:10
Task [1] 208:18
Taught [1] 25:16
Taylor [4] 11:19,21 12: 7 18:1
Team [8] 70:7,19 82:19 85:21 145:22 157:4 165: 11,13
Tears [1] 180:23
Tech [1] 91:18
Techs [1] 160:23
Telephone [1] 108:5
Ten [2] 45:6 90:13
Tend [1] 128:10
Tension [2] 14:12 181:3
Term [3] 14:18,22 50:13
Terms [3] 10:11 107:15 114:3
Terrible [1] 81:7
Tested [1] 31:11
Testified [5] 130:16 208:6 211:17 222:21 223:8
Testify [6] 76:19 98:4 214:5
Testimony [1] 132:11
Thanked [1] 103:14
Thanksgiving [1] 118: 16
Therapist [2] 33:7 49: 2
Therapists [1] 50:2
Therapy [1] 9:5
Thereafter [6] 21:8 32:19 128:4,15 175:1 231: 9
Therein [1] 231:6
Thinking [5] 71:19 172:13,21 174:18-19
Thinks [3] 45:1 129:23 219:19
Third [7] 55:10 141:8 208:22 224:17,19 227:12
Third-party [1] 208: 22
Thomas [12] 39:13 59: 12 60:9 61:2,10 62:8 193:14 197:1 199:12 200: 9,13 224:8
Thomas' [1] 61:23
Thorough [2] 208:18
Thoughts [1] 117:18
Thread [1] 57:5
Threat [11] 152:7 197: 3 202:4,8,18,20 203:4,7, 9 206:19 224:12
Threaten [9] 52:20 53: 6-7 54:4 60:9 78:9 152: 13 178:2 191:18
Threatened [41] 51:2 57:3 60:16 68:19 79:4 87: 1,3 135:19 146:5,18-19 148:8,11-13,17 149:8,13, 16 151:4,7,14 152:19,21- 23 153:1 175:20 177:17 190:14-15 191:23 197:1 199:12 200:10,13 202:14- 15 208:21 224:7-8
Threatening [11] 54: 15 142:16 153:10 200:16 201:9,13 203:21 204:14, 18 227:13 228:5
Threats [11] 27:21 51: 5 98:17 134:3 195:20 197: 18 198:17 205:8 216:2 218:21
Three [25] 4:11,13-14 36:14 45:20 85:1 92:5 101:9 102:13 111:12 130: 6 152:18 155:4 158:15 159:23 160:2 167:21 168:

117:10
1 170:7,15 192:20 222:4- 5 228:13
Three-week [1] 168:1
Threw [5] 52:16 63:3, 14 69:1 221:1
Thrilled [2] 158:19 160:13
Throughout [1] 100:3
Throw [2] 62:21 132:10
Throwing [1] 75:10
Thrown [2] 62:17 64:22
Throws [1] 57:7
Thursday [3] 124:17, 20 148:23 189:2-3
Ticket [1] 220:16
Tight [1] 66:7
Tired [3] 10:2 47:23 49:16
Title [4] 186:19,22-23
Today [13] 4:4,9 10:19 94:23 98:2-3 110:15,19 118:23 122:18 194:5 211: 17 227:8
Todd [18] 189:17 190: 14 199:1,4,11,14 200:15 201:8 202:13,19-20 203: 6,19 204:1,4-5,9 224:12
Toe [1] 18:19
Together [21] 40:4 53: 20 54:1 66:13 70:1 97:7, 16 111:1,13 117:18,22 118: 11 120:9 153:15 163:3,6 164:2 177:22 180:8 182: 13 220:22
Tonight [1] 61:8
Tons [1] 94:18
Took [10] 4:10 36:22 45:12 47:14 80:8 99:17 110:21 114:18 118:1 136: 19 148:19 164:5 186:19, 22 187:1 189:3 211:7 231: 6
Top [5] 102:14 107:18 125:21 131:23 184:11
Topic [3] 44:8 125:1 132:18
Totally [2] 88:4 116:11
Touched [1] 113:20
Touchy [1] 153:18
Tough [1] 100:6
Towards [7] 51:10 55:9 56:20 57:2,10,12 143:15
Track [2] 25:10 110:7
Tracy [3] 65:7 67:9,11
Transaction [1] 160:7
Transcribed [1] 231: 10
Transcript [1] 231:10
Transcription [1] 231:10
Transpired [2] 225:23
Trash [15] 37:18 112:4 139:8 140:13 142:6,8-9 144:4-5 149:20 150:3 152: 8 185:4 223:23
Trashy [1] 224:1
Trauma [1] 11:22
Traumatic [2] 4:22 11: 13
Trazodone [5] 3:13,21, 23 5:2 7:16
Treat [1] 6:1
Treated [2] 89:10 114: 22
Treating [6] 4:20 6: 23 11:16 222:13-14
Treatment [6] 9:3 17: 7,9 21:20 57:18 58:7
Treats [1] 57:6

Tried [10] 10:4 43:20 81:21 82:1 107:13 144:10 158:23 159:5,17 208:18
Tries [1] 181:9
Trigger [3] 47:12 49:3, 6
Trips [1] 146:10
Troublemaker [1] 86:7
Troublemakers [2] 29: 19,21
True [3] 194:11 211:23 231:11
Trust [8] 41:20 42:11, 13,17 43:1 142:22 166:9 223:9
Trusting [1] 42:3
Try [9] 10:2,17 11:8 12: 21 20:9 42:17 43:8 79: 22 105:1
Trying [22] 10:5 18:7 29:2,9 30:2,14 48:18 76: 6 80:1 85:17 97:11 101: 16,21 108:13,16 155:8 169:19 205:19 207:12 212: 10 228:6
Turn [4] 8:20 100:12 144:17 156:22
Turn-overs [1] 156:22
Turned [9] 58:20 86:6 105:13 172:23 173:13,16 179:6,12
Twice [6] 41:10,18,22 48:9 169:18 193:6
Twin [3] 87:21-22 221:1
Two [39] 8:16,23 21:9 40:4 43:5 47:8 63:2 71: 10,23 74:18 78:6 80:19 84:21 85:2 95:22 113:19 117:1,21 118:9 124:3 126: 14 127:13 140:16 151:6, 13 155:23 157:22 163:7 164:13 179:21 180:8 181: 10 182:16 192:20 214:23 216:17 217:10
Two-thirds [1] 108:11
Tylenol [6] 3:18 4:4 6: 9 7:19 45:13,18
Type [11] 5:10,15 7:10 13:1 22:12 31:12 33:21 55:3 62:11 115:21 117:3
Typed [1] 116:22
Typing [1] 90:1

**U**

Unattended [1] 134:19
Unaware [1] 91:17
Uncomfortable [11] 11:7 41:21 43:19 53:13 83:5 114:3,14 192:3,7, 19 193:5
Undated [1] 216:11
Under [10] 15:9 24:7 29:23 33:20 38:1 69:17 101:9 198:5 222:18 231:9
Undermined [2] 27:5 169:6
Understood [2] 135:10 191:4
Underwriter [7] 25: 22 26:8-9 70:15 80:23 159:8 174:4
Underwriters [4] 39: 8 75:7 160:12 189:18
Underwriting [1] 23:7
Unhappy [1] 17:21
Unit [77] 24:21 25:3 26:21 28:15-17 29:12,18, 20 30:2,14,19-20 33:1 37:10 38:19 40:22 43:6 50:12 51:14,16,22 52:3 53:20 59:16 60:3,7 61:

## From Unit to Zoloft

13 70:9 76:13 77:6,8,22
78:2 85:6 86:4 90:12,14,
16-17 93:15 103:7 107:
16 111:19 132:23 134:17,
19 136:4,20 147:1,7,14
156:8 164:6,17 165:3,10,
18,20 166:1 167:2,7,12,
20,22 168:3,10,14 171:5,
8 172:19 173:4,21 175:7
201:22
**Unless** [3] 100:5,12
105:5
**Unsafe** [1] 193:5
**Up** [77] 12:10 17:23 18:
5 20:5,8 29:15 32:7,9-
10 39:23 54:9,15 61:7
64:20-21 65:12 66:14 69:
4 71:14,23 72:1 73:8,22
75:18 79:7 80:11 84:11
86:9 95:8 100:4 102:1
103:15,17 105:22 113:16
114:16 129:12 130:17 132:
10 135:2 142:7-9,11,17
144:6-7 146:18 148:9,17
149:17,21 150:4 152:9,
11 153:9,16 158:20 159:
18 160:13 163:20 169:6
173:15,17 175:20 178:23
184:8 187:7 191:5 197:4,
6 212:10 219:21 221:6
224:21 228:6
**Upset** [11] 18:16 19:4
26:22 155:8 170:20 179:
11 180:22-23 182:3 211:
6,9
**Upsetness** [1] 210:15
**Upsets** [1] 46:23
**Urgent** [2] 124:7 125:10
**Usual** [1] 189:4

### V

**Vacation** [2] 189:6,8
**Valuable** [1] 91:11
**Value** [1] 71:22
**Various** [2] 118:21 161:
11
**Varn** [9] 22:2-3,11 83:
8,18,21 84:2
**Vegas** [1] 32:9
**Vehicle** [1] 8:13
**Vent** [2] 181:12,14
**Vented** [1] 210:16
**Verbal** [1] 171:2
**Verbally** [1] 66:18
**Verify** [1] 119:19
**Version** [2] 127:8 216:
13
**Versions** [1] 127:17
**VERSUS** [1] 1:5
**Vicinity** [1] 90:12
**Vicious** [2] 66:14,17
**Viciousness** [1] 210:
16
**Victim** [2] 82:6 193:18
**Violence** [17] 47:13
48:23 49:2,5 52:20 53:6
60:10,17 79:5 87:2 134:
4 152:14,20 153:20 178:
2 191:23 197:2
**Violent** [3] 98:13-14
193:18
**Visit** [1] 13:23
**Visiting** [1] 32:8
**Vita** [5] 199:3 200:12
201:6 204:17
**Vivid** [1] 117:14
**Voice** [7] 80:4 86:1 95:
21 138:16 173:9,14 220:
16
**Volunteered** [1] 101:6

### W

**Wacker** [1] 1:15
**Wait** [17] 13:3,6 25:22
44:20 106:12 144:22 153:
8-9 176:3 178:21,23 184:
4,8 213:10 227:4
**Waiting** [4] 48:1,13
185:6 224:3
**Walk** [2] 100:18 107:22
**Walked** [6] 18:16 26:1
27:2 102:20 147:6 170:11
**Walking** [1] 26:4
**Wall** [1] 104:20
**Wants** [4] 80:4 94:21
129:21 157:8
**Ward** [1] 67:10-11
**Warm** [1] 39:3
**Warned** [1] 164:4
**Wash** [1] 40:20
**Waste** [1] 75:21
**Watch** [2] 49:2 129:10
**Watched** [2] 48:7 49:4
**Watching** [3] 20:12 48:
6,12
**Wear** [1] 18:17
**Wednesday** [1] 124:19
**Week** [44] 13:6 31:6 55:
10 63:10 75:9 86:22-23
88:23 89:12 92:2-4 98:9,
18,20 99:13 100:4 103:
23 112:10 124:16 140:22
142:5 148:20-21 149:7,
18,22 150:1,9 151:9,17
164:22 168:1 189:5 200:
17 208:8,11 211:5 226:
18,20 228:16 229:1
**Weekend** [1] 135:14
**Weekends** [2] 25:8 102:
13
**Weekly** [1] 12:1
**Weeks** [6] 9:16 47:9 63:
10 108:12 129:18 167:21
**Weighed** [1] 188:5
**Weight** [15] 85:21 89:7
91:12,15,18,21 92:6,16
93:8,20 157:5 188:2,9,
11,13
**Weinberg** [7] 5:9-10,
15 6:1,10 7:14 9:3
**Weird** [3] 43:11 48:14
73:10
**Wendy** [1] 67:14
**Wheeler** [2] 219:23 220:
1
**WHEREOF** [1] 231:12
**Whispered** [2] 137:10
139:21
**White** [30] 24:12,14,16-
18 37:18 43:7 53:9 76:
11-12 79:18 112:3 139:8
140:13 142:6,8-9 144:4-
5 149:22 150:3 152:8 181:
5 185:3-4 219:7 221:12
222:5 223:23 224:1
**Whole** [12] 30:2 51:6-7
67:17 93:2 116:19 125:1
169:6 200:6 217:4 220:11
224:10
**Wilgoren** [53] 1:18 4:
3 5:12 15:7,17 30:9 44:
2,7,13 45:3 46:1 51:23
76:19 83:13 84:4 95:13
97:21 98:1,5,23 99:3
120:18 121:1,6,9 127:10,
14 130:15 176:3 181:22
182:6,14,16 183:9,11
187:4 194:20 205:17,21
206:12 213:7,10,13,15
214:7 216:5,11,21 217:5
225:5 226:10 229:6

**Wilgoren's** [1] 225:8
**Williams** [15] 39:14
70:17 84:18 86:17 87:1
89:1,12 150:2 193:10 200:
16 201:9 204:14,18 209:
23 221:22
**Win** [1] 74:15
**Winner** [1] 95:2
**Wish** [1] 157:7
**Wished** [3] 115:3 157:
10 221:2
**Witness** [30] 1:8 2:2
10:20 11:3,11 15:8 30:8
44:5,12,14 45:1 68:5 76:
17 81:14 94:3 97:22 99:
2 120:19 121:8,21 128:
13 182:1,18 199:9 200:7
214:11 216:15 227:7 231:
5,12
**Witnessed** [4] 67:12,
22 68:4 198:17
**Witnesses** [8] 67:8
132:1 198:2 204:21 205:2
207:7 224:10-11
**Woman** [12] 50:15 63:6
66:5 78:8 83:19 85:23 89:
6 187:23 210:12,14-15
219:17
**Women** [4] 38:5 49:8
143:5 147:21
**Wondered** [1] 141:16
**Wonderful** [1] 35:3
**Wood** [2] 65:7 67:9
**Worcester** [1] 1:19
**Word** [9] 51:8 116:4 157:
12 223:19,21
**Wording** [1] 116:1
**Words** [4] 78:13 139:5
197:3 207:21
**Worker** [9] 11:21 35:4-
5 56:9 61:13 159:21-22
162:4 220:1
**Worker's** [1] 19:8
**Workers** [1] 156:23
**Workplace** [20] 14:13
17:15,17 108:22 109:3,8,
12 110:14,18 114:18 115:
4 133:14,21 134:13 196:
6 215:15,23 216:2 217:
18 218:10
**Worse** [3] 46:4-5 51:10
**Worst** [1] 179:9
**Wright** [19] 30:10 37:
11 125:20 126:9,16 166:
22 167:16 168:2 169:3-4,
8,12,16 198:13 199:1,15
200:19 201:12 202:13
**Write** [1] 116:8
**Writing** [6] 18:11 109:
4,12 110:2 185:12 231:8
**Written** [6] 72:7 96:7,
16 116:10 174:4 186:7
**Wrongful** [1] 71:13
**Wrote** [6] 97:10 110:5
116:5 133:17 134:23 213:
21

### X

**Xanax** [6] 13:14,16 16:
3-4 17:13 22:19

### Y

**Year** [24] 5:21 16:4,23
20:16 23:12 33:16,23 34:
1,4 67:19 72:1 73:23 74:
20 76:17 84:20 85:2 92:
22 96:12 120:14 126:12
205:5 211:20 212:21
**Years** [30] 23:20 35:5
53:21 59:15 63:2 71:9,
11,23 73:11 74:19 78:6

83:10 84:21 85:1,3 90:
13 92:1 103:14 113:20
147:8 154:10 155:4 177:9
214:23 216:17 217:10 219:
11
**Yesterday** [1] 172:19
**Yourself** [9] 29:17 46:
8 94:17 97:2 110:10 122:
11,20,23 175:16

### Z

**Zoloft** [3] 3:19 6:21 7:

A grid on the left contains:
- Doris
- Barbie
- Grace | Shauna
- Bernadette

A grid on the right contains:
- Lisa
- Ernie | Judi
- Jackie | Margaret
- Abbi | Bob

AISLE

EXHIBIT
#1 BConnick
9/1/00 EMB

1. Friday, August 20th 1999 (my day off) I phoned my boss Abbi from home. I had a serious issue that concerned me involving the unit of Commercial Mass Auto, I asked that my phone call to her be kept confident, I asked her not to mention my name during the phone call, or to let on that I had called. I knew that if she didn't keep this confident my situation would worsen. I did not discuss the issues at hand only to say that it was important that I meet with her. I told her that I did not want to meet anywhere on or within the premises of work, I did not want my co-workers to see me meeting with her that would make things worse and I was afraid of what would happen. Also the issue was very upsetting to me and I did not know if I could keep my composure and I did not want to leave a meeting with her all upset and then return to work. My safety had been recently (within the week) threatened by that of a co-worker Shauna Williams through harassment with racial slurs that took place with that of another co-worker Grace Clemetson (both African Americans). I had at this time already been harassed by their friend Greta Thomas also African American (an employee in another work area). The situation was hostile at the time and I feared for my life. I asked her if we could schedule such a meeting, I realized she was busy but I asked her to make it as soon as possible. She said she would get back to me; (I hoped she'd call me at home with an appointment first thing Monday morning). By Monday August 23rd at 12:30 p.m. we had scheduled a meeting for Thursday August 26th 1999 at The Fours at 12:45 p.m.

