UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARBARA CONNICK,<br><br>        Plaintiff,<br><br>v.<br><br>CONTINENTAL CASUALTY<br>COMPANY,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 04-12208-WGY<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S MEMORANDUM OF LAW IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Continental Casualty Company ("Defendant" or "CNA"), by its attorneys, Sonnenschein Nath & Rosenthal, LLP, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, hereby submits its Memorandum of Law in Support of its Motion for Summary Judgment.

### Introduction

CNA is entitled to summary judgment on two distinct grounds. First, as a matter of law, Connick's claim fails because she cannot prove that the allegedly harassing conduct rose to the level of severity necessary to establish a hostile work environment claim; and second, Connick cannot establish a basis for liability on the part of CNA. CNA responded to all complaints with appropriate action, ranging from several unit meetings to oral corrections of the alleged offender. As demonstrated below, Connick's claim is without merit. Accordingly, summary judgment should be granted on CNA's behalf.

## **Argument**

Summary judgment should be granted on CNA's behalf because there is no genuine issue of material fact for trial here. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the Plaintiff fails to establish any element of her claim, summary judgment is appropriate. *Id.* Here, Connick cannot establish that she was subject to a racially hostile work environment or establish a basis for liability on the part of CNA; and CNA is thus entitled to judgment as a matter of law. *Id.*

To prove a claim of a racially hostile work environment, a plaintiff must establish that she was subjected to unwelcome verbal or physical conduct relating to race that was sufficiently severe and pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *See, e.g., Morgan v. Mass. Gen. Hosp.*, 901 F.2d 186, 192 (1st Cir. 1990) (*quoting Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)); *Williams v. Astra, Inc.*, 68 F.Supp. 2d 29, 34-35 (D. Mass. 1999). Where, as here, the unwelcome conduct was perpetrated by non-supervisory coworkers, the plaintiff must also show a basis for holding the employer liable. *See, e.g., Sarin v. Raytheon Co.*, 905 F.Supp. 49, 52-53 (D. Mass. 1995). Such a basis is found <u>only</u> where a plaintiff shows the employer knew or should have known about the harassing behavior but failed to respond with appropriate remedial measures. *Id.*; *see also, Cerqueria v. Corning Net Optix*, No. Civ.A. 03-10306-DPW, 2004 WL 1932758, at *6 (D. Mass. Aug. 13, 2004). As demonstrated below, Connick cannot satisfy this standard.

I. **Connick's Claim Fails As A Matter Of Law**

    A. **The conduct about which Connick complains was not race-based; was not pervasive or severe; did not alter the terms and conditions of her employment; and would not have been hostile or intimidating to a reasonable person.**

Connick's hostile work environment claim is based on three isolated incidents. The limited number of incidents is significant because a claim for a racially hostile work environment requires "more than a few isolated incidents of racial enmity." *Williams*, 68 F.Supp.2d at 35 (plaintiff subjected to five incidents over a three year tenure with former employer). The overall work environment is key as a hostile work environment may be "based on the cumulative effect of harassing acts over time." *Cerqueira*, 2004 WL 1932758 at *6. Courts look to the frequency and severity of the allegedly discriminatory harassment, whether the harassment is physically threatening or humiliating or merely an offensive utterance, whether the harassment unreasonably interferes with the employee's work performance, the physical proximity of the alleged harasser, and the presence or absence of other persons. *See Farragher v. City of Boca Raton*, 524 U.S. 775 (1998). Here, looking at the totality of the three incidents upon which Connick bases her claim, there is not the sort of pattern of conduct that a reasonable person would find hostile or abusive. *See Morgan*, 901 F.2d at 192-93 (three incidents of "harassment" by a co-worker was neither sufficiently severe or pervasive to be actionable under Title VII" where the co-worker (1) stood in a position so that the complaining employee would bump into him; (2) looked at the complaining employee's "privates;" and (3) asked the complaining employee to dance at a Christmas party.) In fact, Connick's allegations are so far from the paradigmatic case of a hostile work environment that judgment as a matter of law is clearly appropriate.

The first incident which Connick complains of can hardly be considered an incident at all. Not only was there no physical conduct or physical aggression, there was not even any verbal communication. Here, on June 24, 1999, Connick simply believed that an African-American co-worker, Greta Thomas ("Thomas") <u>stared</u> at her in a "hateful" way.

(Deposition of Barbara Connick ("Connick Dep.") 64:19.) Connick unjustifiably leapt to the conclusion that the stare was racially motivated, despite the fact that she was, at the time, attending a party in another unit, paid for by that unit, without invitation. Connick did not report this incident to management. (Connick Dep. 70:23-71:9.) Connick admits that Thomas' objection to her presence at the party was not race-based. (Connick Dep. 76:10-13.) However, even assuming that the stare was race-based, no reasonable person standing in Connick's shoes could have found "the stare" sufficient to alter the terms and conditions of employment.