2. On Thursday August 26th 1999 the meeting was delayed till about 2:00 or 2:30 p.m. We met at The Fours. I proceeded to tell Abbi that I felt very badly about what I had to tell her but that I had no choice and that she needed to know what was going on (my job was being affected). Before I had called Abbi the prior week Friday August 20th I had spoken several times (including that day the 20th) with Jean Boudreau a friend and worker in another area (also a friend of Abbi's). Jean knew what was going on. She knew that the situation had been stressing me out, and had told me that I had to speak to Abbi. I told her I felt so bad having to tell the boss such a thing and Jean said Abbi had to know. Jean also assured me that Abbi would appreciate knowing what was going on. Jean said Abbi knows that there are problems in the unit but that no one would be straight with her. (Everyone acted like things were "just ducky" in front of the boss, but behind her back things were different.) Jean said that Abbi would appreciate me coming to her and that made me feel a little bit better. When I met with Abbi, I told her that there was a serious racial issue in the unit. I told her that approximately a week earlier Shauna Williams (an African American co-worker who sits behind me) had stated to Grace Clemetson (another African American co-worker who sat beside Shauna) that I was white trash, and that they could get Heather Gill (another African American employee no longer employed as of June 25th '99) to beat me up. Shauna's words were "White trash, white trashy bitch, we'll get Heather to beat her up, Heather will have no problem beating her up." At the time I was really afraid and I wanted to say something to stop these women, but I was shaking and I knew they had no respect for me as their co-worker. This had happened shortly after a conversation I had with Ernie Goddard (another African American employee). Ernie had asked me why I don't come in on Saturday's anymore to work overtime. He said "How come you don't come in on Saturdays any more to work overtime, you used to always come in on Saturdays." This was true and



EXHIBIT
#2 B. Daniel
7/11/00 Ends

Lw/o
of
Aug
99

his question frustrated me because my workload is heavy and my desk could use a good 8 or 10 hours on a Saturday to get ahead. I responded to him (with much frustration) "The reason I don't come in on Saturdays is because Grace and Shauna talk (personal talk) all day and Shauna is on the phone all day with personal phone calls." This causes much disruption to my work throughout the week as it is. And since they both come in on Saturdays as well, I told him that I was not going to come in on a Saturday (my day off) unless I could do so without interruption and with productive results. Because without such it only created more frustration and I couldn't get anything done, thus defeating the purpose of being at work on a Saturday. Ernie is a long time co-worker and a friend and I thought that he would understand my frustration he has always seemed to be (like myself) a dedicated and loyal employee. I didn't realize at the time that he had become very close to Grace Clemetson (closer than just work peers, he was "involved" with her.) I was told this after the fact from several peers. Ernie told Grace and Shauna or he told Grace and she told Shauna what I had said and then on the same day almost immediately the threats were made. This sort of talk made me very nervous and frightened. They continued the harassment and several times that day I would have to leave my desk to get away from it. I knew that Ernie had caused this and so the very next day first thing in the morning I said to him "Don't ever do that again", (he knew what I meant). I said "You asked me a question and I answered you and you had no business telling the source it only created problems." (I don't know that he realized at that point to what extent his doing this had caused). I told all of this to Abbi. I also told her that on June 24th 1999 during an accounting "good bye" party Greta Thomas another African American Employee from another area (also a friend of Grace and Shauna) had made a very aggressive statement to me referencing a physical fight. I was with Louise Grover (a mentally challenged employee), helping her get a plate of food at this gathering. Greta was staring "hatefully" at me for us being there. I asked her if there was a problem (with me helping Louise get some food). She responded with serious aggression in her voice and on her face "What do you want to beat me up right here, right now?" She was actually trying to provoke a fight. I was stunned, as were the people around the area who heard it, I think that people thought that a fight would actually break out from the looks on their faces. I didn't know what to say I responded "No, I don't want to beat you up!" with much confusion in my response, (I don't beat people up nonetheless, what was my reason?) The whole statement was "dumbfounding". I didn't know where it came from. I don't work with Greta. I've never spoken to Greta and I hardly even know her. I told this all to Abbi. I referenced to Abbi a time back in the spring of '99 when Abbi was sitting at my desk with work. At the time Grace's friends Heather and Greta would gather at Grace's desk and eat lunch while discussing demeaning and derogatory comments about me and other members in my unit (putting us down). I pointed it out at the time to Abbi. It wasn't just that they gathered in the unit and talked distracting me from work, but that they talked about myself and Lisa, and Doris and Gina all members of the unit and it was all derogatory. Grace would refer to us as "stupid, stupid people" etc. and put us down. Greta would sit in the empty desk beside me while grace was putting me down and Greta would nod her head towards me and say "who this one here, ya ya uh-ha uh-ha" referring to me right in front of me and they would carry on. Heather

would be saying, "Dumb bitch, that dumb bitch." I pointed it out to Abbi when it was happening one day. And I said to her "See this is what I have to listen to while I'm trying to work and it's very distracting; Why can't they take their lunch somewhere else especially since all they do is talk about individuals in this unit?" I told her that it was very bad for moral and that I found it very offensive. (I had mentioned this to our prior Manager Laura Nicholas about a year or so earlier than this time. Laura did not address the issue, only to suggest that I mention it to them myself and ask them to stop. I knew that this was not an option, they had no respect for me and would have laughed in my face.) Abbi said that she would speak to them about it. I never knew if she had spoken to them about it until our meeting August 26ᵗʰ 1999 when I asked her if she ever had. She responded that she did, and I told her that that very same week when she was in Orlando Florida after she had spoken to them they continued to do it anyway. They had no respect for management or their authorities and they certainly had no respect for me as their co-worker. I said to Abbi as I told her this that I feared for my life with these women. I told her that I was afraid that if they knew that I was telling her this that they would "come after me", or if she was to dare bring this up to them (without it being her own discovery) they would again "come after me". I was in my own way asking her to try and observe some of this behavior on her own and address it or try to correct it. At the time I told her that Shauna was actively looking for another job on a daily basis and that I hoped that soon she would be gone on her own. (Shauna seemed to be the instigator and if she left the company and there wasn't as much "strength in numbers" my problem with Grace and Greta would hopefully minimize or diminish.) I told her that Grace and Ernie had a bad habit of discussing peoples' errors and mistakes amongst each other and amongst their friends yet not at all in a constructive way with the party at fault. I told her I thought this behavior was wrong, and that if a person found an error; it was up to that person to let the party at fault know, but to do so in a constructive way. Perhaps they weren't aware that they had made the mistake, or how the work is properly done. Also people are sensitive and by no means should someone's work be paraded around the office and made fun of, again it's not good for moral and I find it very offensive. (Part of my job function is the I.S.I. error report both in Underwriting and in U.B.S., with this responsibility part of my job is to address my peers with their errors, in an effort to proceed with the job function from that point.) I told Abbi that it is imperative as to how to approach an individual with his or her fault, because people are very sensitive and some of them extremely job conscious. This was an issue I wanted her to reference to the unit in a meeting and to put a stop to it. I had once asked Grace not to do that (when she was discussing with my work with a peer), and that I thought it was disrespectful and she responded "I'll say what I want to whomever I want, it's a free country!" At this particular time Grace told me "I trust only my own people." At the time, I tried to tell Grace that she shouldn't feel like that, that there were a lot of very good employees within the company with whom she could have a great deal of trust. I also told Grace that it's a shame she felt like that because her opinion about her peers was wrong. I told Abbi this and that her "trusting only her own people" made me feel very uneasy. I told Abbi also that when she was not present in the office it was like a "three ring circus". And that some of my peers could not be trusted to work unsupervised, also that it is embarrassing to be

3

in a unit that displays such behavior and disrespect for its' authorities. I told her that there were some very sneaky people in the unit. She told me that she had been told by outside underwriters (people who work within the vicinity of the unit) several times that the unit was out of control when she left it unattended. I told her that I had a lot of respect for the company and that there isn't anything I wouldn't do for anyone in my unit, but that I didn't feel I had the same cooperation from several of my peers and I felt that that was wrong. I told her that people within the unit didn't know how good they had it, and that they were taking advantage of her (undermining her) just as they had done to our prior manager Laura Nicholas. I told her that the unit was "out of control" and she said that I was exactly right, the unit was "out of control". This was very hard to accept because as of August 20th '99 several "good" employees had been let go as the result of relocating job responsibilities to the state of Florida. I said to Abbi, "My God so many good employees, people that I have worked with for years lost their jobs and some of the people in this unit don't know how lucky they are." (Several people in the unit are miserable and are sending out a resume everyday.) "All they do is complain that we may not have jobs if Commercial Mass Auto is moved to Florida within the next three to five years, thereby leaving them not committed to their jobs." I said to her "As long as they are employed by C.N.A., they still have an obligation to this company. And if they are so miserable, than why don't they leave and give the rest of us a chance to work with someone who wants the job and will be committed to this department and to this company?" Shauna for one had been complaining on a daily basis referring to the work as "garbage, pure garbage", saying that she inherited the work in that condition. This alone was upsetting because even though the woman Bik Lee (a Chinese woman) who did her work before had now left the company, she was a very dedicated employee and I had a lot of respect and admiration for her dedication to hard work. Our meeting ended after about two hours and I apologized for having to take up her time with such a meeting. But I stressed to her that she had to know what was going on (with me in particular), because I feared for my life and it was affecting my job. And I hoped that in some way (without them knowing that I told the boss) Abbi could put a stop to it. I begged Abbi not to let them know that I had told her this, but I stressed to her that something had to be done, though I didn't know what.

3.  A week or so around this time (the first week in September '99), the department was being restructured as was the entire office (due to the huge layoff). I was not moved so I don't remember the date. Some people (processing folks) were moved into the area and other desks around the area were now to be occupied by some of the underwriters in other areas of work (Business Accounts, Custom Accounts etc.) but not Mass Auto, we only have one underwriter Bernadette Joyce. Grace was to be moved out of her seat, therefor to be occupied now by an underwriter (outside of the team). I was thrilled to see the two of them split up (Grace and Shauna) because all they did was talk all day and this was such a distraction to me. Also, the workers who were to move in next to me were serious "dedicated" employees who did not "talk" all day, and I knew that that would make my job easier to concentrate on. The existing people immediately around me (with the exception of Shauna who was actively looking to leave the company) took their jobs seriously and (were like myself) "buried their heads" into their work. I like working amongst people with

4

such habits, together we worked well. Just prior to the move, Bernadette Joyce the underwriter (a friend of Grace's) tried to make the suggestion to move my desk and put Grace into it (she didn't want Grace to move far from her). I couldn't believe this (coming from a woman in her position who should know better), all Shauna and Grace did was talk all day; the worse thing they could have done was to put them together. Bernadette tried to get Doris (the Chinese woman who sits in front of me) to agree with her and to push the onto Abbi. But Doris thought the same thing that I did (Grace and Shauna talk all day and they are distracting) and besides she knows that her and I are dedicated "good" workers and we work well in each other's company. (I respect her peace to do her job and she respects mine as well.) At that Doris made it clear (to Bernadette and to Abbi also), "Barbie is a good worker, if you move Barbie, you move me too." When Doris told me this, I went to Bernadette and I said to her "How could you suggest to put Grace into my desk thus keeping her in close range with Shauna?" "You know that they talk all day and they don't work." Bernadette denied that such takes place. I couldn't believe it, there was no way that she could not "hear" the distracted behavior that went on all day between them, I realized that she was denying it because she was their friend. I then went to Abbi and I said to her "Please don't move my desk Abbi." (I thought that Bernadette Joyce would have perhaps convinced her to do so.) I told her that I work very well with the people who surround me, they all "bury their heads into their work"(with the exception of Shauna). I told her that it is important to me to work within this vicinity of quiet workers who take their jobs seriously and respect their surrounding peers in reference to the work. Also I have a lot of job interaction with those particular workers (due to the job function) with whom I sit amongst. (I also was hoping and praying that any day now Shauna would give her notice and be gone soon, she certainly had been applying to a lot of places for a new job, and I thought that something would break for her soon and that she wouldn't be there long. She was obviously miserable, she complained all day.) Abbi said to me that she had no intention of moving me, only the ones that had to be moved were the desks needed to make room for other/employees. I told her that I really liked where I sat particularly with reference to "doing the job". At least it was a great place before "disruptive" Shauna moved in, but I thought that since her and Grace were separated and the fact that Shauna would probably soon be gone, my problems with them were soon to subside.

4.  The following week on Wednesday September 15th 1999 we had a unit meeting. Abbi addressed some of the issues we talked about in out private meeting (but she did not disclose that we had met). She talked about correspondence with peers' errors and the proper way to handle it. Shauna (with her innocent act) asked if employees should bring their peers' errors to Abbi's attention. Abbi said NO, that she did not want to hear about employees' errors, unless there seemed to be a problem with a particular individual. At which point you were to speak to the individual first (constructively) and with sensitivity and then if, and only if there continued to be a problem with an individual and the problem was not being corrected, would she then have to be made aware of such. Even after she said this, Shauna (with her innocent act again) questioned if she should bring all errors to Abbi (again making like she didn't understand the question). Poor Abbi had to repeat everything she had just said.

5

She was trying to teach them how important it is to be a "team" and to work together and that the goal was to win the game (so to speak). She said there is no "I" in the word "TEAM." Also in the meeting Abbi stressed that when told by management to distribute their work amongst their peers (in an effort to get the job done in a more timely manner because of too high a work load), that she expected them to do such. This they did not like to do because they did not want any one else to see their errors. They all think that they are perfect and that they don't ever make errors. However this is not true, everyone makes errors, and I correct their work all of the time. However to abate this issue, they used the excuse that certain people could or would "sabotage" their work. Lisa Wright (a co-worker) said what I had on my mind, "Who in God's name would do such a thing after all we are all one company, any one's fault is a reflection on the company as a whole!" I was highly insulted I said "I for one have to touch everybody's work and I would never dream of doing anything of the sort." At the end of the meeting (after if broke up) a new girl Karen (I don't know her last name) said I never saw such a bunch of babies. (She was referring to all of the African Americans and Bernadette Joyce) who sat together in the back row "bucking" Abbi on everything she said). Karen said, "You'd think that Abbi was talking to a bunch of 'kinder-gardeners', she had to repeat everything twice." Lisa Wright responded "Don't you get it, they didn't like the answer." They terribly undermined Abbi in the meeting, it was obvious and Abbi even said that at a later time to Lisa, referring to "the ones in the back row", I think she was disgusted.

5.  On Thursday September 16th 1999 (the next day), at about 7:45 a.m. Ernie Goddard was standing towards the back of the unit two desks behind me. Abbi was seated to the right of him and Bernadette Joyce was seated to the left of him he was discussing a file with Bernadette and he was referring to something done wrong in the file. He was saying "These dummies in this place, dummies, dummies in here!" Doris and I both heard it and we were angry. Doris said to me "Do you hear him back there, listen to him." (Abbi had just addressed the unit on this issue yesterday.) I turned around and said to him "Stop calling your peers dummies, it's rude and I don't want to hear it!" " 'I don't care if it's me or her or her or her," and I began to point around me randomly. "It's rude!" I said, "and you guys do it all the time." Abbi responded / Barbie's right, there'll be no name-calling. The underwriter then said "I don't do it all the time." And I said, "I didn't say you Bernadette." (When I said "you guys" I meant it to Ernie and he knew what I meant because he and Grace did it consistently.) I went back to work, shortly thereafter I went to the file room to pull a file and there right in front of the entranceway was Ernie telling all of this to Shauna. She hadn't even made it to her desk yet. She had just come into work. I knew what he was doing because she looked at me with "hate" in her eyes. I was angry with him and nervous about her hateful reaction to such. I couldn't believe he was gossiping to her about this after what happened the last time he did this. I looked at him and I said, "You should be shot!" I meant you should be ashamed of yourself. The last time he gossiped to her she threatened to have Heather Gill beat me up and I had told him never to do that again. He then said pointing to me "You stay away from me!" He was mad at me because my reaction to his insults caused the boss to address him on such. But I couldn't believe that he was doing this (insulting his peers) after being addressed and reprimanded on this the day earlier in a unit meeting. I went into the

file room to pull my file and returned to my desk upset. Shauna now seated behind me began to say "Wait till Grace gets a hold of this, she's going to be all over you." "She's going to rip you up!" "Oh you just wait!" Grace was not yet in work for the day she starts later, closer to 9:00 a.m. I was so upset I turned around and Abbi saw there could be a fight so she stepped in before I said anything. (I wanted to ask Shauna to go into a conference room and try to resolve this before it went any further) but Shauna was ranting and raving, threatening me with Grace. Abbi then came to my desk quietly and asked to speak to me in the conference room. She now was well aware (since our private meeting on Thursday August 26th 1999) that this woman hated me and now she was seeing it for herself. I went into conference with her. She told me how important it was that I not let Shauna upset me on the floor to the point where I could lose my job by possibly saying something out of line. She said that if a fight broke out, that it wouldn't be between black and white, but that we would both get fired and that she wouldn't have any choice in the matter. She stressed to me that I was a good employee (she was holding back tears), she begged me not to let anything get out of control on the floor. She said that she didn't want to see anything happen to my job and that she valued me as her employee. She told me at that time that if she starts anything with me to "don't let her provoke me" to just get up and leave my desk. She said "I don't care if you go for ½ hour, an hour, two hours, just don't let her cause you to lose your job." She said that if I needed to vent to come get her and vent on her, just don't let Shauna "ruin me". I was upset I said to her, "Abbi this was between Ernie and I." "What business was this of Shauna's?" "And Grace wasn't there either; it had nothing to do with Grace. Why is Shauna threatening me with Grace?" Then I said to Abbi "And Bernadette proclaiming innocence, when she replied "I don't do it all the time." Abbi I said "She's just as guilty for letting Ernie talk like that, downing his peers." "Didn't you just address this yesterday in a unit meeting?" I apologized for all of it I felt so badly that this should happen to her as our Manager, she is a good Manager and a wonderful person, but she knew the situation and she felt just as badly, I could tell by how upset she was. We were in the conference room for about ½ hour. When I returned to my desk, she called Shauna into the conference room they were in there all but 5 minutes. Shauna came out returned to her desk ranting and raving again to me "You wait, You just wait"! She was really angry. Abbi was not around now, she hadn't returned to her desk and within seconds Shauna was on the phone saying to someone "I'm going over Abbi's head on this one, I'm gonna go see Charles" (He's the head of personnel, and also African American.) she was "cussing" the boss. Then she said "And this white trash bitch that sits in front of me, white trash bitch, I'll have her taken care of, I'll have someone waiting in the garage for her, and you know who I mean!" to the third party on the phone. It was as though whoever she was talking to knew (between the two of them) they had a mutual friend that would in fact "take care of me" for her. I was shaking and trembling all over my left arm was jumping off the desk so high and I couldn't control it, and the more I shook the worse it was (for me) for her to see me in such a state. Inside I was thinking how badly I wanted to be able to say to her "You're not scaring me!" "I'm not afraid of you!" But I was so scared I knew that even if I could have said that (hence following my managers advice not to), nothing would come out! I could not for the life of me even in my wildest dreams stand up to