The second incident, equally as inflated by Connick, consisted of her overhearing an August 1999 conversation between two African American co-workers, in which one co-worker, Shauna Williams ("Williams"), allegedly referred to Connick as "white trash" or that "white trash bitch," and referenced that a former coworker, Heather Gill, would have no problem "beating her up." (Connick Dep. 142:5-11.) Connick admits the statement was made to a third party, and was not directed to Connick. (Connick Dep. 151:16-23.) Even assuming that this was an offensive utterance with a racial component, there was no unreasonable interference with Connick's work performance. A coworker's isolated use of the pejorative expression "white trash," and speculation as to whether a former employee -- no longer present in the workplace -- might want to beat Connick up, does not satisfy the level of severity necessary to establish a racially hostile work environment claim. Moreover, the term "bitch", however foul, was not necessarily ill intentioned by Williams. In fact, Connick admits that on at least one occasion Williams referred to herself as a "bitch." (Connick Dep. 129:4.) In addition, Connick cannot demonstrate that Williams' comment was unwelcome. Connick similarly used loose language in the workplace. For example, on one occasion she directly told a coworker that he should be "shot." (Connick Dep. 175:10-18.)

The third, and final, incident, again involved Connick overhearing a conversation that was not directed to her. This occurrence took place on September 16, 1999, shortly after an initial verbal clash between Connick and Williams. In the initial clash, Laushine observed tensions mounting between Connick and Williams, approached both individuals and summoned each, alternately, to a conference room to discuss and diffuse the situation. (Connick Dep. 179:11-14, 179:3-7, 180:12-13, 183:16-18.) Later that same day, Connick allegedly overheard Williams on the telephone, making a statement about having someone "waiting in the garage" for "that white trash." (Connick Dep. 184:20-185:10.) Connick subjectively believed that Williams intended her statement to be overheard and subjectively perceived this statement to be threatening. (Connick Dep. 151:16-23.) But, this statement was not a verbalization of a racially hostile workplace. Rather, it was the aftermath of an admittedly two-sided clash that occurred earlier that day.

These incidents -- a stare and two overheard conversations -- alone or in concert with each other, do not rise to the severity of a hostile work environment. There was no verbal threat or insult directed to Connick. No physical aggression. In *Sarin*, although the court granted summary judgment to the employer based primarily on the employer's remedial actions, the court stated nonetheless that the incidents alleged by the complaining employee did not reach the level of a hostile work environment. *Sarin*, 905 F. Supp at 54. In that case, the alleged co-worker harassment included: (1) three incidents of verbal and nonverbal taunting and mockery; (2) two incidents where an alligator clip was attached to the complaining employee's neck; and (3) one incident involving a direct physical threat -- "I will break both your hands...there is no law here...I could beat you up and nobody [sic] going to

help you." *Id.* at 53. Although still <u>not</u> actionable, these incidents are both more severe and numerous than the isolated and comparably trivial incidents alleged by Connick.

  **B.** **There is no basis for holding CNA liable because the company took appropriate measures to remedy the workplace conditions about which Connick complained.**

Even if the three incidents are deemed both (1) hostile to an objective reasonable person and (2) severe enough to have altered the terms and conditions of Connick's employment, Connick's claim still presents no genuine issue as to any material fact because she cannot establish a basis for liability on the part of CNA. To succeed on her claim, Connick must show that CNA knew or should have known of the conduct and failed to take appropriate corrective action in response to its non-management employees' allegedly harassing conduct.[1] *Sarin*, 905 F. Supp. at 52-53. Connick cannot meet this standard.

Promptly on the heels of the second and third incidents -- Connick admittedly did not report the first incident to management -- CNA acted swiftly to investigate and remedy any potentially harassing behavior. (Connick Dep. 70:23-71:9) After the second incident -- the overheard "white trash" comment -- Connick requested an off-site meeting with her supervisor, Abbi Laushine ("Laushine"). (Connick Dep. 112:13-14, 124:6-11.) This was the first time that Connick contacted Laushine regarding her concerns of the workplace environment. (Connick Dep. 112:10-22.)[2] On August 26, 1999, Laushine and Connick met for over two hours to discuss Connick's concerns. The thrust of this conversation revolved around Connick's opinion that

---

[1] It is undisputed that the individuals involved in the allegedly harassing conduct were not Connick's supervisor nor did they wield any supervisory authority.

[2] In the Spring of 1999, with Laushine at Connick's desk, Connick alleges that she overheard a coworker state "white trash," although Connick was unsure whether Laushine overheard the same comment. (Connick Dep. 140:6-10.) Even though Connick did not complain to Laushine that a racial comment was made, Connick admits that Laushine spoke to the coworkers that same day or the next day. (Connick Dep. 139:21-140:5; 140:18-141:7.) Laushine believed her efforts were fruitful, because, at that time, Connick did not discuss the matter further.

several of her coworkers were not doing their jobs and that the workforce was racially divided. (Connick Dep. Exh. 2, p. 3.) Although Connick claims that she informed Laushine of the "white trash" comment, Laushine vehemently denies as much. (Deposition of Abbi Laushine ("Laushine Dep.") 25:15-19) However, even assuming this fact, Laushine's response was more than sufficient. Laushine promptly organized an all-unit meeting shortly after the Labor Day holiday. On September 15, 1999, the meeting was held, and, as admitted by Connick, Laushine addressed each of Connick's concerns. (Connick Dep. 164:5-9.)