her. I was so petrified and she had to have seen me shaking. Never ever in my life have I been I such a situation where I thought I would be killed (murdered), never in my life have I shaken like such. I jumped up from my desk I felt like I was running for my life, like she would do something right there. I ran for Abbi, "petrified" it seemed like it took me forever to find her. She was on the floor in another area but I felt like I needed to find Abbi before Shauna found me. I must have looked like I had seen a ghost because when I found Abbi, she just knew there was a problem. I think I was hyperventilating when I found Abbi. I pulled her away into an area where there are few or no people to hide from Shauna so that I could tell her what happened. Abbi began to get extremely nervous when I was telling her what had happened. Abbi was asking me where I was parked in the garage. She was asking me if I thought she should walk me to my car. She knew I wasn't allright. I told her that I was parked right outside the door because I come in at 6:30 a.m. and there is a camera right there at the door. At that point I drew a "blank" and I can't remember what happened or how long it was before I was in personnel. I think Abbi said, "Alright wait here," because I remember her leaving me alone. The next thing I remember is that I was being called into personnel from my desk phone by Abbi. She asked me to come to the Branch Manager's conference room. But I don't even remember what happened from the time we were hiding on the other side of the office to that point; I don't remember going back to my desk, but that's where I was when she called me, (I drew a blank). We went into the Branch Manager's conference room and Charles Edwards (head of Personnel) was on a conference call he had been in Farmington Connecticut. She must have gotten the Branch Manager's secretary Gladys Kwash to get a hold of him on the conference call. I went into the room and I was very nervous still shaking, I remember it seemed frustrating to not speak with Charles in person. He asked me what was said, and I told him. He said that this was a very serious situation. He said that her calling me "white trash" was no different than me calling her the "N" word. He asked if I knew why she would do that. I told him that I didn't know why. (I had never even had "words" with Shauna the only thing that I could think of was that I knew (or I suspected) that I suspected that she hated the fact that I was good friends with Jackie Offut an (African American) employee who no longer worked here. (Jackie was the best, and we got along like sisters, she was probably one of my favorite co-workers in fifteen years at C.N.A. Before Jackie left the company, Shauna seemed desperate to be her friend and I loved Jackie and the response I got from Jackie was that she felt the same. I always told her that she should get the "best all around" award, if there ever was such a thing. She was loyal, dependable, dedicated and a great co-worker. She was just "adorable". I always felt that Shauna hated our relationship. Jackie used to always say to me "Hey you girlfriend, what's up!" almost daily. I used to get vibes that Shauna just hated our good relationship. But I loved Jackie, I couldn't let Shauna's disapproval for our relationship ruin what Jackie and I had together as friends she was one of my favorite co-workers. Charles told me that Jackie's and my relationship was irrelevant. He asked me if she had ever made such threats before. I told him of the time that Greta Thomas (her friend) made the comment to me (trying to provoke a fight) about "beating her up right here, right now!" at the accounting party in the office in June. And I tried to remember the third time and I drew a blank, (it was the time she called

me "white trash" again and threatened to have Heather Gill beat me up). I looked at Abbi and I said you remember Abbi, I told you at our meeting." I was so upset I couldn't even think straight. She then said to Charles "You remember Charles I told you about that." And then she told him that I was all shook up. He asked me if any body would have possibly heard this threat from Shauna. I said that the only person who was possibly within hearing distance beside myself was Todd Stansbury an underwriter who sits beside her. But Todd is a diligent worker and he is always engrossed into phone calls with his work. I said, "Chances are he didn't hear it because he was probably on the phone." I said to him "Charles what am I going to do?" I told him "I fear for my life!" I said "We work with the Mass. Registry of Motor Vehicles, and she can find out where I live she can access a lot of my personal information", (what I drive, my license plate, my social security etc. and possibly do some damage as well). He then told me that for my own safety I should leave work now and go to the Police Station in my home town to report this. He advised me to stay out of work the next day (Friday September 17th this was my day off anyway). He said that that was good. I told him that my husband and I were going on vacation the following week so although I was safe from being in work, I was worried that she would cause damage to my home. He told me to have the police check my home while I was away. He then said to me that he wanted to call her in and confront her with this, he said "Do you feel alright with this?" I told him again that I was afraid and that I feared for my life. I was worried at that point of retaliation and I didn't know what to do. I wanted to call my husband and tell him about this and ask him what I should do. I felt "helpless". Though I knew I would have a hard time reaching him I knew his work would have his hands full, hurricane Floyd was now pounding the Baystate and the weather was horrific. I just didn't feel safe at all. Charles then said that he wanted me to give them a few minutes. They were going to call her down and he wanted me to go to my desk and just grab my pocketbook shut down my computer and leave the building while they had her in the conference room and go right to the police. Abbi said that she would call me at home later that day. As I left the conference room and headed for my desk I must have looked "still" like I'd seen a ghost. Three women (two of them co-workers) Doris Chan, and Maura Capplis and Jean Boudreau all saw me come out of the conference room and towards the unit, and they knew something was wrong. I tried to go quickly but they wouldn't let me be. They knew that whatever had happened it must have been bad. Jean Boudreau (who knew about the prior threats and racial slurs) knew something had happened, and I told her quickly "My life's been threatened!" I said "Charles is sending me home, and she's down there now, they're talking to her now and they want me to leave." She said "Do you want me to walk you down to the elevator?" I said, "There's no time I've got to go." "I've got to go now." I just wanted to get the hell out of there I was in a panic. I kept saying, "I've got to go." Doris Chan and Maura Capplis were following me saying, "What's wrong? What's wrong? As they followed me to the elevator I told them quickly "My life's been threatened." they said "Oh my God!" and they jumped onboard the elevator to be sure that I was safe out of the building. I drove away from the building, thinking at the time to go right to the Quincy Police Dept., but the weather was so bad and Charles had told me to go to the police in my hometown. I figured that probably when I got to the Quincy Police that they would

tell me to go to the Hull Police. So I drove straight to the Hull Police Station. It was pouring in sheets and I was soaked. I told the Hull Police what had happened and they told me that this had to be reported to the Quincy Police Dept. because it had happened in Quincy. But they took my name and address and the information and said that they would have a cruiser frequently drive by my house and check on things, but in the mean time to go home and call the Quincy Police Dept and report it to them. I came home and tried to call my husband. I also called Todd Stansbury at work, (the Underwriter who sits next to Shauna). I told him what had happened, and I told him that I told them (Personnel) that he (Todd) might have heard her say it. He said that he didn't, and that he was probable on the phone. I said "I was afraid of that, and that's what I told them, was that I thought that you probably didn't hear her." I told him that they might call him to Personnel and ask him anyway. I then called the Quincy Police Dept. I spoke with a woman police officer I think her name was Rebecca. She urged me to get in and report this, I told her that the road conditions were so bad and that I had just driven from Quincy to Hull. I told her that I was so upset and shaking that I was afraid that I would "wreck" if I tried to drive back to Quincy from Hull. She put the call through to her Sergeant, Sergeant Doherty. The Sergeant took my information including the company information. He urged me to have my husband bring me up to report it in person when he came home that night. And in the meantime to contact the Hull Police and let them know that I had had frequent threats made on my life and to have them do frequent checks on my home. I told him that I had already reported it to them and that they urged me to call Quincy and that they would check on my home frequently. I asked him what was going to happen. I was afraid that a Police Officer was going to go to the building that day and that this would result in some retaliation. I was afraid that involving the Police at all would result in retaliation from Shauna. I didn't know what was going to happen. Sergeant Doherty said that I needed to come in and file for an application of complaint with the availability to withdraw at any time without prejudice, pending C.N.A.'s effort to resolve the said matter. They said that it was the company's responsibility to do something to resolve this matter and that they (the company) could not let it go unattended. Later that day my boss Abbi called me at home. She asked me how I was. I said, "I'm a wreck Abbi." I told her that I had gone to the Hull Police Department but that they told me that I had to go and report it to the Quincy Police Department. I told her that I had called the Quincy Police and had put the call through to the Sergeant Doherty who took my information and said that I had to come into the station to report it. I said "What am I going to do Abbi, I can't believe this!" Abbi said that she thought that everything would be all right. I asked her "Should I be very concerned?" She replied that "If it were me Barbie I would be very concerned." She declined to tell me about the meeting with Shauna and her response to their question, and I was reluctant to ask because I didn't want to know the answer. I didn't want to know the possibility that she had denied it. My poor husband didn't get home that night until about 10:00 p.m. that evening. The bad weather had kept him at his job till then. He was on the roof of the building in the storm repairing something all day, yet at 10:00 p.m. when he walked through the door, he had a dozen roses for me; it was our 10-yr. Wedding anniversary. I told him what had happened in the short time we had together before we went to bed, at that he didn't know what

to think. He told me to make sure that I go to the Quincy Police Dept. the next day to report it.

6. Friday September 17th '1999 I was afraid to go to the Quincy Police Station. I was so afraid of retaliation from Shauna. When my husband got home I told him that I was afraid of the police getting involved. The more I thought of the police involvement, the more frightening situations (of retaliation) ran through my head. He was upset that I didn't go to the police station at first but then when I explained to him why, and he understood. But he said "Barbie we have to report this. I told him that I needed to know what was going to happen if they got involved and I said "I'm such a wreck over this!" I told him that I wasn't "thinking" straight and that I didn't want to walk away from the Police Dept. and forget to ask them something important about relation to this. He said that when he came home from work on Saturday that he would take me to the police station and report it with me. That night I phoned the Quincy Police Dept. I spoke with Sergeant O'Brien. I told him of the issue and that I was frightened and reluctant to go to the police. He said that I really had no choice and that I had to come in and report it. I told him that I would be in the next day with my husband.

7. Saturday September 18th '99 when my husband got home from work we went to the Quincy Police Station. Immediately they asked "Why the two day delay?" I told them that I was afraid of retaliation. I apologized, I said "I know that the police are here to protect you, but what if something were to happen because I reported it?" They stressed to never ever wait to see the police on such an issue. We sat with an Officer Joe O'Rielly for about an hour while he took the information from us. He took Shauna's name title and description. He took Ernie's name and title, Abbi's name, title etc., Charles' name, title etc. and the information on what happened. He also took Greta's name and the statement that she said to me referencing beating me up. I was pretty much shaking and nervous the whole time and at one point I started to cry when I told him how scared I was now and when it happened. My husband asked him about a restraining order. The Officer said that if we tried to take her for one, that she would probably try to turn it around and say that "she was going to have a friend meet me in the garage for coffee and that it was nothing." (If you knew Shauna, she is a person with two sides to her, she is one way in front of management and then a completely different one on her own, her voice doesn't even sound the same. Her real voice is pretty scary, when she is not "acting" for her superiors.) I didn't remind him that she had referred to me as "white trash bitch". I thought that deep down inside, if I were to go in front of a Judge, a Judge would know who was telling the truth. I believed this until the Officer said that she could "bluff" her way through it and turn it around (she is a good actress and that scared me about going into court, let alone the fact of having to face her in a court of law). What if she did fool a Judge and the result was that I wasn't granted a restraining order, then what? Then where am I? Now she knows I have no protection and she has won the "upper hand". I asked him what would happen if I filed the Application of Complaint. He told me that they would then go to speak to her and that it would then be forwarded to the Detective Bureau (or something like that). I thought "Oh my God, if she knew I reported this to the Police she'd kill me." The Officer told me that this was the company's first responsibility to rectify the situation, he said that they may have to

07/22/2000  14:21    508-626-8610    LAWOFFICE H.WILGOREN    PAGE  11

place her in another office or branch of the company to get her away from me. He told me to call them first thing on Monday 9/20/99 and ask them what they were going to do to rectify the situation, and to call him as well and let him know what was happening. When we got home from the police station, my husband (now having had the time to realize everything that was going on) was so mad at C.N.A. for letting this happen, he wanted to call Charles Edwards and Abbi Laushine at home on the weekend. He kept saying, "I want to talk to them now!" He was very angry.

8. Sunday September 19th 1999 about 7:00 p.m. Charles Edwards called me from his home to my voice mail in work, just calling to check on me to see if I was OK.

9. Monday September 20th 1999 I called Charles Edwards at work I told him that the police wanted me to call to find out what was going to be done, and that they stressed to me on Saturday night that this was the company's first responsibility. He said that an Officer Nancy Collatta had called them on Friday September 17th 1999, the day after it had happened, but he didn't say what the outcome was. He kept saying don't worry about it it's going to be alright and to have a nice vacation and to call him at any time, he was avoiding the issue it seemed and I wasn't getting any specifics at all. I was afraid to ask him about her response to them questioning her although I really needed to know. I asked him to transfer me to Abbi. He said that he really didn't think that there was any need to talk to her but if I wanted him to he would transfer me to her. We got cut off. At that point my husband was upset, he said, "I wanted to speak to him!" I told him that we got cut off. In the meantime Charles called and left me a message that we got cut off and I was dialing him back so that my husband could speak to him. My husband got on the phone and he asked "Charles I want to know what are you going to do about this situation?" He asked Charles about moving her away from me and Charles said that Abbi wanted to do that. My husband said that he wanted them to do that, and I as well wanted them to do that. But Charles thought that that would create more aggression on her behalf and that it would create more of a hostile situation. My husband kept asking him what specifically they were going to do about it. Charles kept on "running circles around him" and saying what a "professional" company C.N.A. was and all sorts of "Personnel" talk without giving him a straight answer. He asked Charles what happened when they met with her. Charles said that she denied it, she admitted that there was aggression there, but she denied the racial slurs and threats. Charles said that she had to deny it or she would have been fired right on the spot. In so many words Charles told him that they knew that she did it but they couldn't prove it. It was her word against mine. My husband asked "What can you do to guarantee that my wife can return to work in a non-hostile, safe environment and that she won't be harassed?" He responded "We can't guarantee that." When my husband got off the phone I said "Paul, they're not going to move my desk are they?" He said, no, and that Abbi wasn't going to move my desk. He then said "Barbie she's the aggressor, why would they move you?" Then he told me that Abbi wanted to move her away from me but that Charles was afraid that it would create more aggression on her behalf. I couldn't believe they hadn't moved her away from me yet. I asked him what happened when they asked her about it. He responded that she denied it. When I heard that I started to shake, I knew that she had fooled them. Paul said to me "Oh no Barbie, they know she did it, but they can't prove it." Charles told him in so many words that they know it happened but

12

they can't prove it. I said to my husband "What are they going to do?" He said, "I don't know, Barbie they told me that they can't make any guarantees." I said, "Well what's going to happen?" He said, "I don't know, they wouldn't be specific." I had no answers at that time for the Quincy Police Department with regards to what they would do so when I called the police department on Monday, I told them what had been done so far, nothing. I reminded the officer that we were going to be away this week, so that I wouldn't know what was going to happen for at least a week and that I would be in touch with him at that point. The Officer said that it was just terrible that such a thing would have to interfere with someone's vacation. He knew that we had been delayed now three days later than our original plans for the week. The rest of the week seemed ruined as well; the appetite just wasn't there for us to enjoy our time together. We were supposed to go back to Martha's Vineyard where we honeymooned 10 yrs. ago, but that never transpired, my parents were worried about our safety and our sanity and insisted that we go to their little cottage in the woods (a hideaway without a phone) to get away. The entire week I dreaded going to work to face her, I figured that I would have to meet with her in a conference room in "some kind of" an effort to resolve this and go on from there. Also I didn't know what to expect from her since I knew that they must have given her some kind of warning.

10. Monday September 27th 1999 I returned to work. I went in at 6:00 a.m., a half an hour earlier than my starting time. That was my intention (I knew that I was going to be behind after being out for a week) but I was awake at 3:00 a.m. I couldn't sleep, I was thinking "I've got to get in there and get as much done as I can before she (Shauna) comes in." I was afraid of her. But the systems aren't up that early, I think that if I could have gone in that early I would have, I certainly couldn't sleep. As I walked towards the office I saw Vita Falzone a co-worker (she is dear to me) I started to cry, she looked at me with dear sympathy. She knew what had happened and she said, "Barbie are you alright?" I said, "No I feel like I'm going to throw up." I felt really bad. She said, "What are you going to do?" She said, "What's going to happen?" I said, "I don't know, I just don't know." Then as I walked towards my desk I realized that in the week while I was away they hadn't moved her desk away from me and I was nervous and worried seeing her. I E-mailed my boss early in the morning before she came in. Then before she had a chance to reply, I saw her first thing in the morning before anyone came in. I went to her desk and said to her "Abbi I don't understand, why is she still sitting behind me?" (I had figured that she was going to schedule us, Shauna and I for a conference together in an effort to resolve this, I knew that was something I would dread, but I couldn't continue with things the way they were.) But something didn't seem right and It seemed as though the atmosphere was as though nothing had ever happened, (that is as far as all else was concerned, but I was never going to be the same.) Abbi responded to me "Well let's just see how it goes for the week and if it's still not good then we'll move her." I realized then that Charles had convinced her to just "close our eyes" as though nothing had ever happened and move on. I said "But Abbi, how do you expect me to continue to sit in front of her, if she gets away with this she's going to make my life hell!" Abbi said "Oh she's not going to get away with this Barbie, she's not going to get away with it." I said, "Why does she have to continue to sit in back of me?" "I'm scared as hell of her!" "Please get her away from me, so that I at least don't have to

13

listen to her."(Shauna's tone when she did her personal phone calls was very disturbing, it was like she was another person; a different person than whom she displayed to all else on the workplace.) Abbi responded, "Let's just see how it goes for the week." I said "But how can I even work with her I can't correspond with her (work wise), I can't even look at her." She said to just not have anything to do with her. I don't know what she expected from me, but I certainly couldn't just "ignore" the woman. I had nothing to do with her before all of this happened and she was harassing me then. She then changed the subject and said that I was going to have my review the next day on Tuesday September 28th 1999 and could we schedule a time to do such. I said, "Yes." At that point other peers had started to come into the office for work and I didn't feel comfortable at the boss' desk discussing this, so I sat down at my desk. I was all confused. I was trying to deal with the concept of what was going on while asking myself "Is this right?" "How can I go on like this?" "What is going on here?" "Is it me?" "What is happening here?" I had no choice but to try to do my job under these horrible circumstances. In the meantime Abbi had read my E-mail and replied asking me if I still wanted to meet with her. I said, "Yes, let's go downstairs for coffee." (I wanted to meet with her away from the unit.) She replied that she had to put me on "hold" till about 11:30 a.m. due to other meetings she had. I told her that I hoped that I could make it till then. (I didn't know how I was going to handle "still" sitting in front of this woman Shauna after what had happened.) Shauna came in at around 8:00 a.m. and acted as though nothing had ever happened. She came in and said hello to all but me like I wasn't even there She went back to her daily routine of "goofing off". She chatted with the Mass Auto Underwriter Bernadette Joyce, "kissed up" to the boss and of course she seemed as though nothing had happened. I thought that she would at least "walk a straight line" as though she had been seriously warned. Me on the other hand I seemed to be in a state of shock trying so hard to just concentrate on my work and block it out, (what had happened, what was happening), but I couldn't. I tried so hard. My desk was a mess because when I left over a week ago I had to leave it in the condition it was in when I was working. I had accounts from over a week ago all over my desk plus a week's worth of work added (because I was away, although this is not unusual if I'm away for a week) and although I know my job extremely well, I just couldn't think straight. Also, now since Shauna knew that I had told them what she said, and it was obvious that the company had taken no action since, things were worse than if I would have never said anything at all. (Though I would have expected the opposite as would be the case if she thought that she were possibly at risk of losing her job.) Shauna soon was on the phone saying to someone "She's spreading rumors about me." Her friends (other "kiss-ups") were all giving me the silent (weird) treatment, when I passed them they would look away intentionally and I realized that she had told them all that I made up this "vicious" rumor about what had happened. Now I was "the bad guy". She had obviously convinced, deceived (or somehow twisted things in her favor) in the eyes of the authorities and her friends regarding the truth about what had happened almost two weeks ago. It was as though she was trying to tell me that she was "untouchable", and this made her even more vicious or should I say vindictive. When the boss had left the area that morning. Shauna said (across the floor) to a co-worker "So Bob, Abbi's going away this week." (Abbi was to go to Reading PA on