CNA's response to the third incident -- the overheard comment regarding someone "waiting in the garage" -- and the initial verbal clash which prompted this incident, were similarly as appropriate. In response to the initial verbal clash, Laushine approached both Connick and Williams on the floor, summoning each separately to a conference room for verbal correction. (Connick Dep. 180:3-7.) Connick admits that Laushine "stepped in before [Connick] said anything." (Connick Dep. 179:13.) Equally as proper was CNA's response to the third incident, the "waiting in the garage" comment. Here, <u>within minutes</u> of Connick bringing this occurrence to Laushine's attention, the matter was escalated to human resources and an investigation was launched. Human Resources Vice President Charles Edwards ("Edwards"), although not physically present at the Quincy office that day, participated by telephone first in an interview of Connick and then in an interview of Williams. (Connick Dep. 185:13-15; Deposition of Charles Edwards ("Edwards Dep") 48:15-51:9.) Laushine was physically present for both interviews and was able to describe Connick's and Williams' demeanor to Edwards. (Connick Dep. 185:16-21.) When Williams denied having made any threat, and Connick was unable to identify any percipient witnesses, both employees were separately and privately admonished to hew to the professionalism standards established in CNA's "Code of

Professional Conduct," a written policy manual that prohibits all forms of harassment in the workplace and with respect to which Connick admits having received training prior to the incidents in question. (Edwards Dep. 50:24-51:3; Connick Dep. 72:6-11.) Moreover, in accord with CNA's harassment policy, Edwards also advised both Employee Relations and Corporate Security of Connick's concerns, and, after Connick expressed concern for the safety of her residence during her impending vacation, Edwards advised Connick to report the incident to her local police. (Edwards Dep. 51:10-52:8; 53:20-54:16.)

To further address Connick's concerns, CNA initiated a production monitoring system, conducted teamwork training and monitored employee interactions. CNA also planned an all-unit meeting, but could not schedule such until Connick returned from a scheduled vacation that ran from the day after she reported Williams' alleged conduct, September 17, through September 26, 1999. (Connick Dep. 188:21-189:10.) Thus, on October 4, 1999, Laushine, Edwards, Jim Martin, Chief Underwriting Officer, and Chris Dye, Branch President, conducted an all-unit, mandatory meeting to underscore the importance of respecting diversity and to reinforce that the consequences of engaging in behavior that created a hostile work environment for others would be swift and severe. (Edwards Dep. 65:13-66:19; Laushine Dep. 57:15-18.) Connick attended the meeting, albeit tardy. (Connick Dep. Exh. 2, p.24.)

On October 5, 1999, Connick requested a half-day off. On October 6, Connick again requested a personal day. At this time, Connick commenced a disability leave from which she never returned. From the time Connick returned from her vacation, September 27, 1999, through the time she commenced her leave, October 7, 1999, Connick admits that she was not subjected to any racial remarks. (Connick Dep. 192:13-16.)

CNA appropriately responded to Connick's complaints. CNA had individually and separately met with Connick and Williams on two occasions; arranged two different unit meetings to discuss employee relations; reminded all employees of corporate policies; initiated a production monitoring system and monitored employee interactions. Here, the alleged harassment clearly stopped, and as a result, CNA's actions were adequate. Connick's subjective opinion about the merits of the investigation is of no import. *See e.g., Sarin*, 905 F.Supp at 53 (remedial action was adequate where the alleged harassers were not formally disciplined (only verbal warnings) and an employee identified by the victim was not interviewed because, subsequent to the employer's actions, the harassment neither continued nor threatened to recur), *quoting Saad v. Stanley Street Treatment & Resources, Inc.*, Civ. A. No. 92-11434-DPW, 1994 WL 846911 (D. Mass. May 20, 2004) (the victim's dissatisfaction with both the investigation and the discipline received was of little consequence where the employer's actions led to the cessation of the alleged harassment).

## CONCLUSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Here, there is no dispute as to any material fact. The alleged conduct were not objectively severe and pervasive enough to interfere with a reasonable person's work performance. And, even assuming this standard was satisfied, CNA's actions in response to Connick's complaint was swift, appropriate and successful in stopping the alleged harassment.

For all of these reasons, CNA respectfully requests that its Motion for Summary Judgment be granted.

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

Dated: 29th November, 2005

By: *Dana Gruen (LHM)*
One of the attorneys for Defendant
Continental Casualty Company

Jeffrey S. Goldman
Dana B. Gruen
Catherine S. Nasser
SONNENSCHEIN NATH & ROSENTHAL LLP
8000 Sears Tower
233 S. Wacker Dr.
Chicago, Illinois 60606
(312) 876-8000
(312) 876-7934 (facsimile)

Scott Douglas Burke
Lynne McNeill
Morrison Mahoney LLP
250 Summer Street
Boston, Massachusetts 02210
(617) 439-7500
(617) 969-8737 (facsimile)

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each (other) party by mail electronic (by hand) on 11-29-05 filing