14

business with another co-worker). She then said, "Ooh when the cat's away the mice will play." I just knew there would be trouble that week, I knew that meant that something would happen and that I was not at all protected from her further harassment. I continued to try to do my job, but I was shaking. No one backs me up (does my work) when I'm on vacation, no one knows how to do my job. Except Vita Falzone and she only knows to send down some I.S.I. correspondence reports to the Personal Lines Auto Dept. when I'm not in the office. Regardless, she does her best and that's more than I could ever ask. I got a call from Rosemarie Harrington, the woman in Personal Lines who receives the reports she said that the wrong reports were sent down for September 21st and 22nd and could I please send her the right ones. I said of course and proceeded to do so. I sent her down the wrong dates, and the wrong reports, not once but three times. (I do this work every day.) By the time she called me for the third time because it was wrong again. I thought I would just scream. Oh she was very nice about it, and said "Oh don't worry about it Barbie, I'll retrieve it from the fiche." But I was so upset with myself that I put my head in my hands and I thought that I would "lose it", I was at that point crying (to myself). I had to get away. I went to lunch down stairs in the atrium with Joani O'Brien a friend from Personal Lines Mass auto (she had retrieved for me some information from the Internet on "reporting complaints of misconduct within the company"). She also told me that on Monday September 20th 1999 (the Monday after this happened that she saw Abbi with Charles walking across the street, and then on Tuesday September 21st 1999 she saw Charles walking with Chris Dye (The Branch Manager) across the street. While we sat in the atrium (Joani and I) I was so paranoid. I don't know if it was coincidence or what but every African American that I saw seemed to look right at me, as though she had told every one of them and they were watching me. (Anytime I went down stairs since this had happened I would see the African American girls from the office all grouped together in the hallways and talking for a half an hour or more at a time. I knew that they had been discussing me and it seemed very hard to avoid them. I would stall in an area and wait till they had dissipated, but they would never break up and dissipate and I couldn't hide forever. So I would have to pass right by them to get back to my desk. It was awful.) The day was a struggle as I continued to "white out" everything I did, repeatedly fill out papers wrong and redo them and basically work all day on one item, yet still not complete it. I found myself corresponding on the phone with the Insured, yet as soon as I hung up the phone, I didn't even know what was said, I forgot completely about the call and couldn't follow through with the task (corresponding with the call). It "blanked out" as fast as it came in. The whole day seemed a blur. I remember at the end of the day, Doris Chan the Chinese woman who sits in front of me left at the same time so that she could walk me down to the elevator and out of the building. I remember being petrified that Shauna would see us walking out to the garage together (Doris goes the opposite way because she takes the train to go home), then I knew that Shauna would know I was afraid of her if Doris was walking me out. Doris had told me that Mike Revisi (an Underwriter in another department) had asked her why she doesn't work late anymore, she replied to him "It's not safe in here anymore."

11. The next day Tuesday September 28th 1999 I went in at 6:00 a.m. again, and again up at 3:00 a.m. I was falling so far behind from all that had happened and I just couldn't

15

seem to catch up. It wasn't just that there was too much work, (I'm used to a huge workload), it was because I couldn't seem to do any of it. I tried and I tried but nothing seemed to sink in, I couldn't seem to accomplish anything. I couldn't concentrate for 5 minutes. Abbi came in and she asked if I was ready for my review. We went into the conference room and my review (relating to the job) lasted all but 10 minutes, the subject changed immediately to my still "unresolved" situation. I said (thinking about my present horrible situation) "This is all going to affect my review isn't it?" She said "Of course not, this has nothing to do with your work performance, your work is fine." She gave me a level "2". A level "1" is best, a level "4" is worst. Nobody gets a level "1" and if you got a level "4" unless you did a 90-degree turnaround, you probably wouldn't last long. She said, as before that she has no doubts about me. She asked me for her permission to speak to Ernie about the way he treats me on the work front. She said "I don't like the way he throws things on your desk (like he's in disgust), I don't think it's proper behavior." I said that she could speak to him about that by all means. I wasn't even thinking about my review. I said "I'm sorry Abbi I'm not trying to cause trouble for you but I just don't understand what is going on here." (I had gathered up all the strength that I had to go behind closed doors with this "monster" and yet that didn't happen, in fact nothing had happened and I was so confused.) I said "Why didn't we have a conference over this or something?" "I don't understand, how is this ever going to be resolved?" She said that maybe that could happen in a week or so but for now Shauna was too aggressive. I felt as though the Boss was afraid (even with her and the head of Personnel in the room) to be behind closed doors with the two of us. (Later that week I realized that the head of Personnel Charles Edwards was in Farmington CT and Atlanta GA.). I said "But Abbi, I want answers, I want to know why she said that to me and those things about me." I said "The incident had nothing to do with her, it was between Ernie and I, and it didn't involve Grace either." "Why'd she threaten me with Grace as well?" Abbi said "Barbie you're not going to get any answers from her she's denied it, so she won't respond to anything you want answers to." I said so does this mean that I could walk up to her and whisper in her ear "_____ Nigger, I'm gonna kill you." And because no one else hears it I can get away with it?" She replied with "You're not going to do that are you?" I said, "Of course not Abbi, I could never do that." "It's inhuman, as angry as I am right now or ever, I could never say that to another human being." (I am not, or don't think I could ever be that way.) I told her that I try to see the human side in people and when people do me wrong I know (or I try to believe) that there is a human being in there somewhere. I then said to her "But not this Abbi, this is inhuman." I realized then that I was living in a "dreamland" this was never going to go away, it was never going to get resolved and I was beginning to believe that there was no hope for it. After all when they confronted her it's not like she said "Hey I didn't mean to upset Barbie, I just had a bad day, I'm sorry that I upset her I had P.M.S." She had denied it to them, denied it! I said "What did she act all sweet and everything like nothing happened?" and say "Oh gosh no I never did that." Abbi didn't say anything. I looked straight at her. I said "Abbi I feel incredibly bullied by that woman, I am petrified of her." "Why can't you pull her phone record and find out who the third party was that she made the threat to, her phone record alone would get her fired." "I just wish that there was

someway that you could get rid of her" (She's no "star" employee and she abuses
company time terribly there are plenty of reasons to fire her). "If she got fired for
some other reason then maybe she wouldn't come after me." Abbi wasn't
responding. I was frustrated. I said "Abbi if I have to get a restraining order to keep
her away from me I will, because in a court of law a Judge can tell who's lying and
they'll grant me one." "There's no harm in them granting me one, but if they don't
and something happens then they're responsible." "So if I go to court I will get a
restraining order, and then what, then you'll have to move her away from me, then
you'll have to fire her." "Because that's why people go to court to settle the truth and
if a Judge believes it and I get a court order than you can't say that she denied it and
than you'll have to fire her wouldn't you, because a Judges' order says she did it."
Abbi said, "I don't know, I don't know what would happen in a case like this." Then
I said "And if she loses her job because of me, she'll come after me with retaliation,
so I'm up a creek." (When I said all of this I wasn't thinking of what Officer
O'Reilly of the Quincy Police department said about her twisting things in court, I
wasn't thinking about what a good actress she is and how "sly" she is. I was only
believing in the truth and that a Judge would know the truth regardless of anything.) I
was feeling very desperate and frustrated knowing I am still afraid. Abbi tried to
console me and make me believe that she wouldn't harm me. She said, "Barbie if
anything happens she'll be the first one they come for." I said "Abbi she's not stupid
she's not going to do it herself, besides she said she'd have someone else do it; and if
someone else does it than how can they prove if was her?" "Abbi I don't know who
she knows, I don't know who she was talking to!" I was not getting any answers at
all. Abbi was looking at the clock. We had been in the room for about and hour. She
said "I'm sorry but I have an appointment at 9:00 to do Gail's review" (another
employee). The clock said 9:30. I looked at the clock and said, "I'm sorry." (I
apologized for taking her time on this, during what was supposed to be my work
review, but I still felt desperate and didn't know what to do. I was looking for
answers) And I got up and left the room, while she followed. I went back to my desk
and she came by a minute or two later and said "Barbie I just need you to sign this
(my review) and I'll give you a copy." I said, "OK." I signed it, handed it to her and
said "Thanks Abbi." (I was trying to "act" like everything was OK in front of
Shauna; I didn't want her to know how upset I was after that meeting.) Abbi headed
towards the photo copy machine and Shauna said "Mm-mm, something's fishy going
on around hear." I think that she thought that I had signed some sort of statement
regarding the incident that had taken place, which was now monopolizing my life. Of
course Abbi didn't hear it. It was Shauna's way of saying "Don't mess with me bitch,
you better not be messing with me." I tried to ignore it, but like the day before, her
comments were a sure sign that she had gotten away with what she had done and she
had not been "scared straight". Me on the other hand I was still shaking. I had been
getting the shakes since this happened and it was starting to get embarrassing, but I
couldn't be concerned with that. I was just trying to keep my sanity, and to hold off
tears that was hard enough. The fact that she was not "straightened out" made things
even worse for me because now she was even more intimidating and fearless. I went
to lunch that day, or should I say I left my desk for lunch like I had done the day
before. Normally I would always work through my lunch; I'd eat it in about 5

minutes and then continue to work. But now I couldn't stand to be at my desk any longer than I had to even though I had plenty of work to do, I couldn't do my job. That day during lunchtime I went to the post office (diagonally) across the street. As I walked down and across the street passed the building I felt as though a bullet was going to hit me. I walked fast and I was petrified. I returned to my desk after lunch still shaking. That afternoon Abbi and another co-worker Judi Beck left for Reading PA on business (they were driving) and the department was left alone. Shauna proceeded to go around from desk to desk gossiping (showing no respect) about the incident that had happened to me. I could not look at her. I could not even look in her direction it was awful. I left five minutes early that day. I was so desperate to get out of there and away from her.

12. The next day Wednesday September 29th 1999, again I went in at 6:00 a.m. and up at 3:30 a.m. tossing and turning unable to sleep. Abbi was going to be out all week, and Charles Edwards was in Farmington CT and in Atlanta GA that week so nobody (authority figure) was there. Nothing had changed for me. My situation was no better and seemingly getting worse. I was still very, very nervous and I couldn't think straight. Around 1:00 p.m. I got a call from a woman in the Reading PA office. She said that the Boss and Judi had never arrived at the branch and that they had been mugged the night before. I was shocked. She said that she had called Bob Oliver (an employee in the unit and a friend of Shauna's group) first thing that morning and left note that they had never arrived because of the mugging, and asked him to call her if he had heard anything. When I got off the phone I turned to the Underwriter Bernadette Joyce and said "Bernadette, did you hear from Abbi?" She replied "No but I know what happened." The only people who were around at that time were the African American women and Bob Oliver none of them acted surprised, they all knew about what had happened to Abbi and our other co-worker, and didn't tell anyone else in the unit. The Underwriter tried to excuse it by saying, "Well I didn't tell everyone because I didn't have all the details." (She could have at least let the rest of us known what had happened.) It was horrible to find out such news from someone that didn't even know them. The woman who called me seemed more "emotionally" concerned than the peers in my own unit who knew about it. Bernadette Joyce intentionally told only her friends and that was awful, this is a fifty something year old "childish" woman. She like Shauna is kind of sneaky, but acts innocent (in front of management). That afternoon Shauna and Grace went out of control. Grace was standing next to Ernie's desk (right next to mine). Referring to a file in an extremely loud tone she was saying "Stupid, stupid people." She was doing this for my benefit, trying to provoke me while there was no supervision in the unit to stop her. Then Shauna went over to Grace at her at her desk and said "I'm gonna get you." And Grace said "No, I'm gonna get you." And Shauna said "Oh-oh, your in trouble now." Grace said "Oh I'm scared." And Shauna said "You should be shot." And Grace said, "She should be shot" (referring to me). Then Grace said, "So sue me," and started to laugh. Her and Shauna were both laughing. I couldn't believe it! They were making a mockery about the horrible incident that had happened to me almost two weeks ago to the day. They thought it was a big joke and they were laughing about it. I felt that this reaction was because Shauna had gotten away with it and that worsened the situation. I just tried to hold it together, I think I may have left

a little earlier that day too. I was desperate. At the end of that day Lisa Wright who sits right in back of Grace and heard it all said to me at the elevators "Did you hear those two? I'm your witness." That's disgusting!

13. The following day Thursday September 30th 1999 Abbi returned to the office. The poor thing had been mugged in Reading PA two days earlier. I didn't feel as though I could go to her with what had happened the day before, so I went to the Branch Manager's Secretary Gladys Kwash. I asked her to get Charles Edwards (still out of the branch) on the phone so that I could speak to him. I went into the "interview room" a conference room on a speakerphone with him. I told Charles what had happened while the unit was unattended. I told him that they were taunting the incident while the boss was away. I told him that they had made a complete mockery of the serious situation that had happened two weeks ago, three days since my return to work. I told Charles that Lisa Wright was a witness to it. And he said "How do you know Lisa saw it?" I said, "Because it happened right in front of her and that she had told me that she had witnessed it." He then said "OK, we'll call Lisa down and talk to her." The only thing he seemed to be concerned about was the fact that they said, "So sue me!" He was asking "Who said sue Me." and "What did they mean by that?" I said, "I don't know!" (I felt like saying "Why don't you ask them." I said "Charles what are my rights to protect myself?" "Should I bring a tape recorder to work for my own protection?" (At this time I was thinking that Charles cared about me and wanted to help me.) He then said "Well now Barbie, If you were to do that than that would create a mockery and I can't prevent anyone from making a mockery of you." (I don't know what he thought, that I would put a recorder "on display" on my desk) I said "But Charles I would keep the recorder hidden." He then said "Besides if anyone called you a racial slur or threatened you then they would be fired right on the spot." I then said "But Charles I told you two weeks ago that I was racially slurred and threatened and you said that your only defense is that "She denied it and it's her word against mine"; "so I'm asking you should I bring in a tape recorder to protect myself?" He then proceeded to say that he can't prevent my peers from making fun of me (Isn't that harassment, and isn't it Personnel's job to prevent that? Or is it right that my peers can get away with doing this on the work front?) I asked him "Why can't you pull her phone record?" (Because I want to know with whom she was talking when she threatened my life.) He said, "That's not possible." I told him that it in fact was possible and that the company has records of all calls that come and go to every phone line in the company. He replied "Well if we pull her phone record than we have to pull everybody's phone record because that wouldn't be fair." (Even in an investigation?) I said to him "Charles what is the company's policy on personal phone call use?". He then replied "We promote personal phone call use." I said "What?" (I know individuals who have been fired in that company for just that alone.) Then I said "How can that be when it's disruptive to another individual trying to do their job?"(Is he saying that they promote disruption to peoples work?) Then he said "Why should we keep somebody here for eight hours when they can do their job in four hours, we should just let them go home." (With this he meant to say as long as she's getting her work done. And my question is "How on earth can she be getting her job done if she's on the phone all day?" Besides they've never let people work like that. You can't say "Hey Abbi, I finished

my work load in half the time, I'm leaving for ½ a day." If by any chance you were ever caught up, which never happens, you would help out the guy next to you. That's what "teaming" is supposed to be all about). I then told him "Charles, yesterday I went to the post office at lunch and I felt like I was going to get a bullet in me, I just didn't feel safe." Then he said "Oh wait a minute now, I just thought she was going to 'rough you up', a bullet and 'roughing you up' is two different things."(He tried to minimize what had happened to me) I said, "Charles let me repeat what was said." I said "She said 'white trash, white trashy bitch, I'll take care of her, I'll have someone waiting in the garage for her.'" Then I said "Charles I don't know what that meant; whether it meant a bullet, a knife, a club or what." "May I remind you Charles that I weigh just over 100 lbs., even to get beat up I could dye, it wouldn't take much for someone to do that." I told him once again "Charles I fear for my life!" I said "What she said was inhuman!" He then said "Well Barbie if you feel like that than you need to go to the police." He said "It doesn't matter what we think, what's important is what you think and if you feel like that than you need to go to the police." I told him "Charles you told me to do that two weeks ago and I did that, what are you talking about?" He then said "Well then you need to contact Corporate Attorneys, and you need to contact Corporate Security." I then said "Look Charles, I can't do my job, I can't work under these conditions." "What am I going to do?" Then he said, "Well if you can't do your job than you need to speak to Chris Dye" (the Branch Manager). Yeah." he said "You need to speak to Chris Dye on this one, 'cause I'm pretty sure we've done all that we can do." "You need to see Chris, it's over my head." He said to me that if this is the sort of thing that is happening in "Mass Auto" than we obviously have the wrong people working in that unit. (I felt like saying, "No kidding.") Then I asked him "Charles, a year ago last summer when they made the announcement that the branch would be moved to Orlando Florida with the exception of Mass Auto, they also said that Mass Auto should be on it's best behavior. Because the company was going to keep the 'cream of the crop' to work in that unit; What ever happened to that?" They (management) told us back then "Just because you work in Mass Auto doesn't mean that you are safe from losing your job, C.N.A. is going to keep its best employees to remain in the branch." Then he said, "Well Laura Nicholas (the previous Commercial Mass Auto Manager) told them that there were no problems in the unit." (I liked Laura Nicholas as my boss, we got along fine, but either she was "blind" or she lied, I for one had told Laura about the African American women grouping at lunch discussing peers at least two years ago. She at the time did nothing, instead she told me to address them and the situation myself and ask them to stop. If they had any respect for me in the first place than I never would have had to come to her for help. Asking them to stop was like asking them to laugh in my face. Laura didn't want them to get mad at her or to dislike her. Laura wanted to keep everything "warm and fuzzy" in the unit, but things weren't "warm and fuzzy". Unfortunately there were situations that needed the attention of superiors and Laura chose not to do anything and the situations just got worse. These peers undermined Laura Nicholas just as they do Abbi Laushine. They have no respect. When Laura had another job offer she assured management that the unit was fine. She knew there were big problems in Commercial Mass Auto, everyone knows that. I think that Laura just didn't want to deal with the particular personalities in that unit.)

20

Then Charles proceeded to tell me "We're going to have a unit meeting with Abbi, Chris and I, where we're going to address racial slurs and threats." "It's just been a matter of getting a time when everyone can be together for it." "I'll tell you what, let me contact Corporate Attorneys and Corporate Security cause I'm pretty sure we've done all that we can do." He said, "Yeah, I need to contact Corporate Attorneys and Corporate Security, let me call them and then I'll call you back, OK?" And he rushed off the phone. (I was beginning to get the feeling that he had never reported this to Corporate Attorneys or Corporate Security.) After this meeting I told Lisa Wright that I had told Charles about her witnessing what had happened. I told her that she would probably be called down (at some point) to be questioned about the incident. I also told Lisa about the feeling that I had that they were "running circles" around me. I told her that he tried to lie to me about a few things when I wanted answers (about her phone record and such) and that he just wasn't being straight with me. She couldn't believe some of the things he said. I kept saying "I don't know what to do Lisa, I don't know what to do!" About two hours later that same day he called me on the phone (at my desk) and asked me "Did someone make the remark 'you should be shot'? I said "Yes Charles I said that to Ernie for telling this all to Shauna." "It's an expression." "Do you know what it means?" He said, "Yeah, yeah I know what it means." Then I said to him "It means 'You should be ashamed of yourself', and I meant that Ernie should be ashamed of himself because the last time he ran back and told Shauna what I said she made threats to have me 'beat up'." It was awful to have to try to discuss this at my desk with him on the phone, Shauna was sitting at her desk (right behind me) and Grace was standing at it. And for a long time I couldn't say anything to him because they were right there. Also a "temp" had come back to my desk to ask me something (work related) and it was very embarrassing (as well as impossible) to try to talk to him about this matter in the department at my desk. Charles knew that they were right there because for a long time I said nothing to him and he figured it out. Then Charles Edwards told me that he had spoken to Corporate Attorneys and to Corporate Security and that he was pretty sure that they had been doing all that they could do. He also told me (after advising me that I had to speak to the Branch Manager because it was out of his hands) that there was nothing that Chris Dye could tell me that he hadn't already told me. He said that Chris would probably tell me the same thing, "They had done all that they could do."

14.  On Friday October 1st 1999 (my day off) I called the Branch Manager's secretary Gladys Kwash to make an appointment to see Chris Dye the Branch Manager. I dialed her through the receptionist and the receptionist put me through to the wrong Gladys. I was so distraught that I didn't even realize I was speaking to the wrong person. I said "Hi Gladys this is Barbie I need to make an appointment to see Chris Dye on Monday, I'll be in at 6:00 in the morning and I'll see him at any time that day, it's very important." Then the woman said to me "Barbie it's Gladys Morales, did the receptionist put you through?" I said, "Yes." Then she said, "Hold on I'll put you through." She connected me to Gladys Kwash and I told her the same thing that I would be in at 6:00 a.m. and that I would see him at any time. She asked me twice "Are you exhausting your resources with Charles?" And I answered her twice that Charles told me that I needed to speak to Chris. She said that she would check his schedule and get back to me. She asked me what my voice mail number at work was

2L

and she said that she would get back to me and leave a message with a time (for a meeting) on my voice mail. She left a message later that day scheduling me for a (tentative) meeting at 1:00 p.m. She said that if anything changed she would let me know otherwise. That day I also called Joan Decola (my previous, long-time Mass Auto Manager). I told her what had happened. She asked me who the parties involved were and I told her. She couldn't believe it. I said "Joan I've got four big black girls that want me dead and I'm petrified." Joan said "You've never in all the years you've been here had any problems with an 'inter-racial' relationship." I said "I know." And I began to reference some of the African American relationships I have had in the past over the years; all people who have been very dear to me and I started to cry. Joan said, "Barbie they've (the black girls) got you right where they want you." Joan asked me "So what happens now?" I told her that I have to see the Branch Manager, and I said Charles told me it's out of his hands. I told her that so far they (the company) hasn't done anything to rectify the situation. I told her about the Unit meeting that Charles had talked about where they were to address racial slurs and threats to the whole group. I said "Joan, I don't think that I can sit in a meeting with my whole unit on this." I said "I'm the victim here, and I don't know if I can keep my composure." She knew that I was very upset. I said "Joan, I can't do that to myself in front of my peers, I'll never be able to face anyone again." She agreed and she said "Barbie, don't you go to any such meeting." Then I said "I can't believe that I have to meet with Chris Dye on this." I told Joan, "I think that when I look into his eyes to tell him this I will lose my composure (cry) as well." Joan knows I'm a very emotional person. She helped to tell me to look away if that happens and try to compose before continuing with him. I told her that people were telling me to get a Lawyer. As we talked for probably at least an hour and I told her all of what had happened. She knew that I was very upset and she told me to calm down and she said I should see a doctor. She helped to advise me on how to handle this with my authorities, but at this point I had already gone through all of the channels like they had told me and nothing seemed to be happening. She said that when I saw Chris to say to him "Hey look Chris, this just isn't my neighborhood and I really don't know what to do." I told her how I had a helpless feeling like I couldn't trust anybody and no one was giving me any straight answers or help on the issue and that day by day I was just hanging by a thread. She said that for now I needed to think of myself and that "I" was the most important thing at hand. She wished me luck and assured me that I was a good employee to C.N.A. I think she said "Keep me posted Barbie, let me know how things work out." But day by day I feel worse and worse "dumping" my problems on people looking for answers and I don't want to be a bother to anyone. Later that day I phoned the Quincy Police Department and I spoke to Officer Joe O'Rielly. I told him that I kept getting the "run around" and that nothing so far (two weeks after the incident and four days since my return to work) had been done to rectify the incident. The officer then gave me the names and numbers of two outside organizations. The Equal Opportunity of Employment (617) 565-3200 and The Mass Commission Against Discrimination (617) 727-3990. The Officer told me that if C.N.A. had no other choice to get her away from me that they would have to place her with employment outside of the company in order to rectify the situation. He said to call them if the company continued to do nothing about the situation. I had hoped

22

that my meeting with Chris Dye (The Branch Manager) would rectify this situation. I also feared bringing in an outside organization for fear that they would try to fire me (they don't want any "bad" publicity in the branch, because branches are being closed countrywide.)

15. On Monday October 4th 1999 I went to work at 6:00 a.m. again sleepless. At 7:00 a.m. when Abbi came in I told her about my meeting with Charles on Thursday 9/30/99. I told her that because of her ordeal of being mugged I didn't feel as though I could bother her last week when she got back. Also she was so busy with people asking her about it and making phone calls to cancel her stolen credit cards etc., that I just couldn't bother her. She thanked me and I told her how sorry I was for what had happened to her. I told her about Charles telling me of such a unit meeting where they were to address racial slurs and threats to the whole dept. (I thought that this was awful to bring in the whole unit on such a thing. There are problems, "neglected problems" in that unit but I didn't think that they should use "what happened to me" as an excuse to reprimand the unit.) I told her that "I was the victim" of such an ordeal and that I didn't think that I should have to partake in such a thing. (I thought that this was one "whacked out" way to handle this.) She sympathized and agreed. I told her that Charles told me that I had to speak to Chris Dye and that it was out of his hands. I told Abbi that I couldn't work like this. That morning Lisa told me at coffee that she was afraid that she would get fired (with reference to witnessing the mockery.) (Her husband is not working, they are struggling financially and she is the main "bread winner" now within her household.) I tried to assure her that they could not fire her, but I really don't know (with the way things were going) if that was true. That afternoon after lunch I went to head back to my desk and I heard the "temp" say that we were having a mandatory unit meeting at 1:00 p.m. "Mandatory", yet there were two employees that were out that day and one of them was Lisa Wright. She was the girl that they were supposed to question as a witness for me. (Were they intentionally avoiding her being a part of this so that they wouldn't have to question her and forget about this whole thing?) 1:00 p.m. was the time that I was scheduled to have my meeting with Chris? And in the meantime, no one had called me to reschedule it. I just had a feeling that this unit meeting was to "blow me off" and get me out of meeting with the Branch Manager (as I had been instructed to do so). (I didn't want this to have to go "all the way to the top dog" in the first place, but I wasn't getting any resolution elsewhere, and this is what I was advised to do.) I headed down towards Personnel and the Branch Manager's office to wait for my appointment with Chris. I went to use a nearby desk phone to call my husband I told him what was going on and he said "No Way Barbie, don't go to that meeting." Then I saw Abbi, I told my husband to hold and I put the phone down and went to her and said "Abbi, I told you I can't be a part of this meeting, I don't know if I can handle it and it's wrong. She didn't know what to say. Earlier she said that she agreed with me but now they were telling her that I had to attend. Then Charles walked out of his office to head upstairs. I told him the same thing. He looked like he didn't know what to do. I just stood there; I didn't know what to do. I headed towards the Branch Manager's office I saw his secretary I said "I don't know what's going on but I have a meeting with Chris at 1:00 p.m. and I'm not going to this unit meeting Gladys." She looked at me she felt so bad she said, "I feel so bad I wish that I could help you but I

23

don't know what to do." She went into Chris Dye's office and told him what I had said. Chris Dye called to me from his office. He said "Barbie you have to go to the meeting." "It's a mandatory meeting." (Mandatory, yet not all of the unit was there including one very key player, Lisa Wright.) Also Chris Dye was not even a part of this meeting like I was originally told he would be. He wasn't even going to be there. I walked into his office and I said "Chris I can't go to this meeting." He said, "You have to go it's mandatory." I said "Chris I don't know if you're aware of the context of this but I'm the victim here and I don't know if I can keep my composure." He said (as he waived his hand at me) "I know all about it, now you have to go you're a big girl, you can handle it." I said "But I was supposed to meet with you at 1:00 p.m.?" He said "You have to go to the meeting and if you still want to meet with me afterwards then you can come see me." I walked out of his office and I said to his secretary "I can't go." I began to walk around in circles saying; "I can't go." I was so upset. Gladys Kwash felt so bad, like her hands were tied. Chris hollered out of his office "Barbie you've got to go, now go on now." I felt that I had no choice (like maybe I'd get fired for insubordination or something). So I walked towards the stairs, turned around, then turned around again and again, before I I headed up to the meeting. I walked into the meeting about 15 minutes after it had started. It felt horrible to be the victim of such a thing initiating this group meeting which involved people that had nothing to do with it. It was being addressed by the boss, Abbi. (I missed most of what she said). Then Charles spoke he said that he was very angry having to address the unit like this on such serious issues. I never heard him mention the facts of racial slurs and threats (because I came into the meeting late) but obviously everyone knew what was being discussed at hand. He mentioned having been given the name of a witness regarding this issue. But then he said "I can't call the witness, she's one person's best friend so I can't believe anything she says!" I couldn't believe it. Lisa is a friend (co-worker), but we are not best friends. (Outside of work, we have nothing in common.) Even if that was his opinion and he thought that perhaps I had told Lisa what to say, then couldn't he have come up with the "right questions" for her (when he interviewed her); in an effort to find out if she was lying for me or if I had actually told her what to say? Shouldn't he have had a "fool proof" way to investigate this? I was very insulted to think that he would suggest that I would ask another individual to lie for me, suggesting that I "made this whole thing up", especially when he knew that I didn't and that it was in fact true. He then said "I am mad as hell at one individual in here and I'd like to fire that person right now!" "I can't believe that certain individuals made a mockery of a very serious situation that happened here two weeks ago." "But let me warn you now that if anything more of this continues (he meant the threats and racial slurs,) I won't hesitate to fire you, and you can go tell your lawyers (he was referring to the African American woman Grace and Shauna who made a mockery of the incidents and said with reference to such, "So sue me!"), because I can and I will fire you!" I couldn't believe that Shauna made some stupid remark (proclaiming innocence) like, "Oh, so you mean if we see something going on behind Abbi's back we should tell her?" (This is exactly what she does!) She got no direct response. Abbi told me after the meeting the next day that the Commercial Insurance Manager Jim Martin knew who the parties were involved despite her "innocence" plea. I told Charles after the meeting that his

24

making that remark to them was good (They needed someone to "put their foot down", these women think that they are "untouchable".) His remark unfortunately was just a little too late. However also, Charles had said these things not only to those who needed it, but to the whole unit as well. There were three "middle aged" women who had nothing to do with any of this and had just moved into the unit. These women, all three said, "Why are we being addressed with this?" "Why aren't the parties involved being addressed specifically?" They were mad and were disgusted and angry to have been addressed in such a situation, one of which they had no involvement. Three different women, Maura Capplis, Vita Falzone and Peggy Kehoe all asked the same question but really got no direct answer. After Charles spoke at the meeting, the Commercial Insurance Manager Jim Martin (new to the company) addressed the unit. I remember that he tried to encourage people to have feelings for one another and to care about what happens to their peers. He said, "People need to be aware that if there is a struggle between peers, they must try to help." He mentioned a situation that he was in where he was asked for help and he turned away thinking "This is not my area, not my problem." And that party (to whom he denied help) committed suicide. He said "So next time there's a situation that you can help in, think about that, 'cause you don't ever want to feel as though you could have possibly prevented a tragedy." He was very serious and he said "You don't ever want to feel responsible, it's a terrible feeling." They stressed that they wanted to see people be "overly" friendly to each other from here on in. When the meeting was over that afternoon they were "investigating" the department. Charles and Gladys Kwash (the Branch Manager's Secretary) who never ever come near the department were in the area (undercover) just checking things out. They were occupying the desks that seat next to Shauna and I. I was struggling like hell to do my job. I was shaking and making mistakes and trying my hardest to concentrate on my job while holding back tears. Shauna as usual (I don't know whether she's obstinate or just plain stupid) continued to make her "bull----" personal phone calls in her "slang" tone of voice. I don't know how they didn't "pickup on it" and address it. It made me sick to my stomach. I was getting by just minute by minute. I had been coming in a 1/2 hr. earlier each day since I had been back to work, to try to avoid Shauna (rather than staying later at night to get caught up); yet I didn't put in for the overtime. My work was slipping so badly, (between the meetings I was having with Personnel and my Manager in an effort to resolve the situation along with the awful affect that this was having on me resulting in lost production). I didn't feel honestly that I should be entitled to receive compensation for the extra time. I felt that with all the time I'd missed on my job, I owed it to the company to work extra on my own time to get ahead. This however wasn't helping. I continued to slip minute by minute, hour by hour, trying to get by each second of the day as my job was failing. I found myself afraid to be at my desk (because there she was behind me); afraid to leave my desk for fear that I would run into her wherever I went. I was "jumping" around corners if a person was there, afraid it would be Shauna. I was having anxiety attacks throughout the day so badly that I would get dizzy and think that I would "black out" at any second. I was breaking into tears here and there feeling frightened, confused, hurt, helpless and desperate. I didn't know what to do.

25

16. On Tuesday October 5th 1999 I went to work at 6:00 a.m. I knew that I wouldn't be able to make it through the day. I E-mailed my Boss Abbi telling her that I needed to take ½ of personal day I told her that I had started at 6:00 a.m. this entitled me to leave work at approximately 10:40 a.m. for ½ day. I apologized for the short notice but I told her that it couldn't be helped. I also thanked her for her understanding. She replied to me that it would be OK for me to take the half day and she also said that she hoped everything was OK. That day Shauna came into work that day exclaiming, "What a wonderful day it is!" (As though none of what had happened had any affect on her.) I on the other hand felt like I was losing my mind. I wished I had a knife. I thought about stabbing her, and I am not a violent person. I drove home, desperate to get away. I felt like I would throw up on my ride home. During the past 5 days I had had thoughts of shooting Shauna, her black friends and then turning the gun on myself. And I felt so desperate and betrayed I thought about committing suicide. That day I called Howard I. Wilgoren Attorney At Law. I was desperate and I didn't feel like I could trust anyone within my company. It didn't seem as though things were right. None of my authorities were being straight with me and I needed to know what my rights were. He advised me not to return until this situation was resolved. He talked to me about some of my rights as an employee and he clarified that things had not been handled properly. He understood the situation that I was in. He offered to see me the very next day with my husband. I was so confused I didn't know what to do, also I hadn't had a chance to fully entail my husband with all that had happened and possibly all that was going to happen. I didn't have any available sick days, and without scheduling a vacation day, I was afraid that I could get fired if I didn't go to work on Wednesday October 6th 1999, by calling in a vacation day. I felt that I had no choice but to return to work on Wednesday.

17. On Wednesday October 6th 1999 I went to work at 6:00 a.m. again. I replied to the E-mail of her response (to my request about taking ½ day on October 5th 1999) about the part where she asked me "I hope everything is OK." I replied that things were not OK at all. I thanked her for asking and I asked her if it was possible could we meet sometime that day. I didn't know what to do. I just couldn't go on with things the way they were. It was impossible for me to concentrate on my job; I was paranoid, afraid and intimidated. I was getting the "shakes" all day while being on the verge of tears throughout. I was having such anxiety that at times I felt as though I would pass out, because it was making me dizzy. I was feeling extremely insecure while losing my self-confidence and self-esteem while at the same time losing confidence in my employer. I felt unsafe and desperate and confused and at times I thought I would "lose it". Abbi agreed to meet with me and we met upstairs on the eighth floor (where nobody is) in a private conference room. I told Abbi how I felt. I told her that I was having such trouble doing my job and that I couldn't work under these circumstances. She seemed very understanding toward my problem. I told her that I had been coming in at 6:00 a.m. instead of 6:30 a.m. (because I couldn't sleep at night) and I asked her if while this was happening could I leave work ½ hour earlier. I told her that I felt more comfortable leaving with her at the end of the day (she leaves at 4:00 p.m.) because I didn't feel safe when she wasn't around and I was left alone with Shauna without supervision. She granted me that. I told her that I was having such a hard time (concentrating) doing my job and that I was not being

26

productive at all. She said she understood. I proceeded to tell her that I was so confused at how things had been handled. I told her that Charles had not questioned any of the witnesses that I had given him the names of and I told her that I couldn't understand why. I told her that I couldn't understand any of it, what Charles had told me about not being able to pull her phone record, that the company promotes personal phone call use. And that he couldn't protect me from being so harassed. I told her that the day before when I was driving home I felt like I had to pull over to throw up. I told her that when Jim Martin the Commercial Insurance Manager talked about that person committing suicide out of desperation that I felt the same way. I told her "Abbi I feel like that, I'm going to 'eat a bullet' anyway so what's the difference." I think I told her that I thought of sticking a knife into Shauna (and I was afraid of all of this, these feelings I was having). I knew that I needed help! She referenced herself at a time in her life where she felt like minute by minute she couldn't get by. I was crying at this point, I just felt so desperate. I said to her as I cried, "You know Abbi I love my job, I really love my job and I'm so good at it, but right now I just can't do it, I just can't do it at all." (This hurt me to tell her this.) She understood. I asked her if I could please take a personal day the following Thursday October 8th 1999. I said I needed to "get some paper work done." I didn't really know what I needed but I knew that I couldn't work at this point and that I needed professional help. I couldn't continue my job the way things were. Abbi granted me the personal day. Before the meeting was over Abbi told me that she had a gift certificate for my 15 yr. Anniversary with C.N.A., (for L.L. Bean catalog or something) waiting for me at her desk . She also told me that I was due an anniversary luncheon where I could take to lunch (in celebration) my choice of office workers and friends. She said that the new Commercial Insurance Manager Jim Martin thought that it would be a good idea to invite the unit as a whole (despite all that had happened). She said something like "Jim thought it would be a good idea to include everyone as a team to your luncheon, sort of 'a new start'." "But of course", she said, "the choice is yours." I said "That would be just like me, 'turn the other cheek', but again I would be the one to get hurt when they (Shauna, Grace and Ernie) refused to accept." I said "Abbi what if that happens, I can't do that to myself ." I said that in all my years at C.N.A., every time I had an anniversary celebration (5- yrs., 10-yrs. Etc.) I always invited my unit as a whole." Lot's of others (when it was their anniversaries') were choosy and only invited their friends. I always felt that that would hurt peoples feelings. I'd seen it in the past and it was very awful seeing others (in my team) and myself getting hurt and feeling resentment. (Such an anniversary tradition was meant for a celebration, yet when people were slighted, it always caused hurt feelings and my feeling was that it to some point 'defeated the celebration'. I always had invited all of us. I always felt who best to celebrate with than those who have worked with you to give you such success. I looked at her and I said "It's different this time, as much as I would love to have my unit as a whole." "I just can't do it." "Not after this, I could never celebrate such an occasion with these people." I said "I'm sorry Abbi but I just don't think that I could do it." She reminded me to pick up the certificate at her desk after the meeting. After the meeting (it was the end of the day) when I returned to the office to get my purse to leave, Lisa Wright said to me (I had been crying and she felt so bad) "You're not coming back are you?" I looked at her and I thanked her for all

27

of her support through all of this and I said, "I don't know."(As I nodded my head with a "lost" look on my face). "I have to go now or I won't make it." (As my eyes started to fill). I was on the verge of breaking down right there and I tried to leave quickly (and hide it) so no one (especially Shauna) would see me. The look in Lisa's eyes and what she said just broke my heart, because I just didn't know anything anymore. I had no more answers. I never did get the certificate from Abbi; I just got my pocketbook and went home.

28

**Connick,Barbara Carol**

EXHIBIT
#3 B Connial
9/1/00 EMB

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, August 23, 1999 11:43AM |
| **To:** | Connick,Barbara Carol |

Barbie,
I did not forget about your phone call, How does Wednesday or Thursday sound of this week?  I figure we could go to the Fours for lunch, How does 12:45 sound?   Please let me know thanks.
Abbi

**Connick,Barbara Carol**

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, August 23, 1999 12:34PM |
| **To:** | Connick,Barbara Carol |
| **Subject:** | RE: |

Why don't we go on Thursday.
Abbi

> ----------
> **From:** Connick,Barbara Carol
> **Sent:** Monday, August 23, 1999 11:58AM
> **To:** Laushine,Abbi G.
> **Subject:** RE:
>
> Thanks Abbi,
>
> Either day would be great, just let me know which, and thank you.
>
> Barbie
>
> > ----------
> > **From:** Laushine,Abbi G.
> > **Sent:** Monday, August 23, 1999 11:43AM
> > **To:** Connick,Barbara Carol
> >
> > Barbie,
> > I did not forget about your phone call, How does Wednesday or Thursday sound of this week?  I figure we could go to the Fours for lunch, How does 12:45 sound?   Please let me know thanks.
> > Abbi

**Connick,Barbara Carol**

**From:** Laushine,Abbi G.
**Sent:** Thursday, August 26, 1999 6:38AM
**To:** Connick,Barbara Carol
**Subject:** Lunch Today

Hello Barbie,
Just checking to make sure that we are still on for today at 1:45 at the fours.  I will meet you there.
Let me know
Abbi

## Connick,Barbara Carol

**From:**     Laushine,Abbi G.
**Sent:**      Thursday, August 26, 1999 12:20PM
**To:**        Connick,Barbara Carol
**Subject:**   RE: Lunch Today

Barbie, I am assuming we are still on.  Are going to be leaving first or should I?  We really did not work out the details.  I was thinking that you would leave first, then I would take a late lunch..  Let me know if this is doable.or if you have changed your mind.
Abbi

> **From:**     Connick,Barbara Carol
> **Sent:**      Thursday, August 26, 1999 6:51AM
> **To:**        Laushine,Abbi G.
> **Subject:**   RE: Lunch Today
>
> As long as it's ok with you Abbi, it's fine with me.
>
> Thank you,
> Barbie
>
> > **From:**     Laushine,Abbi G.
> > **Sent:**      Thursday, August 26, 1999 6:38AM
> > **To:**        Connick,Barbara Carol
> > **Subject:**   Lunch Today
> >
> > Hello Barbie,
> > Just checking to make sure that we are still on for today at 1:45 at the fours.  I will meet you there.
> > Let me know
> > Abbi

Page 1

## Connick,Barbara Carol

| | |
|---|---|
| **From:** | Connick,Barbara Carol |
| **Sent:** | Thursday, September 16, 1999 7:21AM |
| **To:** | Laushine,Abbi G. |
| **Subject:** | VACATION wk 9/20 - 9/23 |

Hi Abbi,

Please don't forget I would like to have next week off, my husband has special plans.  I don't know if it matters but please know that I have started 1/2 hour earlier every day for a week and not put in for overtime. I currently have 56 endt. carryover.  Please let me know by the end of today.  I will sincerely appreciate it.

Thanks,

Barbie

**Connick,Barbara Carol**

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, September 27, 1999 7:08AM |
| **To:** | Connick,Barbara Carol |
| **Subject:** | RE: RACIAL TENSION |

Thanks Barbie, I know it is tough and I wish I had easier solutions.  I trust that you will be able to make it!:)
Abbi

---

| | |
|---|---|
| **From:** | Connick,Barbara Carol |
| **Sent:** | Monday, September 27, 1999 7:02AM |
| **To:** | Laushine,Abbi G. |
| **Subject:** | RE: RACIAL TENSION |

Thank you, 11:30 it is, I just hope that I can make it till then.

Barbie

---

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, September 27, 1999 7:00AM |
| **To:** | Connick,Barbara Carol |
| **Subject:** | RE: RACIAL TENSION |

I am not sure that I can make coffee, I have a meeting at 8:30 with Dottie, the underwriting meeting at 8:45 and a Staff meeting at 9:30-11:30.  How about after the staff meeting at 11;30.
Sorry to have to put you on "hold" but this morning is pretty full, and I don't want to have to cut it short.
Let me know.
Abbi

---

| | |
|---|---|
| **From:** | Connick,Barbara Carol |
| **Sent:** | Monday, September 27, 1999 6:46AM |
| **To:** | Laushine,Abbi G. |
| **Subject:** | RE: RACIAL TENSION |

Yes, lets go downstairs for coffee.

---

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, September 27, 1999 6:43AM |
| **To:** | Connick,Barbara Carol |
| **Subject:** | RE: RACIAL TENSION |

Barbie, I am just now reading your e-mail, do you still want to meet to discuss?  Let me know.
Thanks
Abbi

---

| | |
|---|---|
| **From:** | Connick,Barbara Carol |
| **Sent:** | Monday, September 27, 1999 6:39AM |
| **To:** | Laushine,Abbi G. |
| **Subject:** | RACIAL TENSION |

Can we meet in private please?; I don't feel that I can discuss this at your desk with you!



**Wright,Lisa M.**

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Wednesday, November 17, 1999 10:25AM |
| **To:** | Beck-Rochelle,Judith; Chan,Doris K.P.; Clemetson,Grace M.; Connick,Barbara Carol; Gilmore,Dorothy M.(NXI); Falzone,Vita T.; Cody,Gail A.; Millette,Gerard U.; Goddard,Ernest B.; Joyce,Bernadette; Quigly,Karen; Kehoe,Margaret; Ward,Mary E.; Capplis,Maura; Mullane,Margaret Mary; Antoine,Regina Lorraine; Oliver,Robert J.; Tutty,Todd; Williams,Shauna L.; Wright,Lisa M. |
| **Cc:** | Edwards,Charles Henry(NXI) |
| **Subject:** | Huddle Wednesday November 17th |
| **Importance:** | High |

In todays huddle I noticed some  things that are unacceptable at a huddle or at any other time.  I have stated before that everyone should be treated with the same respect, common courtesy and professionalism that they would like to be treated.  If someone offers up and opinion or an idea they should never feel that others are rolling their eyes, saying things under their breath or whispering to others.  I witnessed this today and I am informing everyone that this will not be tolerated in future huddles or on the floor.  Every person on this team has a right to express his or her ideas, and offer up suggestions and opinions.  If anyone is in disagreement then it can be discussed in an open and professional manner, if it cannot be discussed in this manner it can either be tabled for a different time or we should  agree to disagree and move on.   Personality conflicts must be put aside.  I cannot stress this factor enough.  No one has  ever said that everyone in the unit has to be best friends, but what we have to be is, professional and be able to work in an environment with all different types of individuals and personalities.  We are a very diverse group and this ability to work as professionals  becomes even more important because of this diversity.  This unit has many positives, we are all hard workers, and we all appear to want the unit to succeed, but I will not consider the unit a success until the personality conflicts can be put aside and we can work in what truly would be a professional atmosphere.  I do believe I came down hard on with this e-mail, but I feel that this is an extremely important issue.  Again, do not overlook the fact that we do many things right and we should be proud of those things, we just need some improvement in this area!
Thanks for your time and as always I welcome anyones comments.
Abbi

## COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION



BARBARA C. CONNICK,     )
                              )
            Complainant,    )
                              )
v.                            )
                              )          **Docket No. 00130700**
**CONTINENTAL CASUALTY**  )
**COMPANY**             )
                              )
          Respondent.   )
                              )

## BARBARA C. CONNICK'S RESPONSES TO RESPONDENT'S
## FIRST SET OF INTERROGATORIES

Now Comes, BARBARA C. CONNICK, Complainant in the above entitled action, and responds to Respondent's Interrogatories as follows:

**INTERROGATORY NO.1:**

Identify all persons you believe to have knowledge of facts, statements, or circumstances relevant to the allegations in your Charge and describe in detail the issues upon which you believe they have knowledge.

**ANSWER No 1:**

Abbl Laushine   -     Is aware of all the threats and racially hostile conduct that I was subjected to during the course of my employment.

Charles Edwards   -     Is aware of all the threats and racially hostile conduct that I was subjected to during the course of my employment. Made the statement that calling me a white trash bitch is the same as someone using the "N" word to an African American individual.

1

Chris Dye    -    Is aware of all the threats and racially hostile conduct that I was subjected to during the course of my employment. Chris Dye told me, "I know all about the situation."

Lisa Wright Observed the racial harassment that I was subject to.

Doris Chan   Victim of harassment.

Margie Fleming    -    Is aware of the numerous incidents of racial harassment.

Joan O'Brien    -    Is aware of the numerous incidents of racial harassment.

Jean Beaudreau    -    Is aware that Shauna Williams threatened to beat me up  She is also aware that Greta Thomas threatened me with bodily injury.

Maura Capplis    -    Was present the day Shauna Williams threatened me.

Gina Antoine    -    Is aware of the ongoing racial harassment.

Gerard Millette    -    Is aware of ongoing harassment

Also please see my chronology of events, which is being provided in response to Respondent's request for production of documents.

**INTERROGATORY NO. 2.**

Regarding your contention that "certain African American employees" engaged in discriminatory conduct against you, please identify each employee by name, last known job title, and working relationship you have with them.

**ANSWER NO. 2:**

| | | |
|---|---|---|
| Shauna Williams | Rater Tech | Co worker |
| Grace Clemetson | Rater Tech | Co worker |

2

| Greta Thomas | Rater Tech | Co worker |
| Ernie  Goddard | Rater Tech | Co worker |
| Heather Gill | Clerk | Co worker |

**INTERROGATORY NO. 3**

In with particularity the events and happenings that are alleged in your Charge to have occurred, and describe the nature of the acts each employee named in Interrogatory Number 2 subjected upon you.

**ANSWER NO. 3:**

Grace, Greta and Heather would group together during lunch at Grace's desk making disparaging comments about employees on a regular basis for the past several years. I was referred to by these individuals as "pure garbage." They constantly put down Doris with disparaging comments. They referred to me and other employees as stupid people   I reported this conduct to my former supervisor Laura Nichols. No action was ever taken by Laura regarding these complaints. In the presence of Abbie Laushane Shauna mimicked Doris' accent. They regularly made disparaging comments regarding Doris' national origin.

In June 1999 Greta Thomas stared at me during an office party. She also threatened me with physical violence. I reported this misconduct to Abbie Laushane, however no action was taken.

In August 1999 Grace and Shauna were talking at Shauna's desk. I heard Grace say that I was pure garbage. Shauna said that Heather would have no problem beating me up. Shauna stated, "White trash bitch, we'll get Heather to beat her up". I reported this misconduct to Abbie Laushane, however no action was taken.

3

In September 1999 Shauna was on the telephone. I heard her say into the telephone about me, "This white trash bitch that sits in front of me, white trash bitch, I'll have her taken care of, I'll have someone waiting in the garage for her, and you know who I mean." I reported this racially harassing statements and threats to my physical safety to Abby and Charles Edwards. However, no action was taken to address the racial harassment of threats to my physical safety.

**INTERROGATORY NO. 4:**

Describe with particularity any and all reports you made to Abbie Laushine, Mass Auto Manager, regarding the events and happenings that are alleged in your Charge to have occurred.

**ANSWER NO. 4:**

I reported the conduct to my former manager Laura Nichols on several occasions.

I reported the conduct to Abbie in the spring of 1999 during a meeting on my desk. I had an off site meeting with Abbie on August 26, 1999. I reported the conduct to Abbie and Charles Edwards in a meeting held on September 16, 1999.

**INTERROGATORY NO. 5:**

Describe with particularity any and all reports you made to Charles Edwards, Vice President of Human Resources, regarding the events and happenings that are alleged in your Charge to have occurred.

**ANSWER NO. 5:**

I described the three incidents to Charles Edwards in a meeting on September 16, 1999 in the conference room. Charles was on the speakerphone.

**INTERROGATORY NO. 6:**

Identify and describe with particularity any and all conversations you had with any other employee of Respondent regarding the events and happenings that are alleged in your Charge to have occurred.

**ANSWER NO. 6:**

I spoke with Doris, Maura Capliss Lisa Wright Joan DiCola and Jean Boudreau regarding the above described hostile environment and threats to my physical safety.

**INTERROGATORY NO. 7:**

Please identify with particularity if you, or anyone else, has obtained statements in any form, from any person(s), regarding any of the events or happenings that are alleged in your Charge to have occurred. Please identify all persons who made such statements or have such statements and describe the substance of the statements or notes of statements.

**ANSWER NO. 7:**

None.

**INTERROGATORY NO. 8:**

Identify with particularity and describe what occurred after you reported the concerns raised in your Charge to Abbi Laushine and Charles Edwards.

**ANSWER NO. 8:**

No action was taken to eliminate the racially hostile environment.  No action was taken to make the work environment safe so that I could return to work and not be in

fear that the threats on my life would not be carried out. I asked that Shauna's desk be moved but this request was denied. Abbie told me she was for this move but that Charles was against. I told Abbie that I felt as though the matter was being swept under the rug. I asked to meet face to face with Shauna behind closed doors to discuss the matter. However Abbie told me this could not be done because they were afraid of Shauna's aggression.

**INTERROGATORY NO. 9:**

Identify and describe with particularity why and how you contend Respondent failed to investigate and failed to take corrective action regarding your voicing your concerns of harassment as alleged in your Charge. Please also identify and describe with particularity how Respondent has failed and refused on an ongoing basis to investigate the hostile work environment as alleged in your Charge.

**ANSWER NO. 9:**

Paul Connick asked Charles Edwards during a telephone conference what actions were being taken to give Barbara a safe non-racially hostile work environment. Charles Edwards responded, "I can't guarantee anything." I requested that the Company move Shauna's desk, a reasonable request given the racist and threatening statements that she had made. However, this request was denied. This request was made at the suggestion of the Quincy Police department, to whom I had been referred by Charles Edwards.

**INTERROGATORY NO. 10:**

Please identify and describe with particularity how you think Respondent should have investigated the events and happenings that are alleged in your Charge to have

occurred.

**ANSWER NO. 10:**

Respondent failed to talk with witnesses to the events, including but not limited to, Lisa Wright, Doris and others. Contrary to Respondent's Code of Professional Conduct policy, this matter was not investigated by Corporate Security after I spoke with Abbie on August 26, 1999. Failed to respond to my suggestion that Shauna's telephone records be checked. Failed to move Shauna's work location after the same was suggested by Detective Nancy Coletta of the Quincy Police Department.

**INTERROGATORY NO. 11:**

Do you contend that you have been injured or damaged by the acts or omissions of Respondent? If you contend that you have suffered any physical, mental or emotional injury proximately caused by defendant, please describe the nature and duration of the injury and identify. all physicians, psychiatrists, psychologists, clinical social workers, clergy, counselors, or other healing arts professionals from whom you have sought or obtained treatment for such physical, mental and/or emotional injuries since January 1, 1996.

**OBJECTION:    The interrogatory is not designed to lead to the production of relevant evidence, and is overbroad. Notwithstanding the foregoing objection, the interrogatory will be answered with for the period from September 1999 to the present time.**

**ANSWER NO. 11:**

I have suffered severe emotional and physical injuries caused by Respondent's unlawful conduct. I have suffered constantly from September 1999 to the present time

7

from post traumatic stress syndrome, major clinical depression, lack of sleep, anxiety, exhaustion, suicidal ideation, loss of self esteem, side effects from medications, inability to concentrate, nausea,  inability to sleep, nightmares and dizziness.   Dr. Robert Sipzener, Kate Taylor and Dr. Collella have treated me.

**INTERROGATORY NO. 12:**

If you contend that you have suffered any physical injury proximately caused by defendant, please describe the nature and duration of the injury and identify all physicians, osteopaths, naturopaths, homeopaths, or other healing arts professionals from whom you have sought or obtained treatment for such injuries since January 1, 1996.

**ANSWER NO. 12:**

See the answer to interrogatory number 12.

**INTERROGATORY NO. 13:**

If you are seeking an award of any sum of money, whether as damages or otherwise, state the fill amount of money you seek and describe the manner in which the amount was calculated. Your description should include each element of damage or component of recovery that you seek (wages, employment benefits, other compensation), the amount sought for each element or component, the manner in which each element or component of the calculation was determined, and should identify the source of each number used in the calculation and any documents which support your damage allegations.

**ANSWER NO. 13:**

I am seeking all lost wages and benefits of approximately $650.00 per week,

including but not limited to contributions to the 401k plan, (the six per cent company match), the bonus that was paid to employees in the first quarter of 2000 based on my service to the company  during 1999 (everyone in my group got the bonus except for me), approximately $500.00 in out of pocket expenses for co - pays and approximately $72.00 per month in out of pocket expenses for medications. My insurance is not paying the cost of my therapist anymore.   The cost of the weekly appointments with my therapist, Kate Taylor is $90.00 and $110.00 for Dr. Collella who I see once per month at the present time. There is no amount of money that can sufficiently compensate me for the severe emotional and physical distress caused by Respondent's unlawful conduct.   However, my attorney advises me that emotional distress awards in cases similar to mine, have been in the $100,000.00 to $250,000.00 range. I have also incurred attorney's fees.

**INTERROGATORY NO. 14:**

14.   Please identify the sources and amounts of all income and other monies you have received since October 7, 1999 to the present, including, but not limited to, wages, fringe benefits, and disability income benefits.

**ANSWER NO. 14:**

Since approximately October 21, 1999  I have received disability income benefits in the sum of  $763.76    bi weekly.

**INTERROGATORY NO. 15:**

Please identify all documents not in your possession or subject to your custody or control that you believe may support the allegations made in your Charge, and for each document or group of documents so identified, please identify the maker and the

9

last known custodian.

**ANSWER NO. 15:**

There are numerous documents within the possession of Respondent that I am certain will corroborate my claim, including but not limited to, documents pertaining to the investigation into this matter, e mail between Abbie and me and documents in the possession of Abbie Leshaune and Charles Edwards.

Signed under the pains and penalties of perjury this 17h day July 2000.

BARBARA C. CONNICK

As to Objections:

BARBARA C. CONNICK
By her Attorney

Howard I. Wilgoren
1661 Worcester Road
Framingham, Massachusetts 01701
508 626 - 8600
B.B.O. # 527840

DATED: July 17, 2000

CERTIFICATE OF SERVICE

I, hereby certify that a copy of the foregoing document was served on Respondént by mailing a copy of same by first class mail, to its Attorneys, Allison C. Blakley, Fox and Grove Chartered, 311 South Wacker Drive, Suite 6200, Chicago Illinois 60606.

Howard I. Wilgoren

DATED July 17, 2000

11

EXHIBIT
#3 BConnick
9/1/00 EMB

## Connick,Barbara Carol

**From:**    Laushine,Abbi G.
**Sent:**    Monday, August 23, 1999 11:43AM
**To:**      Connick,Barbara Carol

Barbie,
I did not forget about your phone call, How does Wednesday or Thursday sound of this week?  I figure we could go to the Fours for lunch, How does 12:45 sound?   Please let me know thanks.
Abbi

**Connick,Barbara Carol**

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, August 23, 1999 12:34PM |
| **To:** | Connick,Barbara Carol |
| **Subject:** | RE: |

Why don't we go on Thursday.
Abbi

---

| | |
|---|---|
| **From:** | Connick,Barbara Carol |
| **Sent:** | Monday, August 23, 1999 11:58AM |
| **To:** | Laushine,Abbi G. |
| **Subject:** | RE: |

Thanks Abbi,

Either day would be great, just let me know which, and thank you.

Barbie

---

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, August 23, 1999 11:43AM |
| **To:** | Connick,Barbara Carol |

Barbie,
I did not forget about your phone call, How does Wednesday or Thursday sound of this week?  I figure we could go to the Fours for lunch, How does 12:45 sound?   Please let me know thanks.
Abbi

**Connick,Barbara Carol**

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Thursday, August 26, 1999 6:38AM |
| **To:** | Connick,Barbara Carol |
| **Subject:** | Lunch Today |

Hello Barbie,
Just checking to make sure that we are still on for today at 1:45 at the fours.  I will meet you there.
Let me know
Abbi

## Connick,Barbara Carol

**From:** Laushine,Abbi G.
**Sent:** Thursday, August 26, 1999 12:20PM
**To:** Connick,Barbara Carol
**Subject:** RE: Lunch Today

Barbie, I am assuming we are still on. Are going to be leaving first or should I? We really did not work out the details. I was thinking that you would leave first, then I would take a late lunch.. Let me know if this is doable.or if you have changed your mind.
Abbi

**From:** Connick,Barbara Carol
**Sent:** Thursday, August 26, 1999 6:51AM
**To:** Laushine,Abbi G.
**Subject:** RE: Lunch Today

As long as it's ok with you Abbi, it's fine with me.

Thank you,
Barbie

**From:** Laushine,Abbi G.
**Sent:** Thursday, August 26, 1999 6:38AM
**To:** Connick,Barbara Carol
**Subject:** Lunch Today

Hello Barbie,
Just checking to make sure that we are still on for today at 1:45 at the fours. I will meet you there.
Let me know
Abbi

## Connick,Barbara Carol

**From:**      Connick,Barbara Carol
**Sent:**      Thursday, September 16, 1999 7:21AM
**To:**        Laushine,Abbi G.
**Subject:**   VACATION wk 9/20 - 9/23

Hi Abbi,

Please don't forget I would like to have next week off, my husband has special plans.  I don't know if it matters but please know that I have started 1/2 hour earlier every day for a week and not put in for overtime. I currently have 56 endt. carryover.  Please let me know by the end of today.  I will sincerely appreciate it.

Thanks,

Barbie

**Connick,Barbara Carol**

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, September 27, 1999 7:08AM |
| **To:** | Connick,Barbara Carol |
| **Subject:** | RE: RACIAL TENSION |

Thanks Barbie, I know it is tough and I wish I had easier solutions. I trust that you will be able to make it!:)
Abbi

----------
| | |
|---|---|
| **From:** | Connick,Barbara Carol |
| **Sent:** | Monday, September 27, 1999 7:02AM |
| **To:** | Laushine,Abbi G. |
| **Subject:** | RE: RACIAL TENSION |

Thank you, 11:30 it is, I just hope that I can make it till then.

Barbie

----------
| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, September 27, 1999 7:00AM |
| **To:** | Connick,Barbara Carol |
| **Subject:** | RE: RACIAL TENSION |

I am not sure that I can make coffee, I have a meeting at 8:30 with Dottie, the underwriting meeting at 8:45 and a Staff meeting at 9:30-11:30. How about after the staff meeting at 11;30.
Sorry to have to put you on "hold" but this morning is pretty full, and I don't want to have to cut it short. Let me know.
Abbi

----------
| | |
|---|---|
| **From:** | Connick,Barbara Carol |
| **Sent:** | Monday, September 27, 1999 6:46AM |
| **To:** | Laushine,Abbi G. |
| **Subject:** | RE: RACIAL TENSION |

Yes, lets go downstairs for coffee.

----------
| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Monday, September 27, 1999 6:43AM |
| **To:** | Connick,Barbara Carol |
| **Subject:** | RE: RACIAL TENSION |

Barbie, I am just now reading your e-mail, do you still want to meet to discuss? Let me know.
Thanks
Abbi

----------
| | |
|---|---|
| **From:** | Connick,Barbara Carol |
| **Sent:** | Monday, September 27, 1999 6:39AM |
| **To:** | Laushine,Abbi G. |
| **Subject:** | RACIAL TENSION |

Can we meet in private please?; I don't feel that I can discuss this at your desk with you!



**Wright,Lisa M.**

| | |
|---|---|
| **From:** | Laushine,Abbi G. |
| **Sent:** | Wednesday, November 17, 1999 10:25AM |
| **To:** | Beck-Rochelle,Judith; Chan,Doris K.P.; Clemetson,Grace M.; Connick,Barbara Carol; Gilmore,Dorothy M.(NXI); Falzone,Vita T.; Cody,Gail A.; Milliette,Gerard U.; Goddard,Ernest B.; Joyce,Bernadette; Quigly,Karen; Kehoe,Margaret; Ward,Mary E.; Capplis,Maura; Mullane,Margaret Mary; Antoine,Regina Lorraine; Oliver,Robert J.; Tutty,Todd; Williams,Shauna L.; Wright,Lisa M. |
| **Cc:** | Edwards,Charles Henry(NXI) |
| **Subject:** | Huddle Wednesday November 17th |
| **Importance:** | High |

In todays huddle I noticed some things that are unacceptable at a huddle or at any other time. I have stated before that everyone should be treated with the same respect, common courtesy and professionalism that they would like to be treated. If someone offers up and opinion or an idea they should never feel that others are rolling their eyes, saying things under their breath or whispering to others. I witnessed this today and I am informing everyone that this will not be tolerated in future huddles or on the floor. Every person on this team has a right to express his or her ideas, and offer up suggestions and opinions. If anyone is in disagreement then it can be discussed in an open and professional manner, if it cannot be discussed in this manner it can either be tabled for a different time or we should agree to disagree and move on. Personality conflicts must be put aside. I cannot stress this factor enough. No one has ever said that everyone in the unit has to be best friends, but what we have to be is, professional and be able to work in an environment with all different types of individuals and personalities. We are a very diverse group and this ability to work as professionals becomes even more important because of this diversity. This unit has many positives, we are all hard workers, and we all appear to want the unit to succeed, but I will not consider the unit a success until the personality conflicts can be put aside and we can work in what truly would be a professional atmosphere. I do believe I came down hard on with this e-mail, but I feel that this is an extremely important issue. Again, do not overlook the fact that we do many things right and we should be proud of those things, we just need some improvement in this area!
Thanks for your time and as always I welcome anyones comments.
Abbi

CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

NO. 1490  D. 30700
EEOC 16CA01155

| MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION | and EEOC |
|---|---|
| (State or local Agency, if any) | |

NAME (Indicate Mr. Mrs. or Miss)
Barbara Connick

HOME TELEPHONE NO. (Include Area)
781-925-2727

STREET ADDRESS
28 Rockland House Road, Hull, Massachusetts  02045

CITY, STATE AND ZIP CODE | COUNTY

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

NAME
CNA Insurance Co.

NO. OF EMPLOYEES/MEMBERS
15±

TELEPHONE NUMBER (Include Area C.
617-984-4500

STREET ADDRESS
1250 Hancock Street  Quincy, MAssachusetts    02269

CITY, STATE AND ZIP CODE

NAME

TELEPHONE NUMBER (Include Area C.

STREET ADDRESS

CITY, STATE AND ZIP CODE

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))
☒ RACE  ☒ COLOR  ☐ SEX  ☒ RELIGION  ☐ NATIONAL ORIGIN  ☐ AGE  ☐ RETALIATION  ☐ OTHER (Specify)

RECEIVED
September 29, 1999
MAR 13 2000
COMMISSION AGAINST DISCRIMINATION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s))

The Charging Party named above is Caucasian.

On an ongoing basis commencing in the Spring of 1999 and continuing on a regular basis through September 29, 1999 certain African American employees have engaged in an ongoing pattern of harassment and threats against the Charging Party because of her Race, Caucasian. As part of these threats and harassment these individuals have made threats against the safety of the Charging Party. Among these threats are statemets that CHarging Party was a "White trash bitch." "We will have Heather take care of that White Trash BItch," and "This white trash bitch , we will have someone  take care of her ...someone waiting in the garage."

All of the harassing and threatening conduct was reported by the Charging Party to her supervisor and Charles Edwards, Respondent's Director of Human Resources. Respondent's Director of Human Resources understood the seriousness of the unlawful conduct when he stated to Charging Party on  September 16, 1999 that her being called a white trash bitch was no different than using the "N" word.

Despite reporting the above conduct *to Fail and refuse to* of threats and the ongoing hostile work environment based on race, the Respondent has continued on an ongoing basis to investigate the hostile work environment and has failed to take any corrective action.

As a result of Respondent's unlawful conduct in allowing the continuation of a hostile work environment based on race, Charging Party has been unable to work because she fears for her safety, has suffered severe emotional distress and has suffered other damages due to Respondent's unlawful conduct.

☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

X  *Barbara Connick*

SIGNATURE OF COMPLAINANT

X  *Barbara Connick*
SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

EXHIBIT
A.C Connick
3/13/00 EMB



RECEIVED
MAR 1 3 2000
COMMISSION AGAINST DISCRIMINATION

## COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION

1 Ashburton Place

Boston, Massachusetts 02108

Docket No. .......................................

Complainant  *Barbara Connick*

Respondent  *CNA Insurance*

### APPEARANCE OF COUNSEL

I appear as attorney for

☒ Complainant  ☐ Respondent
in the above named complaint.

*Howard I Wilgoren*
Print Attorney's name

*[signature]*
Signature of Attorney

*1661 Worcester Rd*
Address  *Framingham MA 01701*

*508-626-8600*
Telephone No.

*3-13-00*
Date

EXHIBIT

# 1B'onnieh

7/1/05   EMB

# OUR COMMITMENT TO PROFESSIONAL CONDUCT



ISSUE          NAME          PHONE #

COMMUNICATION   MIKE GOSS    312 822 1510

LEGAL           MARY CASHMAN  312 822 1864

SECURITY        LARRY SCHRODER 312 822 5662

H.R. EMPLOYEE   KEVIN MCKENNA  312 822 5713
   RELATIONS

# LETTER FROM THE CHAIRMAN

Dear CNA Employee:

At CNA, our commitment to ethics, integrity and proper business conduct has been the cornerstone of our company since 1897. As we move into our second century, it is appropriate to revisit that commitment and explore its meaning in today's context. This handbook is intended to do just that. It outlines some specific areas where our conduct is especially important. We've tried to explain these situations and our obligations simply and clearly. We've identified whom to contact in case you have questions, and there is a reference section that can guide you to more detailed information.

While much has changed since 1897, the core ideas of ethics and integrity remain the same.

Proper business conduct goes beyond the practice of avoiding wrong. It is also a matter of choosing to do right. Your personal commitment to high standards of ethics, integrity, fairness and equal treatment will be more effective in achieving these standards than any penalties that might be imposed by the company or by law. This personal commitment is essential to a successful career at CNA — and to the success of our business.

Insurance is a business based on trust, something we earn every day with our customers, business partners and each other. For this reason, I ask you to review this handbook and learn more about what we expect of ourselves, what the law requires of us, and the processes we've put in place to encourage and support professional conduct at CNA.

*Dennis Chookaszian*

Dennis Chookaszian
Chairman and Chief Executive Officer

# Table of Contents

Page

Introduction .................................................................................................................................... 3

Reporting Misconduct ..................................................................................................................... 4

Conflicts of Interest ........................................................................................................................ 6

Improper Payments ........................................................................................................................ 7

Fraud, Dishonesty and Criminal Conduct ...................................................................................... 8

Contracting and Dealings with the Government ............................................................................. 9

Antitrust Laws .............................................................................................................................. 10

Confidential Information ................................................................................................................ 12

Unfair and Deceptive Trade Practices ......................................................................................... 14

Employment Practices .................................................................................................................. 15

Public Statements and Activity .................................................................................................... 16

Environmental and Workplace Safety .......................................................................................... 18

Additional Information ................................................................................................................... 19

References .................................................................................................................................... 20

# Introduction

CNA is judged every day by the way we conduct ourselves in our business dealings with others. Our partners and constituents range from customers and clients to fellow employees and stockholders. All these groups trust that we will be honest and straightforward with them. They also trust us to be around when it is time to deliver on our promises.

Trust has to be earned over time, and it is a commodity that can be easily and quickly lost. It must be nurtured and preserved with a great deal of care. That's one reason these guidelines were written. They highlight our obligations to all those who expect that we will conduct our affairs according to the highest ethical, business and legal standards. This handbook attempts to clearly set forth CNA policies, values and expectations so they are understood and observed by every employee.

A manual, however, cannot anticipate all the situations we encounter. It can only outline principles for guidance. It is our policy to comply with all applicable laws and regulations everywhere we do business. But because no one person can be familiar with all those requirements, compliance will depend on our continued good-faith efforts and good judgment.

The topics covered on the following pages should help us do the right thing. But the current legal environment also encourages corporations to have effective compliance programs in place. This handbook is part of such a program. It should help us meet both the ethical standards we've set for ourselves, and our legal obligations.

# Reporting Misconduct

If you suspect misconduct or believe you are a victim of discrimination, sexual harassment or other inappropriate behavior, it is required that you report the misconduct. Reporting misconduct is your obligation as an employee. We also ask that you cooperate fully with any internal investigations. We would rather resolve a problem early than allow it to grow worse or affect our valuable reputation.

Upon a report of misconduct, every effort will be made to protect your confidentiality. If your identity **must** be revealed to correct the problem or to comply with legal requirements, CNA will protect you from retaliation. Anyone who attempts to retaliate will be disciplined, up to and including dismissal.

Resolving an employee relations problem usually begins by discussing it with your supervisor, manager or Human Resources representative. If for some reason that is not appropriate or desirable, you can also seek assistance from Corporate Employee Relations through the CNA Compliance Hotline.

## Guidelines

- Report suspected violations of CNA's policies, the guidelines in this handbook, or of any statute or regulation.

- If you are personally subjected to improper conduct (for instance, sexual harassment) make it clear that the conduct is unwelcome and improper.

- When in doubt, report. Your information will be carefully evaluated and action will be taken if it is warranted.

- 4 -

If your concern relates to theft, fraud, threat of violence or the like, contact Corporate Security through the Compliance Hotline. Managers and supervisors **should not** attempt to investigate these situations. These investigations must be initiated by Corporate Security.

The CNA Compliance Hotline will channel information and complaints to the appropriate specialists (primarily Corporate Security or Employee Relations) to resolve the issue and report results back to the caller (unless the caller has reported misconduct anonymously).

CNA does investigate information that is provided anonymously. Resolving a problem is much easier, however, if the person reporting it is available to provide additional information or clarification. If you report a problem anonymously, please provide CNA with enough detail so the claim can be thoroughly investigated.

All employees are required to report misconduct. The chart below indicates whom to call to report misconduct, or to obtain clarification or guidance.

| Situation | Who to Call | Phone Number |
|---|---|---|
| ■ fraud<br>■ kickbacks<br>■ theft<br>■ threat of violence<br>■ uncertain to whom a problem should be reported<br>■ want to report anonymously<br>■ talking to manager or HR representative is inappropriate or unacceptable | Compliance Hotline | 1-888-679-9252 |
| ■ conflicts of interest (not involving attorneys or law firms)<br>■ discrimination<br>■ workplace harassment | Supervisor, Manager or Human Resources representative | |
| ■ legal matters<br>■ insider trading<br>■ antitrust issues<br>■ receive a subpoena or other legal document<br>■ conflicts of interest involving attorneys or law firms | Law Department | 1-312-822-1864 |

All of the topics covered in this manual are highly sensitive and, therefore, other than as may be required by law, they should not be discussed with anyone other than the individuals listed above. Doing so may risk charges of libel or slander against you and/or the company.

# Conflicts of Interest

As employees of CNA, we must be sure that our personal interests do not conflict with the company's interests or give the appearance of impropriety. Here are several examples in which conflicts of interest could occur:

- Sharing company information with others when it could adversely affect CNA, or using company information for personal benefit;

- Accepting nominal gifts, entertainment, loans, discounts or other favors that might affect your business judgment, or appear to do so; consult with your supervisor or manager before accepting questionable gifts or entertainment (refer to the Human Resources Manual, Procedure 7250, for additional information);

- Buying stock in a company you know CNA plans to purchase; it would also be wrong to influence CNA investment decisions to benefit you, your family or friends. If a friend owns a business that provides services that might be used by CNA (for example, an auto body shop or home repair contractor) it would be wrong to give business to that friend without revealing the potential conflict of interest.

These certainly aren't all the cases where conflicts could occur, but they provide examples of the type of activity to avoid and report. This basic principle is this: *Avoid using CNA time, resources or information — or your position as a CNA employee — for personal benefit, the benefit of your family, friends or a member of your household.* Employees at certain levels and in certain positions must sign a conflict of interest disclosure annually. Even if you are not one of these employees, if a conflict does exist or could exist, report it to your supervisor or Human Resources representative. Exceptions may be made, with appropriate approval, if CNA's interests are not, or are not likely to be, adversely affected.

## Guidelines

- Never use CNA information or your CNA position for personal financial gain.

- You must not solicit any of the following from anyone doing or seeking to do business with, or in competition with, CNA:
  - gifts of more than nominal value
  - loans of any amount
  - excessive entertainment (paid trips, for example)
  - substantial favors (for example, employment for friends or relatives or excessive payment for speaking engagements)

- Contact your supervisor or Human Resources representative if:
  - you or a family member are an employee or owner of a firm doing business with CNA
  - you or a member of your immediate family or household holds any licenses or registrations as an insurance agent, broker, solicitor or securities salesperson
  - you are offered any of the items mentioned in the guideline above

- Contact the CNA Compliance Hotline at 1-888-679-9252 if:
  - you are offered special favors, discounts, kickbacks or bribes
  - you suspect unlawful or inappropriate activity of this type

# Improper Payments

We must pay particular attention to ensure that
we never give, directly or indirectly, CNA funds,
property, etc., to a United States or foreign
government official or agent to obtain business
for CNA, or to obtain any special or unusual
treatment for the company.

| Guidelines |
|---|
| ■ If you become aware of any improper payments (or requests for payment), report them. |
| ■ If you become aware of any improper accounting for assets, or wrongful use of company resources, report it. |

- 7 -

# Fraud, Dishonesty and Criminal Conduct

Fraud, dishonesty or other criminal conduct relating to CNA's property, employees or operations are, of course, forbidden. Prohibited acts include threats of violence; violating the company's drug policy; theft of employee or company property; using company equipment or employees to perform non-company work; misuse of the company's computer, telephone or mail resources; and falsifying company records or expense reports. It is also essential that our record keeping of business data, reports and statistics be complete, accurate and reliable. Employees must also deal honestly and fairly with each other, with customers and suppliers. Fraud and misrepresentation in these relationships will not be tolerated.

It is inappropriate, for example, to "churn" a customer's insurance policies, i.e., to change or replace the customer's policy frequently to generate commissions, rather than to provide protection the customer needs. It is also inappropriate to direct a customer to doctors, hospitals, repair shops or the like in return for kickbacks, bribes or other favors. Money laundering is another example of fraud. This involves passing illegally-generated money through a legitimate business. If you have reason to suspect that funds are coming to you from a criminal enterprise, immediately report it to Corporate Security through the Compliance Hotline.

If you detect or suspect fraud, dishonesty or criminal conduct, immediately report it to Corporate Security through the CNA Compliance Hotline at **1-888-679-9252.** CNA prohibits retaliation against anyone who reports evidence of fraud, dishonesty or criminal conduct. Neither employees nor managers or supervisors should attempt to investigate this type of misconduct on their own.

| Guidelines |
|---|
| ■ Don't terminate an employee because of suspected or proven fraud, dishonesty or criminal conduct until you have been given permission to do so by the Human Resources Department. |
| ■ Don't make any promises not to report conduct covered by this policy. |
| ■ Don't try to persuade anyone not to report suspected criminal activity to a law enforcement agency. |

# Contracting and Dealings with the Government

All communication with federal (as well as state and local) government officials, must, of course, be truthful and accurate. Misstatements can expose the company and the employee in question to fines and penalties, so particular care must be taken in these dealings.

Contracting with the federal government, or sub-contracting with a federal contractor, involves complex and difficult regulatory and legal issues. Our policy is to comply with all statutes and regulations related to government contracting.

You can be charged with a federal crime for violating these requirements. The federal government can, and occasionally does, jail individuals who sign forms without carefully examining and reading them.

Because of the complexities in this area, contact the Law Department to help you deal with these situations.

## Guidelines

- Do not sign a document containing the words "I hereby certify" if you suspect that it may relate to a government contract, unless you have obtained legal advice. Contact the Law Department when necessary.

- Watch for for "red flag" words that suggest that a government contract may be involved. These include:

  - FAR (Federal Acquisition Regulation)

  - Cost or Pricing Data

  - CFR (Code of Federal Regulations)

  - DAR (Defense Acquisition Regulation)

  - Allowable Costs

  - CAS (Cost Accounting Standards)

  - "I hereby certify"

  - USC (United States Code)

- Never offer a bribe, gift, gratuity or other thing of value to a public official or to any other person for the purpose of obtaining favorable treatment in connection with a federal contract or subcontract.

- Never offer government officials future employment (even implicitly) when transacting business.

# Antitrust Laws

Antitrust laws prohibit a wide range of activities that generally involve business transactions and combinations that restrain trade. Prohibited activities include such things as competitors agreeing to fix prices, agreeing to divide markets, entering into group boycotts, engaging in tie-in sales, unfair competition or deceptive trade practices, and some interlocking of officers or directors among competitors. Most states also have similar antitrust statutes, as well as other laws that prohibit unfair claims practices, or discrimination or misrepresentation, in the sale of insurance.

The insurance industry has a limited exemption from federal antitrust laws, but this exemption is much more limited than insurance company employees often believe. This protection has narrowed, as the courts have defined what constitutes "the business of insurance" and what is "regulated" by state law. CNA is also increasingly involved in activities beyond what is normally considered "the business of insurance." The exemption allows insurance companies to participate in trade associations for legislative or lobbying purposes. Boycotts, coercion or intimidation are **not** protected, however, and should not be engaged in.

## Guidelines

- Never suggest any action relating to the pricing of insurance products to anyone outside CNA, make any agreement to fix prices or divide/share markets, or exchange pricing information with employees of other insurance companies. If there is a compelling need to obtain pricing information from a competitor, consult the Law Department before proceeding.

- Get advice before making the sale of one insurance product a condition for the sale of any other product, i.e., avoid "tie-in" sales, as these are prohibited.

- Never discuss coverage terms with competing companies in a way that can be interpreted as suggesting or agreeing to limit CNA's ability to offer coverages, to participate in certain markets or to interpret its own policy provisions.

- If you participate in a trade association, avoid discussions that could involve limiting competition. Avoid discussions of prices, underwriting practices, business plans and future product offerings. A specific agenda for meetings is desirable to avoid such discussions. Discussions of concerted action relating to proposed legislation or regulation are permitted.

- Avoid any practice that can be characterized as deceptive in dealing with customers.

- Avoid discrimination among customers unless it is based on recognized and valid underwriting considerations.

- Generally conduct the affairs of CNA to promote healthy competition, and as if the antitrust exemption for insurance businesses did not exist.

- Ensure that discussions in trade association meetings stick to a pre-published agenda and have to do only with legislation or lobbying activities.

- Always contact the Law Department if you have a question or concern regarding antitrust issues.

# Confidential Information

### Securities Laws and Insider Trading

CNA, its employees and members of their immediate families and households are subject to a variety of securities laws. The most important securities laws that you need to be aware of are the laws pertaining to insider trading. The insider trading laws prohibit trading in securities of companies (including CNA) for which you have material non-public information. Material information is any information that could influence a reasonable person's decision to buy, sell or hold the security. Examples include major changes in company direction, changes in earnings, expansion plans, etc.

Inside information is information that has not been released to the public. Companies release information in a variety of ways, most commonly through a press release. Persons who trade in securities for which they possess inside information are subject to a variety of civil and criminal penalties and fines.

If you have material non-public information about a company, CNA's policy prohibits you or a member of your household from trading in that company's securities, giving that information to others for their benefit or yours, or getting others to trade for you.

| Guidelines |
|---|
| ■ Never disclose material non-public information about a company to any other person, unless the person needs to know the information to carry out assignments for CNA. Before you give material non-public information to another person, tell that person the information is not public, and that he or she may not use the information to trade in, or to get someone else to trade in, that company's securities. |
| ■ If you know that someone is trading in securities of a company based on material non-public information that this person obtained during work at CNA, contact the investment compliance area of the Law Department or the CNA Compliance Hotline at 1-888-679-9252. |
| ■ Protect confidential information from disclosure to unauthorized individuals, whether the information is stored or transmitted in hard copy, electronically or by voice messaging. |
| ■ Don't terminate an employee because of suspected or proven insider trading until you have been given permission to do so by the Human Resources Department. |
| ■ Don't make any promises not to report conduct covered by this policy. |
| ■ Don't try to persuade anyone not to report suspected criminal activity to a law enforcement agency. |

## Confidential Business Information

In connection with serving our customers' needs, CNA receives a great deal of business information about our customers, which they regard as confidential. Except in carefully selected instances where we exchange claims information with other companies and industry groups, our policy is to not divulge any information about our customers without their written request or permission, or upon a court or administrative order requiring such disclosure, as determined by the Law Department.

Similarly, there is information about the company that CNA considers private, and which others might find useful for competitive or other reasons. This is considered proprietary information. Examples of proprietary information include information that the company owns, develops, pays to develop, possesses, or to which it has an exclusive right. During the course of business, this information may become available to you. It is extremely important for you to safeguard this information and keep it within the company.

## Intellectual Property

Intellectual property is any work developed by you at CNA, or developed by someone else for your use at CNA. Intellectual property also includes copyrighted or proprietary information that belongs to others and that should not be reproduced without permission. Intellectual property includes a wide range of things from computer software to logos to printed material or other expressions of ideas and know-how such as videotapes. It may also appear in books, magazines or on the Internet. Intellectual property assets are valuable. These assets may belong to CNA or to someone else. Our policy is to protect intellectual property from unauthorized use or disclosure.

### Guidelines

- Don't make personal use of the company's intellectual property assets.
- Remember that misappropriation of intellectual property (computer software, for example) is theft.
- Be cautious about making copies of any intellectual property assets in which an entity other than CNA has rights.
- Do not discuss information about CNA, or a current or prospective customer, obtained and used in the line of work outside the workplace. Share information received from a client only with those who need to know.
- Never use information obtained from CNA or a customer for personal benefit.
- Immediately refer any demand, order or subpoena seeking information about a client to the Law Department. Prompt referral will help preserve our legal rights.

# Unfair and Deceptive Trade Practices

Many states have laws and regulations that prohibit insurance companies from engaging in unfair and deceptive practices. These can vary from state to state; however, you can generally comply by avoiding the following activities:

- Misleading a policyholder of CNA or a competitor;

- Making false or misleading statements about a competitor or their business;

- Using or planning to use boycott, coercion or intimidation to unreasonably restrain the insurance business;

- Filing false financial information about a competitor with a regulator;

- Keeping false records to deceive an insurance examiner or other representative of a Department of Insurance;

- Engaging in "redlining" or other forms of unfair or discriminatory underwriting.

| Guidelines |
|---|
| ■ Because these laws and regulations vary from state to state, contact the Law Department if you have any questions or concerns. |

# Employment Practices

## Equal Opportunity Employment/ Workplace Harassment

CNA adheres to all applicable federal, state and local employment laws. We go even further by our commitment to equal opportunity, affirmative action and diversity.

CNA policy prohibits any form of discrimination by its managers or employees based on race, color, religion, age, disability, sexual orientation, national origin, marital status, or gender. Sexual harassment is also prohibited. Sexual harassment can occur when:

- Hiring, promotion, raises, bonuses or other benefits are contingent on sexual favors;

- Unwelcome sexual conduct, language, gestures or jokes create an intimidating, hostile or offensive work environment, or unreasonably interfere with an employee's work performance.

CNA employees who believe they may have been subjected to inappropriate or unfair conduct should not hesitate to bring their concerns to the attention of their supervisors or managers, or directly to their Human Resources representatives. An employee may also contact the CNA Compliance Hotline at **1-888-679-9252.** Anyone who discriminates, harasses or otherwise acts unprofessionally towards another will be subject to appropriate corrective action, including dismissal.

Each year, CNA develops a Corporate Affirmative Action Plan. The current Affirmative Action Plan Base Document is available in Human Resources for review by all CNA employees and applicants.

Individuals with disabilities are encouraged to identify reasonable accommodations that CNA can make to assist them in performing their job duties. Military veterans are invited to identify their veteran status.

Our commitment to equal employment opportunity and diversity recognizes the value each individual brings to the organization.

## Guidelines

- Be certain to base employment decisions (hiring, promotions, appraisals, raises, bonuses, etc.) on business criteria.

- Take appropriate measures to ensure that qualified minority and female candidates and employees are considered for hiring, promotion and special assignments.

- Do not make comments or jokes or display pictures, drawings or behavior (sexual, racial or otherwise) which, even though innocently intended, may be offensive to others. Do not send, post or access offensive materials electronically.

# Public Statements and Activity

## Communications Regarding CNA

Inquiries from the press or other media must be referred to CNA Media Relations. Inquiries from financial analysts must be referred to Corporate Finance. Service of legal papers or inquiries from regulators must be referred to the Law Department. Be cautious in providing information about the company, other than materials that have been specifically provided for that purpose, such as *CNA at a Glance*.

Policy statements on public issues by CNA may be made only by or with the approval of the chairman, president, or the senior vice president, marketing.

## Influencing Governmental or Regulatory Action

CNA regularly communicates its positions relating to legislation and regulation. As a good corporate citizen, the company regularly provides information and shares its opinions with government officials and candidates for public office, particularly on issues that affect the company, shareholders, employees, customers and the communities we serve. Communication of these positions may be an important part of your job. It is important to comply with applicable statutes and rules relating to lobbying activities and to remain within appropriate ethical and legal boundaries. If you have questions about the scope of these restrictions, contact the Law Department.

## Communicating Your Personal Views

When communicating your personal views, as in, for instance, a letter to an editor, or posting on the Internet, avoid using CNA stationery, your CNA title or any other information that implies that your views are those of CNA. Be particularly careful not to state or imply that CNA endorses a particular policy, view, political stance or product. If your employment with CNA is made known, you should make a clear statement that your comments and views are your own, and not those of CNA.

## Personal Political Activity

CNA employees are free to engage in political activities of their own choosing. However, care should be taken not to associate the company with your political activities. For instance, you may not use CNA stationery, your CNA e-mail address, or other company assets or associations, or take any other action that associates CNA with your political activity.

CNA administers a political action committee. As explained below, contributions to this committee by CNA employees are completely voluntary. The use of corporate funds to make political contributions is strictly regulated by federal and state law. Do not contribute CNA funds, property, services or time to a political candidate or cause without obtaining advice and approval from the Law Department. Do not charge meals or other activities associated with political fund-raising events to your expense account.

An employee's decision to contribute to any political cause, including the CNA political action committee, is a personal and voluntary choice. CNA's policy states that an employee will neither be favored nor disadvantaged for deciding to make or not make a political contribution. Avoid suggesting to any employee that a political contribution is anything but fully voluntary. Also, in keeping with the voluntary nature of such contributions, CNA will not reimburse employees for their contributions — it would be illegal for CNA to do so.

# Environmental and Workplace Safety

It is CNA's policy to comply with all applicable environmental laws and regulations and to be sensitive to issues relating to the disposal of waste and equipment, such as outdated company-owned computers. We also use a large amount of paper and therefore we practice recycling and other environmentally-friendly measures. Please cooperate and help us minimize our environmental impact.

CNA subscribes to the idea of, and strives to provide, a safe working environment for its employees. Please feel free to report any situation that you consider to be unsafe.

# Additional Information

As a federal, state and local taxpayer, CNA is legally required to file accurate reports and tax returns with the proper authorities. CNA is committed to maintaining proper records that accurately reflect our activities and permit the calculation and verification of the proper amount of its tax liabilities. Filings must be completed on a timely basis (unless an extension is appropriately obtained) and the information they contain must be complete and accurate. Dealings with government tax officials must be conducted in an honest and ethical manner, and in accordance with the standards supported by this handbook.

CNA is similarly committed to following all the laws in all the jurisdictions in which we do business. CNA employees who work in the international operations, whether in the United States or abroad, must be particularly careful to comply with all laws affecting their business. From the United States perspective, such laws include, but are not limited to, the Federal Corrupt Practices Act (FCPA), customs and immigration, international boycotts, currency exchange and laws restricting trade with certain countries. If you have any questions regarding these laws, contact the Law Department at 312-822-1864.

## A Word About Disciplinary Action

CNA and its employees must be committed to conducting business that complies with the principles in this handbook and all applicable rules and regulations.

CNA's Board of Directors created the Ethics and Compliance Council to oversee the implementation of and provide guidance for matters relating to our compliance program. The Council is responsible for setting the "tone at the top" that affects integrity, ethics and other factors necessary for a positive work environment. Council members include: the company's chief human relations officer, chief financial officer and chief legal officer.

Serious compliance problems will be reported to the Ethics and Compliance Council. Employees who fail to comply with the policies and procedures outlined in this handbook are subject to disciplinary action, up to and including dismissal. In some cases, violation may also be punishable under civil or criminal law.

# References

## Conflicts of Interest
- Human Resources Manual, Procedure 7200 – Conflict of Interest and Statement of Principles
- Human Resources Manual, Procedure 7300 – Participation in Outside Organizations

## Improper Payments
- Human Resources Manual, Procedure 2700 – Foreign Corrupt Practices Act of 1977

## Confidential Information
- Human Resources Manual, Procedure 2500 – Insider Trading and Securities Fraud
- M303 Internet Access Policy

## Employment Practices
- Human Resources Manual, Procedures 1500, 1550, 2400
- M303 Internet Access Policy

## Public Statements and Activities
- Public Policy Communications, Corporate Bulletin 1531
- M303 Internet Access Policy

This manual is designed to present a number of CNA policies and procedures to employees. However, CNA reserves the right to modify or discontinue these policies and procedures at any time, in whole or in part. The topics, policies and procedures highlighted in this manual are not a contract of employment between CNA and any of its employees.